UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SALLY GREENHOUSE | : | |
| Plaintiff | : | CIVIL ACTION NO.<br>3:05 CV 01429 (AHN) |
| vs. | : | |
| YALE UNIVERSITY | : | |
| Defendant | : | SEPTEMBER 12, 2007 |

## REPLY MEMORANDUM IN SUPPORT OF JUDGMENT OF DISMISSAL

In her August 29, 2007 brief in opposition to the defendant's motion for judgment of dismissal, the plaintiff argues primarily that the defendant's motion should be denied based upon a July 22, 2007 letter from plaintiff's counsel to defense counsel. (A copy of this letter is attached to the plaintiff's opposition brief as Exhibit 3.) This letter should not dissuade the Court from granting the defendant's motion for judgment of dismissal. The July 22, 2007 letter from plaintiff's counsel addresses some of the outstanding discovery issues in this case, and promises to provide discovery; however, plaintiff's counsel has not actually followed through on any of those promises.[1] In the July 22 letter, plaintiff's counsel promised to provide, at the defendant's expense, copies of documents referred to in previous discovery responses. These documents have not yet been provided. They were first requested in October, 2005. Plaintiff's

---

[1] The defendant did not refer to this letter in its memorandum in support of motion for judgment of dismissal because defense counsel did not see it until it was attached as an exhibit to the plaintiff's brief in opposition.

**DONAHUE, DURHAM & NOONAN, P.C.**
CONCEPT PARK  •  741 BOSTON POST ROAD
GUILFORD, CONNECTICUT 06437
TEL:  (203) 458-9168  •  FAX:  (203) 458-4424
JURIS NO. 415438

counsel also promised to review the plaintiff's answers to the defendant's first set of interrogatories in order to supplement those answers that are incomplete or unresponsive.  To date, however, plaintiff's counsel has not provided more complete responses to those interrogatories, nor has he contacted defense counsel to indicate that he does not believe more complete responses are required.  Finally, plaintiff's counsel promised to respond to the defendant's second set of interrogatories and request for production, originally served on June 13, 2006, which he claims to have misplaced.  A copy of those discovery requests were re-sent via e-mail to plaintiff's counsel on August 30, 2007.  To date, no responses have been provided.

The plaintiff argues that the defendant's motion should be denied for failure to comply with an unspecified local rule.  This argument is without merit as the defendant's motion properly complies with Fed. R. Civ. P. 37.  Rule 37(b)(2) provides that a court may make such orders as are just, including dismissal of the action, for a party's failure to provide or permit discovery.  In filing a motion under this Rule, all that is required is that the movant include a certification of a good faith attempt to obtain the requested discovery without court action.  See Fed. R. Civ. P. 37(a)(2)(A).  The defendant complied with this aspect of Rule 37 through its correspondence to plaintiff's counsel, dated July 20, 2007 (a copy of which is attached as Exhibit E to the defendant's memorandum of law), in which all outstanding discovery issues were addressed.  Although plaintiff's counsel responded to this letter on July 22, 2007, the outstanding discovery disputes were not resolved as the plaintiff has never provided the information to which the defendant is entitled.  Defense counsel also attempted to resolve outstanding discovery issues at the parties July 19, 2007 conference with the Court.  At that

conference it was suggested that defendant move for a judgment of dismissal.  Therefore, this motion is properly before the Court, as the defendant has complied with all the requirements of Fed. R. Civ. P. 37.

In her brief in opposition, the plaintiff also makes much of her inability to travel as a reason for her failure to comply with the defendant's attempts to obtain discovery.  As an initial matter, the plaintiff's alleged inability to travel provides no excuse for her failure to respond to the defendant's written discovery requests.  Additionally, the plaintiff cannot simply choose to disobey an order of this Court because of her inability to travel.  Pursuant to the parties' scheduling order, depositions were originally to have been completed by March 1, 2006.  The plaintiff then moved for an amendment of the scheduling order on the ground that she had been involved in a motor vehicle accident and as a result would be unable to complete her deposition until mid-June of 2007.  The defendant consented to the granting of this motion.  (See Plaintiff's Consent Motion for Continuance of Pretrial Conference and for Amendment of the Scheduling Order, dated March 10, 2007.)  The Court (Nevas, J.), granted this motion on March 13, 2007 and ordered that the plaintiff's deposition be completed by July 2, 2007.  If the plaintiff was unable to submit to a deposition by the date ordered by the Court, she should have requested an additional extension of time.  The plaintiff is not free to simply ignore this order. The defendant has also sought copies of the plaintiff's medical records relating to her treatment from this motor vehicle accident so that it may substantiate the plaintiff's claim that she cannot travel to attend her deposition.  The plaintiff has refused to provide these records.  Despite the plaintiff's contentions to the contrary, there is nothing inappropriate about the defendant's

attempt to obtain a dismissal of this case based on the plaintiff's blatant violation of a court order.

Plaintiff has completely frustrated defendant's efforts to obtain information about the plaintiff's psychiatric history. This is especially egregious in this case in light of the plaintiff's July 23, 2007 damages analysis, which claims the sum of $500,000 as fair compensation for the plaintiff's emotional distress. The defendant first sought information on the subject of plaintiff's psychiatric history in its first set of interrogatories and requests for production, dated October 14, 2005. Plaintiff responded on January 17, 2006. Plaintiff at that time did not object to the questions regarding her psychiatric history; instead, she filed an incomplete answer. A copy of those answers are attached hereto as Exhibit A. Interrogatory 4(c) asks the plaintiff to identify any clinician "with whom you have treated or consulted at any point in your life for any psychological, psychiatric or emotional condition or illness." The plaintiff's response to interrogatory 4 simply ignores that question. Similarly, request for production number 5 sought a medical authorization to permit defense counsel to obtain any records relating to treatment for emotional or mental illness. The plaintiff filed "an objection", but did not provide any legal basis for such an objection. Instead, the plaintiff wrote: "The emotional distress which I claim is not a diagnosed medical condition but simply the normal response of any human being to the kinds of abuse inflicted upon me by the defendant. Accordingly, there is no basis for searching my unrelated medical records in this case."

In her opposition to the present motion, the plaintiff for the first time supplied a legal argument for refusal to provide information regarding her psychiatric history by relying on an

4

oral ruling allegedly issued by Judge Bruce Thompson of the Connecticut Superior Court in some unidentified case. (See Plaintiff's Opposition Brief, p. 5.) This unidentified oral opinion could hardly be used to overturn established caselaw holding that a defendant is entitled to records of psychiatric and psychological treatment where a plaintiff has put her emotional condition at issue by making claims of damage for emotional distress.

There can be do doubt that the present plaintiff has made a claim for damages for emotional distress. Indeed, her July 23, 2007 damages analysis places the sum of $500,000 on the claim for emotional distress. Numerous courts have recognized that records regarding psychological treatment must be disclosed when a plaintiff has put his or her mental condition in issue by claiming emotional distress damages. See Williams v. Gillette Co., 3:02CV2213, 2004 WL 717173, *1 (D.Conn. March 24, 2004) (Eginton, J.) ("there is no privilege as to communications relevant to the mental or emotional condition of the patient in any proceeding in which the patient relies on the condition as an element of the patient's claim or defense. A claim for mental pain and suffering waives protection of the psychotherapist-patient privilege because the claim puts the patient's mental condition in issue.") (internal quotation marks omitted); Murray v. Board of Educ. of City of New York, 199 F.R.D. 154, 156 (S.D.N.Y. 2001) ("Plaintiff put her mental condition 'in issue' when she claimed damages for emotional distress in this action and therefore waived the psychiatrist-patient privilege for the psychiatrist's notes that are relevant to the time and subject matter of this action.").

Indeed, the courts in Connecticut have ordered disclosure of records relating to psychiatric and psychological treatment even where there has been no specific claim for emotional distress damages. See Levine v. Diaz, No. CV 99 0067457, 36 Conn. L. Rptr. 137 (Conn. Super. Ct. Dec. 4, 2003) (Moran, J.) (granting the defendant's motion to compel the plaintiff to answer questions regarding her psychiatric/psychological history where the plaintiff claimed injuries of headaches and loss of equilibrium); Kelly v. Giguere, No. CV 99 69450, 2000 WL 1918027 (Conn. Super. Ct. December 19, 2000) (Sferrazza, J.) (ordering disclosure of plaintiff's psychiatric records where the plaintiff claimed injuries of anxiety, headaches and mental distress, *inter alia*, and such records were necessary to prepare an adequate defense); Treff v. Hanover Insurance Co., No. CV 98 0064872, 25 Conn. L. Rptr. 432 (Conn. Super. Ct. September 29, 1999) (Arnold, J.) (granting the defendant's motion to compel the plaintiff to answer questions at deposition regarding her mental health counseling where the plaintiff put her mental condition at issue by claiming an inability to perform her normal activities); Flokos v. Pilot Corp., No. CV 96 053428, 1997 WL 434001 (Conn. Super. Ct. July 22, 1997) (Corradino, J.) (finding that defendant is entitled to plaintiff's psychiatric records where plaintiff intended to rely on depression she experienced as a result of slip-and-fall accident to support her claim for loss of enjoyment of life's activities); Staffey v. Hocurscak, No. CV 93 309433, 1996 WL 62734 (Conn. Super. Ct. February 1, 1996) (Thim, J.) (ordering disclosure of plaintiff's mental health records where plaintiff sought compensation for mental anguish and emotional injuries). The plaintiff's contention that

information regarding her psychological treatment is not discoverable is clearly a misstatement of the law.

Finally, the defendant's motion for judgment of dismissal is not the first correspondence between the parties regarding the plaintiff's damages analysis. In defense counsel's July 20, 2007 letter, it was requested that a damages analysis be provided because, pursuant to the parties' agreed-upon scheduling order, this analysis was due on February 1, 2006. In response, the plaintiff has provided a damages analysis that is completely inadequate, and it should come as no surprise to plaintiff that the defendant would seek an order from the court. The plaintiff's damages analysis seeks $2.5 million in lost earnings, $500,000 in emotional distress damages, and 1% of the defendant's net assets as punitive damages. The plaintiff's damages analysis provides absolutely no basis for these excessive claims. Plaintiff's counsel cannot seriously be surprised by defendant's desire for a more complete analysis.

This action was filed on September 12, 2005. In the two years since that date, the only discovery the defendant has received from the plaintiff are incomplete responses to 11 interrogatories and an incomplete deposition of the plaintiff. While any one of these transgressions on its own may be excusable, when viewed as a whole, dismissal of this action is the only appropriate remedy. The plaintiff's repeated failure to provide the defendant with requested discovery has made it impossible for the defendant to defend itself in this action.

For the reasons stated herein, as well as those reasons stated in the defendant's memorandum of law in support of its motion for judgment of dismissal, the motion for judgment of dismissal should be granted.

THE DEFENDANT
YALE UNIVERSITY


By _____
            Patrick M. Noonan  (ct00189)
            Donahue, Durham & Noonan, P.C.
            741 Boston Post Road
            Guilford, CT 06437
            203-458-9168


## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed, postage prepaid, on the

above-written date, to:

John R. Williams, Esquire
John R. Williams & Associates, LLC
51 Elm Street, Suite 409
New Haven, CT 06510


                              _____
                              Patrick M. Noonan

8

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SALLY GREENHOUSE : CIVIL NO.: 3:05CV01429(AHN)

V :

YALE UNIVERSITY : JANUARY 17, 2006

## PLAINTIFF'S RESPONSES TO DEFENDANT'S INTERROGATORIES AND REQUEST FOR PRODUCTION

Pursuant to Section 13-1 of the Connecticut Practice Book, the defendant

requests that the plaintiff answer under oath and within thirty (30) days, the following

Interrogatories and Requests for Production.

## Definitions and Instructions

A.    As used herein, "you" or "your" shall mean plaintiff.

B.    The word "person" shall include any natural person, group of natural persons acting as individuals, group of natural persons acting in a collegial capacity (i.e., as a committee, board of directors, etc.), proprietorship, partnership, company, corporation, association, joint venture, governmental body or any other entity.

C.    The word "document" is used herein the broadest possible sense and shall include any written or graphic matter of whatever kind or nature, or any other means of preserving thought or expression (including, without limitation, tape recordings), and all tangible things from which information can be processed or transcribed, whether originals, copies of drafts (including, without limitations, non-identical copies i.e., different from the originals by reason of notations made on or attached to such copies, or otherwise), however produced or reproduced.

D.    The word "identify" when used with respect to a person or persons means: (1) to state the name and last known address and telephone number of each such person; (2) to state the name of the last known employer; and (3) if such person was affiliated at any time with you, by employment or otherwise, to state the nature and dates of such affiliation, including all job titles held and the dates during which each

1

position was held.

E.    The word "identify" when used with respect to a document means:
(1) to state its nature, *i.e.*, letter, memorandum, etc., the date and author of the
document; (2) to identify all persons to whom the document was directed; (3) to state
the topics discussed in the document; (4) to state the location of the document at the
present time.  If the document is one which once existed but has since been lost or
destroyed, include the date or approximate date of loss or destruction, the name and
address of its last known custodian, and, in the event it was destroyed, the method of
and reason for its destruction.

F.    If any privilege is claimed as to any information called for, or as to any
document required to be identified:

> i.    state the nature of the privilege claimed (e.g. attorney-client,
>        work product, etc.);
>
> ii.   state the basis for claiming the privilege as to the specific
>        information or documents;
>
> iii.  if the privilege is claimed respect to any information, identify each
>        person who has knowledge or such information, or to whom such
>        information has been communicated; and
>
> iv.   if the privilege is claimed as to any document, identify such
>        document and identify each person now in possession of such
>        document.

G.    Each request set forth herein shall be construed to include any
supplemental information, documents or data responsive thereto which are later
discovered, prepared or created by you.

H.    With respect to any response or documents which you withhold on the
ground of confidentiality, the defendants' attorneys are prepared to receive such
response or document subject to an appropriate protective order.

## INTERROGATORIES

1.    With regard to your claim that the defendant violated your rights, please:

> a.    State the names of each individual employee of the defendant who
>        participated in each alleged wrongful action;

2

b.      Describe in detail each action taken by the defendant which you claim violated your rights;

c.      State the date on which each such action was alleged to have occurred;

d.      Identify by name, address and telephone number each individual present when each such event allegedly occurred;

e.      Identify each document which refers or relates, directly or indirectly, to each occasion when you claim your rights were violated by the defendant(s);

f.      Identify by name, address and telephone number each individual who has knowledge concerning each alleged occasion when the defendant(s) is alleged to have violated your rights.

**ANSWER:**

**Sue Rochette** - Sue Rochette was the financial aid officer who told me that I would "have to decide between motherhood and going to Yale Drama."

**Liz Diamond** - Liz Diamond initiated the retaliatory action of placing me on warning for dismissal, for relaying information regarding the background of a male directing classmate that was alarming.  I was unjustly accused of "impunging the character and integrity of three individuals associated with Yale," from which she irrationally deduced that I was therefore "incapable of collaborating" in theater.  She misrepresented me as having originated the information regarding this above-mentioned male directing classmate, knowingly, in order to obtain a dismissal warning against me from the Dean, and to ascertain agreement from David Chambers.  Instead of advising me regarding my entirely justifiable fear of this male classmate, she harassed and threatened me in an unequivocally punitive manner, badgering and baiting me, letting it be known that this male classmate should be the recipient of my caretaking sympathy since he was an alcoholic, and, incredibly, referring me for psychiatric help, in spite of the fact that all of the information I provided was about his psychological condition and previously threatening behavior was accurate (as subsequently borne out by his having threatened the life of our Theater History professor, his having finally been place on warning for dismissal for having done so, and his own admission to me that he had "gone off his anti-psychotic meds" and was on his way to the health services to go "on anti-psychotic medication" so that he would not be dismissed.  She has provided mendacious accounts of my comportment as a student.  She dismissed my reports of the "male bonding" dynamic in my small directing seminar, as well as my reports of the Dean's odd behavior toward me,

3

refusing to attend a meeting with him that I had implored her to attend.  I was the only assistant director who was not called upon by her during the year to report on the Yale Repertory plan on which I had assisted the dean.  When Mark Bly took over my rehearsal process with this demands, she only agreed to show up once, after I had repeatedly informed her of what was transpiring, her shared reasoning being that she had a "long-standing divisive relationship with him," leaving him to sabotage my rehearsal protocol and undermine my authority in the production – all knowingly.  She dismissed me at the end of the year for fallacious reasons, and in spite of having repeatedly reassured me that I was doing competent work as a first year student.  She chronically placed me in the inappropriate position of being her confidante, sharing information with me about others in the program, thereby impinging destructively on my boundaries as a graduate student and disrupting my focus.  (For instance, at a reading given by guest artist, Anna Deveare Smith, who she directed, she literally grabbed me afterwards, touching my hair, and nervously seeking my approval of her directing, sharing her anxieties about the performance and complimenting me on my hair, my clothing, my purse, subsequently introducing me to a group of audience members as her "friend."   She divulged her "divisive relationship with Mark Bly" in a late-night telephone call to me from her parents' home in Boston.  She took me out to an expensive lunch in the second semester, and shared with me that she felt badly about placing me on warning and wanted "our relationship to turn toward the sun from now on," divulging that the reason she was initially suspicious of me was that she had had "so many problems with Susan Finque", another "older woman" in the directing program, who she would "never recommend" to theaters.  She related to me privately that the Dean's production at the Yale Rep was "terrible," which she said was the real reason she had excluded it from our seminar discussions, and that the Drama 50 project was an ill-conceived curriculum instigated by David Chambers, that should not be given in the first year.)  She was completely inconsistent with her rationale for dismissing me – initially wanting to dismiss me for "showing signs" that I was "incapable of collaborating" and subsequently accusing me of "collaborating" my "ass off."  Her pedagogical instruction to me regarding a problematic actor in my cast led to an extreme worsening of our dynamic that was never remediable, for which I was blamed.  Her pedagogical instruction regarding my collaborative relationship with the playwriting student destroyed the rapport I had established, for which I was blamed.  When a male directing classmate demonstrated his incompetence in collaborating in his production, everyone else in the production was blamed, and he was supported and praised to the point of indulgence, as he was in seminar as well (to the notice of all, even himself).  Whenever I had difficulty with an actor or playwright, I was blamed.  When Nick Avila ran into constant difficulty with his work, and he had problems with an actor or playwright, they were deemed "problem" actors, or "problem playwrights," and he received empathy and exoneration.  Ms. Diamond, as Interim Chair of the

4

Department, would ultimately have been responsible for setting this tone of bias within our division.  She took me aside during a directing seminar in April and privately told me that she "knew of so many other programs that would be better for someone "my age."  This constitutes harassment.  When I reported to her the phone call I received from David Chambers in which he gave me information in which it became obvious that the Dean had lied about my academic work, she refused to intervene and intimated again that I should withdraw.  "Oh, Sally, you're so unhappy here, why don't you just leave?"  In the working world, what Ms. Diamond enacted is called a "constructed dismissal – she created the conditions within which it would be unlikely to impossible that I could succeed (un-collaborative, too collaborative) and then dismissed me when I could not prevail above the inherent bias and attendant intimidation.  In a meeting with the head of stage management after my directing project had concluded, requested by me to discuss the wildly inappropriate conduct of Mark Bly that undermined my work in the later phase of rehearsal, Ms. Diamond remarked to the head of stage management, "Well, it's not like this is the first time he's ever done something like this (paraphrase)", casting a knowing glance at her.  However, when she dismissed me, she accused me of being wholly responsible for "failing" in my production work.

During this end phase of rehearsal, Ms. Diamond looked at notes Mr. Bundy gave me as he delivered an ultimatum to me to "change" my directing or I would be dismissed and, in reply to my anxious query, "What am I supposed to do?, she said "Ignore him.  His notes to you don't make any sense at all."

Ms. Diamond described her decision to remove me from the school during the Commission on Human Rights and Opportunities hearing in 2005, as having been a circumstance of Yale having admitted "the most contentious directing quartet ever" and having to decide which student could be removed whereby there would be an amelioration of this dynamic.  I was the sole woman.  I was dismissed.

<u>Frank Diehl</u> - Frank Diehl was responsible for teaching what was supposed to have been a workshop on collaborative theater-making to supposedly guide us in the creation of a theatrical performance project based on a portion of the classic, THE ODYSSEY, our first semester Drama 50 curriculum.  He created a climate conducive to a sort of adolescent sexually provocative acting out in these final collaborative "skits," ordering the males in the skit before mine to "strip" off their clothing down to their waists.  (To each of four groups, he gave a direction for a second run through with no consistent pedagogical aim, but rather one seemingly designed to generate and increase this level of sexual provocativeness.)  Following this display, when my group gathered onstage, he cried out, "And now, METAMORPHOSIS REVISITED...or...ROCK OUT WITH YOUR COCK OUT!"  (To this day, I remain uncertain whether Mr. Diehl originated this

5

title, or whether my fellow students came up with this salacious title without my knowledge.  In any event, the mood of sexual "hysteria' in the classroom markedly increased upon his calling out this second title, and to my personal shock.)  As my group's supposedly collaborative "skit" evolved in a way that bore little resemblance to what we had planned together, apparently led by two male actors who were evidently playing some sort of prank on me (as the sole female director in the class/group), I am sure that I must have appeared visibly shaken throughout this exercise, but Mr. Diehl did not intervene.  In fact, at the dramatic apex of this "skit," one of these two above-mentioned male actors, simulated masturbation (to the cheers of most of my classmates, as well as Mr. Diehl, who, at the close of this display, yelled out, "That was great!")  His subsequent direction, also hollered out to apparently continue to stoke the mood of sexual hysteria, was "This time, do it again, only really come!"  In addition to ignoring my obvious discomfort, as a reluctant participant in this sexual acting out on stage, and either originating or tacitly condoning a title supplied that was pandering to the acting out that he himself was encouraging, Mr. Diehl demonstrated not only a complete absence of clear pedagogical intent throughout this "exercise," but subjected me to having to participate in an experience that was deeply offensive and lacking in any redeeming academic value or meaning within the context of what he was charged with providing within this workshop.  He violated my rights to having been given the actual means whereby to fruitfully engage in collaborative creative theater-making, as previously promised by the introduction to this workshop experience presented by David Chambers, Evan Yiannoulis and Catherine Sheehy (in which we were shown serious films portraying theater troupes in the United States and in France, who utilize this principle to create acclaimed dramatic work).  In other words, he made a mockery of the curriculum I was offered and subjected me instead to enduring a drawn-out prank (which he condoned) in which I was demeaned and subjected to sexual harassment techniques, under his direction and tutelage.  (Consequently, I did state within my directing seminar, to David Chambers, that if this sort of "class" was paid for with any of my tuition money, I expected a refund of that portion.)  Lastly, following this workshop, I learned in one of the subsequent hearing proceedings, that Mr. Diehl approached faculty acting Chair to complain about MY unenthusiastic participation, casting me as a resistant student who caused a problematic dynamic for my more enthusiastic and compliant classmates.  I allege that this further gesture on his part was nothing more than a pre-emptive accusation to cover what he could see would result in a possible complaint by the only woman in the directing class regarding his unjustifiably provocative and irresponsible pedagogy.  (In point of fact, though, three out of four of us in that directing class ended up registering complaints regarding his "teaching," although mine was considered to have been the most "vociferous.")  If the pedagogical aim was collaboration, then it was abundantly clear that my group, unbeknownst to me, had decided to deviate from

that task, and instead of them being otherwise instructed, in alignment with the curriculum objective, they were cheered on. My graduate training, in this process, was sacrificed in favor of the sexual "hi-jinks" of a couple of male acting students. This fact alone, as sponsored by Mr. Diehl (and condoned by Yale Drama), was INHERENTLY DISCRIMINATORY BASED ON GENDER.

<u>David Chambers</u> - David Chambers displayed overt bias in the seminar setting with regard to my male classmates. Early in the year, he took Steve Fried out to dinner while I never received any such invitation. He ignored frequent outbursts and off-color language by Chris Sanderson. Early in the year, Mr. Sanderson entered the seminar by loudly exclaiming "Joe Roach is bullshit!" (Professor Roach was the faculty he eventually threatened and for which he was finally placed on warning for dismissal.) On another occasion, Mr. Sanderson loudly boasted, within hearing of both Mr. Chambers and Ms. Diamond, that he had told a female audience member at a Thesis Production, to "f-k herself." Whereas, he was not the subject of disciplinary action, but I was in fact overtly censored for "utilizing language unbefitting a future director bearing the mantle of The Yale School of Drama" because I over-used the vernacular of the word "nightmare."

In the seminar, when I endured a grossly inappropriate personal verbal attack by a male directing classmate, Nick Avila, I was told during the class break, when I requested that Mr. Chambers speak with Mr. Avila to enforce protocol in a graduate seminar that would ensure he would not act out again, Mr. Chambers both assured me that he would and then added "some people just don't fit into the subculture of Yale Drama." It is abundantly evident that he was overtly expressing his bias in that comment, since he totally meant me, although at the time, I thought he was referring to Mr. Avila, about whom many had been speaking for his obvious shortcomings.

At the September dismissal meeting, Mr. Chambers related to me in classic power-abusive style, demoralizing me in his insistence that "none" of my "life experience" was relevant "here," instructing to "think" of myself "like all the other 22-year olds here," forbidding me from "divulging" my "age," from "registering any more complaints," from "starting any sentence with the pronoun 'I,'" or utilizing the vernacular of the word "nightmare." I believe that forbidding me from engaging in these activities did constitute a violation of my First Amendment rights.

In a subsequent altercation instigated by the above-named Nick Avila, who demonstrated a consistently inscrutable pattern of overt hostility toward me that was allowed to be expressed unchecked, Mr. Chambers berated me for "speaking to him in a teacherly manner." In point of fact, I had spent much of my life as a college level teacher, so it would not be unthinkable that I may have "sounded

7

teacherly," and to have been singled out and spoken to in a harsh and deprecatory manner is another instance of intimidating harassment.

Mr. Chambers informed me that no directing student is required to actually perform in the Drama 50 productions, and that two of the second-year students had not.  Yet one of the reasons given for my dismissal was that I "had not performed in Drama 50."  (In point of fact, I did appear with my cast, so that even that accusation was erroneous.)

Mr. Chambers predictably made eye contact with my male classmates throughout the year-long seminar (when he was present) avoiding mine.  In one particular class, he spoke to "the guys" at some length about his youthful affair with Shelley Hack, one of the Charlie's Angels, to my discomfort.

As the year progressed, my level of participation markedly dropped, and, after one seminar in which it was yet again clear that I was being skipped over in favor of the aggressive outpourings of Chris Sanderson, and the always sought-after contributions of Steve Fried, I briefly but succinctly shared my sentiments with Steve who acknowledged that the dynamic existed and subsequently gave me a book entitled "Upstaging Big Daddy" in a gesture of compassion and apology (since I had become irritated with his own eventual participation in this classroom dynamic by which I was shut out).

Although I never witnessed Mr. Chambers commenting on the attire or appearance of my male classmates, he would, upon occasion, comment on mine. On one occasion, he complimented my attire upon my entry into seminar and on how that was his favorite outfit (long skirt with a brown-toned patterned fabric depicting a hunting scene, combined with a multi-layer t-shirt in brown and beige, along with a shoulder purse that had similar colors and depicted dogs in a landscape).

After the sexually provocative class in collaborative theater-making by Frank Diehl, three out of four of us in the first-year directing class voiced our complaints.  One day later, when Ms. Diamond accused me of "impugning the character and integrity"of Mr. Diehl, I reminded Mr. Chambers that three of us had complained, not just myself, to which he brusquely replied "But your complaint was the most vociferous!"  Clear punitive gender bias.

<u>Mark Bly</u> - Mark Bly violated my academic freedom and interfered with my graduate training in directly ordering me what to do in my student production. His words verbatim were: "Just have the actors come on, say their lines, and walk off!  It is NOT your task to interpret the play!"  He did not interfere with any of the male classmates' work in this way.  He refused to leave my rehearsal room

in the final two weeks of production, while he did not engage in such intimidating practices with my male classmates.

Mr. Bly yelled and screamed at me in the hall when I informed him that it was not my role as a graduate directing student to accommodate the whims of his directing student as he had told me that I should "because she is so young and just starting out," disrupting my rehearsal and terrifying me with his uncontrollable outbursts.

I allege that my Chair knowingly allowed Mr. Bly to disrupt and undermine my project to the end of serving her constructed dismissal of me.

James Bundy - James Bundy, in his role as acting instructor during the six-week absence of Evan Yianoulis, provided me with the most sexually provocative direction/instruction he gave any student, after which numerous classmates teased me. He instructed me to hike up my skirt and straddle, crotch-to-crotch, my male acting classmate playing the scene with me. My classmate blushed as we ran our lines. It was a scene from Chekhov that in no way called for this kind of configuration.

My subsequent experiences with Mr. Bundy as an instructor were in the context of directing seminar as he would fill in for Mr. Chambers. In one class, he quite clearly displayed bias toward my male classmates, as he sensitively provided corrective critique of their assignments to create a production design for a Chekhov play. When it was my turn, he viciously disparaged my entire concept, declaring that "no one would ever produce this!" His manner was more one of a verbal assault, juxtaposed against the compassionate non-judgmental critique he provided my male classmates, no matter how deficient their work had been (it was our first real directing seminar assignment). He went on to denigrate every single detail of my creative work, relentlessly attacking my artistic vision as "performance arty." Immediately following the close of this class, Mr. Fried commented to me "Why was he so vicious with you" with a tone of incredulity.

In another seminar in which he was subbing for Mr. Chambers, much later in the year, he collected our Shakespeare proposals (our first) to review, which I saw him skim during a break. In the meantime, I was given a chance to go over what was happening in my directing project. (As designated by Mr. Chambers, each of us was given class time to present our work and solicit assistance or constructive guidance. Previously, this had taken anywhere from 15 minutes to 45 minutes – the longest allotted to Mr. Avila, to discuss his "problem" playwright.) Since I had been ordered by the previously mentioned Mark Bly to comply with the wishes of his playwriting student, and since I had been placed on

9

warning for dismissal supposedly for being non-collaborative, I was giving the playwriting student what she wanted by way of set design, to the detriment of the production. Mr. Bundy criticized both my design and my compliance, as did Christopher Sanderson, to the point of denigration. I was caught in a situation whereby I was being ordered to take action that could potentially appear to be "non-collaborative" by both the playwriting student and by faculty, and, for fear of being dismissed, was insecure about asserting my leadership. (It was a catch-22.) Mr. Bundy then expressed irritation and impatience that I was "taking up so much time," even though Mr. Avila had previously taken up an equivalent amount of class time with no similar criticism. Mr. Bundy then announced that because I had taken up "so much time"with my project predicament, he would not go over my Shakespeare proposal in class at all. (I had no right to protest this decision on his part.) Mr. Avila had proposed the same play, Romeo and Juliet, as I proposed, but his proposal was so deficient in many ways that Mr. Bundy went over it thoroughly. Oddly, every interpretation I had made in my proposal was articulated by Mr. Bundy to Mr. Avila by way of explaining the play and in the very same words that I had used. According to Mr. Chambers, Mr. Bundy reported to him that I had "never turned in the assignment." Mr. Chambers raised this with me in early May, via telephone, one week before I was formally dismissed. When he heard my shock and surprise, and my account of exactly what had taken place, he relied, "Don't get angry at me. I'm your friend in this!" I allege that Mr. Bundy intentionally provided a mendacious account of my work for the purpose of maligning my academic credibility. Mr. Chambers concluded, "Well, I didn't get anything formally in writing about this, so let's just say it never happened!" I assert that my discovery that the Dean of the school was maliciously lying about my academic work, and my call to Ms. Diamond about having had this revealed to me factored into their decision to dismiss me.

During my tenure as Assistant Director or Mr. Bundy, I was under the impression that he was generally pleased with my work (as were the cast and crew on that production) as evidenced by his having declared on at least one occasion, dramatically, "tuition refund for you" by way of praising my contribution to the production. However, according to Ms. Diamond, he reported that my work had been substandard and did constitute a reason for my dismissal. Even when he insisted on holding a private meeting with me to review my work with him, he offered nothing in the way of criticism. (We met for breakfast at a café, during which time, he talked about his trip to Russia and how he and his wife had drunk and smoked to excess.) During this breakfast, when I mentioned that Ben Sammler had commended me on my work, he openly scoffed. When I showed him a card sent to me by the stage manager commending my teamwork with him and my "wisdom" as evidenced in my work on the production, he wouldn't look at it.

Mr. Bundy disparaged me in an email for having "a forceful personality" – commonly viewed as an asset to a director, and certainly an attribute for which Christopher Sanderson had never been denigrated.  He accused me of not making it possible for him to speak about my work as an assistant director, even though we spent so much time at breakfast, and even outside on the sidewalk, which made me late for my class.

During my assistantship, Mr. Bundy repeatedly invited me to accompany him on dinner break, so that "we would have time to talk," but in testimony before the Yale grievance committee, he denied "ever having been along with Sally."  He was, for the most part, self-disclosing and solicitous of me during my tenure with him, even kissing me good night after a party at his house early on in the production time frame and complimenting me on one particular outfit that I wore that was his "favorite."  He often sought my opinion and implemented my directorial ideas, but I was told that I was being dismissed in part because, as previously mentioned, my assistance was a "failure."  From an academic standpoint, none of this made sense, as he had even agreed to sign a letter of recommendation for me after the production.

During the production, on a Saturday night, he was not present for post-performance notes to the technical crew as led by Mr. Sammler.  Mr. Sammler asked me if I could deliver the notes because they were going into overtime, which I did from memory.  Instead of being pleased, Mr. Bundy, when he showed up later, appeared irate.  On another occasion, a student in costume design told me there was an emergency backstage and asked me to come with her. I went with her and found one of the actors crying in her dressing room and refused to go on because of something Mr. Bundy had done or said.  I calmed her down and spoke with her about her impending entrance.

When the play began and I reported back to Mr. Bundy, he berated me.  Then, when the play opened and she made her entrance perfectly, he remarked, "Well, you must have done something right  because that's the best entrance she ever made!"

I assert that Mr. Bundy knowingly fabricated a malicious account of my work on his production in order to secure my dismissal for some reason other than what he claimed, having more to do with the peculiar intensity of his sentiments toward me and their possible erotic origins.

<u>Evan Yianoulis</u> - Evan Yianoulis supported Frank Diehl's denial of my rights of access to the curriculum promised, as well as his decision to pander to the male students' defiance of the curriculum objectives of "collaboration," and not only declined to call them to task for having disrupted the workshop and having

11

placed me in a compromising position, she instigated retaliatory action against me by contacting my Chair the next day.  (This information emerged during the Yale grievance proceedings.)

Ms. Yianoulis did in no way respond to extreme and disruptive actions that constituted rendering an unsafe classroom environment for all students, when enacted by a male directing classmate, Chris Sanderson, but became dramatically enraged and punitive, verbally deprecating me during a class for checking the time.  The previous incident, in which Mr. Sanderson, with unrestrained force, threw a wooden chair during a scene with an acting student, took place early in the fall semester (September) and was talked about for several weeks by all of the acting students.  The students were not only literally terrified by what appeared to be Mr. Sanderson's complete absence of normatively safe conduct within the context of the class in electing to throw the chair, but puzzled, bewildered and dismayed by Ms. Yianoulis' indifference – both directly after this event and in the face of their subsequent expressions of fear and concern.  What could be more discriminatory than to harangue a female directing student for checking the time, but ignore a violent and inappropriately dangerous gesture initiated by a male directing student to the point of not ensuring a safe classroom environment.

On the matter of rehearsal practices, I was censored by Ms. Yianoulis for any rehearsal practice that she felt deviated in any way from the Yale Drama norm, but simultaneously permitted a male directing classmate to engage in a rehearsal stratagem that was a complete deviation from the norm. He was allowed an entire day to interview his cast (and crew) about their personal lives in an implementation of his Jungian-based approach to directing and even given an unprecedented amount of time in the acting studio in which to engage in this pre-rehearsal activity.

Every first year student except for the playwriting and technical design students were present at Frank Diehl's class.  The large directing class was aware of the discrepant "coddling" of Nick Avila, the skipping over of my assistant director account, of neither Liz Diamond nor David Chambers themselves open critiquing my work at the end of the year.  Patrick Diamond knew that I had been placed on warning for dismissal, the third year student who had advised me to go Liz with the information regarding Christopher Sanderson if I was anxious because she would be "helpful."  He had confided afterwards that he "kept" his "mouth shut" the whole first year because this sort of thing happens there, and he ended up with what he described as "a life-threatening case of bleeding ulcers at the end" of his first year and that most people knew about this climate of power abuse before they came to Yale Drama so they were prepared as opposed to myself, since I was a crossover artist.

12

**Deb Margolin has knowledge of defendants violating my rights.**

**Bram Stevens, non-Yale director and artistic director, has knowledge of defendants violating my rights.**

**Jim Nicholson has knowledge of defendants violating my rights.**

**Toni Dorfman, after we met in February, has knowledge of defendants violating my rights.**

**In addition, numerous other individuals are identified in those documents produced herewith and other documents available at the offices of my attorney for inspection and copying.**

**Submitted herewith is a sampling of documents obviously responsive to the request set forth above.  The file is voluminous, however, and is available in its entirety at the offices of my attorney for inspection and copying upon reasonable notice.**

2.      State the names and addresses of all experts whom you intend to call as an expert witness at trial, and for each such expert state:

a.      the subject matter on which each expert witness is expected to testify;

b.      the substance of the facts and opinions to which each expert, witness is expected to testify;

c.      a summary of the grounds for each opinion of each expert witness expected to testify.

**ANSWER:**

**My attorney has not yet contemplated an expert witness list in this case.**

3.      Describe in detail each item of economic and non-economic damage you claim to have suffered as a result of the defendant's actions, and as to each such item, please:

a.      identify by name, address and telephone number each person who has knowledge concerning each item of damage;

b.      identify each document which refers or relates, directly, or indirectly, to each item of damage;

c.   describe in detail each item of damage you are claiming in this lawsuit;

d.   describe the method by which you have calculated each item of damages, including all assumptions you have made for purposes of computation with respect to projected life expectancy, projected work expectancy, retirement, promotion, pay increases, and any other factor.

**ANSWER:**

**I leave it to the sound judgment of the jury to determine the value of my losses. However, at a minimum, my losses include the tuition I paid the defendant, my living expenses during the time I was in residence in New Haven to attend Yale, the income I lost during that period of time by devoting myself 100% to student life rather than my professional life, and the economic value of the YSD degree. Had I received that degree, I would have had graduate degrees from both Harvard and Yale, in addition to a B.A. from Sarah Lawrence, and over 20 years of professional theatrical experience and awards, honors, grants, commissions and teaching experience, so the value of my particular CV would have been higher than most, if not all, of my directing classmates who either had no already existing graduate degree (from an ivy league institution) or had relatively speaking, less freelance experience or awards – let alone the combination of both.  Of great importance, in addition, is the severe emotional distress I have suffered as a result of my Yale experiences that are the subject of this litigation.  I continue to suffer from that distress.**

4.   If you are claiming damages for any physical, emotional or mental illness or distress, please:

a.   describe in detail the nature of any such condition, including all signs and symptoms and the duration of same;

b.   identify by name and address each doctor, nurse, social worker, psychiatrist, psychotherapist, psychologist, or other clinician with

whom you have treated or consulted in connection with said illness or emotional distress;

c.   identify by name and telephone number each doctor, nurse, social worker, psychiatrist, psychotherapist, psychologist, or other clinician with whom you have treated or consulted at any point in your life for any psychological, psychiatric or emotional condition or illness.

14

**ANSWER:**

**I was treated through the Yale Health Plan while I was in New Haven.  Other than that, I have not sought treatment for the injuries caused by the defendant.  The nature of my emotional distress is the anguish I experience whenever I think of the events during my time at Yale and the anguish I experienced while I was there.  I arrived at Yale as an experienced and self-respecting woman of the theatre.  I was humiliated, degraded, and made to feel that there was no room for a self-respecting woman at this institution.  When I objected to the "frat house" atmosphere which prevailed at the YSD, I was punished for my objections.**

5.     With respect to the allegations contained in Paragraph 7 of your Complaint, please identify by name, address and telephone each person who was present during the conversation during the plaintiff and Interim Chair of the Directing department and please state whether the plaintiff has any recording, memo, note or other document relating to the events described in Paragraph 7.

**ANSWER:**

**My notes are available for inspection and copying at the offices of my attorney upon reasonable advance notice.  They fully respond to this question.**

6.     With respect to Paragraph 8 of your complaint, please identify by name, address and telephone number each individual who was present during the events alleged in that paragraph.

**ANSWER:**

**See my answer to Interrogatory 5.**

7.     With respect to Paragraph 11 of your Complaint, please identify by name, address and telephone number each person who was present at the meeting referred to in that paragraph and please state whether the plaintiff has any recordings, notes, memoranda or other documents referring or relating to the meeting alleged in that paragraph.

**ANSWER:**

**See my answer to Interrogatory 5.**

8.     With respect to Paragraph 12 of your Complaint, please list each action, remark or event which you claim constituted the "pattern of disparate treatment" and

15

list each action, conversation or event which you have alleged constituted an atmosphere of "macho" and "frat house" behavior.

**ANSWER:**

There was a general attitude on the part of my faculty toward me that less supportive, even less seemingly interested, as evidenced in the mid-year group critique, when Mr. Chambers and Ms. Diamond entered into somewhat detailed feedback sessions with Mr. Sanderson and Mr. Avila, noting their progress and reminding them of how far they had progressed, even interjecting personal comments – like reminding Mr. Avila that he was no longer on psychiatric medication anymore and that he wasn't to think of himself as someone who was...those sorts of remarks that indicated a serious investment in a successful outcome for my male classmates. Ms. Diamond was detached in this mid-year critique, so much so that I do not recall any comment made by her at all, positive or negative. Ms. Chambers made a few cursory remarks that were rather neutral before they moved on to Steve Fried to close the session, whose work they profusely praised. Although I had done unique and what they themselves had previously described as outstanding work in large directing practicum, they did not mention any of it in my mid-year review. (Notably omitted was any remark that would have predicted that I would be dismissed, in part, for my allegedly substandard production work or allegedly not having performed in my Drama 50 project. Nothing was said.)

How discrepant this treatment really was can be evaluated in light of Mr. Avila's own remark, couched as a complaint of sorts in our last first year directing seminar class: "I feel like I've been treated with kid gloves all year, and I'd like to be treated like everyone else." On one occasion, a second year directing student, Gia Forakis, actually asked me in the bathroom during a brieak, "Why are they coddling Nick?" The faculty did everything they could to ensure that he would prevail, giving him the benefit of the doubt in every instance and affording him numerous opportunities to master assignments that he inevitably failed to grasp in the first semester. There was absolutely no equivalent investment in my prevailing, to overstate the case. There was every effort to force me out. Another glaring instance of this discrepant treatment with Mr. Avila, besides the previously detailed account of how Mr. Chambers related to us, was his abysmal level of functioning in his Drama 50 group, all of whom were desperately unhappy to be in his group. They reported that he literally fell asleep during rehearasal and that he did not contribute to the process. One actor, about whom he complained repeatedly, took over and created/directed a hugely successful Drama 50 project for which he was given credit. And, again, the actor was referred to as a "problem."

Although the uncontrollable and often socially inappropriate behavior of Mr.

16

Sanderson was noted by virtually all of us – one playwriting student, Kenneth Lin, was so frightened by the prospect of working with him that he told me he had his Chair guarantee that he would not have to be paired up with him on his project – no action was ever taken by the school to contain and control what was perceived by many to be threatening behavior until eight months into the program, when he threatened a faculty member outside the drama school.  This fact alone illustrates an investment in looking the other way when it came to his inappropriate behavior no matter how extreme.  Most notable, Mr. Sanderson actually disrupted a third-year thesis project in rehearsal, challenging the director for whom he was supposed to be an assistant.  Instead of being placed on warning for dismissal, he was required to attend a meeting prior to our mid-year directing group critique.  This was yet another dramatic example of the disparate treatment I received – I never disrupted any class, let alone a classmate's thesis project, nor did I even come close to displaying this level of exceptional misconduct, and I was delivered a formal warning (for telling the truth).  My male classmate, in actuality, disrupted proceedings at the school, and he did not receive a warning letter, whereas I was expressly told that (although I had not demonstrated a similar disruptive tendency), I was viewed as someone who might not be able to "collaborate" artistically, so I was placed on warning for dismissal.  Hugely disparate treatment.

No other first year directing student was assigned an entire cast of first year acting students, which had been noted by Mark Bly as an unfair disadvantage, since there would be no leadership based on experience at the school in these sorts of productions, or simply put, to set a seasoned example of appropriate comportment, as well as refinement of talent in the final showing.

No other first year directing student was assigned to work with an acting student who had caused bodily injury to him.

In Yale's reply to my complaint, it was written that I was supposedly overly dominant in my Drama 50, whereas, in fact, my classmates elected for me to direct the piece as a whole after my back was injured and I in no way "took over" creatively or coerced classmates into participating in a way that detracted from their own artistic objectives.  Conversely, Mr. Sanderson was known to have been exceptionally dominant in his Drama 50 group (to no negative feedback from faculty) even to the point of literally insisting that a female acting student simulate anal intercourse for one section, about which she was extremely ambivalent.  This student, Christianna Nelson, confided to me one evening in my apartment that this had not been her idea and that Mr. Sanderson's behavior within their rehearsal process was "like Dr. Jekyll and Mr. Hyde," that he would present a veneer of normalcy when faculty observed and then behave in out-of-control ways once they left.  I agreed to be present when she told Mr. Sanderson

17

that she did not wish to continue to simulate anal intercourse in the performance. She approached him on the steps of the Green Room and expressed her reluctance to appear in that way in the performance.  He argued with her and demanded that she do it.  (And yet, I was vilified for supposedly being too dominant in my group.)

Lastly, Nick Avila's directing project was a resounding failure, by all accounts, in its process and its showing.  Deficient in every aspect of production values: lighting design, set design, blocking, continuity, acting values, his project received the most scathing feedback of the year from directing practicum.  Some said it was the worst they had ever seen at the school.  But he just graduated with his MFA.

     9.    With respect to the allegations contained in Paragraph 12 of your Complaint, please identify by name, address and telephone number each individual who was present during any of the actions, conversations or events identified in response to the preceding interrogatory.

**ANSWER:**

**Toni Dorfman - 787.2404**
**Dave Bardeen - 397.1456**
**Kate McConnell - 776.4374**
**David Nugent - 980.8997**
**Jedadiah Schultz - 671.2225**
**Sarah Bierenbaum - 668.8438**

     10.    With respect to Paragraph 17 of your Complaint, please itemize in detail each item of economic loss claimed by the plaintiff and state how such economic loss was calculated.

**ANSWER:**

**To be furnished later when calculations are completed.**

     11.    With respect to your claim for attorney's fees and punitive damages, please state the substance of the agreement between you and your counsel regarding the payment of attorney's fees.

**ANSWER:**

**Objection.  This is not discoverable until the plaintiff prevails on liability, if ever.**

18

## REQUESTS FOR PRODUCTION

1.      Please provide a copy of each document identified in response to the foregoing interrogatories.

**RESPONSE:**

**Available for inspection and copying at the offices of my attorney upon reasonable advance notification.**

2.      Please provide a copy of each document which refers or relates, directly or indirectly, to any communication between you and any agent, or employee of the defendant.

**RESPONSE:**

**Available for inspection and copying at the offices of my attorney upon reasonable advance notification.**

3.      Please provide a copy of each document which refers or relates, directly or indirectly, to your claims for damages.

**RESPONSE:**

**Available for inspection and copying at the offices of my attorney upon reasonable advance notification.**

4.      Please provide copies of all documents relating to plaintiff's relationship with the defendant as a student, including without limitation the following: all notes, diaries, memos, performance evaluations, audio or video tape recordings or any other document which refers or relates to plaintiff's studies with the defendant or to any contact or communication between any representative of the defendant and the plaintiff or any agent of the plaintiff.

**RESPONSE:**

**Available for inspection and copying at the offices of my attorney upon reasonable advance notification.**

19

5.    If you are claiming physical, emotional or mental illness as a result of defendant's conduct, please provide a medical authorization in the form attached hereto.

**RESPONSE:**

**Objection.  The emotional distress which I claim is not a diagnosed medical condition but simply the normal response of any human being to the kinds of abuse inflicted upon me by the defendant.  Accordingly, there is no basis for searching my unrelated medical records in this case.**

6.    Please provide copies of any and all statements made by you, any representative of the defendant or by any other person which refers or relates to the allegations of your complaint or the damage you claim to have suffered.

**RESPONSE:**

**Available for inspection and copying at the offices of my attorney upon reasonable advance notification.**

7.    Please provide a copy of any memorandum, correspondence, transcript, audio or videotape recording or any other document or tangible item in plaintiff's custody or control which captures any conduct or conversation of any of the defendants or any agent, servant or employee of any of the defendants.

**RESPONSE:**

**There is no videotape.  The other categories requested are available at the offices of my attorney for inspection and copying upon reasonable advance notification.**

8.    Please provide a copy of any and all agreements, correspondence, cancelled checks or other documents relating to your agreement with your counsel with regard to the payment of attorney's fees.

**RESPONSE:**

**Objection.  Not discoverable unless plaintiff prevails on liability and submits an attorney fee application.**

I, Sally Greenhouse, hereby certify that I have reviewed the above Interrogatories and responses thereto and that they are true and accurate to the best of my knowledge and belief.

SALLY GREENHOUSE

Subscribed and sworn to before me this _____ 17 _____ day of January, 2006.

_____
Notary Public
Commissioner of the Superior Court

THE PLAINTIFF

BY

John R. Williams (ct00215)
51 Elm Street, Suite 409
New Haven, CT 06510
203.562.9931
FAX: 203.776.9494
Email: jrw@johnrwilliams.com
Her Attorney

## CERTIFICATION

This is to certify that a copy of the foregoing was handed on February 3, 2006, to

the following counsel of record:

Patrick M. Noonan, Esq.
Donahue, Durham & Noonan, P.C.
741 Boston Post Road
Guilford, CT 06437

John R. Williams

21