UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT

SALLY GREENHOUSE,              .   Case No. 3:05-CV-01429
                               .   (AHN)
               Plaintiff,      .
                               .   Bridgeport, Connecticut
        v.                     .   September 15, 2008
                               .
YALE UNIVERSITY,               .
                               .
               Defendant.      .
. . . . . . . . . . . . . . . .

                         JURY TRIAL
           BEFORE THE HONORABLE ALAN H. NEVAS
             SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      Law Offices
                        By:  JOHN R. WILLIAMS, ESQ.
                        51 Elm Street
                        Suite 409
                        New Haven, Connecticut 06510

For the Defendant:      Donahue, Durham & Noonan
                        By:  PATRICK M. NOONAN, ESQ.
                        Concept Park
                        741 Boston Post Road
                        Guilford, Connecticut 06437

Electronic Court
Recorder Operator:      MS. RITA PAYTON

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

                    BOWLES REPORTING SERVICE
                         P.O. BOX 607
                 GALES FERRY, CONNECTICUT 06335
                        (860) 464-1083

1          (Proceedings commenced at 9:00 a.m.)

2               THE COURT:  Morning.

3               MR. WILLIAMS:  Good morning, Your Honor.

4               MR. NOONAN:  Good morning, Your Honor.

5               THE COURT:  I understand, Mr. Williams, that

6     your client is delayed in traffic?

7               MR. WILLIAMS:  Yes.  She has arrived, Your

8     Honor.  She just had to go to the restroom.

9               THE COURT:  Okay.

10              MR. WILLIAMS:  There was apparently an

11    accident on I-91, around Exit 15.

12              THE COURT:  All right.

13              Well, let's take care of some preliminary

14    matters before we call the jury.

15              First, Mr. Williams, you have a motion to

16    sequester the witnesses?

17              MR. WILLIAMS:  Yes, Your Honor.

18              THE COURT:  Mr. Noonan?

19              MR. NOONAN:  I would object to that, Your

20    Honor.

21              The -- I think the people who are really

22    accused in this case are sitting with me at the table,

23    there's three of them, and I think, number one, they're

24    entitled to hear the evidence against them, just as a

25    matter of fairness; and number two, I need them as

1    representatives of my client.  They were each involved

2    in different aspects of the case, some of them

3    overlapping, but some of them different, and I'm

4    entitled to a party representative.

5         I don't intend to have other people present.

6    There a number of other witnesses, and they'll be

7    present just for their testimony, but these three

8    individuals, Professor --

9         MR. WILLIAMS:  He has no --

10        MR. NOONAN:  Chambers --

11        MR. WILLIAMS:  He has no right to do that,

12   Your Honor.  I don't think that it's discretionary.

13        Obviously, he has a right to have one

14   corporate representative, but this is not a suit

15   against a group of people, this is a suit against a

16   corporation, and as is always the case, the corporation

17   has a right to designate a representative to sit with

18   counsel, but they do not have a right to have all their

19   people here.

20        That's just -- As I understand it, that's the

21   rule.  I don't think there's discretion.

22        MR. NOONAN:  I -- There is clearly

23   discretion.  The plaintiff doesn't have the right to

24   preclude people from the courtroom.  These are the

25   people against whom the accusations are being made.

1    These are the people whose reputations are going to be

2    damaged if there's an adverse verdict.  They're

3    entitled to be here.  There's --

4              THE COURT:  There are three people?

5              MR. NOONAN:  They are --

6              THE COURT:  You want to identify them,

7    please?

8              MR. NOONAN:  Dean Bundy, Professor Diamond

9    and Professor Chambers.

10             MR. WILLIAMS:  Obviously, Dean Bundy is the

11   highest ranking among them, and obviously he is the

12   appropriate corporate representative, unless counsel

13   wants something else, but I have to tell you, Your

14   Honor, I've never heard of such a thing, and I -- Your

15   Honor, we were talking --

16             THE COURT:  Well, Mr. Williams, just because

17   you've never heard of it --

18             MR. WILLIAMS:  Well, yeah, --

19             THE COURT:  -- doesn't necessarily mean that

20   that's --

21             MR. WILLIAMS:  -- that gets back to the --

22             THE COURT:  -- that it's inappropriate.

23             MR. WILLIAMS:  You're right.

24             That gets back to the point we were taking up

25   the other day, about Judge Posner's observation, Your

1    Honor.

2            The fact remains that the law is clear in

3    this regard, that when you're suing a corporation, the

4    corporation can designate a corporate representative.

5            You see this every day when you have --

6            THE COURT:  What's the rule?  Mr. Noonan, do

7    you have the rule -- the citation to the rule?  I'm not

8    -- I don't know the exact rule under which

9    sequestration orders are --

10            MR. NOONAN:  I don't think there is a rule.

11            MR. WILLIAMS:  There is a rule.

12            THE COURT:  There is, or is not?

13            MR. WILLIAMS:  I don't --

14            MR. NOONAN:  I'm not aware of --

15            MR. WILLIAMS:  -- so --

16            MR. NOONAN:  -- any rule, Your Honor.  It's

17    clearly a matter of the Court's discretion.

18            I think there ought to be some finding that

19    these people are -- would somehow be prone to perjury

20    if they stayed here.

21            MR. WILLIAMS:  That's got nothing to do with

22    it, Your Honor.

23            MR. NOONAN:  They're entitled to hear what

24    the case is against them, and to participate with me in

25    defending that case.

1          MR. WILLIAMS:  Your Honor, I would refer the
2    Court to <u>Doe ex rel. A.M. v. The East Haven Board of</u>
3    <u>Education</u>, the case with Judge Droney that we were
4    talking about on Friday.
5          In that case, Judge Droney specifically
6    ordered Attorney Keefe, who was the defense attorney,
7    to designate one corporate representative for the East
8    Haven Board of Education, which he did.  That is the
9    practice because that is the rule.
10         MR. NOONAN:  It's not the rule.  It's clear
11    the Court has discretion, I understand that, but
12    there's no right of the plaintiff to exclude witnesses,
13    particularly the people against whom the accusation is
14    made.
15         I don't have a problem with the people
16    against whom the accusations are not being made, but
17    the other people have a right.  I think it's a
18    fundamental right of due process to hear the accusers,
19    to hear the evidence and, frankly, to participate with
20    me in responding to it.
21         MR. WILLIAMS:  Your Honor sees this every day
22    in the criminal cases you hear, and I know you hear a
23    lot of them, probably more than anybody else in the
24    district, and the United States Government doesn't get
25    to bring in all of its law enforcement agents and have

1    them sitting in a row behind the prosecutor, they have

2    to designate a case agent.  There's a reason why we do

3    that.  It's because it's the rule.

4              MR. NOONAN:  And, of course, rules are

5    different in criminal and civil proceedings.

6         (Pause.)

7              THE COURT:  Aaron has -- my law clerk, has

8    shown me -- called my attention to Rule 615 of the

9    Rules of Evidence.

10             You want to look get it?  You have it in front

11   of you, Mr. Williams?

12             MR. WILLIAMS:  I don't have the rules with

13   me, Your Honor.

14             THE COURT:  I'll give you a copy.

15             MR. WILLIAMS:  Thank you, Your Honor.

16        (Pause.)

17             MR. NOONAN:  And I think my clients are

18   entitled to be here, under subdivision (3) of the rule,

19   Your Honor.  Well, (2) and (3), but --

20        (Pause.)

21             MR. WILLIAMS:  It clearly is not -- it's

22   clearly not covered by that.  As a matter of fact, it

23   places the burden of proof on the party claiming an

24   exemption from the rule, and the only basis

25   (unintelligible) they're affected by it, all witnesses

1   are affected by it (unintelligible).

2           I'm not suing Professor Diamond.  I'm not

3   suing Dean Bundy.  I'm not suing any of these people.

4   I'm suing the institution.  They might as well say that

5   President Lund is being sued.

6           MR. NOONAN:  There's nothing in the rule that

7   says I have the burden.

8           What it says, and I'm quoting:

9           "This rule does not authorize exclusion of,"

10          and subdivision (3) reads:

11          "A person whose presence is shown by a party

12          to be essential to the presentation of the

13          parties' cause."

14          And I am representing to the Court that these

15  are the three people who made decisions, primary people

16  who made decisions, about which this lawsuit was

17  brought.

18          They each made decisions based on information

19  at varying times, sometimes overlapping, sometimes not.

20  They are absolutely --

21          THE COURT:  All right.

22          MR. NOONAN:  -- essential to my case.

23          THE COURT:  All right.

24          I'll make a finding that under subpart (3),

25  based on the representations of counsel, that the three

1    witnesses are essential to the presentation of the
2    defendant's case, and I will permit them to remain.
3              All right.
4              What we have left, the issue of the motion in
5    limine, and I'm prepared to rule on that, and I'm going
6    to read the ruling into the record, as follows:
7              "The defendant seeks to introduce evidence of
8              the plaintiff's conduct that allegedly
9              transpired after the sexually harassing
10             incidents at the Yale Drama School, that she
11             alleges in her Complaint.  That more recent
12             conduct allegedly involved the plaintiff
13             engaging in a voluntary, simulated, sexual
14             act at the Yale Drama School, as part of a
15             classroom exercise.
16             The Court holds that the conduct that the
17             defendant seeks to introduce is governed by
18             Federal Rule of Evidence 412.  Rule 412
19             provides that in civil cases, 'Evidence
20             offered to prove the sexual behavior or
21             sexual predisposition of any alleged victim
22             is admissible if it is otherwise admissible
23             under these rules, and its probative value
24             substantially outweighs the danger of harm to
25             any victim, and of unfair prejudice to any

party.  Evidence of an alleged victim's

reputation is admissible only if it has been

placed in controversy by the alleged victim.'

The rule applies in cases that allege sexual

harassment.  See Wolack, W-O-L-A-C-K v.

Spucci, S-P-U-C-C-I, 217 F.3d 157, at page

160 (2d Cir. 2000).

In Wolack, the second circuit held that the

act of viewing pornography in the context of

a sexual harassment claim, "Falls within

412's broad definition of 'sexual behavior.'"

Subsection (c) and Rule 12 (phonetic) also

provides the Court with a procedure to

determine admissibility of alleged sexual

behavior, which involved filing a motion 14

days in advance of trial, an in-camera

hearing with the victim, and filing all

related documents under seal.

However, the advisory notes to Rule 412 state

that:

'The procedures set forth in subdivision (c)

do not apply' to alleged sexual behavior

offered in a civil case.  See Federal Rules

of Evidence 412, Advisory Committee Note,

1994.

1   The advisory notes further provide that

2   instead of the procedure discussed in

3   subsection (c) of the rule, the Court must

4   engage in a balancing test regarding the

5   relevance of the proposed evidence, that is

6   more stringent than the test found in Federal

7   Rule of Evidence 403; that is, the Court must

8   find that the probative value of the evidence

9   substantially outweighs the danger of harm to

10   any victim, and of unfair prejudice to any

11   party.

12   Accordingly, the Court makes a finding that

13   because the plaintiff has made the issue of

14   what constitutes sexual conduct that is

15   embarrassing or humiliating to her, in the

16   context of the classroom, a central issue in

17   this case, and that this incident took place

18   after the conduct alleged in the Complaint,

19   it is relevant to this case and the jury

20   should be allowed to hear it, see Holt v.

21   Welch Allen, Inc., Number 95-CV-1135, 2000 W.

22   L. 98118, Northern District of New York,

23   January 11th, 2000, noting that in the

24   context of workplace sexual harassment

25   allegations, the plaintiff's workplace sexual

1      conduct is relevant and admissible.
2      The Court further finds that allowing the
3      evidence to be admitted would not cause harm
4      to the plaintiff.  The defendant does not
5      seek to introduce any evidence regarding the
6      plaintiff's sexual behavior when she is not
7      at the Yale Drama School, such as who the
8      plaintiff is dating, or any other after-hours
9      sexual conduct.  See Burns v. MacGregor
10     Electronic Industries, 989 F.2d 959, pages
11     962 to 963 (8th Cir. 1993), which held that
12     the fact that the plaintiff posed for nude
13     pictures for a magazine after work, did not
14     indicate that she welcomed sexual advances in
15     the workplace.
16     However, based on the allegations in her
17     Complaint, the plaintiff has placed the
18     propriety of certain sexual conduct at the
19     Yale Drama School squarely in issue in this
20     case.
21     Accordingly, the defendant may introduce
22     evidence of the plaintiff's subsequent sexual
23     conduct that transpired within the confines
24     of the Yale Drama School class."
25     All right.

1              You want to call the jury, please?

2        (Pause.)

3              MR. WILLIAMS:  May I inquire what procedure,

4   if any, Your Honor had in mind for the stipulations

5   that the parties filed?

6              THE COURT:  Thank you for reminding me of

7   that.

8         (The Court and the Law Clerk confer.)

9              THE COURT:  I think they're in the jury

10  instructions, but we'll --

11             MR. NOONAN:  Yes, they are.

12             THE COURT:  -- we'll look into that.

13        (Jury in.)

14             THE COURT:  Morning.

15             JURORS:  Good morning.

16             THE COURT:  You may be seated.

17             Will you call the roll?

18             THE CLERK:  Andrea Henchcliffe.

19             MS. HENCHCLIFFE:  (No audible response.)

20             THE CLERK:  Morgan (unintelligible)

21             MS. UNIDENTIFIED:  (No audible response.)

22             THE CLERK:  Amy Taylor?

23             MS. TAYLOR:  Here.

24             THE CLERK:  Marilyn Abrams?

25             MS. ABRAMS:  Here.

1          THE CLERK:  Delores Larracuente?

2          MS. LARRACUENTE:  (No audible response.)

3          THE CLERK:  Steven Karng?

4          MR. KARNG:  (No audible response.)

5          THE CLERK:  Samantha St. Clair?

6          MS. ST. CLAIR:  (No audible response.)

7          THE CLERK:  And Daniel O'Shea?

8          MR. O'SHEA:  (No audible response.)

9          THE COURT:  You want to stand and raise your

10    right hands, please?

11        (The Jury is Sworn.)

12          THE COURT:  You may be seated.

13          We're going to start the evidence in a few

14    minutes, but before we do, I'm going to give you some

15    preliminary instructions to guide you in your

16    participation in this trial.

17          It will be your duty to find from the

18    evidence, what the facts are.  You, and you alone, will

19    be the judges of the facts.  You will then have to

20    apply to those facts, the law as the Court will give it

21    to you, and you must follow that law, whether you agree

22    with it or not.

23          Nothing that I say or do during the course of

24    the trial is intended to indicate, or should be taken

25    by you as indicating what your verdict should be.

1          The evidence from which you will find the

2     facts, will consist of the testimony of witnesses,

3     documents, and other things received into the record as

4     exhibits, and any facts that the lawyers agree to or

5     stipulate to, or that the Court may instruct you to

6     find.

7          Certain things are not evidence and must not

8     be considered by you, and I will list them for you now.

9          First, statements, arguments and questions by

10    the lawyers are not evidence;

11         second, objections to questions are not

12    evidence.  Lawyers have an obligation to their clients

13    to make objections when they believe evidence being

14    offered is improper under the Rules of Evidence, and

15    you should not be influenced by the objection or by the

16    Court's ruling on it.  If the objection is sustained,

17    ignore the question.  If it's overruled, treat the

18    answer like any other.

19         If you are instructed that some item of

20    evidence is received for a limited purpose only, you

21    must follow that instruction.

22         Third, any testimony that the Court has

23    excluded or told you to disregard, is not evidence and

24    must not be considered; and

25         fourth, anything you may have seen or heard

1    outside the courtroom is not evidence and must be

2    disregarded.  You are to decide this case solely on the

3    evidence presented here in the courtroom.

4           Now, there are two kinds of evidence, direct

5    and circumstantial.

6           "Direct evidence" is direct proof of a fact,

7    such as testimony of an eyewitness.

8           "Circumstantial evidence" is proof of facts

9    from which you may infer or conclude that other facts

10   exist, and I'll give you further instructions on these,

11   as well as other matters, at the end of the case, but

12   keep in mind that you may consider both kinds of

13   evidence.

14          It will be up to you to decide which witnesses

15   to believe, which witnesses not to believe, and how

16   much of any witness' testimony to accept or reject, and

17   again, I will give you some guidelines for determining

18   the credibility of witnesses at the end of the case,

19   but just preliminarily, let me say that on the issue of

20   credibility, which is what you're going to have to

21   decide, you're going to see the witnesses.

22          The witnesses will be seated right here,

23   right in front of you.  You will be able to observe the

24   witnesses, listen to what they have to say, see how

25   they answer on direct examination, see how they answer

1    on cross-examination, and then do what you do every day

2    in your own lives, when you meet someone for the first

3    time, you size people up, you make a determination, "Is

4    this person direct, honest, somebody I can trust, or is

5    there something about the way they conduct themselves,

6    or the way they speak or answer questions, that should

7    give me pause?"  That's what credibility is, and that's

8    what you do when you listen and watch the witnesses,

9    you determine credibility.

10         Now, this is a civil case.  The plaintiff has

11   the burden of proving her case by what is called "the

12   preponderance of the evidence."  That means that she

13   has to produce evidence which, considered in the light

14   of all of the facts, leads you to believe that what she

15   claims is more likely true than not.

16         To put it differently, if you were to put the

17   plaintiff's and the defendant's evidence on opposite

18   sides of the scales, the plaintiff would have to make

19   the scales tip somewhat on her side.  If she fails to

20   meet this burden, the verdict must be for the

21   defendant.

22         Now, some of you may have sat on a criminal

23   case or you -- you've heard or read that in a criminal

24   case proof must be beyond a reasonable doubt.  That

25   standard does not apply in civil cases, and therefore,

1    you should put it out of your mind.

2              A few words about your conduct as jurors.

3              First, I instruct you that during the trial

4    you're not to discuss this case with anyone, or permit

5    anyone to discuss it with you, and until you retire to

6    the jury room at the end of the case to deliberate on

7    your verdict, you simply are not to talk about this

8    case, and that means you are not to discuss it amongst

9    yourselves.  Once you start talking about it amongst

10   yourselves, that constitutes deliberation, and you

11   can't deliberate on a verdict until you've heard all

12   the evidence, and until you've heard my instructions on

13   the law.  So don't talk about it.

14        Second, don't read or listen to anything

15   touching on this case in any way, and if anyone tries

16   to talk to you about it, bring it to my attention

17   promptly.

18              Third, do not try to do any research or make

19   any investigation about this case on your own.  In this

20   age of the Internet and Google and people -- we've had

21   experiences with jurors who are sitting on a jury and

22   go home at night, get on the computer, and start to do

23   their own research.  Don't do that.

24              And finally, do not form any opinion until all

25   the evidence is in.  Keep an open mind until you start

1    your deliberations at the end of the case.

2          They don't have pads and pencils or do --

3    You've got pads and pencils.  I permit jurors to take

4    notes, so you are free to take notes, to the extent

5    that you wish to.  Some jurors take a lot of notes.

6    Some jurors don't take any notes.  It's up to you.

7    Some of you are used to taking notes in your daily

8    lives, others are not so familiar, but it doesn't

9    matter.  It's purely your decision.

10          If you do wish to take notes during the course

11   of the trial, you may do so, however, it is difficult

12   to take detailed notes and pay attention to what the

13   witnesses are saying at the same time.  If you do take

14   notes, but sure that your notetaking does not interfere

15   with your listening to, and considering all of the

16   evidence, and also, if you do take notes, do not

17   discuss them with anyone before you begin your

18   deliberations, and do not take your notes with you at

19   the end of the day, leave them here in the jury room

20   overnight.

21          If you choose not to take notes, remember

22   that's your own individual responsibility, to listen

23   carefully to the evidence, and you cannot give this

24   responsibility to someone who is taking notes.  We

25   depend on the judgment of all members of the jury, and

1    you all must remember the evidence in this case.

2            We're going to begin the trial now.

3            First, each side is going to make an opening

4    statement.  An opening statement is not evidence and

5    it's not argument.  It is simply an outline of what

6    that party intends to prove, offered to help you follow

7    the evidence.

8            Then, after the opening statements, the

9    plaintiff will present her witnesses, and the defendant

10   has the right to cross-examine them, and then the

11   defendant will present its witnesses, and the plaintiff

12   may cross-examine them.

13           After all the evidence is in, the parties will

14   present their closing arguments to summarize and

15   interpret the evidence for you, and then I will give

16   you instructions on the law, and then you will retire

17   to deliberate on your verdict.

18           Mr. Williams?

19            MR. WILLIAMS:  Thank you, Your Honor.

20           Good morning, again, ladies and gentlemen.

21           First of all, I'd like you to meet my client,

22   Sally Greenhouse.  Ms. Greenhouse is sitting here

23   across the table, next to me.  She lives in western

24   Massachusetts, and she'll be driving down here every

25   morning for the trial.

1           This is a case about retaliation, and it's
2    been drawn under a provision of federal law called
3    "Title 9," and it's a provision of law that only
4    applies to educational institutions that choose to take
5    money from the Federal Government to subsidize their
6    educational activities.  Yale University is such an
7    institution, and they have admitted that, it's one of
8    the stipulations you'll be told about in this case,
9    that they are the recipient of federal money, which
10   means that they are governed by the provisions of
11   Title 9.
12           Title 9 is designed to protect people against
13   various forms of sexual misconduct in the educational
14   experience.  One form of misconduct that people are
15   protected against, is sexual harassment.  "Sexual
16   harassment" will be defined by the Judge, but
17   essentially, I think we all know what it is.
18           Title 9 also prohibits retaliating against a
19   student who complains about sexual harassment, and
20   that's what this case is about.
21            In the course of this trial, and our
22   presentation of evidence, that we -- I think will be
23   pretty brief, because I -- it's our view that the
24   important parts of the evidence are not very much in
25   dispute, and in the course of this case, you're going

1    to learn that in 2002 Ms. Greenhouse was a 49-year-old

2    graduate of Harvard Divinity School, who was working,

3    and had been working for most of her adult life in the

4    theater world (unintelligible).

5         Being in mid life, and deciding to change the

6    direction of her life, she made two decisions.  As a

7    single person, she decided to adopt a child, and she

8    also decided to try to be all that she could be in the

9    theater world, by applying to what she considered to be

10   the best and most prestigious theater program in the

11   United States, and that was the Yale School of Drama in

12   New Haven.

13        You'll learn that she did apply.  You'll learn

14   that the admission process is extremely competitive.

15   They take only a very small number of people, and many,

16   many apply, and you'll learn that she was one who was

17   accepted.  She was accepted into the directing program,

18   as one of a group.  I think it was only four people

19   chosen that fall, to enter that class.

20        You will learn that she applied for financial

21   aid.  You will learn that she was granted financial

22   aid, but to (unintelligible) financial aid that she was

23   granted, what she felt was going to be insufficient for

24   her to survive, given that she was an older person who

25   didn't have parents back home subsidizing, and had not

1   been making any (unintelligible).

2          You will learn that she had a meeting with the

3   financial aid officer about this subject, and the

4   financial aid officer, in the course of that meeting,

5   at which Ms. Greenhouse explained that she was about to

6   (unintelligible) that she really had very good

7   (unintelligible) circumstances, said something to the

8   effect of, "(unintelligible) you're going to have to

9   choose between motherhood and a career."  You'll learn

10  that she complained about that, but she moved on and

11  didn't pursue that.

12         And you'll learn that at the beginning of the

13  fall semester, in September 2002, she was told by a

14  person she knew in the theater world, that one of the

15  individuals in her class, a guy by the name of "Chris

16  Sanderson," was suffering from severe psychiatric

17  problems, that he was potentially dangerous.

18         You'll learn that she reported that fact to

19  Professor Diamond, who was the acting head of the

20  department, and Ms. Diamond told her, "Suck it up.  You

21  can handle that," and so she tried to.

22         And you will learn that the very first

23  semester there was a class which was a sort of

24  interdisciplinary class within the drama school, called

25  "(unintelligible)."  It was taught by a theater person

1   from the outside, but the name of Frank Deal

2   (unintelligible), who was an adjunct -- I believe an

3   adjunct professor at the drama school at that time.

4         Now, Ms. Greenhouse was in the directing

5   program.  The purpose of the class (unintelligible) was

6   to help the students learn how to collaborate with one

7   another and various participants, including

8   (unintelligible), in order to make them coherent and

9   successful (unintelligible).

10         You will learn that in September of 2002, Ms.

11  Greenhouse was in a class with a group of other

12  students, and the class exercise that day was supposed

13  to be based on a play that -- appearing on Broadway,

14  called "Metamorphosis," and the idea was to do a kind

15  of a rethinking of the play, and the title of the

16  exercise was called "Metamorphosis Revisited," based on

17  the Greek theater, and Ms. Greenhouse was on the stage

18  with two young, male student actors in their 20s, and

19  you'll learn that Mr. Deal -- Professor Deal, sitting

20  in the audience, announced a change, and he said, "The

21  name of this exercise is," and I'm quoting now,

22  "Metamorphosis Revisited, or Rock Out with Your Cock

23  Out," in which the actors (unintelligible) instructed

24  to simulate masturbation in the presence of Ms.

25  Greenhouse.

1            Ms. Greenhouse was horrified, disgusted, and

2      that happened, and after it happened, Professor Deal

3      said, "That was great.  Let's do it again, only this

4      time, really try."

5            Ms. Greenhouse attempted to leave the stage.

6      Another one of the students, in the presence of

7      Professor Deal, held up his hand, "Stop."

8            Deeply upset, shaken by the experience, she

9      complained to the head of the program about what she

10     considered to be sexual harassment of an extreme kind,

11     a horrifying experience, from her point of view, that

12     contaminated the educational experience.

13            And you will learn that literally within a

14     matter of days of making that complaint, she was placed

15     on administrative warning by Dean Bundy, now sitting at

16     the end of the table over here, in writing, and you

17     will learn that the Defendant Yale University, through

18     these people who are sitting at the table over here,

19     admitted that there were three reasons for doing that,

20     and the three reasons were complaining about, "Well,

21     you have to choose between a baby and a career

22     (unintelligible)" or bringing the -- the issue of Mr.

23     Sanderson to the attention of the head of the

24     department, and for complaining about Rock Out With

25     Your Cock Out, that they specifically put her on

1   warning because of those things, and you will learn

2   that she was kept on warning, which is, by the way, the

3   last step before expulsion.

4           All of this was in the first weeks of her

5   participation in this program that she

6   (unintelligible), and she was kept on administrative

7   warning the rest of the year, her entire time at Yale,

8   and at the end of her first year, she was expelled.

9           The law is, and the Judge will tell you, that

10  as long as a retaliatory motive is one of the

11  motivating factors, then that is sufficient to

12  (unintelligible).

13          You're going to hear (unintelligible), and

14  they're going to give the usual defenses.  They're

15  gonna say, "She's no good.  She was a lousy student, we

16  could tell from the beginning.  She was no good, and

17  what happened the rest of the year just confirmed it.

18  She was terrible.  Everybody hated her

19  (unintelligible)," and yet, you will also learn that in

20  the course of that year, the same Christopher Sanderson

21  that she had been worried about, actually threatened

22  the life of a member of the faculty, and he was kept

23  (unintelligible) graduated from (unintelligible).

24          And so at the end of the case, we're going to

25  ask you folks to award damages to Ms. Greenhouse, not

1   only to compensate her for what happened, but we're

2   going to ask you to award punitive damages against Yale

3   University, to teach them that this kind of conduct in

4   the 21st Century is not acceptable.

5           MR. NOONAN:  Do you mind if I turn the

6   lectern, Your Honor?

7           THE COURT:  No.

8           MR. NOONAN:  Thank you.

9           When you're going to change the Judge's

10  furniture, it's polite to ask.

11          May it please the Court, good morning ladies

12  and gentlemen.  As I mentioned last week, my name is

13  Pat Noonan, and I would like to introduce the people

14  that I represent.

15          Dean James Bundy is on the end of the table.

16  In the middle is Professor Elizabeth Diamond, and to

17  her left is Professor David Chambers.

18          And let me begin by thanking you for

19  participating.  I know it wasn't exactly voluntary when

20  you got the jury summons, and none of you probably

21  jumped for joy, but we appreciate you coming in.  We

22  appreciate you giving us your time and your attention.

23  We know that we are taking you away from your families

24  and your jobs, but our system simply doesn't work

25  without you, and all of us appreciate it.

1          Now, as Judge Nevas has already told you,

2    Attorney Williams' remarks are not evidence, and as he

3    also told you, your verdict has to be based on the

4    evidence, so what I would like to do is talk to you

5    about the evidence.

6          The evidence is going to show that there was

7    no discrimination.  The evidence will show you there

8    was no retaliation.  The evidence will show you there

9    was no sexual harassment, and at the end of the case,

10   after you've considered the evidence, you'll understand

11   why Ms. Greenhouse simply has no case.

12         Keep in mind, as you listen to the evidence,

13   that this case is not about whether or not you agree

14   that the school had grounds to dismiss Ms. Greenhouse.

15   It's not about whether she got fair treatment.  The

16   question is whether she has proven to you that there

17   was a violation of the federal statute.

18         Now, she's claiming to have been the victim of

19   retaliation and discrimination and, therefore, the

20   question that you have an answer at the end of the

21   case, is the motivation of the people who made

22   decisions in the case, those people and others at the

23   drama school.

24         Obviously, the people who know, who actually

25   know the motivation, are the people who made the

1    decision, and you're going to hear from them, and they

2    will tell you that -- unequivocally, that the fact that

3    Ms. Greenhouse was a woman had nothing to do with their

4    decision making.  The fact that she complained about

5    certain issues had nothing to do with her dismissal.

6            The reason she was dismissed is that Ms.

7    Greenhouse demonstrated, through the course of that

8    nine months, that she was simply incapable of

9    participating in the collaborative process that is so

10   essential to the Yale Drama School, and as Mr. Williams

11   already alluded, the plaintiff herself will knowledge

12   that collaboration is an important part of that

13   school.

14           At the end of the year, the drama school

15   faculty voted unanimously not to continue Ms.

16   Greenhouse on to the second year, and the reason is

17   given her shortcomings, they felt it would be unfair to

18   the other students to keep her in the program.  They

19   will explain to you their reasons for reaching those

20   conclusions.

21           Did you need some water?

22       (Pause.)

23           MR. NOONAN:  You okay?

24           UNIDENTIFIED SPEAKER:  Yes, (unintelligible).

25           MR. NOONAN:  What you're going to find out is

1    that there are two main activities in the Yale Drama

2    School for students.  One is classroom work, and the

3    other is production work, and unlike what Mr. Williams

4    said, these folks aren't going to say that she was

5    terrible from the outset.  They're not going to say

6    that she failed in every aspect of her course work and,

7    in fact, what they're going to tell you is on the

8    classroom work, where she worked by herself and didn't

9    have to collaborate with others, she did quite well.

10            They passed her in all -- There is a

11   pass/fail system, there's no grades, but she was passed

12   in all of her courses, and you are going to hear one of

13   the people that supposedly retaliated against her,

14   David Chambers, he actually told her that her paper in

15   his course was very good and, in fact, was good enough

16   to be published.  He wasn't retaliating against her

17   when he said that, and he wasn't retaliating against

18   her when he reviewed her production work and found it

19   lacking.  Like any good educator, he praised what was

20   good, and he let her know what was not so good.

21            And, in fact, what you will learn, and I think

22   Ms. Greenhouse will agree with this in her testimony,

23   when she was dismissed from the program, Professor

24   Diamond, who is one of the people she claims

25   discriminated against her because she's a woman, and

1   retaliated against her for raising what she says are

2   gender-based complaints, Professor Diamond, which she

3   dismissed Ms. Greenhouse from the program, told her

4   that she had done solid work in her course work, in her

5   classroom work, and that she was particularly strong in

6   one particular seminar.

7         She went on to tell her that she had talent

8   and she could make a contribution in theater, but

9   simply that she was not cut out to be in a program that

10  required the type of collaboration that the Yale School

11  of Drama requires.

12        Now, Ms. Greenhouse was also given a unique

13  opportunity.  She was allowed to serve as an assistant

14  director with James Bundy, who is the dean of the drama

15  school.  As a student, it was a particularly plum

16  assignment, since it would give this director to be,

17  Ms. Greenhouse, an opportunity to work with the top

18  director at the Yale School of Drama.

19        You will hear from Dean Bundy about his

20  experiences with Ms. Greenhouse.  He will tell you

21  there were times he praised her work, and indeed, she

22  will agree that he did that.  He also let her know when

23  she did not meet his expectations, and that's really

24  the duty of an educator, is to let people know, let

25  students know when they do well, and when they aren't

1    doing well.

2          The other major production project that Ms.

3    Greenhouse engaged in, besides the assistant

4    directorship, was to be a director in something called

5    the "Collaborative Work Project."  You'll hear

6    witnesses talk about it as the "CWP," and it's actually

7    the major production work upon which students,

8    directors and others, are evaluated.

9          The evidence will show that virtually all of

10   the other students in the project who -- working with

11   Ms. Greenhouse, complained about her, and said that she

12   was the reason for the failures of that project.  This

13   includes the playwrite, the stage manager, the

14   dramatur, and the other actors.  Virtually all of them

15   complained to the faculty about Ms. Greenhouse's

16   shortcomings.

17         And as you listen to that evidence, keep in

18   mind that this wasn't a situation where there was a

19   group of guys complaining about the woman.  In that

20   project, there were eight students.  Six of them were

21   female, two were male.  The men and the women

22   complained about Ms. Greenhouse, and the way she -- and

23   the ways in which she failed to collaborate.

24         You'll also hear from several female

25   professors at the drama school.  They will tell you

1    their reasons for voting to dismiss Ms. Greenhouse.

2    They will tell you that it had nothing to do with her

3    having made complaints and, in fact, these female

4    professors, as you'll find out, are strong supporters

5    of women in theater.  It would really strain belief to

6    think that these female faculty members would

7    discriminate against another female, either because of

8    her gender or because she made gender-based complaints.

9           Now, I'd like to address that skit called,

10   "Metamorphosis Revisited, or Rock Out With Your Cock

11   Out."

12          First of all, one of the things that Mr.

13   Williams didn't mention is there was no nudity in that

14   skit.  The male actor who was pretending to have --

15   pretending to masturbate was fully clothed.

16          The evidence will show that the purpose of

17   that particular improvisational exercise, or one of the

18   purposes, is to allow students, as they are entering

19   the program, to lose their inhibitions, to move beyond

20   themselves, if you will, to really participate in the

21   action.

22          One of the things you have to remember, as

23   you listen to the evidence, is that this was not an

24   eighth grade play.  This was a drama theater

25   production, and theater explores every facet of the

1   human condition, of which sexuality is an important

2   component.

3           In order to be an actor, the students have to

4   be ready to engage in types of scenes they will engage

5   in, in their careers, and I think everybody here, who

6   watches even the family hour, sees sexual activity on

7   the screen every night.

8           When I first heard about this skit, I was

9   reminded of the movie, "When Harry Met Sally."  I don't

10  know if any one of you remember that, but there was a

11  famous scene -- The movie stars Billy Crystal and Meg

12  Ryan.  There is a famous scene where Meg Ryan is in a

13  diner and she simulates an orgasm, and it's quite

14  graphic, and she's moaning and calling out, gestures,

15  and screams of passion, and at the end -- it's a great

16  comic scene because at the end, the woman next to her

17  says, "I don't know what she's having, but I'll have

18  two of those."  So there's nothing extraordinary about

19  the sexual content of skits and scenes in the theater.

20          You also should remember, when you listen to

21  that evidence, remember who it is that made up the

22  skit.  One of the things Mr. Williams didn't tell you

23  is the professor didn't make up the skit, and he didn't

24  give it the title.  That was done by the students.

25          The students are put into groups.  Ms.

1    Greenhouse was in a group with these other actors,

2    several of them, four or five other actors.  They

3    decide, and they have 15 or 20 minutes to come up with

4    a skit, and then put it on immediately.  They decide

5    what the skit will be, and they get up and perform it.

6              Professor Deal had nothing to do with

7    devising the skit or with naming it, he just took the

8    name that he was given, and announced it.

9              THE COURT:  Couple of minutes, Mr. Noonan.

10             MR. NOONAN:  You also will learn that

11   apparently the claim seems to be that Professor Deal,

12   who was in charge of that session, should have

13   intervened.  He should've recognized somehow, that Ms.

14   Greenhouse was objecting to it.

15             Well, in point of fact, Ms. Greenhouse didn't

16   object to it.  She didn't talk to Professor Deal about

17   it, either during or after the scene.  She never told

18   him she objected to it.  He had no way of knowing that

19   it bothered her, and therefore, had no reason to

20   intervene.

21             Now, as you listen to the evidence, and you

22   consider the claim that she was very offended by this

23   scene, also listen carefully to the evidence about a

24   different scene.  This was one that Ms. Greenhouse

25   selected herself.  She and others were given the

1    opportunity to select their own scene.

2           You will learn that she picked a scene in

3    which an actor was required to put his head under her

4    skirt and simulate oral sex on her.

5           Now, I'm not saying there's anything wrong

6    with that.  That's a perfectly appropriate thing for

7    her to do in theater, but there's also nothing wrong

8    with her classmates picking a -- the scene that they

9    picked.

10          Now, you will learn that there were other

11   signs that Ms. Greenhouse was having difficulty

12   integrating herself into the school, early on.  She had

13   accused the financial aid officer, another woman, of

14   being high handed, condescending and dishonest.  She --

15   Her reaction was all out of proportion as to what had

16   actually occurred and, indeed, it turned out that all

17   the financial aid officer did was to come up with a

18   financial aid package that was consistent with the

19   federal guidelines.

20          She had accused another individual, impugned

21   his integrity, without any evidence other than gossip,

22   and Professor Diamond had noticed, in the first weeks

23   of the semester, Ms. Greenhouse did not seem to be

24   comfortable in class.  She continually referred to the

25   fact that she had no experience in conventional

1    theater, and she was openly hostile to one of her

2    classmates.

3           All of these factors caused Professor Diamond

4    and Professor Chambers to sit down with her at an early

5    stage, in order to see whether this was really the

6    right place for her, and yes, they put her on warning

7    to let her know the seriousness of the signs, and the

8    reason they selected the date they picked was that she

9    had made complaints about spending too much money on

10   her education.

11          The time for withdrawing and getting a

12   substantial portion of her tuition back was coming to a

13   close, was about three days away, and they thought if

14   she had decided she didn't want to stay, the fair thing

15   to do was to let her know that things didn't seem to be

16   going that well at the early stage, and give her an

17   opportunity to withdraw, if that's what she chose to

18   do.  She chose not to do that and she continued on.

19          I said at the outset that I wanted to talk

20   about the evidence and, in closing, I'd like you to

21   commit to doing exactly what Judge Nevas told you, you

22   should do in this case, and that is to listen to all

23   the evidence before reaching any conclusion about

24   anything that happened in the case.

25          You obviously know that what you hear from

1    Ms. Greenhouse and her witnesses is likely to be quite

2    different from what you will hear from other witnesses

3    in the case.  If you're going to be fair to the last

4    witness in the case, just as you should be fair to the

5    first witness, you must keep that open mind throughout.

6          So I ask that you keep your mind open to

7    reach a conclusion about nothing until you've heard all

8    the evidence, until you've heard Judge Nevas' charge to

9    the jury, and if you do that, I am confident that the

10   only fair verdict you will be able to render is a

11   verdict in favor of the defendant.

12         And again, thanks so much for the attention I

13   know you're going to give to this case.

14         Thank you, Your Honor.

15         THE COURT:  All right.  You wanna move that

16   (unintelligible) around, Mr. Noonan, and, Mr. Williams,

17   you want to call your first witness, please?

18         MR. WILLIAMS:  Thank you, Your Honor.

19         Your Honor, I would like to start, if I may,

20   by offering a group of four exhibits that are culled

21   from what previously was marked as Plaintiff's Exhibit

22   for Identification 4, and those are 4-A, 4-B, 4-C and

23   4-D.

24         I furnished a copy to Mr. Noonan, and I'll

25   hand copies to the Court, and I have the original

1    (unintelligible).

2              THE COURT:  Are these -- These are premarked?

3              MR. WILLIAMS:  Correct, Your Honor.

4              THE COURT:  They all may be marked as full

5    exhibits.

6              MR. WILLIAMS:  Thank you, Your Honor.

7              If I may just briefly explain --

8              THE COURT:  Go ahead.

9              MR. WILLIAMS:  -- these to the jury.

10             Ladies and Gentlemen, these are excerpts taken

11   from the bulletin of the Yale drama school for the term

12   beginning August 30th, 2002.

13             The first, which is 4-A, is --

14             MR. NOONAN:  Your Honor, I would object to a

15   characterization of the exhibits.  I think they speak

16   for themselves.  I don't think it's appropriate that he

17   characterize -- I have no problem with what he said so

18   far, but to go beyond that --

19             MR. WILLIAMS:  I don't think he's going to

20   have a problem with what I say in the future.  I'm just

21   -- I'm trying to publish them without taking the

22   morning to have --

23             THE COURT:  Go ahead, Mr. Williams.

24             MR. WILLIAMS:  Thank you, Judge.

25             4-A is simply the calendar that lists the

1   schedule for the year.

2           4-B is simply a list of the members of the

3   faculty and other professional staff, their names and

4   their titles.

5           4-C is a description of the directing

6   program.  Oh, and it also includes a specific

7   description of Drama 4-A.

8           And then 4-D is a summary of tuition and

9   expenses, and the financial aid policy.

10          Ms. Greenhouse?

11          MS. GREENHOUSE:  Uh-huh?

12          MR. WILLIAMS:  Would you take the witness

13  stand, please?

14      SALLY GREENHOUSE, PLAINTIFF'S WITNESS, SWORN

15          THE CLERK:  Please be seated, ma'am.

16          THE COURT:  You want to pull the microphone

17  right up to you, and make sure you speak right into the

18  microphone, please.

19          THE CLERK:  Please state your name.

20          THE WITNESS:  Sally Greenhouse.

21          THE CLERK:  Please spell your last name.

22          THE WITNESS:  G-R-E-E-N-H-O-U-S-E.

23          THE CLERK:  And please state your city and

24  state where you reside.

25          THE WITNESS:  In Northampton, Massachusetts.

41

1                          DIRECT EXAMINATION

2     BY MR. WILLIAMS:

3     Q.   How old are you today, Ms. Greenhouse?

4     A.   Today I am 54.

5     Q.   Would you tell us where you went to high school?

6     A.   Clayton High School in Clayton, Missouri.

7     Q.   Okay.

8          You grew up in Missouri, did you?

9     A.   Southern Florida and Missouri, yes.

10    Q.   Okay.

11         And where did you go to college?

12    A.   Well, I graduated from Sarah Lawrence.

13    Q.   Okay.

14         And that's in Bronxville, New York; is the right?

15    A.   Yes.

16         I had spent some time at Washington University in

17    St. Louis, as well.

18    Q.   Okay.

19         And after you graduated from Sarah Lawrence, what

20    did you do?

21    A.   I went directly to graduate school.

22    Q.   Okay.

23         And where was that?

24    A.   Harvard.

25    Q.   All right.

1       And what did you study in Harvard graduate school?

2  A.  Well, I was technically within the divinity

3  school.  I did half of my course work in the graduate

4  school at education, and also was appointed a teaching

5  fellowship in the psychology department, in

6  psychoanalytic theory, and then did half of my course

7  work in theological studies, which included ethics.

8       Am I popping this mic?

9  Q.  It is --

10  A.  Am I?

11        THE COURT:  Just put it back a little bit.

12  Okay.

13  BY MR. WILLIAMS:

14  Q.  And you received a Master of Arts in Divinity from

15  Harvard; is that correct?

16  A.  I received a master's in theological studies, and

17  continued to dance.  I had trained throughout my life

18  in classical dance.

19  Q.  After graduating from the Harvard divinity school,

20  what did you do, as far as a career?  What were your

21  choices?

22  A.  Partly what happened next was determined by the

23  fact that my brother had cancer and I went back to St.

24  Louis while he underwent an amputation, and was with my

25  family for a number of months.

1           Then I returned to the northeast, and went back

2      into dance and performance, evolving into the area of

3      collaborative musical improvisation for five years, out

4      of which emerged my work in performance art, which was

5      based on a lot of improvisational work ensemble, in

6      both solo and I created my own original work, as well.

7      Q.    Were you employed, essentially, in the theater

8      world, from that point on, until Yale --

9      A.    I got my first large grant in Cambridge, actually,

10     with the Arts on the Line Grant, the federal funded

11     grant from the Cambridge Arts Council, to create art at

12     construction sites along the Boston Red Line, and it

13     was 21 artists from every genre, so I was in the

14     performance -- I was the performance recipient.

15     Q.    Okay.

16           Did there come a time in your 40s, when you

17     decided to make some mid life changes in your life?

18     A.    Yes.

19           Directly prior to my auditioning for Yale drama,

20     a couple of things happened.

21           First, I received a very high honor in the state

22     of Massachusetts, called the "Massachusetts Cultural

23     Council Artist Grant in Playwriting and New Theater

24     Works," and it was the first time that I had actually

25     been given such a large award, which came with a cash

1    amount, by national people who were in more

2    conventional theatrical professions.

3        One of them was nominated for an Academy Award in

4    screen writing the following year.  They were all, you

5    know, very highly-placed people in theater, and I began

6    to consider what I could do in the event that I would

7    be adopting as a single woman, and I had a half-time

8    teaching job, teaching outside of my field, teaching in

9    a college in Springfield, a small college, teaching

10   English lit and film studies and creative writing, but

11   9/11 change everything for me.

12       I was actually teaching that morning, and we were

13   all gathered around the monitors, and it had the effect

14   of causing me to sit down and reevaluate, at the age of

15   48, what I really wanted to be doing the rest of my

16   life.

17       I knew that if I stayed in the position I was in,

18   I had been promised a full-time teaching job within a

19   few years, but I really felt that artistically I wanted

20   to do something important, something different,

21   something that I would be a leader and -- myself, and I

22   decided that I would be really interested in becoming a

23   director.

24       Although I had directed groups of people before,

25   and obviously directed all of my own work, I'd never

1   been hired to direct either plays or other work, and I
2   also thought that it would be a terrific idea to go
3   back to school and actually get a degree in this.
4        I was very hesitant until I saw a program on
5   Oprah, and it was this guy named "Dr. Phil," and he was
6   doing a five-part series on Oprah, bringing a group of
7   about 40 people together who were in mid life, who had
8   not realize their dreams, and he was working with each
9   one over the course of the week to find out what
10  obstacles were in the way, and how to be the catalyst
11  to get them to take the biggest risks they needed to
12  take, whether it was to quit a job, or go back to
13  school, or whatever.
14       So I kind of drew inspiration from this, and
15  decided that when I researched all the programs, Yale
16  drama, I had heard of and knew to be the most
17  prestigious directing training program in the country,
18  as far as I knew, so I decided to just go for that.  I
19  wasn't sure what was going to happen, and I put
20  everything into it.  I wrote my essay and I started
21  making all the cuts.
22       The first cut was the -- all the transcripts and
23  the written essay, which was a comprehensive statement
24  of what I had done in my life in my artistic vision,
25  and what I wanted to do, and what I sought to learn,

1    and I got an interview following that, and then I just

2    kept passing all, you know, the hurdles, until I got to

3    the addition.

4    Q.    Okay.

5         Before we move on with that, I just wanted to go

6    back a bit.

7         You mentioned, in your testimony, about the fact

8    that you were thinking about being a single woman and

9    adopting.

10        Was that all about?

11   A.   Well, there had been a man in my life for a long

12   time, and he didn't want to have anymore children, his

13   children were grown, and I had to debate, you know,

14   what would I do?  I had always wanted to have children.

15   I'm from the midwest.  It's very -- I'm very old

16   fashioned.  I really wanted to have children.  I had

17   worked a lot with children, and as I got into my

18   forties, I decided that that would be a priority.

19        And coincidentally, during the year that I applied

20   to Yale, I actually met someone at a conference where I

21   was presenting, and we became involved, but then that

22   didn't work out, and I felt that no matter what was

23   going to happen with the relationship, I would still

24   make that a priority, and I had a certain sum of money

25   in the bank that would guarantee that I would be able

1   to adopt, and initially I was looking at Vietnam, and

2   then there were problems with that country, and I knew

3   I was going to wait for few years, until I completed

4   the Yale degree, and so it turned more in the area of

5   where I'm at now, which is a domestic transracial

6   adoption.

7   Q.   Okay.

8        Now, to get back to the business with Yale, you

9   submitted the written application material?

10  A.   Uh-huh.

11  Q.   And at the drama school, do they also require you

12  to give an audition?

13  A.   Oh, yes.

14  Q.   Okay.

15  A.   If you get -- I mean, there are many steps until

16  you are invited to audition.

17  Q.   Okay.

18       How competitive was it to get into the Yale drama

19  school?

20  A.   Well, it's generally known as being the toughest

21  directing, grueling audition process in the country.

22  Q.   Okay.

23       And did you get in?

24  A.   Yes.

25  Q.   I'm going to show you a Exhibit 2 for

1    Identification, and ask you if this, in fact, is a copy

2    of your letter of admission?

3            MR. NOONAN:  I thought that it was already

4    admitted as an exhibit.  He said "for Identification."

5            MR. WILLIAMS:  Oh, I can -- I wasn't clear on

6    the procedures.

7            Is it automatically in already?

8            THE COURT:  Yes.  If it's part of the

9    stipulation, it's a full exhibit.

10           MR. WILLIAMS:  Okay.  Very good.  Thank you.

11   A.   I believe my first indication was a phone call.

12   BY MR. WILLIAMS:

13   Q.   Okay.  Well, let me ask you that.

14        How was it that you first learned that you'd been

15   admitted into the Yale drama school?

16   A.   I received a phone call from Liz Diamond.

17   Q.   Okay.

18        And is she here in court today, by the way?

19   A.   Yes, she is.

20   Q.   And she is the one and only woman sitting at the

21   defense table here?

22   A.   That's correct.

23   Q.   All right.

24        And what did she say, if you remember?

25   A.   She sounded really excited and she said, "I'm

1   calling to invite you to be part of the class of," and

2   then she couldn't remember the year, and she said

3   "2005," and she was sort of giggling, and it was very

4   exciting.

5       I mean, it's considered a very big deal, like a --

6   less like a university, more like a club sort of thing.

7   Q.   Okay.

8       Now, Exhibit 2 is dated March 28th, 2002, and it's

9   from a man whose last name I can't pronounce, Stan?

10      Well, in any event, it starts with a "W," and he's

11  listed as the "Dean and Artistic Director."

12      Was he still the dean and artistic director when

13  you got there in the fall?

14  A.   That's correct.  He was present as part of the

15  committee that auditioned and decided upon my entrance.

16  Q.   Okay.

17      Was that his last year as the dean of the --

18  A.   Yes, it was.  Yes, it was.

19  Q.   Okay.

20      And this indicated that you would -- you were

21  going to receive notification from the financial aid

22  office, and then in May, an orientation package; is

23  that right?

24  A.   That's correct.  However, Liz Diamond already told

25  me on the phone -- she discussed with me the financial

1  aid situation, and gave me the name of the person to

2  contact.

3       She gave me a couple of pieces of information.

4  She gave me the phone numbers for David Chambers and

5  for Stan to -- she wanted me to call and thank them,

6  and if I wished to find out why it was that I was

7  chosen above all others, whatever, I knew that I had

8  been the only woman chosen, I had been told.

9       I had auditioned once.  Often, people audition

10 more than one year in a row, but I had auditioned once

11 and --

12 Q.   Incidently, I'd like to follow-up on that.

13      How many people were admitted to the directing

14 program in your year?

15 A.   Four that I know of.

16 Q.   Four people?

17 A.   Yes.

18 Q.   And besides you, who were the other three?

19 A.   Steve Fried, Nick Avila and Christopher Carter-

20 Sanderson.

21 Q.   Okay.

22      So you were the only woman in the group?

23 A.   I was, yes.

24 Q.   All right.

25      Now, I'm going to show you Plaintiff's Exhibit 3,

1  which is an unsigned copy a letter from a person named

2  Susan Rochette, Financial Aid Officer, and it's dated

3  April 2nd, 2002.

4      Do you recall receiving that letter?

5  A.   Yes.

6  Q.   All right.

7      Now, this letter indicated what the -- what your

8  budget was, which was, for the year, $30,000, and

9  indicated that they were going to give you a

10 combination of assistance in the form of loans and

11 grants, in the amount of approximately $20,000; is that

12 right?

13 A.   Yes.  I --

14 Q.   And that you yourself were going to be expected to

15 contribute the remaining roughly 10,000?

16 A.   There were living expenses.  There was also a

17 certain amount toward tuition, I learned I would have

18 to pay of, I believe, $3,000 or more.

19 Q.   So that, in fact, you found out that it was going

20 to cost you more than $10,000, didn't you?

21 A.   Well, yes.

22 Q.   Now, did you have any concerns when you received

23 that information?

24 A.   Well, yes.

25 Q.   What were your concerns?

1    A.   I didn't -- I was concerned about the small amount

2    of money I was protecting for the adoption, basically,

3    but something else had happened, and I think that what

4    got referred to earlier, in a sort of global way,

5    didn't really happen like that, which is that when I --

6    I had another offer from another university in a

7    different kind of program, and it was Boston

8    University, and they were essentially offering me

9    what's called a "free ride," and they were going to pay

10   for my housing and pay for everything, but it was to be

11   working in another related field, but in the theater

12   program, and I had mentioned this privately to David

13   Chambers.

14        We had -- I had -- He had interviewed me, so I had

15   spoken with him privately about some of the questions

16   and concerns that I had, but this was after I had

17   spoken with Sue Rochette, and learned that it was fixed

18   and rigid, in terms of what was being offered.

19        The confusion about what happened, I learned from

20   Maria Leviton, who is the registrar, is that in the

21   catalog it would state the average amount of financial

22   assistance that each student received was something on

23   the order of $12,000, and that's a little bit

24   misleading, as Maria Leviton explained to me, and she

25   wasn't sure why that was in there.   I --

1   Q.   Okay.

2   A.   Yeah.

3   Q.   So, did you, in fact, then have a meeting with Ms.

4   Rochette about your concerns?

5   A.   I called her after Liz Diamond suggested that I

6   call her.  Liz said, and I think this is verbatim,

7   "We'd like to make it possible for you to come here, so

8   if you have any questions about the financial package

9   that you're being offered, please call Sue Rochette,"

10  and I did so.

11  Q.   And your -- Did you just talk with her on the

12  telephone, or did you meet?

13  A.   Uh-huh.  Yes, I did.

14       I spoke, first of all, with a colleague of mine.

15  I had been teaching in universities, and so --

16  Q.   Just focus on my question.

17       I asked you about Susan Rochette.

18  A.   Uh-huh.

19  Q.   Did you meet with her in person at any point, or

20  was it all over the phone?

21  A.   After I was admitted.

22  Q.   Okay.

23  A.   This initial was -- phone call was on the phone.

24  Q.   Okay.

25       And I'm going to show you a copy of Defendant's

1    Exhibit A, which is a live (phonetic) packet of -- the

2    first page of which is that same letter that I just

3    showed you, but then there's a lot of calculations

4    (unintelligible), and I would just ask you to take a

5    look at that.

6         As part of your application process for trying to

7    get some financial assistance, --

8    A.   Uh-huh.

9    Q.   -- you had made, I take it, full disclosure, as

10   it's showing there, of --

11   A.   Uh-huh.

12   Q.   -- all of your financial picture; is that right?

13   A.   Uh-huh.  Yes.

14   Q.   Safe to say you weren't getting rich off of your

15   theater work?

16   A.   No.

17   Q.   Okay.

18   A.   I had just gotten a rather large grant though.  I

19   mean, --

20   Q.   Okay.

21        When you say "a rather large grant," can we put

22   that in perspective?  How much was it?

23   A.   $12,500.

24   Q.   Okay.

25        And that was a lot of money for you?

1    A.    Well, that's considered -- it's the -- if not the

2    largest sum of a grant you can get in the country, one

3    of the top.

4    Q.    Okay.

5    A.    It's a merit-based grant, --

6    Q.    Okay.

7    A.    -- based on the quality of your work, and so they

8    give you a check, and I got to buy real furniture.

9    Q.    Did you and Ms. Rochette have a conversation about

10   the financial aid package, in which you tried to

11   explain to her your wish, as a woman at the end of her

12   40s, --

13   A.    Yes, I--

14   Q.    -- to adopt?

15   A.    I had spoken with a colleague just to ask, you

16   know, "Can somebody negotiate" --

17          MR. NOONAN:   Your Honor, I'm going to object

18   at this point.

19          The question was about her conversation with

20   Ms. Rochette.

21          THE COURT:   The question can be answered

22   "Yes" or "No," so I think, Mr. Williams it would -- we

23   can move things right along if the witness would listen

24   to the question.  If the question can be answered "Yes"

25   or "No," she should answer it "Yes" or "No."

56

1          If you wish to follow up then, of course, you are

2     free to do so, but she does tend to --

3     BY MR. WILLIAMS:

4     Q.   Could you answer the question "Yes" or "No," if

5     you remember it?

6     A.   Yes.

7     Q.   Okay.

8          What was that conversation?

9     A.   It was pretty brief.  I -- The content --

10    Q.   Specifically, did you explain to her that you were

11    trying to set aside enough money to be able to adopt?

12    A.   I said that I looked at the numbers and I had some

13    concerns, and I was wondering how much money it was --

14    personal money I would have to invest, and I had some

15    concerns about that, and was there any other way to

16    crunch the numbers, and she said "No," and she said, "I

17    guess you're going to have to decide between motherhood

18    and Yale drama."

19    Q.   Did that kind of trouble you?

20    A.   Yes.

21    Q.   In what way?

22    A.   I -- It seemed to cross a boundary and sounded

23    very, to me, what I would call "retro," something you

24    might hear in the '70s, what women were told, and it

25    primarily just, I felt, crossed a boundary.

1    Q.   Okay.

2         Did you complain about that to Ms. Diamond?

3    A.   I left a message for Ms. Diamond because she asked

4    me to leave her a message after I spoke with Sue

5    Rochette, if I had any ongoing concerns or questions.

6    Q.   Okay.

7         Now, was that all before you actually had arrived

8    to take up residence in New Haven?

9    A.   That was the spring that I was -- received the

10   phone call inviting me to enter.

11   Q.   Okay.

12        Eventually, did you decide to just let it go, move

13   on?

14   A.   I made an appointment to meet with David Chambers.

15   We had a talk.  I felt really excited about coming, and

16   he was the first year directing teacher, and I said,

17   "You know, I'm going to bite the bullet."

18   Q.   Okay.

19        Incidently, Mr. Chambers is here today, isn't he?

20   A.   Yes.

21   Q.   All right.

22        And he's the gentleman sitting next to Attorney

23   Noonan; is that right?

24   A.   Yes.

25   Q.   Okay.

1         When did you arrive in New Haven?

2    A.   I moved the end of August.

3    Q.   Okay.

4         Found an apartment near Yale?

5    A.   Uh-huh.   Yes.

6    Q.   Okay.

7         And when did -- When did classes start?

8    A.    I think the orientation was right in the beginning

9    of September, maybe right after Labor Day.

10   Q.   Okay.

11        When was it that you first got to meet the other

12   three -- the three men who had been accepted into your

13   program?

14   A.   At the orientation.

15   Q.   Okay.

16        And one of those was Christopher Sanderson; is

17   that correct?

18   A.   That's correct.

19   Q.   All right.

20        Now, before you had met him, had you ever heard

21   about him, or heard of him?

22   A.    Or actually, I didn't answer that.   I knew Steve

23   Fried before the orientation.

24   Q.   Okay.

25        Well, I'm not asking about him, I'm asking --

1    A.    Uh-huh.

2    Q.    -- about Christopher Sanderson.

3    A.    Uh-huh.

4          I met Christopher Sanderson at the formal

5    orientation.  We shook hands.

6    Q.    Okay.

7          Subsequently, did you have any interactions with

8    Mr. Sanderson that, in any way, made you feel

9    uncomfortable?

10   A.    Yes.

11   Q.    Tell us about that, please?

12   A.    He asked me for a ride after that orientation, a

13   ride to the health center.

14   Q.    And the Yale Health Center is a facility for

15   members of the Yale community, that provides kind of a

16   comprehensive community-based health care; is that

17   right?

18   A.    It was our health program.

19   Q.    Right.

20         And located right in the midst of the Yale campus,

21   correct?

22   A.    That's correct.

23   Q.    All right.

24         And I presume you gave him a ride, right?

25   A.    I did.

1  Q.   Did anything happen in the course of that drive --

2  A.   Uh-huh.

3  Q.   -- that concerned you?

4  A.   Yes.

5  Q.   What was it?

6  A.   Well, some of the things that he told me, and

7  questions he was asking.

8  Q.   What did he say?

9  A.   I can't remember everything he said, but one line

10 of conversation was that he was talking a lot about he

11 wanted to know about the psychiatric benefits.  He

12 asked a number of questions about the psychiatric

13 benefits at Yale Health, and when he initially asked, I

14 said I didn't know anything about it, and he wanted --

15 he just kept asking specific questions about that.  "Do

16 you know, you know, how often we can see a

17 psychiatrist, and under what circumstance?", and I kept

18 saying, "I have no idea.  I have no idea."

19      And then he told me that he was severely

20 traumatized by 9/11, and I asked him, "Oh, were you

21 downtown?  Were you there?", and he said no, he was in

22 New Jersey, at which point I kind of was more

23 restrained.  I wasn't really sure.

24      You know, I asked him, well, did he have relatives

25 in 9/11, he said "No," and his manner of speaking and

1   simply his manner of gesturing next to me in the car,

2   as a woman I can't quite verbalize this, but I felt

3   uneasy, we used to just say.  If somebody gives you the

4   creeps, you don't want to be alone in the car with

5   them, and I just felt this general sense of unease,

6   kind of a hard edge, and saying some things that were a

7   little bit odd and not common, not odd like, "Oh,

8   that's funny," but odd like, "That's very weird."

9   Q.   Did you, after that experience, make any inquiries

10  around about --

11  A.   I did.

12  Q.   Okay.

13       Who did you talk to?

14  A.   I contacted a colleague of mine who teaches in the

15  undergraduate theater program and Yale University.

16            MR. NOONAN:  I'm going to object to anything

17  the colleague might have said to her.

18            MR. WILLIAMS:  I didn't offer anything the

19  colleague said.

20            THE COURT:  He hasn't asked.

21            MR. NOONAN:  I understand, but the answers

22  tend to --

23            MR. WILLIAMS:  I know the rules, Judge.  I

24  wasn't intending to do that.

25  BY MR. WILLIAMS:

1    Q.   And who was the colleague you spoke to?

2    A.   Deb Margolin (phonetic).

3    Q.   All right.

4         What position did she hold at the university?

5    A.   At that time I don't know what her exact ranking

6    was.  She's moved up the ranks.  She was like an

7    assistant professor, playwriting, theater.

8    Q.   In any event, did she, without telling you --

9    telling us what she said, did she, in fact, tell you

10   something about Mr. Sanderson?

11   A.   Yes.

12   Q.   And what was your reaction to what she had told

13   you?

14   A.   Alarm.

15   Q.   And did you do anything about the alarm that you

16   felt as a result of what this professor had told you?

17   A.   I did do one thing.

18   Q.   What was that?

19   A.   That -- Because I was advised to do so, to keep my

20   distance, somewhat.  I didn't want to.  I was in

21   conflict.  I wanted to be part of the tight quartet,

22   but there was confirmation of what I perceived, and I

23   decided not to sit next to him in large classes, and

24   not to really engage, --

25   Q.   Okay.

1   A.   -- and I kept it to myself, and then told a fellow

2   student.

3   Q.   Who was the fellow student you told about it?

4   A.   He was a third year student.

5        Do I have to disclose all the students' names?

6   Q.   No, that's okay.

7   A.   It was a man.  It --

8   Q.   Okay.

9   A.   A man.

10  Q.   And did anything further happen at that stage,

11  that gave you concern with regard to Mr. Sanderson?

12  A.   Yes.

13  Q.   What was that?

14  A.   Well, that he did a lot of unusual things that

15  seemed to have somewhat of a violent edge, in the first

16  two weeks.

17       I remember vividly, Steve Fried and I entering a

18  room, I forgot the name of it, but it's where we had

19  our Drama 50, and we entered the room and Mr. Sanderson

20  was literally hanging from the rafters, and then he

21  would do things like this, and then jump down really

22  hard and make a loud noises, and Steve turned to me and

23  said, "That guy really scares me," and I said, "He

24  scares me too."

25  Q.   Okay.

1          Did you, in any way, pass any of that on to

2     anybody on the faculty?

3     A.   I did decide to, after speaking with the third

4     year student again.  He advised me, if I were anxious,

5     to speak with Liz Diamond.  He thought she would be

6     very helpful.

7     Q.   Now, what position did you understand that Ms.

8     Diamond held at the university, at that point?

9     A.   She was the interim chair of acting, --

10    Q.   Okay.

11    A.   -- taking over from Stan.  I thought --

12    Q.   All right.

13    A.   I may be confused about that.  I know Stan was the

14    dean, and I thought the chair of directing, but I

15    thought that Liz was the interim chair of directing.

16    Q.   Okay.

17         And so did you, in fact, meet with her on that

18    subject?

19    A.   Well, at first we spoke on the phone.

20    Q.   Okay.

21         And what happened in that conversation?

22    A.   She verbally attacked me.

23    Q.   Okay.

24         Well, let's start by seeing what led into that.

25         What did you say to her?

1   A.   I had left her a message that I wanted to speak to

2   her, and that I had received some information that I

3   found alarming about a male classmate, and that I was

4   seeking her guidance in being part of this quartet,

5   simultaneously with what I've heard -- what I heard,

6   that there really needed some advisement on this.

7   Q.   Okay.

8        And what did she say in response to that?

9   A.   When we spoke on the phone?

10  Q.   Yeah.

11       Oh, incidently, in that phone conversation, did

12  you actually mention his name?

13  A.   No, never.

14  Q.   Okay.

15       Now, what did she say in the telephone -- You say

16  that she verbally attacked you.

17       What did she say?

18  A.   She was furious.  She was, from the start,

19  furious.

20       She accused me of a number of things.  One of them

21  was I was coy because I wouldn't disclose his name, and

22  I said that I'd rather not focus on who it was, but on

23  the dynamics of the quartet, and how to guide me, as a

24  woman, through this quartet that I would be in for

25  three years, and given the information that I had been

1    given, and then she accused me of withholding some of
2    the information.
3         She accused me of being coy for not disclosing the
4    source of the information, which I had not been given
5    permission to disclose, by Deb Margolin, at that point,
6    she wished to remain anonymous, and then she accused me
7    of making what she called a "preemptive first strike in
8    order to avoid future critiques," which I didn't
9    understand at all, and I was getting more and more
10   afraid of her reaction, and realizing that she was
11   obviously really angry about something, and she then
12   yelled at me on the phone, "Okay, c'mon, let's just
13   face it, this f'ers name," F-U-C-K-E-R, "is Chris
14   Sanderson, isn't it?"
15   Q.   She used that word?
16   A.   Oh, yeah.  She -- Yeah.
17   Q.   Okay.
18   A.   People are pretty candid, but she actually said
19   that, at which point I thought, "Okay, somehow I -- The
20   student who steered me toward her probably shouldn't
21   have, or there's something going on here I don't know
22   about," and then she called me into her office.  She
23   said, "I want to see you immediately," and I then met
24   her in her office.
25   Q.   Can we place that, in terms of time, by the way?

1  About when was that?

2  A.   The second week of school.

3  Q.   Okay.

4       So -- And school started, you said, right after

5  Labor Day?

6  A.   End of the second week of school, I think.

7  Q.   Okay.

8       So did you, in fact, report promptly to her

9  office?

10  A.   I did.

11  Q.   Same day?

12  A.   I did.

13  Q.   And what happened?

14  A.   Well, she said a number of things to me.  She was

15  still angry.  She said, "I'm really angry at you for

16  bringing this information to me.  What do you expect me

17  to do about it?", and I said, "I am only seeking some

18  guidance.  You're also a woman, and we're both small of

19  stature," and this guy was not, and I said, "Look, I

20  just want to work out in this quartet, and I'm really

21  anxious right now, about both what I've heard, mostly

22  what I've heard in my direct experience of what people

23  are saying about him, what we're seeing, and I'm

24  anxious about that.  Can you give me some guidance?

25  I'm sure I'll be dealing with a lot of different kinds

1    of people as a director and at this school.  What would

2    you recommend?"

3         And she said, "You can get somebody dismissed by

4    telling me this.  I am really angry that you brought

5    this information to me.  You can handle this with one

6    hand behind your back.  Oh, come on, he's just a

7    pussycat, and then I just grew very, very silent, and

8    she said, "I think you should see a psychiatrist."

9    Q.   She said you should see a psychiatrist?

10   A.   That's correct.  She said, "If you're feeling that

11   anxious, I think that you ought to go see a

12   psychiatrist."

13   Q.   What happened then?

14   A.   Nothing.  I just wanted -- I wanted to leave her

15   office.

16   Q.   And you did leave?

17   A.   And I did.  I thanked her for her time and I left.

18   Q.   Now, by this point, I'm sure you were taking

19   classes, correct?

20   A.   Yes.

21   Q.   Okay.

22        And was one of those classes taught by Frank Deal?

23   A.   You know, Frank Deal was to teach a workshop on

24   creative collaboration, and I believe he taught one

25   class to the actors, I don't know whether he taught all

1    year, called "Theater Games."

2    Q.   Okay.

3    A.   I didn't know him.

4    Q.   All right.

5         This Drama 50, --

6    A.   Uh-huh.

7    Q.   Is that a mandatory class for the first year

8    directing students?

9    A.   Yes.  It was a project, yeah.

10   Q.   I beg your pardon?

11   A.   It's a project.

12   Q.   Okay.

13   A.   It's a production project.

14   Q.   You know, in law school we don't do it -- at least

15   in my day, we didn't do it that way, so I'm having

16   trouble connecting, but I -- I'll figure it out.

17   Q.   I think we had -- Exhibit 4-C describes Drama 50-A

18   as follows, and if I may, I -- I'll just read that.

19        The title is, "The collaborative process."

20        "A laboratory workshop in collective something

21        designed for first" -- Let me read it from a

22        better copy than that.

23        "A laboratory workshop in collective creation

24        designed for first term actors, dramaturs and

25        directors who are divided into four discrete

1          ensembles.  Drawn from a single narrative source
2          work selected by faculty, a literary text,
3          historical event, painting or musical composition.
4          Each group, over the term, develops and rehearses
5          an assigned portion of this selected work.  A
6          final showing of the four ensemble creations in
7          narrative sequence is presented to the full school
8          late in the term.
9          The goals of the project include nonhierarchical
10         collaboration, the exercising of the techniques of
11         the students' chosen field of pursuit, collective
12         imagining an execution, and a sharing of
13         individual theatrical talents."
14         And it says that its taught By David Chambers,
15    Katharine Sheehy and Evan Yionoulis, Y-I-O-N-O-U-L-I-S.
16         How frequently did that class meet?
17    A.   I'm sorry, we met a lot.  I can't remember the
18    exact frequency of that, but it was the major
19    production project of our first semester, --
20    Q.   Okay.
21    A.   -- and it was prefaced by this workshop.
22    Q.   Okay.
23         And did Professor Chambers here, in fact, teach
24    that course?
25    A.   Well, it's not like they taught that.  They would

1    come in sometimes, but we were on our own.  It wasn't a

2    class, you know, like a lecture class.  It wasn't -- It

3    was a production project.

4    Q.   Okay.

5         And what about Katharine Sheehy?

6    A.   Well, Katherine -- It represented three different

7    groups of students, the dramaturgy students, and

8    dramaturgy students are the students who interpret

9    plays, and that's just a simplistic answer, and actors

10   and directors.

11   Q.   Okay.

12        And she was responsible for a particular segment

13   of that; is that it?

14   A.   No, I -- The --It was interdisciplinary.

15        David Chambers, Kathryn Sheehy and Evan Yinoulis

16   were all -- they were the team, --

17   Q.   Okay.

18   A.   -- you know, that sometimes one of them would come

19   in, not early on, they didn't really interfere early

20   on, they would just come in later.  They might watch a

21   late stage rehearsal.

22        I know David was there when we were setting, you

23   know, dress rehearsal, setting them.

24   Q.   And what about Evan Yionoulis, who is she?

25   A.   Oh, Evan Yionoulis was the acting teacher.

1   Q.   Okay.

2       Now, besides the four of you who were in the

3   directing program, and I -- were all four of you in

4   attendance at the same time at this class?

5   A.   At the workshop?

6   Q.   Uh-huh.

7   A.   Yes.

8   Q.   I call it a "class."  I know --

9   A.   No.  No, there was a preliminary training workshop

10  that Frank Deal taught, and then there was Drama 50.

11  Q.   Oh, I --

12  A.   This was the --

13  Q.   -- see.  So it's not one in the same thing.

14  A.   Well, no.  We were the same group, but there was

15  an orientation at which Evan Yionoulis and Katherine

16  Sheehe showed films and talked about famous people in

17  theater who worked collaboratively, and then we had

18  this workshop with Frank Deal, and then we were on our

19  own.

20  Q.   Okay.

21      So, at what point did you enter into the part that

22  Professor Deal was running?

23  A.   That was -- There were two Saturdays.  One was the

24  -- September 14th, I believe, and the other was

25  September 21st.

1   Q.   Okay.

2        And on one of those, was Metamorphosis Revisited

3   on the agenda?

4   A.   Well, no, not exactly.

5   Q.   Tell us about that.

6   A.   That was inaccurate.

7        The culmination of the workshop was an assignment

8   that each group -- and we were divided up according to

9   having one directing student in each group, and the

10  task was to take a whole lot of different elements and

11  really quickly put together a skit collaboratively, so

12  I was with my group, and we got all the elements and we

13  put together -- it was a very mundane skit, and then

14  two guys came up to me, who were in it, both actors,

15  saying, "We can't think of the title.  Give us the

16  title."  And I had just seen Metamorphosis on Broadway,

17  and so I (unintelligible), I said, "What about

18  'Metamorphosis Revisited,' and they went "Great."

19       So that's what I thought the title of our skit

20  was.

21  Q.   Now, had you all kind of rehearsed this together?

22  A.   No, there was no time to really rehearse it.  We

23  just decided on it, and kind of, you know, "You go

24  here.  I'll go there.  Here's the cue for you.  You

25  start on the stage."

1   Q.   Okay.

2   A.   And so we had our, like play book.

3   Q.   So you -- And who were the other students, besides

4   yourself, who participated in this particular thing?

5   A.   The two actors?

6   Q.   Yeah.

7   A.   Okay.

8        You want me to name the actors?

9   Q.   Yeah.  Uh-huh.

10  A.   Okay.

11       Both of their names were "Jeff."

12  Q.   The two Jeffs.  Okay.

13  A.   Uh-huh.  We called them "The two Jeffs."

14  Q.   All right.

15  A.   Jeff Barry and Jeff Withers.

16  Q.   Okay, and so it's you and the to Jeffs.

17       Anybody else --

18  A.   And there were two others.  I don't remember.  I

19  believe they may have been dramaturgy students.  They

20  were sort of in the background, on stage.  They were

21  behind me.  I was placed -- My position was supposed to

22  be front and center stage.

23  Q.   Okay.

24       And then do you recall who the two dramaturgy

25  students were?

1    A.   I actually don't.

2    Q.   Okay.

3         So anyway, there's a total of, what is that, five

4    people?

5    A.   Yes.

6    Q.   Five students?   Uh-huh.

7         And, by the way, how did you fit in, age wise,

8    compared to the others in your class?

9    A.   How did I fit in?

10   Q.   Yeah, compared to them?

11   A.   I was the oldest at the -- not just of the class,

12   but at the school.   I was --

13   Q.   In the whole school?

14   A.   I think I was the oldest student in the school.

15   I'm not sure.

16   Q.   Okay.

17   A.   I was 49, and most -- I was told it that it was

18   the youngest class they'd ever taken, my year.   I think

19   the average age was 22.

20   Q.   Oh.

21        And the two Jeffs, were they right out of college?

22   A.   One of them was not.

23   Q.   Okay.

24   A.   One of them had gone to Dartmouth.   I don't know

25   if he had just come from school or been out for a year,

1   but one of them had been out.

2        The -- Jeff Barry had been out for about five

3   years, working professionally.

4   Q.   Okay.

5        So I think that would have put both of them in

6   their twenties somewhere, correct?

7   A.   Yeah, they were mostly all in their 20s.

8   Q.   Now, in any event, you three had worked out,

9   roughly, what was going to be in this skit?

10  A.   Well, there were five.  There were two other

11  people.

12  Q.   And they participated in that?

13  A.   Oh, yeah.  There -- It was a really mundane skit.

14  We had to do it really quickly and --

15  Q.   I understand that, but was --

16  A.   I can't even -- It was like, I'm on the stage and

17  it's like I'm in a house, and then one of the Jeffs was

18  supposed to answer and open the door of the house.  It

19  was a completely mundane -- Like we had this list of

20  things like, "Where is your destination?  Who is on

21  stage?  Who is going to enter the stage?"  I mean, it's

22  sort of basic -- the culmination of it, and --

23  Q.   Real simple, garden variety stuff?

24  A.   Yeah, not very, you know, --

25  Q.   Okay.

1    A.   And it had happened very in -- mutually.  "Oh, you

2    go here, I'll go there.  Okay.  Whatever," and we got

3    better.

4    Q.   Now, let's see if we can put this in a setting.

5         Does this occur in kind of a theater setup, like

6    we have a stage and an audience and --

7    A.   We were on the stage, although the group before us

8    performed on the floor.

9    Q.   I'm not interested in them.  I want to know about

10   you.

11   A.   Okay.

12   Q.   So you -- you're in a theater?

13   A.   Yeah.

14   Q.   And it's part of the Yale drama school, it has

15   this theater, correct?

16   A.   Yeah, it was a small theater.

17   Q.   A small theater.

18   A.   Yeah.

19   Q.   I guess in a theater school you have to have a

20   theater.

21        So you're on the stage, you and the two Jeffs, and

22   then somewhere also on the stage behind you, the two

23   dramaturs?

24   A.   Well, the two Jeffs were off stage, ready to make

25   their entrance.

1    Q.   Okay.

2    A.   I was the person who was designated to be standing

3    on the stage.

4    Q.   Okay.

5    A.   So I was standing on the stage just waiting.

6    Q.   Okay.

7         Now, who's in the audience?

8    A.   All the other classmates.

9    Q.   Okay.

10        And Professor Deal?

11   A.   Yes.

12   Q.   And did something then happen, that took you by

13   surprise?

14   A.   Yes.

15   Q.   Okay.

16        And incidently, before I ask you about that, when

17   exactly was this?  Do you recall the date?

18   A.   September 21st.

19   Q.   This is September 21st, 2002?

20   A.   Yes.

21   Q.   Okay.

22        So you're standing on the stage, the two Jeffs are

23   in the wings waiting to make their entrance, --

24   A.   Uh-huh.

25   Q.   -- the two dramaturs are somewhere behind you, all

1    your fellow students are in the audience, a lot of them

2    are in the audience, along with Professor Deal, what

3    happened?

4    A.   Well, Frank Deal came out center, in front of me,

5    and he said, "Metamorphosis Revisted," and then he

6    goes, "or", and really loudly, he yells out, "Rock Out

7    With Your Cock Out."

8    Q.   Your reaction was?

9    A.   Well, I just -- I felt like somebody hit me with a

10   board.  I thought that he had originated that, given

11   what had just taken place before that, so I thought it

12   was coming from him.  Like it -- My first thought

13   wasn't, "Oh, the guys have changed everything," or "The

14   guys went up and did that."  I tend to be really

15   trusting.  They came to me and said, "We just can't

16   think of a title," so it didn't occur to me that they

17   would have gone to Frank Deal and say, "Okay, here's

18   the title, 'Metamorphosis Revisited,' but that was

19   Sally's idea.  We're gonna give you an alternate

20   title."  That never crossed my mind.  I felt that the

21   instructor had thought that up at -- in the moment,

22   because he was doing things that were really kind of

23   provocative anyway, so --

24   Q.   Okay.  I'd like to ask you about that.

25        You said that there was something that happened in

1    the skit before yours.

2    A.   Right.

3    Q.   What was that?

4    A.   Well, people would do their skits.  We were the

5    third one up, and I couldn't figure out what was going

6    on in there.  It was supposed to be a course in

7    creative collaboration, based on some really

8    magnificent, renowned work we had seen, like the day

9    before, of Tiatra DeSolay and Joseph Chakin, so I was

10   really looking forward to this, and it turned out to be

11   kind of like a, I don't know, maybe it is -- I don't

12   know what it is.

13        He would give different instructions to every

14   group based on, I'm not sure.  It was my understanding

15   we were all supposed to be learning how to creatively

16   collaborate to prepare to do a piece on Homer's

17   Odyssey, and I'd already had years of experience doing

18   similar kinds of things, and I couldn't figure out what

19   he was doing.

20        The group before me, after they presented their

21   little skit, which had to do with being in outer space,

22   he told them to stip their clothes off to their waist,

23   and the fact that he used the word "strip," which I

24   think is a very provocative word to use in the

25   classroom, and that they looked kind of shocked at the

1  instruction, and he said, "The girls don't have to do

2  it," but I saw one of my directing classmates not

3  looking thrilled, and yet, they all had to do it.  I

4  mean, we were students.  I may have been 49, but we

5  were students.

6      And so they took off their clothes to their waist,

7  and I'm sitting there going, "What is going on here?",

8  and in the meantime, the students were getting pretty

9  excited.  I mean, it seemed like, "Wow, this is really,

10 I don't know, exciting," or something.  I became more

11 concerned.  I know a couple of us were more concerned,

12 in the directing program.

13         MR. NOONAN:  Objection, Your Honor, as to

14 what other people were feeling.

15         THE COURT:  Sustained.

16         MR. WILLIAMS:  Not claimed.

17         THE WITNESS:  Okay.

18 BY MR. WILLIAMS:

19 Q.  All right.

20     And then Professor Deal shouted out this was gonna

21 be "Rock Out With Your Cock" --

22 A.  "Rock Out With Your Cock Out," and so I thought it

23 was coming from him because he had given that

24 instruction.

25 Q.  What happened?

A.   Wow, nothing that we planned collaboratively.   All
the sudden, one of the Jeffs ran on stage.   I looked to
the other one, who was supposed to making -- be making
eye contact with me, Jeff Withers, to make his entrance
over to me, and he wasn't even looking at me.   That
was, in some ways, the scariest moment.   He was not
looking at me at all.   He was looking at the other
Jeff.

      So I'm looking at him.   He's looking at the other
Jeff, and all of the sudden I hear everybody start
laughing, and I look to my left and I see that Jeff
Barry is dramatically gesticulating masturbating, and
the students are laughing, and I don't know what's
going on, and I think, in retrospect, what was so funny
was that there was a woman standing on stage clueless,
bewildered, shocked, and also I was older, I was -- I
obviously dressed differently, I didn't wear blue jeans
and tee-shirts, and I think they thought I was a very
uptight person and they were pulling a prank, and that
-- it was very funny to the students because I didn't
know what was going on.   That was, I think, an
essential part of the humor, to have somebody up there
who --

             MR. NOONAN:   Objection, Your Honor, as to
what other people were thinking and --

1           MR. WILLIAMS:  I think she's describing her

2   feelings.

3           THE COURT:  Sustained.

4           MR. WILLIAMS:  It's a way of describing her

5   feelings, and I think that's appropriate.

6           THE COURT:  Not if she's characterizing how

7   other people felt.

8   BY MR. WILLIAMS:

9   Q.   And so now please continue.

10  A.   Okay.

11       So --

12          MR. NOONAN:  Well, I object to that, Your

13  Honor.

14          Could we just have a question rather than

15  continuing a monologue?  She answered the question.

16          MR. WILLIAMS:  Fine.

17  BY MR. WILLIAMS:

18  Q.   What happened next?

19  A.   They cheered.

20  Q.   And then what happened?

21  A.   Frank Deal yelled, "That was great.  This time do

22  it again, only really cum."

23  Q.   How did you feel during all of this?

24          MR. NOONAN:  Objection, --

25  A.   I didn't know my --

```
 1            MR. NOONAN:  Your Honor, I --
 2     A.    -- place on the stage.
 3            MR. NOONAN:  Your Honor, objection.  Your
 4     Honor ruled on the lack of emotional distress in this
 5     case.
 6            MR. WILLIAMS:  No, Your Honor.  This is about
 7     the effect on the educational experience.  It's one of
 8     the statutory prongs.
 9            MR. NOONAN:  Your Honor has ruled there's no
10     non-economic damage in this case.  We --
11            MR. WILLIAMS:  That's not --
12            MR. NOONAN:  We have a --
13            MR. WILLIAMS:  It's not --
14            MR. NOONAN:  We --
15            THE COURT:  The objection is sustained.
16            MR. WILLIAMS:  All right.
17     BY MR. WILLIAMS:
18     Q.    And what happened next?
19     A.    We had to start it all over, except I didn't
20     really didn't know what it was, and he also -- Frank
21     Deal also told us to do a group orgasm.
22     Q.    And what happened?
23     A.    What happened on the stage?
24     Q.    Yeah.
25     A.    We all linked arms and tried to approximate, you
```

know, breathing together, like, I don't know what -- I
was basically in shock, and thinking,, "I'm a student
now.  I better do whatever I'm told," and then Jeff
Barry started masturbating again, not with his clothes
off, but gesticulating masturbation, and he's in a
very, you know, wild and uninhibited way, and the
students started laughing again, they started cheering
again, and I debated in my mind -- Can I say this?

Q.   Go ahead.

A.   Okay.

     What went through my mind was --

          MR. NOONAN:  Well, I object, Your Honor.  It
really is irrelevant what was going through her mind.
In light of Your Honor's rulings, it is totally
irrelevant what's going on in her mind.

          MR. WILLIAMS:  It's not irrelevant, Your
Honor, and it's not with -- it's not about damages.
It's about what was happening to the educational
experience, which is what Title 9 is about.

          MR. NOONAN:  That's damages.  Objection.

          THE COURT:  Sustained.

BY MR. WILLIAMS:

Q.   Go ahead.  Tell us what happened.

A.   What happened was they started cheering again.
They were laughing and cheering, and I finally thought

1    I couldn't really be a part of it anymore, and I

2    started to walk off the stage, and one of the male

3    students put his arm up to stop me, so I stayed.

4        I lingered a few moments longer, and then I

5    stepped off the stage just as he was, I guess, cuming,

6    and everybody cheered.

7    Q.   And this is September 21st, 2002?

8    A.   My birthday.

9    Q.   Your birthday.

10       What happened next?

11   A.    What happened next.

12   Q.   What did you do about it?

13   A.   What did I do about it.

14       Well, there was one more skit and the class ended.

15   I stayed for the rest of the class.

16       I went home.  I sat in my kitchen.

17       I'm not supposed to describe what went through my

18   head?

19   Q.   Correct.

20   A.   Okay.

21       I sat in the kitchen for three hours without

22   moving.  I cried.  I called Evan Yionoulis.

23   Q.   And describe that conversation.

24   A.    I said to her that I was calling because I felt

25   deeply offended, and ashamed that I had participated in

1    a classroom experience that shocked me, that I didn't

2    ever anticipate would be part of the Yale School of

3    Drama or this preparation, and I was completely

4    bewildered about how it was allowed to happen, and what

5    the point was, and that in any other circumstance

6    professionally, which I was not currently in, I would

7    have immediately left the stage, and that it was

8    obvious that a prank had been played, and I still was

9    not sure whether Frank Deal had thought up Rock Out

10   With Your Cock Out, or the students playing a prank

11   had.

12   Q.   And what, if any, reaction did Professor Yionoulis

13   have?

14   A.   She listened and she thought of some

15   justifications.  She said perhaps that Frank Deal was

16   trying to get the actor to fully commit to his actions,

17   and I questioned that and said, "But it's not an acting

18   class.  We have acting class."  This was a class in

19   learning how to creatively collaborate a piece, and

20   that was not a collaboration.

21        And I also -- I believe I expressed a little bit

22   of Steve Fried's concern that he had talked to me

23   about, and I said, "You know, maybe they're playing the

24   prank because I'm the only woman director, and

25   evidently there's some -- there's always some conflict

1   between actors and directors.  I don't really know."  I
2   was new to traditional theater.
3   Q.   Did anything further transpire during that
4   conversation?
5   A.   She just said that she would look into it.
6   Q.   What, to your knowledge, was the next thing that
7   happened with regard to that matter?
8   A.   To that matter?
9   Q.   Yes.
10  A.   I wasn't sure it was that matter, but I received a
11  phone call four days -- four mornings later, Wednesday
12  morning, from David Chambers, a message.
13  Q.   It was on your voice mail?
14  A.   It was, yes.
15  Q.   Okay.
16       And what was the message that he left you?
17  A.   That I was to show up in a meeting on Friday
18  afternoon.
19  Q.   And that would've been the twenty-sixth?
20  A.   I think it's the twenty-seventh.
21  Q.   And -- All right.
22       And what happened at the -- Or strike that.
23       Did he tell you where the meeting was going to be
24  held?
25  A.   He told me where the meeting was going to be held

1   and he said, "From time to time we just have meetings
2   to check in with students, and see how the work is
3   going."
4   Q.   And did you then do anything, before just showing
5   up at the meeting?
6   A.   Excuse me?
7   Q.   Did you do -- show up at the meeting, or did
8   something else happen?
9   A.   We -- Yeah, we have a directing -- a first-year
10  directing seminar Thursday morning, in which three out
11  of four of us complained about Frank Deal's class.
12  Q.   And to whom did you complain?
13  A.   David Chambers.
14  Q.   And this was after Professor Chambers had left you
15  that voice mail message?
16  A.   That's correct.
17  Q.   And what -- You say three out of the four of you.
18       Who were the other two who complained?
19  A.   Steve Fried and Christopher Curtis-Anderson.
20  Q.   Okay.
21       What was said by all of you, to Professor Chambers
22  at that meeting?
23           MR. NOONAN:   Well, I'm gonna object, Your
24  Honor.   I think it's got to be one at a time rather
25  than the whole group.

1          THE COURT:  It's got to what?

2          MR. NOONAN:  I think it's going to be one at

3   a time rather than the whole group.

4          MR. WILLIAMS:  Well, I would like to assume

5   that it wasn't each of them sitting up, in turn, making

6   speeches, but that there was a conversation, and if

7   it's a conversation, I think the best way to describe a

8   conversation is to --

9          THE COURT:  Well, let's start off with the

10  plaintiff.

11         MR. WILLIAMS:  I'm sorry, Judge?

12         THE COURT:  Let's start off with her.

13         MR. WILLIAMS:  Okay.

14  BY MR. WILLIAMS:

15  Q.   What did you say to Professor Chambers?

16  A.   Well, I didn't lead the conversation, but I --

17  Q.   Oh, okay.

18  A.   -- I --

19  Q.   Well, that's all right.

20       Then who start -- Who went first?

21  A.   I believe it was Chris Sanderson.

22  Q.   What did he say?

23  A.   He really had an issue with a couple of things

24  about that workshop.

25       One of them, of course, was that he was told to

1   strip off his clothes down to his waist, and he was the

2   second oldest directing student, and he said, "You

3   know, look," I'm -- "my body is not in such great

4   shape, and besides, I don't know" what -- "the rhyme or

5   reason to that, and I didn't necessarily want to take

6   my clothes off."

7        And he also had an issue with something that

8   Frank Deal was attempting to teach, which he said was

9   not taught precisely.  It was a method developed by

10  someone he trained with, and he said it was inaccurate.

11       And then Steven Fried spoke about his concerns

12  and --

13  Q.   And what did he say, in that respect?

14  A.   Steve just said he really had some concerns about

15  what had taken place all the way around.  He agreed --

16  He was concerned about the instruction to strip their

17  clothes.  He felt that what had happened in my group

18  was questionable, and he was mostly concerned that the

19  two actors who did play the prank with me, as well,

20  what he said, you know, "Could get away with that."

21       In other words, he was aware of the history of how

22  actors can be director-proof and not take instructions,

23  or whatever, or not be collaborative, and he was

24  concerned about the fact that they would play a prank

25  like that.  He knew that I didn't know what was going

92

1    on.   So I think he had concerns about that.

2    Q.    And then did you speak?

3    A.    Yes.

4    Q.    What did you say?

5    A.    I said I already registered with Evan Yionoulis,

6    what it felt like for me, and if any of my tuition

7    money -- I just want to add, if any of my tuition money

8    went toward that class, I'd like a refund, and David

9    Chambers took notes, and he looked at all of us and he

10   said he would look into a it.

11       He said he had never seen Frank Deal teaching this

12   workshop, and he took it seriously.

13   Q.    And what was the next thing that happened?

14   A.    Friday I had directing seminar, the three-year

15   directing seminar.  It was our first presentation, my

16   first presentation for a production plan --

17   Q.    Okay.

18   A.    -- design.

19   Q.    And was that the day that you had the meeting?

20   A.    Yes, that afternoon.

21   Q.    Where did that meeting take place?

22   A.    It took place in -- Was in Liz's -- I think it was

23   -- It wasn't David office.  I think it was Liz's

24   office.

25   Q.    And that office is at the drama school?

1    A.    On campus, yeah.

2    Q.    Okay.

3          Who was present at that meeting?

4    A.    Liz Diamond, David Chambers and myself.

5    Q.    Okay.

6          And describe what happened at that meeting.

7    A.    Well, I was really shocked when I entered the room

8    and sat down, because David had described it as a kind

9    of casual, you know, "Just want to check it with you,"

10   and I walked in and sat down, and immediately Liz

11   looked very, very stern.  She was in front of me.

12   David was to my right.

13          She had an envelope.  She said that I was being

14   placed on warning for dismissal, which I knew was the

15   -- what would give them the right to dismiss me for

16   anything.  I mean, it's -- you have to do this before

17   you dismiss someone, and she said that I had given

18   warning signs that I would be incapable, or actually

19   was already incapable of collaborating in professional

20   theater, and that those --

21   Q.    No, go ahead.

22   A.    -- three warning signs were that I had "impugned

23   the character and integrity of three people associated

24   with Yale drama."

25   Q.    Did she say who those three people were?

1   A.   Yes.  She said number one, Sue Rochette, the
2   financial aid person.  Number two was Christopher
3   Sanderson, and number three was Frank Deal.
4   Q.   Did she say anything further?
5   A.   Well, I was really thrown by her statement, and I
6   -- for clarification, I said, "You know, you're
7   accusing me of something here with Christopher
8   Sanderson, that actually didn't come from me, and" I
9   would not impugn -- "I don't know his character and
10  integrity," and she then apologized to David Chambers
11  and she said, "It's true.  Sally's right.  She did not
12  directly say these things, she just passed on some
13  information."
14       So I watched that, and then I thought, "I'm in
15  big trouble about that complaint last week," and she
16  said, "We think, you know, you're a major talent in
17  American theater, but here at Yale we collaborate, and
18  you've given signs that you can't, and so this is a
19  letter that I got from the dean, and it places you on
20  warning," and David Chambers said, "If you withdraw by
21  Monday, you can receive two-thirds of your tuition
22  money back."
23  Q.   And this meeting is on a Friday?
24  A.   Friday afternoon.  Right.
25  Q.   Literally six days after Rock Out With Your Cock

1    Out?

2    A.    That correct.

3    Q.    Showing you Exhibit 5, is this the letter that she

4    handed you?

5    A.    Yes.

6              MR. WILLIAMS:  May I read that, Your Honor?

7              THE COURT:  Yes.  That's already been marked.

8              MR. WILLIAMS:  It has been.

9              Letter on the letterhead of the Yale

10   University, James Bundy, Dean and Artistic Director.

11   It's dated September 27th, 2002.  It's addressed to

12   Sally Greenhouse at her address in New Haven:

13             "Dear Sally:

14             On September 26, 2002, the directing faculty

15             recommended that you be reminded of your

16             first year probationary status and,

17             additionally, that you be placed on academic

18             warning.  This means that your faculty will

19             continue to evaluate your progress through

20             this fall term, on the basis of your talent,

21             application to training, and development of

22             craft.

23             Sincerely,

24             James Bundy, Dean."

25   BY MR. WILLIAMS:

1    Q.   Do you have an understanding of what the

2    significance was, of being placed on warning?

3    A.    Extremely.

4    Q.   What was the significance, in the context of

5    Yale's rules?

6    A.   It is extreme.

7    Q.   Is it the last step before being expelled?

8    A.   It's the first and the last.

9    Q.   Okay.

10        Now, were other things said to you at that

11   meeting?

12   A.   Yes.

13   Q.   Tell us what else was said to you.

14   A.   There were to be -- Well, first of all, I was

15   invited to withdraw if I -- I guess if that was an

16   option then I would leave by Monday, and if not, then

17   the rules would be I was forbidden from ever

18   registering a complaint again.

19   Q.   Who said that?

20   A.   David Chambers read the list of rules.

21        Forbidden from ever registering a complaint again.

22        I was to think of myself as being in a boot camp.

23        I was to think of myself as being just like all

24   the other 22-year-olds.

25        I was forbidden from disclosing my age.

1          I had a list that I wrote at the meeting.

2          Oh, I was forbidden from using the vernacular form

3    of the word "nightmare," as in, "What a nightmare."

4    Not, "What a nightmare I had last night" but, "Oh, this

5    is a real nightmare" or "A social nightmare," or --

6    people use it a lot these days.  Maybe in those days

7    they weren't using it as much.  I think even the

8    presidential candidates use it, but I was saying a

9    "nightmare," I'd use the word "nightmare," and he said

10   it was language unbefitting a future director bearing

11   the mantle of Yale drama into the world."

12   Q.   Any other rules imposed on you at that point?  How

13   about referring to yourself?

14   A.   Oh, I was never supposed to start a sentence with

15   the word "I."

16   Q.   And Professor Chambers said all of that in the

17   presence of Professor Diamond?

18   A.   Yes.

19   Q.   Okay.

20        Anything else said at that meeting?

21   A.   Yes.

22   Q.   What else?

23   A.   In my own defense and shock, I began to say, I

24   believe this is directed to David Chambers, I said,

25   "I've been teaching at colleges and universities.  I

1  just spent three years dealing with deans and

2  colleagues and students.  I don't understand what's

3  going on here, and he said that none of my previous

4  work experience was relevant at Yale drama, and then

5  Liz interrupted him and said, "Well, I think some of it

6  might be relevant," and he said, "No, none of it is

7  relevant here."

8      And then I offered to take some psychotropic

9  medication that might alter my personality because I

10  started to feel that maybe they just didn't like me.  I

11  really didn't know what was going on, or that would

12  subdue reactions like -- that I gave to Evan Yionoulis,

13  which is, I did feel ashamed.  I felt humiliated, and I

14  would not have chosen to do that professionally, and I

15  thought perhaps I should be medicated to pretend that

16  I'm not 49 and I don't have any relevant experience,

17  and I don't see what I'm seeing, but I had been

18  profoundly disappointed by the level of that workshop,

19  and was hoping they weren't condoning it.  Evidently

20  they were.

21  Q.   Did you ever get off warning?

22  A.   No.

23  Q.   So you were kept on warning, the last step before

24  expulsion, for the rest of your time at Yale?

25  A.   Oh, that's correct.

1   Q.   Did that have any impact on your handling of the

2   rest of the educational experience?

3   A.   Absolutely and unequivocally.

4   Q.   What impact did it have?

5   A.   I think it affected every single day of my life.

6   I had never been under such an academic, or probation,

7   or artistic, whatever, warning.  I did not see it

8   coming.  I didn't know what the reason was.

9       I had previously collaborated in my career.  I

10   didn't know what they were talking about, except I was

11   getting in big trouble for having behaved in a way that

12   -- I had not been hazed.  It was -- You know, the

13   beginning was kind of like hazing.  It's hard for

14   people to understand what Yale drama is like --

15         MR. NOONAN:  Your Honor, --

16   A.   -- if they're --

17         MR. NOONAN:  -- I'm going to object --

18   A.   -- not there.

19         MR. NOONAN:  -- at this point.  I think she's

20   answered the question.

21         THE COURT:  I think she has.

22         We'll take our recess here.

23      (Recess at 11:10 a.m., until 11:35 a.m.)

24                 AFTER RECESS

25         THE COURT:  Okay.  You want to bring the

1    jury?

2         MR. NOONAN:   Before the jury comes in, can I

3    just raise one point?

4         During his opening, Attorney Williams

5    indicated that there would be testimony about Mr.

6    Sanderson, and some conduct on his part.

7         I just -- I want to make sure that there's

8    not going to be hearsay testimony about that.  I don't

9    believe that there's -- I believe there's certain

10   conduct that Ms. Greenhouse testified about in her

11   deposition that she clearly was not present for.

12        I just want to alert that --

13        MR. WILLIAMS:   I know the difference between

14   direct and hearsay, Your Honor, and, quite frankly, I

15   think that the defense is going to admit it before the

16   trial's over.

17        THE COURT:   Admit?

18        MR. WILLIAMS:   Admit what Chris Sanderson

19   did.

20        MR. NOONAN:   Well, what he said, in

21   particular, is that Mr. Sanderson threatened the life

22   faculty member, and I don't believe that Ms. Greenhouse

23   would have any way of having personal knowledge of

24   that.

25        So --

```
 1              MR. WILLIAMS:  Well, we had discovery --

 2              MR. NOONAN:  So, before the --

 3              MR. WILLIAMS:  -- in this case, Your Honor.

 4     I've read it myself, but that's all right.

 5              THE COURT:  Well, let's -- I'm not going to

 6     anticipate.  Let's wait until the evidence is offered

 7     and see what form it's offered, and we'll rule on it at

 8     that time.

 9              All right, Ms. Greenhouse, you want to come

10     up, please.

11              Without limiting you in any way, Mr.

12     Williams, can you just give me an idea of how much

13     longer you think your direct is going to be?

14              MR. WILLIAMS:  My direct will be done before

15     the lunch break.

16              THE COURT:  Okay.

17              And let me just ask -- Rody, hold on one

18     second.

19              Do you intend to call any other witnesses?

20              MR. WILLIAMS:  I don't think so, unless

21     something unforeseen happens during the cross.

22              THE COURT:  Okay.

23         (Jury in.)

24              THE COURT:  All right, Ladies and Gentlemen.

25              All right, Mr. Williams.
```

1          You can be seated.

2   SALLY GREENHOUSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

3              DIRECT EXAMINATION (CONTINUED)

4   BY MR. WILLIAMS:

5   Q.   I think you testified, just before we broke, that

6   once you were placed on written warning, you never got

7   off written warning; is that right?

8   A.   That's correct.

9   Q.   Did you, from time to time, ask the -- anybody in

10  the administration, what you had to do to get off

11  warning?

12  A.   Yes, I did.

13  Q.   Who did you ask, and when?

14  A.   Liz Diamond.

15  Q.   And did you ask her that more than once?

16  A.   Yes.

17  Q.   Can you give us a time frame?

18  A.   I'm sure I asked at least once before December, if

19  not twice, and I asked probably two times during the

20  spring, as well, --

21  Q.   Okay.

22       And --

23  A.   -- when I got back from winter break.

24  Q.   Okay.

25       And what was it, exactly, that you asked her?

1    A.    "What are the stipulations for the removal of this

2    letter?"

3    Q.    Was there any reason why that was important to

4    you?

5    A.    Of course.

6    Q.    Would you tell us why that was important to you to

7    know how to get off written warning?

8    A.    I don't think I was ever really clear why I was

9    placed on it.

10   Q.    My question is, why was it important to get off of

11   it?

12   A.    Oh, because I could be dismissed immediately.

13   Q.    All right.

14        And so you repeatedly asked Professor Diamond what

15   you had to do to get off warning?

16   A.    Uh-huh.

17   Q.    Did she ever give you an answer?

18   A.    No.

19   Q.    She never answered you?

20   A.    No.

21   Q.    Did the fact that you are on a written warning

22   from September 27th on, have any impact on the

23   educational experience?

24   A.    Absolutely.

25   Q.    What was it?

A.   Well, I felt that I had been somehow paying the
price for having spoken up about what happened in that
class, that was obvious to me, and -- however, I was
naive and trusting enough to actually try to please the
faculty in the area of what they called
"collaboration."

     So, I think that it had the effect of me not
quite ever getting my bearings about was I being
collaborative enough, and I tended to be, I think, more
ingratiating than I otherwise might have been after
having been told, when I was admitted, that I was
expected to be a leader at the school.

     I was fearful all the time.  I felt like a
criminal or something.  I felt targeted.  I felt like a
pariah, and having never been given the stipulations
for its removal, I felt that I was living in this vague
territory of people who say whatever they want, what
they wanted me to do, what they didn't want me to do
and, in fact, I got into a very complicated terrain
when that began to happen, more in the second semester,
of some faculty telling me to do one thing, and other
faculty disputing that, saying just the opposite.  It
was impossible to negotiate.

          MR. NOONAN:  Your Honor, I'm going to object
and just move to strike the comments about what she

1   felt.

2          I think Your Honor has made a ruling that her

3   feelings are not admissible.

4          MR. WILLIAMS:  No, this is --

5          MR. NOONAN:  I would ask that future answers

6   not include her feelings.

7          MR. WILLIAMS:  Well, Your Honor, --

8          MR. NOONAN:  It's what happened, the details

9   with the liability.  Her feelings are not part of the

10  damage case.

11         MR. WILLIAMS:  The statute, Title 9, does

12  refer to "compromising the educational experience."

13  That doesn't have to do with feelings, that has to do

14  with the educational experience, and that's what

15  she's --

16         THE COURT:  All right.  For that purpose I'll

17  allow it.

18         MR. WILLIAMS:  Right.

19  BY MR. WILLIAMS:

20  Q.   You said that someone told you, when you arrived,

21  that you were expected to be a leader.

22       Who said that?

23  A.   Liz Diamond actually said that to me on the

24  telephone, when she said they were inviting me to be

25  part of that class.  She said, "We expect you to be a

1    leader at the school."

2    Q.   Okay.

3         Did there ever come a point, after you were put on

4    warning, where Professor Diamond visited any of the

5    work, or sat in any of the work you were doing?

6    A.   Yes.

7    Q.   Did she ever refer to the extent to which you were

8    or were not collaborating, in any of her comments

9    during that period of time?

10   A.   Yes, she did.

11        Halfway through the rehearsal phase, for what's

12   called the "CWP," Collaborative Work Project, the first

13   play.

14   Q.   Okay.

15        And halfway through would have been roughly when?

16   A.   Two weeks in.

17   Q.   When did it start?

18   A.   In March.

19   Q.   Okay.

20        So this is it your second semester?

21   A.   Yes.

22   Q.   Okay.

23        And what did she say on that subject?

24   A.   Everybody left except from me, and she sounded

25   angry, and she said, "You're collaborating your ass

1     off."

2     Q.   Did you take that to be a criticism?

3     A.   Of course.  It's critique.

4     Q.   Okay.

5     A.   I have to pay attention to that.

6     Q.   Right.

7          Was that project one in which Sara Treem was

8     involved?

9     A.   Yes, it was.

10    Q.   She was in the playwriting program; is that right?

11    A.   Yes.

12    Q.   Okay, and show you Exhibit 6.

13         I'll ask you if this is an e-mail exchange that

14    you had with Mr. Treem on March 17, 2003?

15    A.   Yes.

16    Q.   Okay.

17    A.   I recognize this.

18    Q.   I beg your pardon?

19    A.   I recognize this.

20    Q.   Oh.

21              MR. WILLIAMS:  That's already been, I think,

22    marked by agreement, as a full exhibit, Your Honor.

23              MR. NOONAN:  It is.

24    BY MR. WILLIAMS:

25    Q.   In your e-mail to Ms. Treem at 8:10 on the evening

1   of Monday, March 17th, 2003, you were discussing the

2   rehearsal that the two of you have been involved in; is

3   that right?

4   A.   Yes.

5   Q.   And it was a rehearsal that you were directing, of

6   the play she had written; is that it?

7   A.   Yes.

8   Q.   Okay.

9        And you were praising her for the -- for her work?

10  A.   Yes.

11  Q.   And you asked her, at some point, about a meeting

12  with Mark.

13       Who is "Mark"?

14  A.   Mark Bligh.

15  Q.   Was he another professor?

16  A.   He was her playwriting professor.

17  Q.   Okay.

18       And then she responded to your e-mail later on the

19  same evening; did she not?

20  A.   Yes.

21            MR. WILLIAMS:  If I may, Your Honor, I'd like

22  to read that response.

23            THE COURT:  Go ahead.

24            MR. NOONAN:  Well, could we read the first

25  part as well, then?  If we're gonna read one of them,

1    just read the other?

2              MR. WILLIAMS:  I think that Attorney Noonan

3    is welcome to read whatever he likes.  I'd just like

4    to --

5              THE COURT:  Go ahead, Mr. Williams.

6              MR. WILLIAMS:  Thank you, Your Honor.

7              "Dear Sally:

8              I was thrilled with rehearsal today.  I think

9              you are brilliant and I am the luckiest

10             playwright whoever started the CWP.  It was

11             so great to see how the actors respect you

12             and believe in your ability to guide them.

13             They were hanging onto every word.

14             I loved how you spoke about the play and, as

15             always, I have full confidence in your

16             understanding of what I was trying to write,

17             and I think you were (unintelligible) in your

18             analysis of the organic nature of writing,

19             and the difficulty in analyzing one's own

20             work.  Absolutely no complaints here.

21             I haven't heard from Mark, so let's assume

22             tomorrow's meeting will be postponed.  I'll

23             call if I hear anything to the contrary in

24             the meantime.

25             Also, what should I bring to Rachael's?

1              Sincerely,

2              Sarah"

3              THE WITNESS:  Excuse me, I think you should

4    clarify that time line on that.

5              MR. WILLIAMS:  No, that's okay.

6              THE COURT:  There's no question pending.

7              THE WITNESS:  Oh.  All right.

8              MR. WILLIAMS:  That's okay.  I'll just muddle

9    through, the best I can.

10             THE WITNESS:  Okay.

11   BY MR. WILLIAMS:

12   Q.   Now, I want to show you Plaintiff's Exhibit 15,

13   and ask you whether you agree that this is your

14   official grade transcript from Yale School of Drama.

15   A.   Looks like it.

16   Q.   And that reflects your final grades for each and

17   every course that's contained in that (unintelligible),

18   isn't it?

19   A.   Yes.

20   Q.   All right.

21        And I notice that each one of those courses has a

22   "P."

23        Could you tell us what that means, and why?

24   A.   Passed.

25   Q.   Okay.

1          And is that because at the Yale drama school,

2     courses are on a "pass" or "fail" basis?

3     A.   Yes.  I don't think I remember what the asterisk

4     means.

5     Q.   That's okay.  I didn't ask you that

6     (unintelligible).

7     A.   "P*."

8     Q.   (Unintelligible.)

9          In fact, you passed all your courses, didn't you?

10    A.   Sure.

11    Q.   Now I'm going to show you Exhibit 8.

12         Is this an e-mail exchange that you had with Dean

13    Bundy on the evening of March 22nd and 23rd of 2003?

14    A.   Yes, I remember this.

15    Q.   Can you --

16              MR. WILLIAMS:  Tell you what, maybe I should

17    read the exchange and then ask the questions after, if

18    that's all right Your Honor?

19              THE COURT:  Sure.

20              MR. WILLIAMS:  It starts with an e-mail sent

21    to Dean Bundy at 9:28 p.m. on March 22nd from you.

22              "Dear James:

23              A belated thank you for our breakfast

24              meeting.  You have helped me more than words

25              can express.  Your presence in my life has

1              proven to be a catalyst for my growth as both

2              a director and a person (unintelligible)

3              great."

4              In reply, at 1:03 in the morning, on Sunday,

5      March 23rd:

6              "Dear Sally:

7              (Unintelligible) is no big deal.  I still

8              need to talk to you.  We didn't get to the

9              subject I wanted to address.  I need 30 or 45

10             minutes with you, but the task for you will

11             be to listen while he is speaking.  You have

12             a very forceful personality, which is a

13             perfectly good thing, but I would like to

14             address the subject (unintelligible) altering

15             your approach to your work more rapidly than

16             I believe you have, and soon, Tuesday or

17             Wednesday in my office at 8:30.

18             James."

19     BY MR. WILLIAMS:

20     Q.   What was that exchange all about?

21     A.   He had asked me to meet him at breakfast when he

22     got back from Russia, and we had breakfast, and we were

23     talking.  He was telling me about Russia and his trip,

24     and I was telling him about the start of my CWP.

25             I think I also related to him that I had received

a commendation from Ben Sandler about my work on his --
assisting him at the Yale Rep.

He seemed uninterested in any of that, and had
some comments about relating to him, the question I
asked my stage manager.  He said, "That's the last
question you should ever ask," and it stands out in my
mind because I went directly to David Chambers' class
and David said, "That's the first question you should
ask."  So that's the sort of thing that was going on.

And James Bundy wrote to me later and said, "I
want to meet with you again," and in a later e-mail he
apologized for saying that I didn't listen as much as I
spoke.  He said he didn't really mean that, and I met
him in his office, where he gave me a lot of notes, and
I took notes, and he said that if I didn't do
everything he said in the notes, that I was obviously
on pain of dismissal, so I met with Liz Diamond and
showed her the notes.

Q.   This is in March?

A.   Yes.

Q.   And what did she say?

A.   She looked at the notes at -- we were also at a
breakfast meeting.  She looked at the notes.  She read
through them.  She scrunched up her nose.  She has a
characteristic way of sort of scrunching up her nose

1    and kind of scowling, and I said, "Well, what should I

2    do?", and she said, "Ignore them."

3    Q.   Now --

4    A.   She said she didn't know what they meant.  She

5    said, "I have no idea what this is about."

6    Q.   Now, Dean Bundy had made a point of telling you at

7    that meeting, that you were still on warning; is that

8    right?

9    A.   Yes.  It was mentioned throughout the year by

10   various people.

11   Q.   And did that have an -- any impact, that you were

12   aware of, on your performance in the school program

13   that you were a part of?

14   A.   Absolutely.  I was afraid of, you know, making a

15   move.  I was afraid of not making a move.  I felt like

16   I could do no right.

17        There were times when I obviously did right, but

18   it didn't seem to matter.  It -- Nothing seemed to make

19   a difference, no matter how well I did.

20   Q.   You were sitting here with me this morning at

21   counsel table, and heard -- along with all the rest of

22   us, heard Attorney Noonan say that at some point in the

23   spring -- or second term, second semester, you

24   participated in a skit in which one of -- in which you

25   allowed one of the male actors to put his head up the

1   skirt that you were wearing, and it's not exactly clear

2   what Yale's point is about that, but I'd like to ask

3   you about it.

4   A.    Yeah.  That was not a skit.

5   Q.    Tell us what happened.

6   A.    That was the scene.  I -- In acting class for the

7   year, the directing students participated with the

8   actors in the training, and we did a number of scenes

9   from the Cannon, Chekhov, Ibsen, Strinberg  and then

10  moving into the second semester, more modern, and so we

11  were collaborating all the time with each other, in

12  rehearsing and presenting scene work, and it gave Evan

13  the opportunity to work specifically with the actors on

14  their acting technique, not so much with the directors

15  on our acting technique, but it gave us a chance to

16  learn the experience that the actors were going

17  through, and the very last scene that we --

18       We were given a choice, and actors would ask me to

19  work with them, and this actor had asked me to work

20  with him, and we were choosing a scene, and someone

21  else had made a suggestion of a scene from Carol

22  Churchill, who's quite a major playwright, and it did

23  involve two people, a man and woman, in which, at one

24  point, he is supposed to have his head up her skirt, so

25  we had some serious talks about this, and I decided --

1   We talked about it a lot, and decided to do it -- My

2   motivation, in part, was twofold.

3        One was, I knew this actor really well, and it

4   provided an opportunity for him to really expand his

5   range.  He had never done, you know, this kind of scene

6   before, and he thought it was a challenge, and it

7   wasn't all about sex, it -- there was one section of

8   it.

9        And I also thought -- the person who suggested it

10  to me also thought that if the rationale was, I've been

11  threatened with dismissal because --

12            MR. NOONAN:  Well, objection, Your Honor, in

13  terms of the person who suggested that to her.

14            THE COURT:  Sustained.

15            MR. WILLIAMS:  Right.

16  BY MR. WILLIAMS:

17  Q.   Just tell us what you thought.

18  A.   Oh, that I would get off the hook for looking like

19  I wasn't like one of the boys.  I mean, it was mostly

20  guys there.  I had gotten in all this trouble for

21  reporting something that I had found just really

22  shocking and offensive, and I thought by the end of the

23  year, perhaps if I chose to do something like this, and

24  we prepared it, and we could do it in a way in which it

25  wasn't a prank, in which I knew what it was, and we

1    could do it in, somehow, a way that was understated and

2    not exhibitionistic, as part of the scene, I wouldn't

3    appear to be, say, a prude, or no fun, or something

4    like that.

5         And so, I put on three pairs of tights and we

6    figured out how to do that, and the scene was -- you

7    know, went well.

8    Q.   Was your participation in the decision, in the

9    spring of 2003, to engage in that exercise, affected at

10   all by the fact that you had been on warning ever since

11   September 27th of 2002?

12   A.   As I just explained, that was part of the

13   rationale, that I -- if I was going to be dismissed for

14   not playing along with the guys, that at least if I did

15   something like this, in part, in a way that was, you

16   know, not exhibitionistic, that gave an actor an

17   opportunity to expand his range, and I was willing to

18   somehow work it out so that I didn't feel victimized by

19   it, pulled a prank on, or humiliated by it, that I

20   would at least not appear to be, as I said, somebody

21   who is not modern, or not in touch with contemporary

22   theater.

23   Q.   Did their -- Incidently, when would that have

24   been?  Would that have been in March or April?

25   A.   No, the very end of the year.  That was toward

1    May.

2    Q.    Towards May?

3    A.    Yes.

4    Q.    Okay.

5         Did there come a time in May, when you reached

6    what turned out to be the end of your time at Yale?

7    A.    We were all being called in for critiques, and I

8    wasn't sure what was going to happen.

9         I showed up and I was dismissed by Liz Diamond,

10   which was the dismissal meeting that Joe Roach had

11   warned me would come, so I was there.

12   Q.    Who is Joe Roach?

13   A.    He was my theater history professor, and I had

14   gone to him that Monday morning.

15   Q.    When you say "that Monday morning," you're talking

16   about back in September?

17   A.    Right.

18   Q.    I believe you were handed the letter of academic

19   warning on Friday, September 27th, 2002.

20   A.    Right.

21   Q.    And so the following Monday, which would have been

22   the 29th of September?

23   A.    I think the thirtieth.

24   Q.    The thirtieth, September 30th, you went to see

25   Professor Roach?

1  A.    I did, in the morning.

2  Q.    And did you discuss with him, the fact that you

3  had been placed on academic -- or on -- been placed on

4  written warning?

5  A.    I did.

6  Q.    And did -- What, if anything, did he say to you?

7  A.    He said, "They're leaving a paper trail to dismiss

8  you.   If I were you, I'd leave now."

9  Q.    "They're leaving a paper trail to dismiss you" and

10  "if I were you, I would leave now"?

11  A.    Yes.   He said that's -- this is the way that Yale

12  drama works, and then he told me some of the history of

13  other things that had happened.

14  Q.    But you decided to try to stick it out?

15  A.    Yes.

16  Q.    On May 8th, 2003, did you receive an e-mail from

17  Professor Diamond, scheduling a meeting for a end of

18  term critique?

19  A.    Yes.

20  Q.    Showing you Exhibit 9 for Identification, is this

21  the e-mail that you received?

22  A.    Yes, that was the cabaret building.   I forgot

23  that.

24          MR. WILLIAMS:   I'll offer it, Your Honor.

25          THE COURT:   Full exhibit.

BY MR. WILLIAMS:

Q.   And as instructed, did you, in fact, report for that meeting?

A.   Yes.

Q.   Where did the meeting take place?

A.   The cabaret building.  I had forgotten that name, upstairs.

Q.   And the cabaret building is a building where they literally put on cabaret theater performances over at Yale; is that right?

A.   Well, that's the building where we had Drama 50, where the --

Q.   All right.

A.   -- stage was, and then upstairs, there are offices, and downstairs, the cabaret.

Q.   Okay.

     And Exhibit 9 states that your meeting was actually going to be the last of the four.  Steven Fried would be May 13th.  Christopher Sanderson on May 14th.  Nicholas Avila also on May 14th, and then you on the afternoon of May 15th.

     When you reported for that meeting, who did you find in the room?

A.   Liz Diamond and David Chambers.

Q.   Would you tell us, please, what happened at that

1    meeting?

2    A.   I sat down and Liz Diamond said that they would

3    not be sending me on to my second year, by reason of --

4    Well, she said a couple of things.

5         She said they looked in my academic work and they

6    had even checked with Joe Roach, and I had passed

7    theater history, that there was no academic reason to

8    dismiss me, however, based on the failure of my

9    production work, and my inability to guide a group of

10   students to the completion of a project, as well as the

11   misalignment of my aesthetic vision with that of Yale

12   drama, I would not be invited back.

13   Q.   And what, if anything else, took place at that

14   meeting, or was that it?

15   A.   I think I looked at David Chambers and I had

16   brought with me the paper that he said he thought was

17   publishable.  I was giving him a copy of that, and he

18   was taking notes on a napkin.  He didn't speak at all.

19   Q.   Did Professor Diamond read from a script, what she

20   said to you?

21   A.   I don't think so and -- I don't think she did

22   read.  I didn't say much except I know I said something

23   like, "Well, you said you expected me to be a leader at

24   this school.  I guess perhaps one way I could lead is

25   to dispute this decision."

1          MR. WILLIAMS:  Do we have Defendant's Exhibit

2     O?

3          THE CLERK:  I don't have any (unintelligible).

4          MR. WILLIAMS:  Don't have any?  Well, I'll

5     show you a copy.

6          MR. NOONAN:  We can -- We have it here, if

7     you want offer it now.

8          MR. WILLIAMS:  Yes.  I just wanted to show it

9     to her, not actually offer it, but I (unintelligible).

10       (Pause.)

11         MR. NOONAN:  I have no objection to it being

12    marked as a full exhibit

13         MR. WILLIAMS:  (Unintelligible.)  I sort of

14    think that these are already full exhibits but --

15         MR. NOONAN:  Okay.

16         MR. WILLIAMS:  Yeah.

17    BY MR. WILLIAMS:

18    Q.   And Exhibit 0 --

19         THE COURT:  Well, if it's not, Mr. Noonan has

20    indicated he has no --

21         MR. WILLIAMS:  Yeah.  Well, I --

22         THE COURT:  So O is a full exhibit.

23         MR. WILLIAMS:  I think they're all full

24    exhibits, unless otherwise (unintelligible).  At least

25    that was my understanding, Your Honor, --

1             THE COURT:  All right.

2             MR. WILLIAMS:  (Unintelligible.)

3     BY MR. WILLIAMS:

4     Q.   Exhibit O is the document called, "Prep Notes,

5     page 1 of 3, Directing Department Chair Liz Diamond's

6     prefatory notes for the department's meeting of 5/15/03

7     with Sally Greenhouse, Re: Withdrawal/dismissal."

8             Do you know whether Professor Diamond read from

9     that script?

10    A.   No, she did not.

11    Q.   Okay.

12            If you could, just -- I don't take a lot of time

13    with this, but if you could just glance over it

14    quickly, and tell us whether that, to the best your

15    memory, approximates all the things that she said to

16    you at that meeting.

17            (Pause.)

18    A.   I -- Shocking.

19        (Pause.)

20    A.   (Continuing.)  Do you want me to read all of this?

21    Q.   Yes.  Just quickly look through it, please.

22            THE COURT:  Read it to yourself.

23        (Pause.)

24            THE COURT:  Mr. Williams?

25            MR. WILLIAMS:  Oh, thank you.

1   BY MR. WILLIAMS:

2   Q.   Is that a rough approximation of what she said to

3   you at that meeting?

4   A.   I would say "No."

5   Q.   You would say "No"?

6   A.   No.  I'm in shock.

7         MR. WILLIAMS:  I'd like -- If I could have

8   Exhibit P?

9         Thank you.

10  BY MR. WILLIAMS:

11  Q.   And I'll show you Defendant's Exhibit P, which is

12  a document actually signed by Ms. Diamond.

13        THE COURT:  That's now -- That's a full

14  exhibit.

15        MR. WILLIAMS:  Right.

16  BY MR. WILLIAMS:

17  Q.   And this is a two-page typewritten report of what

18  Ms. Diamond states happened at that meeting, and I

19  would ask you now, to take a look at Exhibit P.

20        (Pause.)

21  Q.   (continuing.)  Now, she states -- I'm going to ask

22  you to read it, but I want to interpose one question.

23        She states in that report, that the meeting

24  lasted exactly 16 minutes.

25        Is that about right?

1    A.    Probably.

2    Q.    Okay.

3          If you would take a moment, please, and read

4    Exhibit P.

5    A.    Out loud?

6    Q.    No.  No.

7              (Pause.)

8    Q.    (Continuing.)  Can you tell us whether not that is

9    an approximately accurate report, to the best of your

10   memory, of what happened at that meeting?

11   A.    No.  No.  I -- What I told you was exactly what

12   she said.

13   Q.    All right.

14   A.    I'm in shock.

15   Q.    She does say in here that you stated, in response

16   to her, that you had felt, throughout the school year,

17   that you had been intimidated and harassed.

18   A.    Yes.

19   Q.    Did you, in fact, make that statement?

20   A.    To her?

21   Q.    Yes, at that meeting.

22   A.    At that meeting?

23   Q.    Yes.

24   A.    I don't know if I used those words, or said it in

25   that way.

1    Q.   Is that an accurate statement of what you
2    believed, and still believe --
3    A.   Oh, absolutely.
4    Q.   -- (unintelligible).  Absolutely.
5         Now, one of the things that she discusses in
6    here, is your Rep assistantship, and she states in here
7    that you said that you felt that your assistanceship at
8    the Rep -- That's the Yale Repertory Theater, correct?
9    A.   Yes.
10   Q.   Where you were -- I think Attorney Noonan was
11   talking about that in his opening comments, that --
12   where you were called upon to assist Dean Bundy?
13   A.   Yes.
14   Q.   And she says in here that you said, in regard to
15   that, that you felt that that was duplicitous.
16   A.   What I -- I was referring to something very
17   specific.
18   Q.   Tell us where you were referring to.
19   A.   James Bundy kept giving me supportive and positive
20   feedback throughout that process, except when I did
21   something that I shouldn't have done, that I didn't
22   know about, and I was always very sensitive to -- in
23   responding to his authority.
24        He would -- This mention of "tuition refund," that
25   was a very dramatic moment in rehearsal, that the other

1     actors remembered, and that I was confused by.

2         He was actually pretty obviously praising my work

3     during the course of the rehearsal process, leading me

4     to feel that I was an intrinsic part of it, never

5     speaking to me about what is mentioned in here, that

6     there was something inappropriate about my boundaries.

7          He was going on dinner breaks with me, inviting

8     me to dinner, he said, so that he could hear and get my

9     input about the play, about the rehearsal.

10        He solicited my ideas when we were in dress

11    rehearsal and in theater.  He actually implemented some

12    of my ideas.

13        It looks pretty strange to me, and because I felt

14    that I thought I was being seen as somebody who was

15    diligent, and conscientious, and devoted to this, and

16    some of the actors became closer to me afterwards and

17    during, as a result of my participation, I had no clue

18    that he was telling Liz Diamond I was failing.

19        I even had a card from the stage manager who --

20            MR. NOONAN:  Objection, Your Honor.

21    Objection, Your Honor.

22            THE COURT:  Sustained.

23            MR. NOONAN:  It's not in response.  It would

24    be hearsay.

25    BY MR. WILLIAMS:

1    Q.    Did you -- Well actually, if I can just have a

2    moment, then perhaps I can find the reference here, in

3    this exhibit.

4              (Pause.)

5    Q.    (Continuing.)    Yes.    One of the things that Ms.

6    Diamond says in Exhibit P, is:

7              "I told Sally that all reports cited solid work in

8              course work, research, writing, and ability to

9              discuss material."

10             And then she says this:

11             "Theater management, in particular, reported on

12             Sally's strong performance on her term project."

13             What's "Theater Management"?

14   A.    Oh, that's another collaborative class in which

15   the directors assume the role of an artistic director

16   and create a fictionalized theater, and a team, and a

17   board of trustees, and so forth, and I was assigned a

18   team, and worked with them throughout the semester, as

19   an artistic director.

20   Q.    Okay.

21             Now, the conclusion of the meeting, of course, is

22   that you're told it's over.    There was a reference in

23   Exhibit P that they were going to give you the option

24   of withdrawing rather than being expelled.

25   A.    That's correct.

1    Q.   And she said you had 24 hours to make up your

2    mind?

3    A.   That's correct.

4    Q.   And it says here that you said that you wanted to

5    speak to Victoria Nolan in hopes of getting more time.

6    A.   More time to talk about it, yes.

7    Q.   And did you, in fact, do that?

8    A.   Yes, I did.

9    Q.   Showing you Exhibit 10, is this a letter that you

10   received from Deputy Dean Victoria Nolan?

11   A.   Yes.

12   Q.   And this letter says that you and she actually had

13   spoken that day, May 16th, 2003, and that you had asked

14   additional time to consider the options, and that they

15   told you, you have until Friday, May 23rd, at 5:00 p.m.

16   A.   Yes.

17   Q.   And that if he didn't withdraw by then, they were

18   going to send you a letter of dismissal.

19   A.   That's correct.

20   Q.   And is it fair to say that you did not withdraw?

21   A.   Well actually, they -- I don't know if they said

22   they would send me a letter of dismissal.  They said

23   they would stamp a red "Dismissed" stamp on my

24   transcript.  I don't know if -- What I was told, I

25   would receive a letter of dismissal.  They did say

1    that.

2              MR. NOONAN:  Well, I would object, Your

3    Honor.

4              The exhibit she's looking at says they would

5    forward a letter of dismissal, just as Mr. Williams

6    said.

7              MR. WILLIAMS:  Doesn't mean she's not

8    entitled to testify to what she was told orally.

9              MR. NOONAN:  But she was asked, "What did the

10   letter say?", and it says --

11             THE COURT:  Well, I think that was the

12   question.

13             MR. WILLIAMS:  I don't think that was the

14   question, no.

15             THE COURT:  I'm sorry?

16             MR. WILLIAMS:  I don't believe that was the

17   question.

18             THE COURT:  Yes, I think it was, because I

19   recollect --

20             MR. WILLIAMS:  Okay.

21             THE COURT:  -- my own impression that she can

22   answer the question "Yes" or "No."

23             MR. WILLIAMS:  Okay.

24             Well, it wasn't what I intended to ask, but

25   that's all right, it's not important.

BY MR. WILLIAMS:

Q.   I want to show you --

        MR. WILLIAMS:   If I could see it, Defendant's
Exhibit Q.

BY MR. WILLIAMS:

Q.   Showing you Defendant's Exhibit Q, this is a memo
to you from Professor Diamond, dated May 15th, 2003,
with a withdrawal form attached.

        Do you remember receiving that?

            (Pause.)

A.   I actually don't remember this, which doesn't mean
I didn't get it.   I was in shock, so I don't remember
this exact --

Q.   In any event, and (unintelligible) I'll ask the
question intentionally, did you, in fact, not withdraw?

A.   That's correct, I did not.

Q.   Why didn't you?

        MR. NOONAN:   Objection, Your Honor.   It's
irrelevant.   She was given an option.   She chose not to
take it.

        There's no claim of retaliation with regard
to --

        THE COURT:   I'll allow it.   Overruled.   I'll
allow it.

A.   Because I was not voluntarily withdrawing.

```
1    BY MR. WILLIAMS:
2    Q.   Did you feel that you had done anything to justify
3    being put out of the program?
4              MR. NOONAN:  Objection, Your Honor.
5              THE COURT:  Sustained.
6              MR. WILLIAMS:  Okay.
7    BY MR. WILLIAMS:
8    Q.   Now, showing you Exhibit 11, did you, in fact,
9    receive this letter from Dean Bundy, a letter dated May
10   26, 2003?
11             (Pause.)
12   A.   I don't remember it, but again, that whole week
13   was -- I'm sure I got this.
14   Q.   In any event, you know that they put you out of
15   the program?
16   A.   (Unintelligible.)
17   Q.   And that's what this letter does.
18        Is that a fair statement?
19   A.   I imagine it does.
20             MR. WILLIAMS:  May I read this, Your Honor?
21             THE COURT:  (No audible response. )
22             MR. WILLIAMS:
23             "May 26th 2003.
24             Dear Sally:
25             At their meeting on May 16, 2003, the
```

1           directing faculty met and recommended that

2           you be officially dismissed from school.  A

3           first year residence is probationary for all

4           students at the school.  This means that

5           students are evaluated on the basis of their

6           talent, application, training and development

7           of craft.  Students in their first year may

8           be dismissed at any time without prior

9           warning.

10          The (unintelligible) of the School of Drama

11          states that dismissal indicates a conviction

12          on the part of the faculty, that a student is

13          unable to meet the requirements of the

14          school.  First year students are normally

15          notified of their status at the end of the

16          year (unintelligible).

17          I understand that you have already met with

18          your faculty and have been informed of their

19          decision.

20          Please note that your transcript will

21          indicate you have been withdrawn from the

22          program.

23          Best wishes in your pursuits.

24          Sincerely,

25          James Bundy, Dean."

1          Copies to Elizabeth Diamond and David

2     Chambers.

3     BY MR. WILLIAMS:

4     Q.   Do you know whether any one of the three males in

5     your directing program had been placed on warning at

6     any point during the school year?

7               MR. NOONAN:   Objection, Your Honor; hearsay

8     and relevance.

9               MR. WILLIAMS:   Asked if she knows.   That's

10    "Yes" or "No."

11              THE COURT:   I think she can answer that

12    question "Yes" or "No," so I'll allow it.

13              MR. NOONAN:   She just can't answer the

14    next one.

15              THE COURT:   You can answer "Yes" or "No."

16    A.   Yes.

17    BY MR. WILLIAMS:

18    Q.   From what source did you learn what you know on

19    that subject?

20    A.   The student himself.

21    Q.   The student himself told you?

22    A.   Yes, he did.

23    Q.   And did the student tell you the reasons --

24              MR. NOONAN:   Objection.

25    Q.   -- for what had happened?

1          MR. NOONAN:  Objection Your Honor.  I move to

2     strike the last one.

3          MR. WILLIAMS:  I haven't --

4          MR. NOONAN:  It's clearly --

5          MR. WILLIAMS:  -- asked a hearsay question

6     yet.

7          THE COURT:  Yeah, I'll allow the question to

8     be asked, but don't answer it, and wait for Mr. Noonan

9     to make his objection.

10          Go ahead, Mr. Williams.

11     BY MR. WILLIAMS:

12     Q.   Without saying what he said, did the student, in

13     fact, tell you the reasons for what had happened?

14     A.   Yes, he did.

15     Q.   Who was the student?

16          MR. NOONAN:  Objection, Your Honor.

17          Your Honor, this is highly improper.  I --

18          MR. WILLIAMS:  I haven't asked a hearsay

19     question yet, Your Honor.

20          MR. NOONAN:  Your Honor, can we have a short

21     side-bar?  I know you don't like them, but --

22          THE COURT:  No.  No.  No.  No side-bars.

23          MR. NOONAN:  Your Honor, this is a way of

24     getting into evidence, some hearsay evidence in a

25     roundabout way.  Everyone will know what we're talking

1    about.   It's totally inappropriate.

2            These are hearsay --

3            THE COURT:   Well, I --

4            MR. NOONAN:   This is a hearsay subject.  She

5    has no personal knowledge.

6            THE COURT:   Well, it may be a hearsay

7    subject, but he hasn't asked any hearsay questions yet,

8    so I'm gonna allow it.

9            You can answer -- Just listen to the

10   question, and answer only the question.

11           MR. NOONAN:   Well, I'm going to object on

12   relevance to the question that's pending.

13           Who the student is, is totally irrelevant,

14   given the fact that there is no admissible evidence.

15           THE COURT:   You can answer.

16   BY MR. WILLIAMS:

17   Q.   Who was the student?

18   A.   Christopher Curtis-Anderson.

19   Q.   Now, as a result of your being dismissed from the

20   program, have you encountered any subsequent

21   difficulties in your professional life?

22           MR. NOONAN:   Objection, Your Honor.

23           It's well beyond the scope of what was

24   disclosed in the damages analysis.

25           THE COURT:   Sustained.

1              MR. WILLIAMS:  I'm sorry, on the ground of

2      what?  Beyond the scope of what?  I don't understand

3      the objection.  I'd like to respond to it.

4              MR. NOONAN:  Do you want me to repeat myself?

5              THE COURT:  Go ahead.

6              MR. NOONAN:  It's a result -- It's beyond the

7      disclosure of the damages analysis that Mr. Williams

8      filed in the case, as we previously discussed, and Your

9      Honor has ruled on.

10              MR. WILLIAMS:  That's -- I don't think that

11     that's correct, Your Honor, and I haven't asked --

12              THE COURT:  Well, I sustained the objection,

13     Mr. Williams.

14              Go ahead.  Next question.

15     BY MR. WILLIAMS:

16     Q.   What have you done with your life since being put

17     out of Yale?

18              MR. NOONAN:  Objection, Your Honor.

19              Again, it's not relevant to the liability,

20     and it's not relevant to the damages.

21              MR. WILLIAMS:  I have a right to put the

22     witness in context.

23              MR. NOONAN:  Completely irrelevant.

24              MR. WILLIAMS:  What she's doing with her life

25     at this point, I have a right to show that.

```
 1              THE COURT:  It has no relevance to the claims
 2    in this matter.
 3              The objection is sustained.
 4              MR. WILLIAMS:  Well, I think it does, Your
 5    Honor, because we have alleged specifically that this
 6    case had an impact on her subsequent life.
 7              MR. NOONAN:  Your Honor, I object to argument
 8    in front of the jury after you've ruled.
 9              THE COURT:  Yeah.
10              I've sustained the objection, Mr. Williams.
11              MR. WILLIAMS:  Very well, Your Honor.
12    BY MR. WILLIAMS:
13    Q.   Are you currently employed?
14              MR. NOONAN:  Objection, Your Honor, same
15    grounds.
16              THE COURT:  Sustained.
17    BY MR. WILLIAMS:
18    Q.   What are you doing in North Hampton, Massachusetts
19    --
20              MR. NOONAN:  Objection, Your Honor.
21              THE COURT:  Sustained.
22    BY MR. WILLIAMS:
23    Q.   How much money did you spend on your tuition at
24    Yale?
25    A.   I believe that the tuition at Yale was 17,500.
```

1          MR. NOONAN:  Object, Your Honor.  Object,

2    Your Honor.

3          That's --

4    BY MR. WILLIAMS:

5    Q.   How much --

6    A.   17,800.

7          MR. NOONAN:  It's non-responsive.

8          MR. WILLIAMS:  The question is how much --

9          MR. NOONAN:  The question was how much did

10   she spend.

11         MR. WILLIAMS:  That is the question.

12         THE COURT:  That's --

13   BY MR. WILLIAMS:

14   Q.   How much did you spend?

15   A.   Well, do you include the money I borrowed?

16   Q.   I beg your pardon?

17   A.   Do I include the money I borrowed to spend on it?

18   Q.   Yeah, I think -- Let me -- Yeah, let me go through

19   it, actually.  Put my hand on in here.

20       Defense Exhibit A says that you start with having

21   to pay out of your own pocket -- started having to pay

22   out of your own pocket, $10,034.

23        Did you pay that?

24         MR. NOONAN:  Well, I'm gonna object, Your

25   Honor.

1          There's been no disclosure of any receipts,

2    or anything of that nature.  This is a projected

3    budget.

4          MR. WILLIAMS:  It's their exhibit, Judge.

5          MR. NOONAN:  It's a projected budget, but it

6    doesn't establish what she spent.

7          MR. WILLIAMS:  That's not a ground of

8    objection, Your Honor, that's a ground of cross-

9    examination.

10          THE COURT:  Well, I think he's asking her

11   what she spent, so --

12          MR. NOONAN:  And it's a leading question, in

13   addition.  So I object to it.

14          MR. WILLIAMS:  Which is the ground I'm

15   supposed to address?

16          THE COURT:  Both.

17          MR. WILLIAMS:  I'll take care of the latter

18   one.  I can't remember the former.

19   BY MR. WILLIAMS:

20   Q.   Would you tell us whether or not the projection

21   that you were going to spend $10,034 out of your own

22   pocket was accurate?

23          MR. NOONAN:  Objection, Your Honor.

24          Again, there's been no -- You know, we filed

25   requests for disclosure.  I asked for documents

1   relating to her damages.  I received --

2            MR. WILLIAMS:  And sorry she didn't keep her

3   receipts, Judge.

4            MR. NOONAN:  I received no documents

5   indicating her expenditures.

6            THE COURT:  Well, she can testify as to

7   whether she spent it or she didn't spend it.

8   BY MR. WILLIAMS:

9   Q.   You can answer that.

10  A.   I'm really bad at math.  I wasn't coming prepared

11  to bring all my receipts of what I spent.  I can --

12           THE COURT:  Well, just listen -- just answer

13  the question.  If you spent it, "Yes."  If you didn't

14  spend it, "No," but we don't -- I mean, let's not get

15  into your ability at math.

16  BY MR. WILLIAMS:

17  Q.   Was the projection that you were going to have to

18  spend at least $10,034 out of your own pocket,

19  accurate?

20  A.   Yes.

21  Q.   Okay.

22        Did you, in fact, spend at least $10,034 out of

23  your own pocket?

24  A.   Yes.

25  Q.   It states in here that they were going to give you

1    loans totaling $14,000.

2         Did they do that?

3    A.   Yes.

4    Q.   Do you have to repay those loans?

5    A.   Yes.

6    Q.   So are you, in fact, indebted to the tune of

7    $14,000 to Yale?

8    A.   Well more, because of interest.

9    Q.   Okay.

10        Do you know how much the interest has added up to,

11   as of today?

12            MR. NOONAN:  Your Honor, I'm going to object.

13            THE COURT:  Sustained.

14            MR. WILLIAMS:  As to the interest?

15            THE COURT:  Yes.

16   BY MR. WILLIAMS:

17   Q.   Now, in addition to the 14,000 that you owe, and

18   the 10,034 that you confirm that you spent, did you

19   have other expenses that you would not have had if you

20   had not put in that year at Yale?

21            MR. NOONAN:  Your Honor, objection.

22            Again, this was never disclosed.  I mean I --

23            MR. WILLIAMS:  It was disclosed.

24            MR. NOONAN:  It wasn't disclosed.

25            MR. WILLIAMS:  It was disclosed.

1          MR. NOONAN:  Well, Your Honor, then I would

2     like to see Mr. Williams show me where he disclosed

3     these figures.  I have no problem with the projections,

4     okay, --

5          MR. WILLIAMS:  It's not my job --

6          MR. NOONAN:  -- but there's nothing in the

7     projections to indicate that there was something beyond

8     that, --

9          MR. WILLIAMS:  It's not my job to bring those

10    files --

11         MR. NOONAN:  -- and there was nothing in --

12         MR. WILLIAMS:  -- here.

13         MR. NOONAN:  -- if I could finish?  And

14    there's nothing in the disclosures that I received.

15         I -- As Your Honor knows --

16         MR. WILLIAMS:  Mr. Noonan is wrong.

17         MR. NOONAN:  If I could have the floor?

18         MR. WILLIAMS:  Oh, sure.

19         MR. NOONAN:  As Your Honor knows from prior

20    rulings that you made on discovery, we asked a number

21    of questions.  We got rulings on getting answers.  We

22    did not get any documents or information, even in

23    interrogatory form, indicating that there were

24    additional expenditures.

25         MR. WILLIAMS:  That is not correct, Your

1    Honor, and Your Honor specifically ordered Mr. --

2              THE COURT:  Well, perhaps, Mr. Williams, you

3    -- in your records you can --

4              MR. WILLIAMS:  I don't have those records

5    here.

6              THE COURT:  -- find --

7              MR. WILLIAMS:  I can bring them tomorrow, if

8    you want.  There's --

9              THE COURT:  No, where you made such

10   disclosure.

11             MR. WILLIAMS:  Absolutely, but I don't have

12   them here in court.

13             THE COURT:  Well, then until you do we'll

14   pass this issue.

15             MR. WILLIAMS:  Well, I'm almost done.  Maybe

16   -- Should we take a long recess, and I can go back to

17   New Haven?  I don't know how you want me to handle it.

18             I -- I'm nearing the end of my direct

19   testimony.

20             THE COURT:  Well, why don't you pass it for

21   now, and we'll discuss it out of the presence of the

22   jury.

23             MR. WILLIAMS:  Very well.

24   BY MR. WILLIAMS:

25   Q.   What was your rent?  You had an apartment on --

1    Gosh, I can't remember the address.  It was out in --

2              THE COURT:  Why don't you ask her?  Ask her

3    the address.

4              MR. WILLIAMS:  It was on Barnett Street.  Oh,

5    I'd hate to do that.  I'm supposed to know New Haven.

6    BY MR. WILLIAMS:

7    Q.   It was on Barnett Street in New Haven, isn't that

8    right?

9    A.   That's correct.

10   Q.   All right.

11        What was your monthly rent?

12   A.   I believe it was 650.

13   Q.   $650 a month?

14   A.   I believe it was 650, yeah.

15   Q.   Okay.

16        And you -- Obviously you took that place at the

17   end of August, you said; is that right?

18   A.   It was inclusive, 650 inclusive.

19   Q.   Right.

20        And how long did you lease?  Was it a one-year

21   lease?

22   A.   Yes.

23              MR. NOONAN:  Objection, Your Honor.

24              Could we do this by way of non-leading

25   questions?

```
 1              MR. WILLIAMS:   Sure.
 2    BY MR. WILLIAMS:
 3    Q.   Was it a one-year -- Can you tell us how long the
 4    lease was for?
 5    A.   One year.
 6    Q.   All right.
 7         At 650 a month?
 8    A.   Yes.
 9    Q.   Okay.
10         Now, you were expelled from Yale at the end of
11    May.  That's three months before the end of the lease,
12    correct?
13    A.   Right.
14    Q.   Did you stay in New Haven for those last three
15    months?
16    A.   Yes.
17    Q.   Okay.
18         Did you -- I'll withdraw that.  I don't want to go
19    into areas that are off limits.
20         Have you encountered any third parties who have
21    expressed to you, that they are aware of the fact that
22    you were expelled from Yale?
23              MR. NOONAN:   Objection, Your Honor.  No such
24    claim.  No claim of damages on that, totally
25    irrelevant.
```

1          MR. WILLIAMS:  It's not a question of

2    damages.  It's a question of reputation.

3          MR. NOONAN:  Well, there's no claim for

4    reputational damage in this case, Your Honor.

5          MR. WILLIAMS:  There certainly is.

6          MR. NOONAN:  Where?

7          MR. WILLIAMS:  It's in the --

8          MR. NOONAN:  I'm looking at the revised

9    damages analysis --

10          MR. WILLIAMS:  It's in the -- I believe it's

11   in the damages analysis.

12          You know, I think Your Honor had ordered both

13   of us, if we had objections to certain areas, to file

14   motions in limine, and I didn't see one on these -- on

15   this subject.  I don't think Your Honor did either.

16          MR. NOONAN:  We actually -- You actually

17   ruled there would be no economic -- non-economic

18   damages discussed in this case.  I did file a motion.

19          THE COURT:  Yeah.  I'm going to sustain the

20   objection, Mr. Williams.

21          MR. WILLIAMS:  Very well, Your Honor.

22          I have no further questions.

23          THE COURT:  All right.

24          I'm going to excuse the jury just for a few

25   minutes.

1              You want to step out, please?

2         (Jury out.)

3              THE COURT:  Mr. Noonan, Rule 50, you want to

4    make a motion?

5              MR. NOONAN:  I don't know that the --

6              MR. WILLIAMS:  I haven't rested my case.

7              THE COURT:  Well, you said she was your last

8    witness.

9              MR. WILLIAMS:  I did not say that.  I said I

10   didn't have anymore questions on direct.

11             THE COURT:  Okay.  I stand corrected.

12             MR. NOONAN:  I will be making a motion, I

13   suspect.

14             THE COURT:  Call the jury back.

15        (Jury in.)

16             THE COURT:  Okay, Ladies and Gentlemen.

17             Mr. Noonan, cross-examination?

18             MR. NOONAN:  Thank you, Your Honor.

19   SALLY GREENHOUSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

20                       CROSS-EXAMINATION

21   BY MR. NOONAN:

22   Q.   Good afternoon, Ms. Greenhouse, how are you?

23   A.   I really have to go to the bathroom.

24             MR. NOONAN:  Even I can't object to that,

25   Your Honor.

1          (Laughter.)

2                  THE WITNESS:  Did that answer your question?

3                  THE COURT:  You want to -- You can go on out.

4          (The Witness withdraws from the courtroom.)

5          (The Witness re-enters the courtroom.)

6                  THE COURT:  Okay, Mr. Noonan.

7                  Thank you, Your Honor.

8     BY MR. NOONAN:

9     Q.   Now I'll ask you, how you feeling now?

10    A.   Okay.

11    Q.   Better?  All right.

12         The -- I want to ask you a series of questions,

13    and I'm going to ask that you answer them "Yes" or

14    "No," or "I don't know," or indicate that you can't

15    answer the question, all right?

16         Will you -- Would you be able to do that?

17    A.   Yes.

18    Q.   Okay.

19         I want to first ask you about that improvisational

20    acting class that you had with Professor Deal.

21         Do I understand correctly, that you were scheduled

22    to engage in two sessions with Professor Deal?

23    A.   Yes.

24    Q.   Okay.

25         And you said that the two sessions were scheduled

1   for September 14th and September 21st; is that right?

2   A.   It's hard to answer this question.

3   Q.   What -- Well, let me try again.  Maybe I -- Maybe

4   it's because I included both dates.

5        Was one of the sessions scheduled for September

6   14th?

7   A.   That's -- I don't understand the question because

8   it wasn't an improvisational acting class.

9   Q.   Oh, I see.  All right.  Well, you didn't tell me

10  when I asked about that.

11       The sessions you had with Professor Deal, however

12  they're described, there were two scheduled that you

13  would be attending, correct?

14  A.   Yes.

15  Q.   All right.

16       And they were scheduled on September 14th and

17  September 21st, correct?

18  A.   That's correct.

19  Q.   All right.

20       And the one on the fourteenth, you were feeling

21  ill, you went to the class, told Professor Deal you

22  were not feeling well, and he suggested you go home,

23  correct?

24  A.   That's correct.

25  Q.   All right.

1          So the only class session that you participated in

2     with Professor Deal, was September 21st, correct?

3     A.   That's correct.

4     Q.   All right.

5          Now, you've told us that Professor Deal introduced

6     the skit, correct?

7     A.   Yes.

8     Q.   And he did that with each of the skits, didn't he?

9     A.   Yes.

10    Q.   All right.

11         And he picked the -- Well, strike that.

12         The way the exercise was supposed to go, is that

13    the students would select the title of the skit,

14    correct?

15    A.   Yes.

16    Q.   All right.

17         And as far as you know, on all the other skits

18    besides yours, the students selected the title?

19    A.   I wouldn't know about what the other students did

20    or --

21    Q.   All right.

22    A.   -- did not do.

23    Q.   All right.

24         And when Professor Deal introduced your skit as

25    "Metamorphosis Revisited, or Rock Out With Your Cock

1    Out," you thought he had made up that title; is that

2    right?

3    A.   Initially.

4    Q.   All right.

5         And you now -- And, in fact, when you complained

6    about Professor Deal to Profession Yionoulis, it was

7    your assumption that Mr. Deal had thought up the new

8    title, correct?

9    A.   No.

10   Q.   Do you remember that I took your deposition just a

11   couple of weeks ago?

12   A.   Yes.

13   Q.   All right.

14        And just for the benefit of the jury, the

15   deposition is a session where you --

16        MR. WILLIAMS:  Your Honor, I don't think it's

17   appropriate for counsel to make that --

18        MR. NOONAN:  Well, it wasn't -- I'll ask it

19   in a question.

20   BY MR. NOONAN:

21   Q.   That was a session where, similar to today, you

22   were sworn to tell the truth, correct?

23   A.   Yes.

24   Q.   And you answered questions?

25   A.   Yes.

1    Q.   All right.

2         And you did your best to answer them truthfully,

3    correct?

4    A.   Yes.

5    Q.   And at that time you remember saying --

6              MR. WILLIAMS:  Can we have a page reference,

7    please?

8              MR. NOONAN:  Yeah.  It's page 157.

9              MR. WILLIAMS:  Thank you.

10   BY MR. NOONAN:

11   Q.   Do you remember saying:

12        "I was really taken aback because it was my

13        assumption that he had thought that up, and I

14        actually thought that for a long time, that it was

15        maybe originating from the professor."

16        Do you recall --

17   A.   Yes.

18   Q.   -- saying that?

19   A.   But that didn't --

20   Q.   Ma'am, that's all I asked.

21        Is that "Yes"?

22   A.   Yes.

23   Q.   All right.

24        Just so you won't feel cheated on this, Mr.

25   Williams will get a chance to ask you more questions

1   when I'm done, as he may have told you.

2       So, at the time that -- Strike that.

3       You would agree that you actually never asked

4   anyone who made up the title, correct?

5   A.   No, I did not.

6   Q.   All right.

7       But the way the exercise was supposed to work is

8   that the students, not the instructor, would bring the

9   whole skit together; isn't that right?

10  A.   Yes.

11  Q.   All right.

12      Now, you indicated that you felt offended by the

13  skit, correct?

14  A.   That it would not be a correct portrayal --

15  Q.   Ma'am, is that "Yes" or "No"?

16  A.   I can't answer that question.

17  Q.   Okay.  You can't answer "Yes" or "No," whether or

18  not you felt offended by the skit?  Just tell me --

19  Answer that one "Yes" or "No."

20      Can you answer the question, "Yes" or "No,"

21  whether you felt offended by the skit?

22  A.   I don't know how to answer that question the way

23  it's posed.

24  Q.   If you can't answer it, that's okay.

25      Now, when the skit was performed, a majority of

1    your classmates were actually cheering during it; were

2    they not?

3    A.   Yes.

4    Q.   All right.

5        And it did not appear that the majority of your

6    classmates were offended, given the fact that they

7    were cheering, correct?

8    A.   I have no idea what they were thinking.

9    Q.   Okay.  Now, I asked you what it appeared to you.

10       Did it appear to you they were offended when they

11   were cheering for your skit?

12   A.   Are you asking about all of them?

13   Q.   I'm talking about the majority of your classmates

14   who you said were cheering during the skit.

15       Did it appear to you that the majority of your

16   classmates were offended?

17   A.   By watching that?

18   Q.   Right.

19   A.   I would say the answer would be "No," they did not

20   appear to be offended.

21   Q.   Okay.

22       And you would agree; would you not, that this

23   particular class, which was observing this skit which

24   had been devised by your classmates, was composed of

25   both male and female students?

1   A.   (No audible response.)

2   Q.   Was the class composed of men and women?

3   A.   Was the class composed of men and women?

4   Q.   Yes.

5   A.   Yes.

6   Q.   Okay.

7        So the people that were watching, that were

8   cheering, was -- it was a class composed of men and

9   women, correct?

10  A.   Yes.

11  Q.   All right.

12       Now, you indicated that there was a student in the

13  class during part of the skit, that put his hand up as

14  a signal to you, correct?

15  A.   A signal?

16  Q.   Did -- Do you remember saying just a little while

17  ago on the witness stand, that there was a point in

18  time where a student put his hand up as a signal for

19  you not to leave the stage?

20  A.   Yes.

21  Q.   Okay.

22       And he was three or four feet away from you at

23  that point in time?

24  A.   Not that far, no.

25  Q.   Do you remember saying in your deposition, that it

1    was three or four feet?

2    A.   I think I remember we tried to --

3    Q.   Well, ma'am, if you don't -- you either remember

4    that, "Yes" or "No."

5         Do you remember?

6              MR. WILLIAMS:  Your Honor, I object to the

7    form of the question, Your Honor, because the word

8    "remember" assumes that it was said.

9              MR. NOONAN:  That's fine.  If she doesn't

10   remember, that's okay.

11             MR. WILLIAMS:  Well, that's --

12             MR. NOONAN:  Let me ask --

13             MR. WILLIAMS:  The question is, "Did you say

14   it?"

15             MR. NOONAN:  May I approach, Your Honor?

16             THE COURT:  You're withdrawing the question

17   and asking another question?

18             MR. NOONAN:  Oh, she answered it.  I'm not

19   withdrawing it.  She answered it.

20             THE COURT:  Okay.  I didn't hear the answer.

21             MR. NOONAN:  Can I approach, Your Honor?

22             THE COURT:  (No audible response.)

23   BY MR. NOONAN:

24   Q.   Let me show you page 162, I'm sorry, 163 of your

25   deposition.

1      Do you see where we were talking about the
2  distance, and your answer in the middle of the page:
3      "It was three or four feet"?
4      That's that one.
5  A.    Oh.
6  Q.    Where it say, "Three or four feet."
7      And it says:
8      "THE WITNESS:", that's you, "Three or four feet"?
9  A.    I see.
10  Q.    Is that what it says?
11  A.    Yeah.
12  Q.    All right.
13      And what had occurred is that I was asking you how
14  far away, and you were trying to measure it by standing
15  a certain distance, I think, from your counsel; is that
16  right?
17  A.    Yes.
18  Q.    And you ended up saying you thought it was -- I
19  said:
20      "Gee, it looks like you're six or eight feet."
21      Mr. Williams said:
22      "I would say three feet."
23      And you said:
24      "Three or four feet."
25      Correct?

1   A.   On your --

2   Q.   Do you need to look at that again?

3   A.   On your script Mr. Williams says, "Four feet."

4   Q.   Right.

5        I said, "Six or eight."

6        Just listen to the question.

7        What happened was I estimated that you were six or

8   eight feet away from (unintelligible) Mr. Williams had

9   said "four feet," and you said, "three or four feet."

10  A.   That's correct.

11  Q.   Now, certainly you didn't think that that student,

12  three or four feet away from you, was attempting to

13  physically restrain you, did you?

14  A.   No, I did not.

15  Q.   All right.

16       And yet, in the Complaint, which you filed here in

17  the District Court, you alleged that an actor attempted

18  to physically restrain you from leaving the stage; did

19  you not?

20  A.   I am -- As I said at the deposition --

21  Q.   No, ma'am.  Ma'am.  Ma'am.

22       Is that "Yes" or "No" or "I don't know"?

23  A.   I don't know.

24  Q.   Okay.

25       Then I will show you the Complaint.

1          And I'm referring specifically to --

2               MR. WILLIAMS:  Is this page -- Is this the

3     document dated February 3rd?

4               MR. NOONAN:  Yes.

5     BY MR. NOONAN:

6     Q.   Paragraph 8 says:

7          "As the male actor closest to the plaintiff began

8          to simulate orgasm, the plaintiff fled the stage

9          as another male student attempted to physically

10         restrain her."

11         Do you see that in the Complaint that was filed on

12    your behalf in this case?  It's the last sentence of

13    paragraph 8.

14         Is that an accurate recitation of that sentence?

15    A.   Yes, it is.

16    Q.   So when you -- You would agree, though, that, in

17    fact, no one attempted to physically restrain you that

18    day, correct?

19    A.   Could you be more specific?

20    Q.   Well, just, ma'am, I'm using the words that were

21    used by your lawyer in your Complaint, and by you in

22    the deposition, "physical restraint."

23         Can we agree that no one attempted to physically

24    restrain you from leaving the stage?

25    A.   No.

1    Q.   Okay.

2    A.   No, we can't agree.

3    Q.   All right.  If we can't agree, because I thought

4    you said a couple of minutes ago --

5            MR. WILLIAMS:  Objection to what Mr. Noonan

6    thought, Your Honor.

7    BY MR. NOONAN:

8    Q.   Do you recall saying, just a few minutes ago, that

9    the student who put his hand up was not attempting to

10   physically restrain you?

11   A.   I --

12   Q.   Do you remember saying that just a few minutes

13   ago?

14   A.   Yes.

15   Q.   Okay.

16       Now, one of the things, as I understand it, that

17   bothered you about this skit, is that it was supposed

18   to be a collaboration, and you felt the other students

19   had changed the skit without telling you; is that

20   right?

21   A.   Excuse me, can you rephrase the question?

22   Q.   Sure, I can do that.

23   A.   I don't --

24   Q.   I can try again.

25       Am I correct that one of the things that bothered

1   you about the skit, is that you felt that your fellow
2   students had changed the skit without telling you they
3   were changing it?
4   A.   That was a fact.
5   Q.   Okay.
6        So what happened was that everyone in the group
7   got together to decide what the skit would be, correct?
8   A.   As I recall.
9   Q.   Okay.
10       And you were one of that group, --
11  A.   Yes.
12  Q.   -- correct?
13       And I think what you told us on direct examination
14  was that was a very quick process, you had 15 minutes
15  or so to come up with an idea to decide what it would
16  be, and then put it on, correct?
17  A.   Sort of.
18  Q.   Okay.
19       And, in other words, I think Mr. Williams asked
20  you, and I think you said, there was no opportunity to
21  rehearse the skit; is that accurate?
22  A.   Yes.
23  Q.   All right.
24       And so what happens is you're given this
25  assignment, you're only given 15 minutes or so to

1    actually come together as a group, decide what it will

2    be, name the skit, and then start performing it,

3    correct?

4    A.    There was a little bit more to it than that.

5    Q.    Okay.

6          Did -- How -- Was it more than 15 minutes?

7    A.    It may have been 20.

8    Q.    Okay.

9          So you had 15 or 20 minutes to completely come up

10   with the idea for this skit, and put it on, correct?

11   A.    No.

12   Q.    All right.

13   A.    We were given a --

14   Q.    I'll ask a question.

15         Were you given some notice in advance, as to what

16   the subject matter would be?

17   A.    No.

18   Q.    All right.

19         And were you given the assignment -- Well, let me

20   ask this.

21         Were you assigned to that particular group that

22   day?

23   A.    Yes.

24   Q.    Okay.

25         So there was no opportunity for you to come

1  together as a group prior to that class, and discuss

2  this, --

3  A.   Right.

4  Q.   -- correct?

5       So that the entire process had to be done

6  immediately before you put the skit on, correct?

7  A.   Yes.

8  Q.   Okay.

9       And so what happened was your group got together,

10 talked about the skit, and then you got up to -- you

11 and your fellow students got up to perform it, correct?

12 A.   We did more than talk about it.

13 Q.   Okay.

14      You acted out some of it?  That's "Yes"?

15 A.   We did kind of a play book, kind of, "You go here.

16 You got there.  This is" --

17 Q.   Okay.

18 A.   -- what's gonna happen."

19 Q.   All right.

20      So you planned it out, you did a little play book,

21 and then you put it on?

22 A.   Right.

23 Q.   Okay.

24      And you didn't see your fellow students, or didn't

25 hear them changing the script, did you?

1    A.   We didn't have a script, per se.

2    Q.   Did you see or hear them changing the skit?

3    A.   As it was unfolding.

4    Q.   Right.

5         Prior to the time that you saw it unfold in a way

6    that was different from what you had thought it was

7    going to be, did you see them collaborating among

8    themselves, and excluding you?

9    A.   I don't remember.

10   Q.   Okay.

11        But what occurred was that after everyone came

12   together as a group and decided what would be done,

13   your fellow students, at least insofar as you believe

14   it to be, changed the skit on you, correct?

15   A.   Two of them, at least.

16   Q.   Yeah.

17        Now, and it was your assumption that the two

18   Jeffs, Jeff Withers and Jeff Barry, were the people who

19   changed the skit, correct?

20   A.   Yes.

21   Q.   All right.

22        It wasn't Professor Deal that changed the skit,

23   was it?

24   A.   Not that I know of.

25   Q.   All right.

1    And you never talked with Professor Deal about
2    this incident, correct?
3    A.   Absolutely not.
4    Q.   All right.
5         You've never talked to him, even up to the present
6    time, about this incident and your -- the fact that you
7    felt offended by it?
8    A.   That's correct.
9    Q.   All right.
10   A.   And you never told Professor Deal that the
11   students had changed the skit on you, and that you felt
12   offended by it, did you?
13   Q.   I told Evan Yionoulis.
14   A.   No, I asked you, ma'am, did you ever tell
15   Professor Deal, who was responsible for that class,
16   that your fellow students had changed the skit on you,
17   and that you were offended by that?
18   Q.   No.  It was obvious.
19   A.   Okay.
20        MR. NOONAN:  Can I just have that last part
21   stricken --
22        MR. WILLIAMS:  I didn't, in fact, even hear
23   it, Your Honor.
24        MR. NOONAN:  I'm asking that the last part be
25   stricken, other than the word "No."

1           MR. WILLIAMS:  I'd like to know what is

2    being --

3           MR. NOONAN:  Well, --

4           MR. WILLIAMS:  -- so I can respond, if I

5    wish.

6           THE COURT:  She said, "No, it was obvious."

7           MR. WILLIAMS:  Oh.

8           THE COURT:  And he's moving that the last

9    part be stricken, and that may be stricken.

10          The answer is "No."

11   BY MR. NOONAN:

12   Q.   And the -- And when you say "It was obvious," the

13   fact is that the majority of the students in the class

14   were actually cheering for their classmates in this

15   skit, correct?

16   A.   I don't know what they were cheering for.

17   Q.   Okay.

18        Well, but you did tell us the majority of them

19   were cheering during this particular part where the

20   male actor was simulating masturbation, correct?

21   A.   Yes.

22   Q.   All right.

23        And there would be no way for Professor Deal to

24   think that the majority of the students were offended

25   by the skit, in light of the fact that they were

1   cheering --

2          MR. WILLIAMS:  Objection; irrelevant.

3   Q.   -- wouldn't you agree?

4          MR. WILLIAMS:  It's irrelevant --

5          MR. NOONAN:  I think it is relevant to

6   whether or not Professor Deal should have intervened

7   and done something, which appears --

8          MR. WILLIAMS:  Your Honor, --

9          MR. NOONAN:  -- to be the complaint.

10          MR. WILLIAMS:  -- his duty to intervene is

11   not based on a majority vote, it's based on whether

12   something was done to this woman that was obviously

13   wrong.  That's a different question.

14          The question asked is irrelevant.

15          THE COURT:  I'll sustain that objection.

16          MR. NOONAN:  All right.

17   BY MR. NOONAN:

18   Q.   Now, without talking to Professor Deal about this

19   issue, you went to talk with Professor Yionoulis about

20   it; is that right?

21   A.   On the phone.

22   Q.   I'm sorry, you need to -- Oh, okay.  You told her

23   on the phone.  Sure.

24          So you didn't talk to Professor Deal, who was

25   actually in the room at the time, but you talked to

1    Professor Yionoulis?

2    A.   That's correct.

3    Q.   All right.

4         And you told Professor Yionoulis that Professor

5    Deal had given the instruction to the effect, "Do it

6    again, only this time really cum."

7         You told Professor Yionoulis about that?

8    A.   That's correct.

9    Q.   All right.

10        And she said to you that, although she wasn't

11   there, "That's the kind of instruction that a director

12   might give in order to get an actor to fully commit to

13   the action?", is that --

14   A.   No.

15   Q.   -- right?

16        She didn't say that to you?

17   A.   No, she --

18   Q.   Okay --

19   A.   -- did not say that.

20   Q.   Hang on.  Let me -- That's fine.

21        Let me just see if you can --

22        I want to ask you again about your deposition,

23   which, by the way, was just taken March 26, 2008, so

24   just a couple weeks ago.

25        Page 171, towards the bottom, I guess it's line 22

1    and 23.

2         Do you see what you said during that deposition.

3         "She said perhaps Frank Deal was trying to get

4         Jeff to fully commit to his actions."

5    A.   That's correct, but the way you stated it would

6    not be correct.

7    Q.   Okay.

8         And to -- That's the type of thing a director does

9    from time to time, isn't it, to give a direction to try

10   to get an actor to fully commit to his actions?

11   A.   I --

12   Q.   Is that something a director is supposed to do to

13   give an instruction that helps an actor to fully commit

14   to his actions?

15   A.   It's not what Evan said.

16   Q.   Ma'am, --

17   A.   No.

18   Q.   Ma'am, can you answer my question?

19   A.   I can't answer your question because of the way

20   that it's phrased, and because of what was -- his role

21   was.

22   Q.   Okay.

23        Let me --

24             THE COURT:  Well, I think he's asking the

25   question more in the abstract, --

```
1    BY MR. NOONAN:
2    Q.   Let me ask --
3              THE COURT:  -- in terms of what directors do.
4    A.   He wasn't the director.
5    BY MR. NOONAN:
6    Q.   (Unintelligible) need to (unintelligible) to make
7    a statement to answer the question.
8         Let me just get that (unintelligible).  I don't
9    want to be unfair, so let's start with what you said.
10        You said that Evan Yionoulis said perhaps Frank
11   Deal was trying to get Jeff to fully commit to his
12   actions, correct?  Is that correct?
13   A.   Yes.
14   Q.   Okay.
15        The next question that I put to you is:
16        "Isn't it true that in theater, sometimes a
17        director will try to get an actor to fully commit
18        to his actions?"
19        Does that happen in theater, or not?
20   A.   In theater if a director is directing --
21   Q.   No, ma'am.  Ma'am, is that a "Yes" or a "No."
22   A.   It's possible.
23   Q.   Okay.
24        Now, Professor Yionoulis sounded like she was
25   taking you seriously, right?
```

1    A.   I don't know.

2    Q.   Do you remember telling me in your deposition just

3    a couple of weeks ago, that you thought she was taking

4    you seriously?

5    A.   That was my --

6    Q.   But -- Well, ma'am, is that --

7    A.   -- feeling.

8    Q.   -- what you told me?  Is that a "Yes"?  Do you

9    remember saying that?

10   A.   My impression was --

11   Q.   That she was taking you seriously.

12   A.   Yes, my impression.

13   Q.   And she didn't sound as though she was acting in a

14   punitive way towards you, did she?

15   A.   No.

16   Q.   All right.

17            THE COURT:  I think we'll take our lunch

18   break here, Mr. Noonan.

19            MR. NOONAN:  Sure.

20            THE COURT:  We'll suspend until 2:00 o'clock.

21       (Recess at 1:00 p.m., until 2:00 p.m.)

22                      AFTER RECESS

23            THE COURT:  Want to bring the jury, Rody.

24            Yeah, you can come up.

25            MR. NOONAN:  Your Honor, I did, in the lunch

1    hour, e-file our motion for a directed verdict.

2              THE COURT:  Okay.

3              MR. NOONAN:  So --

4              MR. WILLIAMS:  How can you file a motion

5    before the party rests?

6              MR. NOONAN:  Well, I anticipated.

7              MR. WILLIAMS:  An anticipatory move.

8              MR. NOONAN:  I'm not asking you to take it up

9    now.  I --

10             MR. WILLIAMS:  I would ask that it be denied

11   on the basis that the -- that it's untimely.

12             THE COURT:  I haven't seen it.

13             MR. WILLIAMS:  Nor have I.

14        (Jury in.)

15             THE COURT:  Okay, Ladies and Gentlemen.

16             Mr. Noonan?

17             MR. NOONAN:  Thank you, Your Honor.

18             Your Honor, one of the -- just housekeeping.

19   There was reference to Defendant's Exhibit A this

20   morning, but it wasn't actually offered, so I think I

21   should probably do that.

22             THE COURT:  Move it in?

23             MR. NOONAN:  Yes, Your Honor.

24             THE COURT:  Full exhibit.

25             MR. NOONAN:  I did want to ask the witness

1    (unintelligible).  (Unintelligible) 4-E

2    (unintelligible).

3            THE CLERK:  (Unintelligible.)

4            MR. WILLIAMS:  Your Honor, while we're at it,

5    the other unobjected-to defense exhibits in as full at

6    this point, which would be --

7            MR. NOONAN:  We didn't offer them yet.  I

8    will --

9            MR. WILLIAMS:  Well, that's what I'm

10   concerned about.  I was --

11           MR. NOONAN:  Well, the others that you

12   referred to are in.

13           MR. WILLIAMS:  But not the other ones to

14   which I had no objection, that were offered but -- Is

15   that right, Your Honor.

16           MR. NOONAN:  I didn't offer them.  Right, I

17   did not offer them.

18           MR. WILLIAMS:  I'm just trying to clarify

19   with the Court.  I thought you had said earlier that

20   they were all in, and I --

21           THE COURT:  I thought, just as a matter of --

22           MR. NOONAN:  Well, I may or may not offer

23   them.  We --

24           THE COURT:  Okay.  Well, if you're not --

25           MR. NOONAN:  (Unintelligible.)

 1              THE COURT:  If there's a possibility you're

 2     not going to offer them, then obviously we can't mark

 3     them.

 4     SALLY GREENHOUSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

 5                    DIRECT EXAMINATION (CONTINUED)

 6     BY MR. NOONAN:

 7     Q.   Good afternoon, Ms. Greenhouse.

 8          You told us this morning that the catalog at the

 9     Yale School of Drama identified $12,000 as the average

10     financial aid award; is that right?

11     A.   I seem to recall that figure that Maria spoke to

12     me about.

13     Q.   All right.

14          And let me -- Your lawyer has offered a portion of

15     the catalog dealing with expenses, tuition, and

16     financial aid.

17          Let me show that to you.  It's Exhibit 4-D, --

18     A.   Uh-huh.

19     Q.   -- and tell us, is there anything in there that

20     identifies the average financial aid award?

21     A.   This would take me a long time to read through.

22     Q.   Well, that's the catalog that your -- or the

23     portion of the catalog your lawyer offered, and you

24     said this morning that the catalog identified an

25     average financial aid award of $12,000.

1    A.   There was an item in there that Maria spoke with

2    me about.

3    Q.   Okay.

4        Can you just look through that and see if that's

5    in there?

6            (Pause.)

7    A.   There is a --

8    Q.   Is there something in there -- Just a "Yes" or

9    "No," is there something in there indicating that the

10   average financial aid award for the Yale School of

11   Drama is $12,000?

12           MR. WILLIAMS:  If it's a full exhibit,

13   doesn't it speak for itself?  Why are we taking time

14   for this?

15           THE COURT:  Well, it's cross-examination.  He

16   can ask her.

17           Overruled.

18   A.   I don't see the item that I recall from that time.

19   BY MR. NOONAN:

20   Q.   All right.  Let me ask  you this.

21       You said, in any event, that the catalog

22   identified average financial aid award of $12,000.

23       Your award was $20,000, correct?

24   A.   No, actually the --

25   Q.   Is that a "Yes" or a "No"?  Was your award

1    $20,000?  Your financial aid award?

2    A.   I think there's a confusion on terms.

3    Q.   No.  No, if you can't answer (unintelligible),

4    don't tell me it's confusing, just tell me you can't

5    answer the question.

6         Was your financial aid award $20,000?

7    A.   My financial aid award --

8    Q.   Is that a "Yes" or a "No"?  Confine yourself to a

9    "Yes" or "No," please.

10   A.   Yes.

11   Q.   All right.

12        In fact, that's what's stated on the front-page of

13   Defendant's Exhibit A, which your lawyer showed you

14   before (unintelligible) financial aid award is $20,166,

15   correct?

16   A.   Yes.

17   Q.   All right.

18        Now, you told us this morning that when you talked

19   to Susan Rochette, the financial aid officer about

20   that, that you were disappointed with the award, and

21   you asked her, "Isn't there another way to crunch the

22   numbers?"

23         Do you recall saying that?  Do you recall saying

24   that this morning, ma'am?

25   A.   Saying exactly what?

1    Q.   I'm not sure that it's exactly, but do you recall,

2    in words or substance, saying, although your exact

3    words were "crunching the numbers," did you ask Ms.

4    Rochette if there was another way to crunch the

5    numbers?  Do you recall saying that this morning?

6    A.   Yes.

7    Q.   All right.

8         And do you recall saying that she told you, "No,"

9    there was nothing she could do?  Do you recall saying

10   that?

11   A.   Yes.

12   Q.   All right.

13        Let me show you, in the middle of Defense Exhibit

14   A, the same document that your lawyer was showing you

15   this morning, you see this handwritten sheet that says

16   "Meeting with student," and there's a whole bunch of

17   different numbers on it?  Do you see that page?

18   A.   Yes.

19   Q.   And you did have a meeting with Ms. Rochette,

20   correct?

21   A.   We all did, yes.

22   Q.   And you say, "We all did."

23        Was it more than yourself and Ms. Rochette in that

24   meeting?

25   A.   There was actually somebody else who was present

1     but -- other than the directing students.

2     Q.   Well, I'm just talking about you.

3     A.   Uh-huh.

4     Q.   You had a meeting with Ms. Rochette after you

5     raised a question about the amount of your financial

6     aid; is that right?

7     A.   We spoke on the phone.

8     Q.   And then didn't you have a meeting with Ms.

9     Rochette, after you raised a question about your

10    financial aid?

11    A.   We did meet, yes.

12    Q.   And isn't this a piece of paper that Ms. Rochette

13    prepared to put in your financial aid file, says at the

14    top, "Meeting with student," where she crunches a bunch

15    of numbers?

16          MR. WILLIAMS:  Your Honor, how can she --

17    There's no way the witness could --

18          MR. NOONAN:  Well, --

19          MR. WILLIAMS:  -- know the answer --

20          MR. NOONAN:  -- if she doesn't know the

21    answer, she can answer that she doesn't know.

22          MR. WILLIAMS:  It's --

23          MR. NOONAN:  (Unintelligible.)

24          MR. WILLIAMS:  It's an internal exhibit from

25    the defense, Your Honor.

1          MR. NOONAN:  She (unintelligible.)

2          THE COURT:  But I think she could look at it,

3    and if she doesn't remember, she'll say she doesn't

4    remember, or whatever her answer is, but it's fair

5    cross-examination.

6    A.    I don't remember this sheet.

7    BY MR. NOONAN:

8    Q.    But you can see that it's in an exhibit that your

9    lawyer asked you about this morning.

10         It's handwritten, correct?

11   A.    Yes.

12   Q.    It says it the top, "Meeting was student,"

13   correct?

14   A.    Yes.

15   Q.    And it has a number of numbers and categories that

16   are handwritten there, correct?

17   A.    Yes.

18   Q.    And the very next page is a message, I suppose a

19   computer-generated message, about Sally Greenhouse, and

20   it says:

21         "Comment: (unintelligible) phone calls from

22         student (unintelligible) if she pays down $5,000

23         of assets or debt, will reduce asset contribution

24         by $1,750."

25         Do you see that?

1    A.   Yes.

2    Q.   All right.

3         So, what actually happened, when you had this

4    meeting with Ms. Rochette, and you asked if she could

5    crunch some numbers, she did crunch some numbers, and

6    she told you that if you were to use $5,000 from the

7    $20,000 in assets you had, to pay down your existing

8    debts, she could then increase your award by 100 --

9    $1,750, correct?

10   A.   That's correct.

11   Q.   All right.

12        So when you told us this morning, that she

13   absolutely refused to try to crunch numbers and give

14   you more money, that wasn't true, was it?

15   A.   I don't quite understand what you're asking.

16   Q.   Okay.  Let me back up.

17        Didn't you tell us this morning, that you asked

18   Ms. Rochette if she could crunch the numbers and come

19   up with more financial aid for you?  Do you recall that

20   from this morning?

21   A.   I actually didn't --

22   Q.   No, ma'am.

23        Ma'am, do you recall testifying this morning, that

24   you asked Susan Rochette to crunch the numbers so you

25   could get more financial aid?

1   A.   No, not financial --

2   Q.   You don't remember saying that this -- You don't

3   have to answer anything else other than "Yes" or "No."

4       You don't remember saying that this morning?

5   A.   Yes, I remember this morning.

6   Q.   All right.

7       And you remember saying that Ms. Rochette

8   absolutely refused, and told you there was nothing she

9   could do?  Remember saying that this morning?

10   A.   That's correct.

11   Q.   All right.

12       It turns out that's not true, is it?

13   A.   That was true during the telephone conversation.

14   Q.   Ma'am, didn't you tell us this morning, there was

15   no way she could crunch numbers, and it turns out she

16   did crunch numbers, and she offered you more financial

17   aid?

18   A.   Not that morning.

19   Q.   I didn't ask you whether it was that morning.

20       Did you leave that out?  Did you leave that out

21   intentionally, from your testimony here today, in

22   talking about what Ms. Rochette offered you, to mislead

23   this jury?

24   A.   No.

25   Q.   Oh.  All right.

1        So when you told the jury that you asked her if

2   she can crunch some numbers, and she said "No," and it

3   turns out she did crunch numbers, and she offered you

4   more money, you think your testimony this morning was

5   the truth, the whole truth, and nothing but the truth

6   on that subject?

7   A.    In the telephone call --

8   Q.    Ma'am --

9   A.    -- that I was --

10  Q.    -- ma'am --

11  A.    describing --

12  Q.    -- that's "Yes" or "No."

13       Do you think you were being forthright with this

14  jury, when you told them this morning, that you asked

15  Ms. Rochette if she could crunch some, and she said,

16  "No," and you failed to mention that she, in fact, did

17  crunch numbers, and offered you more money?  You think

18  that was truthful?

19  A.    I don't understand your question.

20  Q.    I'll move on.

21       And as it turns out, you decided to reject Ms.

22  Rochette's offer of additional funds because you

23  decided not to pay down your debts, as she had

24  recommended to you, correct?

25  A.    I don't understand the question.

1  Q.   All right.

2       Did you -- You don't understand, let me know --

3  A.   No.

4  Q.   -- and I'll -- Fine.  I'll ask you another one.

5       Did you, in fact, accept Ms. Rochette's advice to

6  use $5,000 of your assets to pay down your debts, and

7  thereby get a higher financial aid award?

8  A.   No, I chose to pay.

9  Q.   Okay.

10      Now, you testified on direct examination, about a

11 scene in which you and a male actor simulated oral sex,

12 correct?

13 A.   We didn't simulate it, but it was --

14 Q.   Well, you didn't -- Well, it wasn't real oral sex,

15 was it?

16 A.   No.

17 Q.   Okay.

18      It was a scene in which there was -- he was

19 putting his head under your skirt in order to simulate

20 oral sex, correct?

21 A.   To suggest that that was the (unintelligible).

22 Q.   Okay.

23      And that's an acting exercise.

24      To do something like that is not unusual, is it,

25 in an acting exercise?

1    A.    The -- I don't --

2    Q.    I'll withdraw it.

3          Is it unusual, in an acting exercise, to engage in

4    some kind of conduct that suggests a sexual act?

5    A.    I can't -- I don't know --

6    Q.    You don't know.  You don't know.  That's okay.

7    I'll move on.

8          The -- But you do agree that this particular scene

9    -- And by the way, the play was called, "Cloud 9,"

10   right?

11   A.    That's correct.

12   Q.    All right.

13         And you said that -- this morning, that the reason

14   you picked that scene is because you felt that it would

15   demonstrate that you are not a prude, and it might help

16   you get off warning --

17   A.    That was one of the reasons.

18   Q.    Okay.

19         Do you remember me asking questions about that

20   scene, and how it was selected, when I took your

21   deposition?

22   A.    Yes, I do.

23   Q.    And that was just a couple of weeks ago, right?

24   A.    Yes.

25   Q.    And you were quite well aware of the fact that the

1    reason I was asking questions was so that I would be

2    aware of what your positions were on various issues in

3    this lawsuit, correct?

4    A.   I don't know --

5    Q.   You didn't know?  You didn't know what I was --

6    A.   I've never -- I don't know what you --

7    Q.   Okay.  All right.

8         You weren't aware of the fact that the reason a

9    lawyer takes depositions prior to trial, was to make

10   sure that the lawyer knows what the witness'

11   perceptions and recollections are?

12   A.   I imagine.

13   Q.   Okay.

14        Now, let me -- If you don't -- Would you mind if I

15   read it with you, (unintelligible) behind

16   (unintelligible) in order to do it.

17         Let me just read to you, and I'm just going to

18   ask you whether this is what you told me in your

19   deposition two weeks ago, at page 245.  We're starting

20   here at line 9.

21        "When you say 'go up underneath your skirt,' is

22        that with his head?

23        Answer: Yeah.

24        And is the idea that he's simulating oral sex" --

25             MR. WILLIAMS:  I'm sorry, (unintelligible).

1   What line is this?

2           MR. NOONAN:   Starts at line 9.

3           MR. WILLIAMS:   Oh, I'm sorry.   Here it is, 9.

4   Okay.   Thank you.

5   BY MR. NOONAN:

6   Q.   "And is the idea that he's simulating oral sex?

7        Answer: I think that was the point, uh-huh.

8        Question: And who selected that scene?

9        Answer: Who selected it?

10       Question: Right.

11       Answer: You mean, whose idea was it?

12       Question: Yeah.   How did you get involved in the

13       scene?

14       Answer: Well, Jim Nicholson, a playwright.

15       Question: Is he another student?

16       Answer: No, he's a friend of mine who is an award

17       -winning playwright.

18       Question: A playwright outside of the school?

19       Answer: Uh-huh.

20       Question: Is that a 'Yes'?

21       Answer: Yes.

22       Question: What course was it, that you were

23       portraying the scene?

24       Answer: Acting.

25       Question: And how was it that the outside

1    playwright is the one who selected the scene, or
2    did you go to him and ask for advice?
3    Answer: I talked to him on the phone and e-mailed
4    him all the time.  He had come to the school -- He
5    had been to the school and he had watched the
6    actors work, and he said, 'This scene would be
7    really good one for Alan Reid.  Do you think you
8    can do it?'  And I said, 'Wow, yeah, we can do
9    this in a very demure way,' and I brought it
10   before Alan Reid and he said, 'I would like to do
11   this scene,' and I said, 'Let's try it.'
12   So we had it all planned out, and it did work very
13   well for him.
14   In fact, I remember very well the reaction that
15   Evan gave to him about that, and the commendation
16   that he received, and her specific direction that
17   he should be walking across the stage as though he
18   had a big erection, which was funny for him,
19   because it was the end of the year and by that
20   point I think Alan was -- I think he was feeling
21   at ease enough to be able to work on spontaneity
22   and, you know, he had been, I think, a little bit
23   more structured about his approach to Seymour, and
24   expanding his range, so that he seemed to really
25   -- it seemed to really work.

1          Question: So the way that scene got selected was

2          it was recommended by -- to you by someone outside

3          the school?

4          Answer: Who knew Alan and who had come to campus,

5          and he said, 'Why don't you check this out?'

6          Question: And then you and Alan collaborated on

7          it?

8          Answer: Uh-huh."

9          So, in that exchange --

10              MR. WILLIAMS:  Well, Your Honor, I don't

11     think that's fair.  That's not a complete reading.

12              Mr. Noonan questioned her much more about

13     that very topic.

14              THE COURT:  But I think you, on redirect, Mr.

15     Williams, if you want to -- if you think it's

16     contextual, you can ask her on redirect.

17     BY MR. NOONAN:

18     Q.    Is there anything in that answer that would have

19     alerted me or anybody else listening to it, that you

20     were doing it in order to prove you were not a prude?

21     A.    No.

22     Q.    Is there anything you say in the deposition to

23     (unintelligible) entire (unintelligible) that would

24     alert anyone to that fact?

25     A.    No.

1  Q.   In fact, you made that up after you know that it
2  was going to be an issue in this case.  You made up
3  this excuse that you were doing it in order to get off
4  the warning; isn't that right?
5  A.   That isn't incorrect.
6  Q.   But at least at the time I asked you this question
7  two weeks ago, you told me that you got the idea from
8  this friend of years, Jim Nicholson; isn't that right?
9  A.   That is correct.
10 Q.   And you didn't mention anything about wanting to
11 demonstrate you were not a prude, correct?
12 A.   That is correct.
13 Q.   Now, that particular scene from Cloud 9, that was
14 -- Well, let me ask you this.
15      Would you agree that in acting class, you have to
16 be -- I'm sorry, would you agree that acting class
17 should prepare actors to participate in the type of
18 scenes they'll be doing when they graduate?
19 A.   Could you -- I'm sorry, could you ask that
20 question again?
21 Q.   Try again.  I'm sorry.  Thanks for the
22 opportunity.  I think I fumbled the lines.
23      Do you agree that a drama school should prepare
24 actors to participate in the types scenes they'll be
25 doing when they graduate?

1    A.   I'm not an expert.

2    Q.   Okay.  Well, you --  Well, wait a minute, ma'am.

3    You know, when you testified this morning, you told us

4    about your extensive, extensive experience in the

5    theater.

6         Do you recall that --

7    A.   I don't teach --

8    Q.   -- this morning.

9    A.   -- in a drama school.

10   Q.   I understand.  You told us a lot about theater

11   though, didn't you, and you've had a lot of experience

12   with theater; have you not?

13   A.   Yes.

14   Q.   All right.

15        Do you think --

16   A.   Uh-huh.

17   Q.   -- that a drama school should prepare actors to

18   participate in the type of scenes they'll be doing when

19   they graduate?

20   A.   I suppose.

21   Q.   That's kind of an easy one, isn't it?  Isn't that

22   what they should be doing with their actors, is to

23   prepare them for the work they're going to be doing

24   when they graduate?

25   A.   You'll have to ask Evan Yionoulis.

1    Q.   I see.

2         Do you really mean that you can't answer that

3    question, that you can't sit here and say

4    unequivocally, that an acting school should teach

5    people how to act?

6              MR. WILLIAMS:  Objection, Your Honor.  I

7    wasn't aware that she was a student in an acting

8    school.  I think she was at a directing school.

9              MR. NOONAN:  I see.

10   BY MR. NOONAN:

11   Q.   And would you agree that in that drama school,

12   where actors are being taught, that one of the goals is

13   to teach the actors to participate in the types of

14   scenes they'll be doing once they graduate?

15   A.   I suppose.

16   Q.   And would you agree that theater often explores

17   human sexuality?

18   A.   Explicitly, no.

19   Q.   Do you -- Well, hasn't it had been true since the

20   time of the ancient Greeks, that theater has explored

21   themes of human sexuality?

22   A.   Its themes, yes.

23   Q.   Yeah and, in fact, you're familiar with

24   Aristophanes, aren't you?

25   A.   It's been a long time since I studied Greek

1    tragedy.  That was undergrad.

2    Q.   Okay.

3    A.   I'm not an expert in Aristophanes.

4    Q.   Do you remember that Aristophanes used cod

5    (phonetic) pieces in his productions, one of the

6    ancient Greeks?

7    A.   So you're saying that --

8    Q.   I'm just asking if you recall that.  That's a

9    "Yes" or a "No."

10   A.   I don't recall.

11   Q.   You don't recall that.  Okay.

12        Do you recall that Metamorphosis is actually --

13   was written by of Ovid, one of the ancient Romans?

14   A.   Yes.

15   Q.   Do you remember there being a lot of sexual

16   content in Metamorphosis?

17   A.   How do you mean "sexual content"?  It varies so

18   much.

19   Q.   Well, I'm --

20   A.   Explicit sex acts on stage or --

21   Q.   Well, I'm feeling -- I guess I'm feeling a little

22   bit like President Clinton in this.  I was asking it in

23   the normal way that people use the term.

24        Is it true that Metamorphosis, which is -- was

25   the title that you came up with for that skit, before

1    it was changed, is it true that Metamorphosis explores

2    sexuality?

3    A.    Explores sexuality?

4    Q.    Includes some references to sex?

5    A.    Oh, sure.

6    Q.    It includes references to bestiality; does it not?

7    A.    Not the production I specifically saw.

8    Q.    And more recently, you probably did see that

9    movie, "When Harry Met Sally," and Meg Ryan is doing

10   that simulated orgasm in a diner?  Did you ever see

11   that movie?

12   A.    Yes, I did.

13   Q.    So, there's nothing unusual about sexual issues in

14   the theater, is there?

15   A.    Unusual?

16   Q.    Yeah.

17   A.    No.

18   Q.    All right.

19         You're aware of the Broadway play called "Spring

20   Awakening"?

21   A.    Yes.

22   Q.    All right.

23         That's a pretty famous play, correct?

24   A.    Yes.

25   Q.    It includes a scene where a male actor delivers a

1  monologue while he's masturbating, correct?

2  A.   Yes.

3  Q.   And that play has received a pretty fair amount of

4  critical acclaim, correct?

5  A.   Yes.

6  Q.   And you would want the Yale School of Drama, which

7  I think you said was the best school of drama you're

8  aware of, to prepare its students to be involved in

9  scenes that were going to be in Broadway plays; would

10  you not?

11  A.   Oh, yes.

12  Q.   Now, with regard to that scene that you selected

13  from Cloud 9, that was not your instructor who

14  suggested that to you?

15  A.   No.

16  Q.   And it wasn't one of your classmates?

17  A.   No.

18  Q.   All right.

19      And it was you who asked Alan Reid to perform that

20  scene with you, correct?

21  A.   Not exactly, no.

22  Q.   Well, didn't you tell me in your deposition, that

23  it was you who asked Alan Reid to perform the scene

24  with you?

25  A.   We --

1    Q.   That's really just "Yes" or "No."

2         Did you tell me in your deposition, that you asked

3    Alan Reid to participate in that scene with you?

4    A.   I don't think that's what I said.  I think I asked

5    him did he want to do that scene.

6    Q.   Ah.  Okay.  I'll take that.

7         So, you asked Alan Reid if he wanted to do that

8    scene with you, correct?

9    A.   Yes.

10   Q.   All right.

11        So the confusion was when I asked the question, I

12   said, "You asked Alan Reed to perform that scene with

13   you?", and what you're saying is you asked him if he

14   wanted to do the scene with you?

15   A.   I just asked him if he wanted to do the scene.

16   Q.   All right.

17        With you?

18   A.   Well, by implication, yes.

19   Q.   All right.  Okay.

20   A.   We each had scenes.

21   Q.   Okay.

22        Now, after that scene was done, Professor

23   Yionoulis, the acting teacher, gave Alan Reid an

24   instruction that he should be walking across the stage

25   as though he had a big erection, correct?

1   A.   Something close to that, yes.

2   Q.   Well, I actually was reading that one.

3        You see on page 246, where it says, "Her specific

4   direction that he should be walking across the stage as

5   though he had a" --

6   A.   Yes.

7   Q.   -- "erection."

8   A.   Yes.

9   Q.   So that's something she said?

10  A.   Yes.

11  Q.   Is there reason that you're not answering my

12  questions, agreeing to what I describe, unless I

13  actually show you the exact words?

14  A.   Excuse me?

15  Q.   Have you noticed that unless I show you the words

16  on the page, you won't agree with it?

17         MR. WILLIAMS:   I'm going to object to that as

18  argumentative, Your Honor.

19         THE COURT:   Sustained.

20         MR. NOONAN:   I'll move on.

21  BY MR. NOONAN:

22  Q.   Now, when Professor Yionoulis gave Alan Reid the

23  instruction that he should be walking across the stage

24  as though he had a big erection, you didn't find that

25  directorial comment to be offensive, did you?

1   A.   No.  It wasn't directed to me.

2   Q.   I'm sorry, was the answer "No"?

3   A.   No.

4   Q.   All right.

5       In fact, you thought that it was an appropriate

6   directorial instruction; isn't that right?

7   A.   It wasn't inappropriate.

8   Q.   Okay.

9       And that might be that kind of thing that a --

10  someone -- instructor, actors would do, is to say

11  something like that in order to get them to commit

12  fully to the scene, correct?

13  A.   In acting class?

14  Q.   In any kind of class in the theater, ma'am.

15  A.   In an acting class, I can specifically say a

16  "Yes."

17  Q.   Okay.

18      So the objection that you had to Mr. Deal's

19  instruction to an actor, was that it did not take place

20  in a class that was called an "acting class."

21      Is that what you're saying?

22  A.   That is partially correct, yes.

23  Q.   Okay.  All right.

24      But the subject matter itself is acceptable

25  because this is part of what drama is about; isn't that

1    right?

2    A.   Depending on the context.

3    Q.   Okay.

4         Now, there was also a class where you participated

5    in a scene where you straddled an actor, as you put it,

6    "pelvis to pelvis."

7         Isn't that right?

8    A.   I was instructed to, yes.

9    Q.   Okay.

10        And that was in a class with Dean Bundy, correct?

11   A.   Yes.

12   Q.   And you didn't object to that, correct?  That's a

13   "Yes" or a "No"?

14   A.   I was not permitted to object.

15   Q.   No.

16             MR. NOONAN:  I object and move to strike,

17   Your Honor.

18             THE COURT:  The motion is -- The answer will

19   be stricken.  The witness can answer "Yes" or "No."

20   A.   No, I did not complain.

21   BY MR. NOONAN:

22   Q.   And that was in a play in which you were playing

23   the part of Arkadina; is that right?

24             THE COURT:  How do you spell that?

25             MR. NOONAN:  A-R-K-A-D-I-N-A, I believe.

BY MR. NOONAN:

Q.   Is that correct, you were playing the part of Arkadina?

A.   Yes.

Q.   And that was a play by Anton Chekhov?

A.   Yes.

Q.   Pretty famous fellow in the theater world, correct?

A.   Correct.

Q.   All right.

And when Dean Bundy directed you in that scene, you carried out the scene without objection, correct?

A.   Yes.

Q.   And you did not, at any later date, object to Dean Bundy or anyone else about that scene, did you?

A.   Of course not.

Q.   Okay.

And, in fact, instead of suggesting to Dean Bundy, that you were offended by his direction, you actually sent him an e-mail thanking him for the way he had instructed you on the Arkadina scene; isn't that right?

A.   I'd like to see that particular e-mail.

Q.   You -- And I will be happy to show it to you.

Do you recall sending Dean Bundy an e-mail in which you complimented him on the direction he had

1   given you in the scene in which you were playing

2   Arkadina?

3   A.   No, I don't recall.

4   Q.   Okay.

5        Then let me show you what's been marked as Defense

6   Exhibit F for Identification.

7        Just take a look at that, and ask if you recall

8   that e-mail?

9   A.   Oh, this was not about --

10  Q.   Ma'am, just tell me is that an e-mail that you

11  sent to Dean Bundy?

12  A.   Yes.

13            MR. NOONAN:   We offer it, Your Honor.

14            THE COURT:   Full exhibit.

15            MR. NOONAN:   May I read it to the jury, Your

16  Honor?

17            THE COURT:   Go ahead.

18            MR. NOONAN:   This is an e-mail, dated Friday,

19  October 11th, 2002, from Sally Greenhouse to James

20  Bundy:

21            "Dear James:

22            Following class, I had an opportunity to

23            check in with my acting partner, as well as

24            the other (unintelligible), and we had a

25            lively discussion about a scene where your

```
 1              questions and critiques were illuminating,
 2              and I want to thank you for taking the time
 3              to answer my questions about the relationship
 4              with the text of the script, from the actor's
 5              point of view.
 6              I did have some confusion about adherence to
 7              the parenthetical directions in the script.
 8              For me, the acting class is the greatest
 9              challenge, yet I sense whatever I am able to
10              experientially learn would soon prove to be
11              invaluable in my work as director.
12              Onward through the fog.
13              Blessings,
14              Sally Greenhouse."
15   BY MR. NOONAN:
16   Q.   Now, there were other times when you e-mailed Dean
17   Bundy after his -- after you were involved in a class
18   session with him, correct?
19   A.   Probably.
20   Q.   And oftentimes, in those e-mails, you let him know
21   that you thought his teaching was quite helpful to you,
22   correct?
23   A.   Yes.
24   Q.   All right.
25        Let me show you what's been marked as Exhibit B
```

1  for Identification.

2      Read it to yourself, if you would, and tell me if

3  you recognize that as an e-mail that you sent to him?

4  A.   Yes.

5           MR. WILLIAMS:  Could we have the date on

6  this?

7           MR. NOONAN:  Well, we will once it's admitted

8  (unintelligible).

9           MR. WILLIAMS:  Well, yeah, I don't see a date

10  on it.  That's why I'm confused.

11  A.   Yes.

12  BY MR. NOONAN:

13  Q.   And this is an e-mail that you wrote to Dean

14  Bundy, correct?

15  A.   Yes.  I mean, I don't recall what -- but I -- it

16  looks like my --

17  Q.   All right.

18      Well, you would have -- at that point in time,

19  your e-mail address was "Sally Greenhouse" --

20  A.   Yes.  Yes.  Yes.

21           MR. NOONAN:  I offer it, Your Honor.

22           MR. WILLIAMS:  I just -- I just -- I'd like

23  to have some clarification as to a date on this.  It

24  doesn't have a date.

25           Other than that, I wouldn't have a problem

```
 1   with it, but it's not dated.
 2           MR. NOONAN:  I got from you, John.
 3   (Unintelligible.)
 4           MR. WILLIAMS:  Well, I'm not offering it, he
 5   is.
 6           MR. NOONAN:  I don't have to have a date on
 7   it.  (Unintelligible) she sent it to (unintelligible).
 8           It's not my fault it's not dated, and I'm not
 9   gonna (unintelligible).
10           THE COURT:  It's a full exhibit.  I mean, it
11   is what it is.
12   BY MR. NOONAN:
13   Q.   The -- Let me ask you, about halfway down, tell me
14   if I'm reading this correctly (unintelligible).
15        "Luke" -- Who's "Luke," by the way?
16   A.   He's an actor.
17   Q.   He's the actor that you were doing this --
18   A.   That scene with.
19   Q.   --(unintelligible).
20   A.   Right.
21   Q.   "Luke and I presented our scene today
22        (Arkadina/Tregorin).
23        I take it Tregorin was his role; is that right?
24   A.   Excuse me?
25   Q.   Is Tregorin Luke's role?
```

1    A.    Yes.

2    Q.    "Luke and I presented our scene today

3          (Arkadina/Tregorin).  I want you to know that I

4          was able to completely nail all of my lines, and

5          Evan commended me overall, for my enormous

6          progress in the scene, and told us how well the

7          scene played.  She did not have us rework it at

8          all.  That was pretty much a first, although she

9          has asked us to imagine a set (non-realist

10         (unintelligible)) that would have us sitting

11         facing each other in the chairs, and present it

12         next week.

13         Otherwise, all the work that got done on that one

14         was with you, and I wanted to thank you profusely.

15         I feel like your teaching in that class was a

16         turning point for me."

17         Did I read that accurately?

18   A.    Very well, thank you.

19   Q.    When you thanked Dean Bundy profusely for all the

20   work that he had done with you, were you in any way

21   trying to indicate to him that you felt he was

22   discriminating or retaliating against you?

23   A.    I don't really see the connection

24   (unintelligible).  I know --

25              MR. NOONAN:  Can I -- I move to strike the

1    commentary, Your Honor.  I think the answer was "No."

2              THE COURT:  Yeah, that -- the first part of

3    the answer will go out.  The answer will stand as "No."

4    BY MR. NOONAN:

5    Q.   And you mention in this e-mail, that Professor

6    Yionoulis complemented you on your enormous progress.

7    A.   Yes.

8    Q.   You didn't have the sense that she was retaliating

9    or discriminating against you when she gave you those

10   compliments, did you?

11   A.   No.

12   Q.   You also indicate that this was the first time

13   that you didn't have to rework it, so I take it that

14   prior to that, you had had some difficulty in your work

15   in that class?

16   A.   Yes.

17   Q.   And you end the e-mail by saying to Dean Bundy:

18        "I feel like your teaching in that class was a

19        turning point for me," --

20   A.   Yes.

21   Q.   -- correct?

22        That was intended as a compliment to him, I take

23   it?

24   A.   It was intended as a fact.

25   Q.   Okay.

1          And it was a compliment to him, correct?

2    A.    You'd have to ask him.

3    Q.    Well, I'm asking you what your intent was.

4          Weren't you intending to complement him when you

5    said, "I feel like your teaching in that class was a

6    turning point for me?"

7    A.    Not exactly, no.

8    Q.    Okay.

9          How about when you said:

10         "All the work that got done on that one was with

11         you, and I want to thank you profusely."

12         Was that intended as a complement to Dean Bundy?

13   A.    Statement of gratitude.

14   Q.    Wasn't it a compliment on the work he had done

15   with you?

16   A.    I --

17   Q.    All right.

18         And wasn't it a compliment when you said -- It's

19   okay to compliment him.

20         Wasn't it a compliment when you said:

21         "I feel like your teaching in this class was a

22         turning point for me."

23         Isn't that a intended as a compliment, Ms.

24   Greenhouse?

25   A.    I feel that you're putting words in my mouth.

1   Q.   I'm just asking you questions, ma'am.  You're the

2   one that has to answer them.  If you think that's not a

3   compliment, you can tell this jury that.

4   A.   I felt that I was --

5   Q.   No, ma'am.  That's just "Yes" or "No."

6        Did you think that --

7            MR. WILLIAMS:   It (unintelligible) "Yes" or

8   "No" question.

9            MR. NOONAN:  Yes it was.

10  BY MR. NOONAN:

11  Q.   Did you think it was -- that you were intending to

12  give a compliment to the dean when you wrote to him:

13       "I feel like your teaching in that class was the

14       turning point for me"?

15  A.   Not exactly, no.

16  Q.   Okay.  Fine.  If it's not, I'll move on.

17       You did occasionally acknowledge to Dean Bundy,

18  your shortcomings, and apologize for them, correct?

19  A.   Sure.

20  Q.   Okay.  In fact, let me just show you Exhibit I.

21       Exhibit I, an e-mail communication

22  (unintelligible).

23  A.   Yes, I remember this.

24            MR. NOONAN:  I'll offer it as a full exhibit,

25  Your Honor.

1          THE COURT:  Full exhibit.

2       (Mr. Noonan and Mr. Williams confer.)

3   BY MR. NOONAN:

4   Q.   Now, Exhibit I, which was just made a full

5   exhibit, you apologize to Dean Bundy for interrupting

6   him when he was giving notes; --

7   A.   Yes.

8   Q.   -- is that right?

9       And notes are instructions that the director is

10  giving to the actors; is that right?  Not instructions,

11  but observations.

12  A.   Yeah.

13  Q.   Critiques.

14  A.   Uh-huh.

15  Q.   Fair statement?

16  A.   Sure.

17  Q.   Okay.

18      And you recognized, after rehearsal on that

19  particular day, that you should not have been

20  interrupting the director when he was trying to give

21  notes?

22  A.   That's correct.

23  Q.   That was during the time you were the -- acting as

24  the assistant director on the play with Dean Bundy at

25  the Yale Rep; is that right?

1    A.    Yes, beginning.

2    Q.    You said this morning that the dean -- Dean Bundy

3    praised you all the time, except when you did something

4    inappropriate.

5          Do you recall saying that this morning?

6    A.    Did I say that this morning?

7    Q.    Do you --

8    A.    I don't remember.

9    Q.    I'm not sure you get to ask your lawyer about your

10   testimony.

11         That -- Do you remember your testimony this

12   morning?

13   A.    Most of it, yes.

14   Q.    Okay.

15         The reason I ask is that you testified with some

16   clarity, and I think very -- in a very precise way,

17   about specific things that were said to you by some of

18   these people --

19              THE COURT:  Your Honor; this is

20   argumentative.  I don't think this is --

21              MR. NOONAN:  Oh, no, it's not argumentative.

22   I get -- This is cross-examination.

23              MR. WILLIAMS:  This is not a question.  This

24   is a -- It's a statement.  It's not a question.

25              THE COURT:  Just ask a question, Mr. --

BY MR. NOONAN:

Q.   Do you recall testifying very precisely about what was and wasn't included in the meetings you had with Professor Diamond and Professor Chambers, this morning, even though those conversations took place five years ago?

A.   Yes.

Q.   All right.

     And yet, you're having trouble remembering what your testimony was this morning, correct?

A.   Not exactly, no.  I --

Q.   All right.  Okay.  Well, then let me ask you.  You said you weren't sure whether you said that this morning.

     Do you recall saying to the jury this morning, that Dean Bundy always praised you, except when you did something inappropriate?

A.   I don't recall --

Q.   You don't recall?

A.   -- those exact words this morning.

Q.   All right.  I -- Okay.

A.   I hear the gist of it, and he did praise me --

Q.   That's all I need.

A.   -- for --

Q.   It's just a "Yes" or "No."

1       So there were times Mr. -- Dean Bundy praised you.
2   There were times he give you some criticism, correct?
3   A.   Yes.
4   Q.   All right.
5       And when he praised you, you thought it was
6   accurate, correct?  Correct?  That's a "Yes" or a "No."
7   A.   I'm not inside his head.  I just took it for -- at
8   face value.
9   Q.   Okay.
10      But when he gave you critiques, you thought he was
11  discriminating against you and retaliating against you,
12  correct?
13  A.   I didn't say that.
14  Q.   Okay.
15      So one of the possibilities that you agree in this
16  case, is that the people who decided that you should
17  not continue on in the program, may honestly have felt
18  that you had not demonstrated that you should continue
19  in the program?
20  A.   Oh, no, I don't agree.
21  Q.   All right.
22      So when they decided to -- they decided not to
23  continue in the program, then they were retaliating and
24  discriminating, correct?  Is that your position?
25  A.   Could you restate the question please?

1    Q.   Sure.  I'll even back up a little bit.

2         When you got positive feedback from your

3    professors, you liked them, didn't you?  When they

4    complemented you, you liked them, right?

5         I don't understand why you're hesitating, ma'am.

6         Isn't that an easy question to answer, "Yes" or

7    "No"?

8    A.   It's not actually.  Given the circumstances, --

9    Q.   Okay.

10   A.   -- it's not an easy question, given the context of

11   what went on there.

12   Q.   All right.

13        So you didn't like it, although you mentioned it

14   this morning as -- Do you recall mentioning this

15   morning, that Dean Bundy often praised you?

16        MR. WILLIAMS:  Your Honor, this is really an

17   apples and oranges thing.  He asked her, of all the

18   praise she ever received, did she like it every single

19   time?  She said, "I can't say 'Yes' to that."  Then he

20   says, "Oh, that means" --

21        THE COURT:  Well he's -- I think he's trying

22   to be more specific now.

23        MR. NOONAN:  This is cross-examination.

24        THE COURT:  Go ahead, Mr. Noonan.

25   BY MR. NOONAN:

1    Q.   This morning you told us, in general, that Dean
2    Bundy praised you a lot, right?
3    A.   He did during the assistantship, yes.
4    Q.   Okay.
5         You liked that didn't you?
6    A.   Can you define "like"?
7    Q.   You know, I can't define "like," and I guess
8    President Clinton couldn't define it, as well.  I'll
9    move on.
10        Let me ask you this.
11        Did you think that Dean Bundy, when he gave you
12   all those compliments, was trying to discriminate or
13   retaliate against you?
14   A.   No.
15   Q.   Now, there were other times when you wrote e-mails
16   of a positive nature, to Dean Bundy, correct?
17   A.   Yes.
18   Q.   Let me show you Exhibit J for Identification, and
19   ask you if you can identify that as an e-mail that you
20   sent to Dean Bundy?
21           (Pause.)
22   A.   I recognize this.
23   Q.   Okay.
24        And that was written during the time you were his
25   assistant director, correct?

1   A.   Yes.

2   Q.   And you thanked him for releasing you early

3   because you weren't feeling well, correct?

4   A.   Yes.

5        And you go on to say, all right, in this e-mail:

6        "In spite of some of the technical glitches, I

7        thought there were some perfect moments and some

8        beginnings of truly standout performances by a few

9        of the actors.  This play is totally going to

10       happen on opening night.  I'm so pleased and

11       excited to be a part of the production, and to

12       have had the opportunity to have witnessed how you

13       put it altogether, including my continual

14       amazement at how well you cast the play."

15       Did you intend that as a complement to Dean Bundy?

16  A.   Yes.

17  Q.   Do you remember sending an e-mail to Dean Bundy,

18  in which you say -- or you said, "Your critiques were

19  incisive, detailed, and at times unsettlingly

20  particular"?

21  A.   I don't remember that off hand.

22  Q.   All right.

23       Let me just -- I'm not gonna mark it as an

24  exhibit, but I want to just show you the e-mail and see

25  if --

1            MR. WILLIAMS:  Mark that as Identification,

2    Your Honor?

3            THE COURT:  What is it, it's a --

4            MR. NOONAN:  It's an e-mail (unintelligible)

5    dated 12/2/02.

6            MR. WILLIAMS:  Could it be marked for

7    Identification so we know what is being shown to the

8    witness?

9            THE COURT:  Is it marked for Identification?

10            MR. NOONAN:  It's not marked.  I don't

11    (unintelligible).

12            MR. WILLIAMS:  But I'd like to have it marked

13    so that the record is clear, and I don't know what he's

14    showing her.

15            MR. NOONAN:  (Unintelligible.)

16            MR. WILLIAMS:  That's fine, but I'd still

17    like to have it marked.

18        (Pause.)

19    A.   Huh.  Okay.

20    BY MR. NOONAN:

21    Q.   Is that --

22    A.   I remember it now.

23            MR. WILLIAMS:  May I see it, please, --

24            MR. NOONAN:  Sure.

25            MR. WILLIAMS:  -- before there's any further

1    questioning, and may be marked for Identification?

2            MR. NOONAN:  (Unintelligible) I have

3    highlights, and I don't --

4            MR. WILLIAMS:  Well, that's part of what he

5    showed her.  I'd like to see what he showed her.

6            THE COURT:  For the record, Mr. Noonan, it

7    should be marked for Identification.

8            MR. NOONAN:  Yeah.  I was just gonna get a

9    clean copy.

10           MR. WILLIAMS:  No, I'd like to have what

11   he --

12           MR. NOONAN:  Well, I'm gonna offer it as an

13   exhibit, as long as we're going to mark it, so I'd

14   rather do a clean copy, unless you want the jury to see

15   the --

16           MR. WILLIAMS:  What don't you let me see it

17   first, and then will decide.

18           THE COURT:  Let -- Show it to him.

19           MR. NOONAN:  Oh, I don't care.  I thought you

20   wanted it marked.

21           MR. WILLIAMS:  I said I wanted to see it too.

22   Thanks.

23       (Pause.)

24           MR. WILLIAMS:  Should be -- The way it is, is

25   fine with me.

1          MR. NOONAN:  You want marked -- mark it as it

2    is, as an exhibit?

3          MR. WILLIAMS:  If you want to mark it.  I

4    mean, I'm not offering it, but if you want to mark it,

5    I --

6          MR. NOONAN:  (Unintelligible.)

7          MR. WILLIAMS:  I don't care about the yellow

8    highlight.  That doesn't make any difference.

9          THE COURT:  So what's the number, or letter?

10         MR. NOONAN:  I don't recall what my last one

11   was?

12         THE CLERK:  (Unintelligible.)

13         THE COURT:  So it's Y, and you're offering it

14   as a full exhibit?

15         MR. NOONAN:  I might as well, Your Honor.

16      (Pause.)

17   BY MR. NOONAN:

18   Q.   Now, in that same e-mail you write:

19        "I had been resolutely dubious about my ability to

20        act within the context of Seymour, but your

21        relentless vigilance and capacity to articulate

22        the most subtle aspects of the technique, and

23        contextualize your observations within each scene

24        in which I was working, led me to my growing

25        edge."

1          That was intended as a compliment?

2     A.   No, not exactly.

3     Q.   Okay.

4          Well, when you told the dean that you thought he

5     had "relentless vigilance," did you -- was that -- is

6     that a positive thing, from your point of view?

7     A.   I imagine.

8     Q.   Okay.

9          And his capacity to "articulate the most subtle

10    aspects of the technique," that would be positive, from

11    your point of view?

12    A.   Oh, yes.

13    Q.   All right.

14         You also say, in that same e-mail:

15         "I felt the freedom to question each point when my

16    comprehension was incomplete or vague."

17    A.   Yes.

18    Q.   And that was important to you, as a student,

19    right?

20    A.   As a student, yes.

21    Q.   All right.

22         And there certainly were times when your knowledge

23    was either incomplete or vague?

24    A.   Yes.

25    Q.   All right.

1        And then you say:

2        "By the time I got to my final rehearsal for the

3        Arkadina/Tregorin scene, something clicked and I

4        was able to integrate all of the previous

5        learning.  That scene happened in the second

6        showing."

7        That was a positive development, as well, wasn't

8   it?

9   A.   Yes, I think so.

10  Q.   And the Arkadina/Tregorin scene, that's the one

11  where Dean Bundy had you put your head -- or had an

12  actor put his head under your skirt in order to

13  simulate oral sex?

14  A.   What?  No.

15  Q.   Wasn't that the scene -- Wasn't it

16  Arkadina/Tregorin that you testified about earlier?

17       Let me back up.

18  Q.   Didn't you tell us that it was the scene from

19  Cloud 9 -- I'm sorry, you are actually correct.

20       The Arkadina/Tregorin was the scene -- No, it  was

21  -- it was the scene where the one actor straddled you,

22  or you straddled him.

23  A.   Okay.

24       The Arkadina/Tregorin scene is by Chekhov --

25  Q.   I got them confused.

1    A.    -- and --

2    Q.    I got them confused and I apologize.

3          Am I correct that that's the scene where you

4    straddle a male actor?

5    A.    It was the scene in which James Bundy ask me to --

6    Q.    Is that a "Yes" or "No"?

7    A.    -- straddle him.

8    Q.    Is that the scene where you straddled a male

9    actor?  Is that a "Yes"?

10   A.    Not for the whole scene, but yes.

11   Q.    Okay.

12         And after participating in that scene, you wrote

13   to Dean Bundy and said:

14         "By the time I got to my final rehearsal for the

15         Arkadina/Tregorin scene, something clicked and I

16         was able to integrate all of the previous

17         learning.  That scene happened in the second

18         showing."

19   A.    Yes.

20   Q.    Okay.

21         And you felt so positively about Dean Bundy's

22   instruction of you, that you then asked him to write

23   you a letter of recommendation, correct?

24   A.    The question doesn't make sense to me.

25   Q.    Did you ask Dean Bundy to write you a letter of

1  recommendation?

2  A.   I think I did.

3  Q.   And, in fact, you were talking about it in this

4  very exhibit; were you not, Exhibit Y?

5  A.   Yes.

6  Q.   Okay.

7       Now, you do agree; do you not, that you felt as

8  though you were making some wild mistakes when you were

9  Dean Bundy's assistant director?

10 A.   Could you rephrase that question?  I don't --

11 Q.   Sure.

12      Do you recall making wild mistakes?

13 A.   Wild mistakes?

14 Q.   Right, while you were Dean Bundy's assistant

15 director?

16 A.   I wouldn't say that.  I would say --

17 Q.   Do you remember ever writing to Dean Bundy that

18 you felt that you were making some wild mistakes?

19 A.   You'd have to show me the e-mail.

20           MR. NOONAN:  It's marked as an exhibit.

21 BY MR. NOONAN:

22 Q.   By the way, while I'm finding that exhibit, did

23 you look at any of these exhibits prior to the time you

24 got on the stand today?

25 A.   No.

1    Q.   Oh.  You have a large file.

2    A.   Yes.

3    Q.   Yes.

4         And you have looked at them over the years,

5    correct?

6    A.   Not so much in the last two years.

7    Q.   That was before those other proceedings, that you

8    were looking at them?

9    A.   In the CHRO?  Yes.

10   Q.   Let me show you Exhibit H.

11        Is that an e-mail you sent to Dean Bundy?

12             MR. WILLIAMS:  Could I have the exhibit

13   number, please?

14             MR. NOONAN:  H.  I said "H."

15             MR. WILLIAMS:  Is that H?  I didn't hear you.

16             MR. NOONAN:  No problem.

17   A.   Yeah.

18   BY MR. NOONAN:

19   Q.   Okay.

20   A.   It's the gum chewing.

21   Q.   Okay.

22        The -- We'll get to that.

23             MR. NOONAN:  I'll offer Exhibit H, Your

24   Honor.

25             THE COURT:  Full exhibit.

```
 1   BY MR. NOONAN:
 2   Q.    You write as follows:
 3         "I am terribly sorry about the gum chewing.  I
 4         haven't chewed gum in probably over a decade, at
 5         least.  I think I was on a binge.  It's over."
 6         Then after that, you write:
 7         "My feeling about all the wild mistakes I am
 8         making, is that I'm afraid I will forget
 9         everything when I start directing my CWP.  It's so
10         much.  Isn't there some sort of handbook with all
11         these basics?  I just wish, always, for more time
12         to confer with you, to go for this stuff before I
13         fuck up because it's all so new to me, and I feel
14         terribly clueless."
15         That's what you wrote to him, right?
16   A.    Yes.  Now I recall the context.
17   Q.    Okay.
18         And when you said you were making all these wild
19   mistakes, you weren't just talking about gum chewing,
20   were you?
21   A.    No, it was specifically --
22   Q.    I, that -- Fair enough.  I didn't think it was
23   just gum chewing because you wouldn't need a handbook
24   in order to know that you shouldn't be chewing gum when
25   the director is trying to direct, correct?
```

1   A.   Oh, no.

2   Q.   Okay.

3   A.   That's not it.

4   Q.   Fair enough.

5   A.   He was chewing gum.

6   Q.   Fair enough.

7        Is that a "Yes" or "No"?

8   A.   I don't know anymore.

9   Q.   So when you --

10  A.   I think I need to hear the question.

11  Q.   Okay.

12       So when you said -- Yeah, you do need to listen to

13  the question in order to answer it.

14       When you said, "I am terribly sorry about the gum

15  chewing," what you meant was you were sorry he was

16  chewing gum?

17  A.   No.

18  Q.   Oh, okay.

19       You were talking about you chewing gum?

20  A.   Yeah.

21  Q.   All right.

22       And when you said, "My feeling about all the wild

23  mistakes I'm making is I'm afraid I will forget

24  everything when I start directing my CWP, it's just so

25  much," you weren't referring to the gum chewing, were

1    you?

2    A.   I wasn't really referring to anything in

3    particular.

4    Q.   All right.

5         But you were -- You said -- You went on to say,

6    "Isn't there some sort of handbook for all these

7    basics?", right?  So you were expressing a feeling of

8    being overwhelmed by the responsibilities; were you

9    not?

10   A.   No.

11   Q.   And when you went on to say, "I just wish, always,

12   for more time to confer with you, to go over this stuff

13   before I fuck up because it's all so new to me, and I

14   feel terribly clueless," you were not exactly

15   communicating to Dean Bundy that you have a lot of

16   confidence in your ability, were you?

17   A.   Excuse me?  I don't --

18   Q.   I'll move on.

19        By the way, this morning, when you testified that

20   Professor Diamond referred to Mr. Sanderson as this

21   "fucker," you spelled the word out, correct?  Do you

22   recall that from this morning?

23   A.   Yes.

24   Q.   Because you don't like saying that word, correct?

25   A.   It didn't seem apropos, maybe.

1    Q.   Okay.

2    A.   I didn't know --

3    Q.   Fair enough.

4    A.   -- what, in the courtroom, you would say.

5    Q.   But when you were communicating with -- even with

6    your faculty members, it didn't bother you to use the

7    "F" word, correct?

8    A.   Everybody did.

9    Q.   Just finding out what you did.

10        You felt comfortable using the "F" word in these

11   e-mails with your faculty, correct?

12   A.   Obviously.  Yes.

13   Q.   Okay.

14             MR. NOONAN:  I'd like to offer Exhibit K,

15   Your Honor.  It's an e-mail from Dean Bundy to Ms.

16   Greenhouse.

17             It's premarked, and I also showed it to --

18             MR. WILLIAMS:  (Unintelligible.)

19             THE COURT:  Full exhibit.

20   BY MR. NOONAN:

21   Q.   I'm going to show you Exhibit K.

22        Do you recall getting that from Dean Bundy?

23   A.   Yes.

24   Q.   All right.

25        Now, before, you said that Dean Bundy basically

1   just gave you positive input except when you did

2   something inappropriate, and so you didn't really

3   understand that he would think there's any problem with

4   your work.

5       Do you recall that from this morning?

6   A.   Could you repeat the question?

7   Q.   Sure.

8       Do you remember, this morning, telling us that

9   with regard to input that you got from Dean Bundy, that

10  he gave you all positive comments, except for times

11  when he felt that you were doing inappropriate things,

12  and therefore, you were surprised that he would think

13  that you ought to be dismissed?  Recall that from this

14  morning?

15  A.   (Unintelligible) yes.

16  Q.   All right.

17      Now this -- in this e-mail actually, Dean Bundy

18  tells you that you need to make some positive

19  adjustments in your approach to directing, and he says,

20  "I believe you must implement wholesale and quickly."

21      Correct?

22  A.   In CWP, yes.

23  Q.   All right.

24      So he was trying to meet with you, and what he

25  told you is:

1          "The subject of our meeting is positive

2          adjustments that you can make in your approach to

3          directing, that I believe you must implement

4          wholesale and quickly.

5          I do not want to discuss them in an e-mail.  I

6          scheduled a meeting with you last week.  We

7          clearly discussed subjects of importance to you,

8          and because you are a student in the school, any

9          subject of importance to you is also one of

10         importance to me."

11         And it was true, wasn't it, that you had had a

12    meeting with Dean Bundy, and he allowed you to address

13    your concerns, correct?

14    A.    Not exactly.  That's not exactly --

15    Q.    If you don't agree that's okay.

16         Did you have a meeting with him prior to this e-

17    mail?

18    A.    We met, yes.

19    Q.    All right.

20         Now, Dean Bundy goes on to say:

21         "On the other hand, I found myself disturbed at

22         knowing that I have asked to meet with you to

23         debrief on Psychic Wife."

24         "Psychic Wife" is the play you and he worked on

25    together, correct?

1    A.    Uh-huh.

2    Q.    "Knowing that I've asked to meet with you to

3          debrief on Psychic Wife, you vigorously pursued a

4          discussion of your CWP.  I repeat, you have a

5          forceful personality, and while that can be a very

6          good thing, it is also important for you to learn

7          to listen better, and to find out what is on the

8          other person's mind.  Not only will it make you a

9          more effective member of the community, but it

10         will make you a better director.

11         By the same token, I will take responsibility for

12         letting you know what is on my mind, which is why

13         I insist on another meeting."

14         He goes on to say:

15         "I wrote the recommendation in good faith, and I

16         believe you can contribute as an assistant at

17         Williamstown this summer.  More importantly, I

18         believe there is much you have to learn there.

19         Nonetheless, we both know that in addition to

20         being on probation, as are all first year

21         students, you are also on warning, which is the

22         stage before dismissal.  Your department has not

23         seen fit to remove you from warning status.

24         Doubts about your ability to continue effectively

25         in the program remain real, and I share them.  We

1          have not yet had a conversation on the subject of

2          your status.  That can be part of our conversation

3          on Wednesday, and continuing in the second and

4          third year of the School of Drama is considerably

5          more rigorous and meaningful a responsibility than

6          serving as an assistant director for a summer at

7          Williamstown."

8          Now, when Dean Bundy wrote you this e-mail in

9     March, and reminded you that you were on probation, as

10    all first year students are, and you are on warning,

11    and that there were doubts, and that he had doubts

12    about your ability to continue effectively in the

13    program, you certainly understood that he was

14    considering perhaps voting for your dismissal, correct?

15    A.   Absolutely.

16    Q.   All right.

17         So when that meeting occurred in May, when you

18    were told you were dismissed, you weren't surprised by

19    that, were you?

20    A.   Yes.

21    Q.   But at the very least, in terms of what you told

22    us this morning, it wasn't true Dean Bundy only gave

23    you positive comments, he also told you that you were

24    in trouble, correct?

25    A.   I don't -- I can't answer the question.

```
1    Q.   All right.  I'll --

2    A.   One is about the Yale Rep.

3    Q.   It's okay.  I'll --

4    A.   One is about the CWP.

5    Q.   If you can't answer it, that's okay.  I can move

6    on.

7         Now, we were talking about using the "F" word.

8         Do you remember asking Dean Bundy for a ride to

9    school, and telling him that your car is so fucking

10   stuck that you were wondering if you could get a ride

11   with him?

12   A.   I don't remember it.

13   Q.   All right.

14        Let me just show (unintelligible) exhibit that

15   refreshes --

16            MR. WILLIAMS:  May that be marked, please?

17   A.   Okay.  I remember that.

18   Q.   (Unintelligible.)

19            MR. WILLIAMS:  May that be marked, please?

20            MR. NOONAN:  (Unintelligible) if you want.

21            MR. WILLIAMS:  I'd like to have it marked

22   (unintelligible) know if it's (unintelligible).

23            MR. NOONAN:  I will give Attorney Williams a

24   copy.

25        (Pause.)
```

1        MR. WILLIAMS:  Be marked for Identification,

2   please.

3        THE COURT:  Mark it for Identification.

4   BY MR. NOONAN:

5   Q.   And Dean Bundy did give you rides from time to

6   time when you needed them, correct?

7   A.   During the snow storm, the blizzard that --

8   Q.   Right.  Yeah, if you needed a ride, and you felt

9   comfortable --

10  A.   My car was buried.

11  Q.   Understood, and you felt comfortable asking the

12  dean for a ride, and he accommodated you and gave you

13  rides from time to time, correct?

14  A.   During that blizzard.

15  Q.   Is that a "Yes"?

16  A.   Yes.

17  Q.   Okay.

18       He wasn't discriminating or retaliating against

19  you when he gave you a ride when you needed it during a

20  snowstorm, was he?

21  A.   I have no idea what was in his mind.

22  Q.   And that was true when he voted to dismiss you,

23  you would have no idea what was in his mind then

24  either, correct?

25  A.   That's correct.

1    Q.   All right.

2         Now, one of the things that you were supposed to

3    be doing at the Yale drama school was collaborating

4    with others, including your classmates, correct?

5    A.   Yes.

6    Q.   All right.

7         And would you agree with me that it's difficult to

8    collaborate with people for whom you have very little

9    respect?

10   A.   It depends.

11   Q.   Sometimes it can be difficult, right?

12   A.   It depends --

13   Q.   All right.

14   A.   -- on the situation.

15   Q.   Do you remember you calling some of your

16   classmates names like "the dumb guy"?  You remember

17   that?

18        Do you remember calling one of them "Mr. Psycho"?

19   A.   Is this in an e-mail?

20   Q.   I'm just asking you if you remember, ma'am?

21        MR. WILLIAMS:  Well, I think it depends on

22   the content.  Is this in a private conversation?  Is

23   this in public?  Is this in front of them?

24        MR. NOONAN:  And all of that is subject to

25   your cross -- redirect, but right now I'm on cross-

1    examination.  I'm trying to find out what your

2    recollection is.

3              THE COURT:  I don't think he has to put it in

4    context, Mr. Williams.  It's cross-examination.

5    BY MR. NOONAN:

6    Q.   Do you remember referring to one of your directing

7    classmates as "Mr. Psycho"?

8    A.   Never in public.

9    Q.   Let me ask the question again, because I didn't

10   ask you "in public."

11        Do you remember referring to one of your

12   classmates, directing classmates, as "Mr. Psycho"?

13   A.   I may have, yes.

14   Q.   Not you may have, you did, correct?

15   A.   It depends on what -- if it's --

16   Q.   Ma'am, --

17   A.   -- in an e-mail, then I did.

18   Q.   Okay.

19        "Yes" or "No," do you recall referring to one of

20   your directing classmates as "Mr. Psycho"?

21   A.   Not in conversation, no.

22   Q.   Let me try it again.

23        Do you remember referring to one of your

24   classmates, I didn't limit it to an oral conversation,

25   at that time, as "Mr. Psycho"?

1    A.   Personally or professionally?

2    Q.   Let me try it again.  I'm not putting any

3    limitations on this, except for that I will say -- I

4    will ask you to limit it to the time you were in

5    school, which I agree would be relevant.

6         During the time you were at the Yale drama school,

7    did you refer to one of your directing classmates, one

8    of those three other people that you were going to be

9    collaborating with, as "Mr. Psycho"?

10   A.   I wasn't collaborating with them.

11             THE COURT:  Just listen to the question, Ms.

12   Greenhouse and answer either "Yes" or "No."

13   BY MR. NOONAN:

14   Q.   Do you remember referring to one of your directing

15   classmates as "Mr. Psycho"?

16   A.   I probably did.

17   Q.   Do you remember referring to another of your

18   classmates as "The dumb guy"?

19   A.   I probably did.

20   Q.   Do you remember referring to another one as "The

21   fat Latino guy"?

22   A.   No.

23   Q.   We'll get to those.

24        With regard to Mr. Psycho, who did that refer to?

25   A.   Christopher Sanderson.

1    Q.   You do recall you calling him that; do you not?

2    A.   I didn't call him that.

3    Q.   You referred to him as "Mr. Psycho," didn't you?

4    A.   In a limited communication.

5    Q.   Do you remember saying, in a limited

6    communication, that, "The dumb guy power fucked Steve"?

7    A.   No.

8    Q.   Let me show you an e-mail and see if that

9    refreshes your recollection.  (Unintelligible) I'll

10   just get it from the clerk.

11   A.   Oh.

12        MR. WILLIAMS:  Before we go further, may it

13   be marked as an exhibit?

14        THE COURT:  It will be marked as a -- for

15   Identification.

16        MR. WILLIAMS:  Was the copy that was shown to

17   the witness marked (unintelligible)?

18        MR. NOONAN:  Yes.

19        MR. WILLIAMS:  May that be marked too?

20        MR. NOONAN:  (Unintelligible.)

21        MR. WILLIAMS:  I'd like to have -- Since he

22   showed the witness something with markings, Your Honor,

23   I think I'm entitled to have it marked --

24        THE COURT:  Well, we can show him another

25   copy and duplicate the markings.

1        MR. NOONAN:  I'll withdraw the markings.

2   BY MR. NOONAN:

3   Q.   The question is, do you --

4        MR. WILLIAMS:  I'd like to have that marked,

5   Your Honor.  No, the one that he's got in his hand was

6   placed before the witness.  He's asked her about it.

7   I'm entitled to have it marked (unintelligible).

8        MR. NOONAN:  (Unintelligible.)

9        THE COURT:  You mark it.  Mark it, Mr. --

10        MR. NOONAN:  (Unintelligible.)

11        I've got so much paper.  It's

12   ((unintelligible.)

13        THE COURT:  All right.  We'll -- We're gonna

14   take a recess shortly, and you can duplicate it in the

15   back -- in the copy room, and mark it with a yellow

16   marker.

17        MR. WILLIAMS:  I think Mr. Noonan and I have

18   both been around long enough to know the rules, Judge.

19        THE COURT:  Let's -- You know, let's not --

20   Let's keep going here.  Let's move on.

21        MR. WILLIAMS:  But I'd like this marked now,

22   before we lose track of it.

23        THE COURT:  It will be marked, Mr. Williams.

24   It will be marked.

25   BY MR. NOONAN:

1   Q.   In that e-mail, dated November 19th, 2002, is it
2   true that you wrote, "The dumb guy power fucked Steve"?
3   A.   These were not my words, the ones in quotes.
4   Q.   Ma'am, --
5   A.   These --
6   Q.   Ma'am, ma'am, ma'am, can you just -- I'm not
7   looking at the quotes.  I'm looking at -- The last
8   phrase of the first paragraph is not in quotes.
9        It says, "The dumb guy power fucked Steve."
10  A.   Yes.
11  Q.   And you wrote that?
12  A.   Yes, I wrote that.
13  Q.   Who was the dumb guy?
14  A.   Steve referred --
15  Q.   Who referred -- Who was the dumb guy?
16  A.   Steve referred to one of our classmates ultimately
17  as, quote, and it's in quotes here, "The dumb guy," and
18  then he started calling him "That fat Latino guy."
19  Those were not my words.
20  Q.   I see.
21  A.   They're in quotes.
22  Q.   And then can we agree that the next time you used
23  the phrase, "The dumb guy," it's not in quotes, and you
24  write to your friend, Mr. Nicholson, "The dumb guy
25  power fucked Steve."

1      Is that --

2  A.   I did not put it in quotes the second time, but

3  those terms originated with Steve Fried.

4  Q.   I understand.

5      Oh, Steve Fried?

6  A.   Yes.

7  Q.   All right.

8      He was one of your friends; was he not?

9  A.   Yes.

10  Q.   All right.

11      And you took to calling people those names,

12  correct?

13  A.   No.

14  Q.   All right.

15      You're not suggesting that Steve Fried recommended

16  that you call Mr. Sanderson "Mr. Psycho," are you?

17      That's a "Yes" or a "No"?

18  A.   I would have to go back to the history of when

19  Steve did --

20  Q.   If you don't, that's fine.  I can take that, but

21  it was you who wrote e-mails to your friend, Jim

22  Nicholson, and referred to your classmate, Mr.

23  Sanderson, as "Mr. Psycho," correct?

24  A.   Yes.

25  Q.   In fact, you remember writing this to your friend,

Mr. Nicholson:

    "Mr. Psycho lives at Yale and has offered to walk

    over.  Yet another fucked up, demented predicament

    that will end up making me look like a fuck-off

    because I won't risk my life for the theater."

    You recall that?

A.  Yes.

Q.  All right.

    And that referred to a time where there was a

snowstorm, correct?

A.  Blizzard.

Q.  All right.

    And you were -- You couldn't get over to the

school, and you were upset that Mr. Sanderson lived

there near the school, and was going to walk over and

take your place, correct?

A.  I don't think he was taking my place.

Q.  Well, he was taking over responsibility on a

rehearsal that you had, correct?

A.  I believe that because I couldn't get there, he

had offered --

Q.  Is that a "Yes" or "No"?

A.  Yes.

Q.  Okay.  That's what I thought.

    Now, Mr. Nicholson, that was your friend who first

1   suggested that scene where you had the actor simulate

2   oral sex on you, correct?

3   A.   Yes.

4   Q.   You didn't think that he was demeaning you by

5   suggesting you participate in that scene, did you?

6   A.   No.

7   Q.   Now, with regard to one of your other professors,

8   Mark Bligh, you talked about him this morning --

9   A.   He was not my professor.

10   Q.   Oh, okay.  He was another professor in the drama

11   school?

12   A.   Yes.

13   Q.   And you had some interactions with him?

14   A.   Yes.

15   Q.   And with regard to him, do you recall indicating

16   that, "He ought to fuck himself because he isn't a

17   writer anyway"?

18        Do you recall that, ma'am?

19   A.   In an e-mail to Jim Nicholson?  I would have to

20   see it.

21   Q.   I can show it to you, but before I show it to you,

22   do you recall?

23   A.   I don't recall it.

24   Q.   You don't -- You're not denying you said that

25   about one of the professors at the drama school?

```
1    A.   No, I'm not denying it.  I just --

2    Q.   Okay, --

3    A.   -- don't recall it.

4    Q.   -- want to find out.

5         I will show you this e-mail, dated May 19th, 2003,

6    and you don't -- you can read the whole thing if you

7    want, or you can read the second paragraph.

8              MR. WILLIAMS:  And may that be marked for

9    Identification, please?

10             MR. NOONAN:  (Unintelligible.)

11             THE COURT:  That will be marked.  We'll make

12   copies at the break, and it will be marked.

13   BY MR. NOONAN:

14   Q.   Does that refresh your recollection that with

15   regard to one of the professors at the Yale drama

16   school, you wrote to Jim Nicholson that, "Mark Bligh's

17   out to fuck himself because he isn't a writer anyway"?

18   A.   Oh.  In context I see --

19   Q.   That's not -- Ma'am, ma'am, the question is,

20   having looked at that e-mail, do you now recall that

21   you wrote about one of the professors at the drama

22   school, he ought to fuck himself because he isn't a

23   writer anyway?

24             MR. WILLIAMS:  Your Honor, it just occurred

25   to me, I wasn't allowed to see that before it was
```

1    specifically questioned, but I think that Mr. Noonan

2    said that was written after she was expelled.

3              MR. NOONAN:  I didn't say it was written

4    after she was expelled.

5              MR. WILLIAMS:  I though he said "May 19th,

6    '03."  Wasn't her expulsion meeting May 17th -- May

7    15th, I'm sorry?

8              THE COURT:  I think I heard "May," but I

9    don't remember the exact date.

10             MR. WILLIAMS:  If it's after she was

11   expelled, it's not relevant.  The jury should be

12   instructed to disregard it.

13             THE WITNESS:  May 19th.

14             MR. NOONAN:  I think it is relevant, Your

15   Honor, not (unintelligible) but I think it's relevant

16   nevertheless.  I think it --

17             MR. WILLIAMS:  (Unintelligible) that's the

18   only way I knew what it was, and he certainly knows

19   that she was expelled on the 15th of May, four days

20   before this apparently angry, and I haven't read it, e-

21   mail was written.

22             I think the jury should be told to disregard

23   all the questioning about it.  It's clearly not

24   relevant to this case.

25             MR. NOONAN:  I think it is relevant.  I think

1    it's --

2            THE COURT:  Well, we'll excuse the jury now.

3            We're going to take our break.  We usually

4    take a break at 3:30, so the jury is excused and we'll

5    resolve this.

6        (Jury out.)

7            MR. NOONAN:  I think I can (unintelligible)

8    this, Your Honor.  It's not May 19th, it's

9    (unintelligible).

10           MR. WILLIAMS:  Where do we -- showing things

11   to the Court that I've never been allowed to see.

12           When is that allowed in the rules, Judge?  I

13   object to this.

14           THE COURT:  Well, can't you give him a copy?

15           MR. NOONAN:  (Unintelligible.)

16           MR. WILLIAMS:  This is a -- This is the

17   equivalent of an ex parte communication.  He --

18           THE COURT:  No, it --

19           MR. WILLIAMS:  -- just (unintelligible) to

20   you to read and (unintelligible) --

21           THE COURT:  No, it -- Mr. --

22           MR. WILLIAMS:  -- seeing it first.

23           THE COURT:  Mr. Williams, you don't think --

24           MR. WILLIAMS:  If I did that --

25           THE COURT:  -- you don't think --

1          MR. WILLIAMS:  -- I'd be (unintelligible).

2          THE COURT:  -- I'm going to admit something

3    that --

4          MR. WILLIAMS:  -- you're going to but --

5          THE COURT:  -- you haven't had a chance to

6    see?

7          MR. WILLIAMS:  I don't think you're going to,

8    but I don't think it's the proper procedure.

9          THE COURT:  Well, here.  Come here and take a

10   look at it.

11         MR. WILLIAMS:  Thank you, Your Honor.

12         MR. NOONAN:  And it's apparent that it's

13   written by Ms. Greenhouse, Sunday, March 9th.

14         At the top there is something that apparently

15   Ms. Greenhouse or Mr. Williams didn't include when they

16   provided this to me, which is a response, apparently,

17   from Mr. Nicholson, dated May 19th, but the e-mail in

18   question was written March 9th, 2003.

19         MR. WILLIAMS:  Yeah, it looks like something

20   went back and forth at the same time frame.

21         THE COURT:  But it looks like the e-mail was

22   written in March.

23         MR. WILLIAMS:  It does look like it was

24   written in March, on March 9th, 2003.

25         THE COURT:  All right.

1          So we're gonna make copies of this, plus the

2     other two, I think there were, --

3          MR. NOONAN:  Yes, Your Honor.

4          THE COURT:  -- that you wanted, and they will

5     be marked for Identification, and I think Mr. Williams

6     wanted some highlighting on one of them, and if that's

7     what he wants, just be sure the highlighting is proper,

8     and we'll take our recess here.

9          (Recess at 3:28 p.m., until 4:45 p.m.)

10                    AFTER RECESS

11          MR. WILLIAMS:  They're just for ID at this

12     point, (unintelligible).

13          THE COURT:  I'm sorry.

14          MR. WILLIAMS:  They're only for

15     Identification at this point?

16          THE COURT:  That's correct.

17          I don't think, Mr. Noonan, you're offering

18     those, are you?

19          MR. NOONAN:  No.  I don't think we need to.

20          THE COURT:  All right.

21          We ready?

22     (Jury in.)

23          THE COURT:  Okay, Ladies and Gentlemen.

24          Mr. Noonan?

25          MR. NOONAN:  Thank you, Your Honor.

```
1   SALLY GREENHOUSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN
2                 CROSS-EXAMINATION (CONTINUED)
3   BY MR. NOONAN:
4   Q.   When we broke, Ms. Greenhouse, I think you had in
5   front of you, what is now marked as Plaintiff's Exhibit
6   18 for Identification, and I apologize because I think
7   I was the one that introduced confusion over the date.
8        Can we agree that the date you sent that e-mail
9   was March 9th of 2003, a couple of months before you
10  were dismissed from the program?
11  A.   Yes.
12  Q.   And May 19th comes at the top of the e-mail chain,
13  if you will, which is when apparently your friend, Mr.
14  Nicholson, wrote something back to you, but we don't
15  have the content on this; is that correct?
16  A.   I don't know whether you have it or not.
17  Q.   Well, I'm just -- you have the full exhibit.
18       Can you see that he apparently wrote something to
19  you, but the content is not there?
20  A.   Right.  This was in reply.
21  Q.   So a couple of months before your dismissal, that
22  was the time when you said that Mark Bligh ought to
23  fuck himself because he isn't even a writer anyway,
24  correct?
25  A.   Correct.
```

1    Q.   And then you go on to say:

2         "This place is so fucking fascist" --

3              MR. WILLIAMS:  Your Honor, I think that if

4    it's gonna be read like that, it ought to be marked as

5    a full exhibit.

6              MR. NOONAN:  Mr. Williams -- It's his

7    exhibit.  If he wants to offer it, I told him before, I

8    have no objection.

9              MR. WILLIAMS:  If counsel is gonna start

10   quoting at that length, I think it should be in

11   entirely, so that we'll have a --

12             THE COURT:  All right.  Then mark it as a

13   full exhibit.

14             MR. NOONAN:  I don't have any objection to

15   it.  I said that before.

16   BY MR. NOONAN:

17   Q.   And you refer to the fact that, "This place is so

18   fucking faciest," that's -- when you say, "This place,"

19   you're talking about the Yale School of Drama?

20   A.   Yes.

21   Q.   All right.

22        You go on to say that, "The students and faculty

23   here are so shallow," correct?

24   A.   Let me see that line.

25   Q.   See that, in the next paragraph?

1   A.   Oh, no, that was not a complete sentence.   That's

2   a reference to this playwright's writing being

3   denigrated.

4   Q.   Okay.

5   A.   And I'm supporting him.

6   Q.   All right.

7        And so what it says is -- Does it say, "The

8   students and the faculty here are so shallow"?

9   A.   No, that's a clause.

10  Q.   Okay.

11  A.   You're taking it out of context completely.

12  Q.   Oh, okay.   Then let me read the whole -- Does it -

13  - This -- At least we can agree on this, is that what

14  the sentence starts out as?   I'll read the rest in a

15  moment.

16  A.   Yes, it starts out with that.

17  Q.   Okay.

18       "The students and faculty are so shallow that they

19       don't get how plausible David's writing is, and

20       they don't get the intensity."

21  A.   Well, that's not a word-for-word reading, but it's

22  closer to it.

23  Q.   Well, I'll try it again.   Maybe I missed a word.

24       "The students and faculty are so shallow here,

25       that they don't even get how plausible David's

1          writing is, and they don't get the intensity."

2          Did I read that correctly that time?

3     A.   Yes.

4     Q.   Okay.

5          And by the way, "David's writing," you're not

6     referring to David Chambers, are you?

7     A.   No.

8     Q.   You're referring to somebody outside the Yale

9     drama school?

10    A.   No, I'm referring to a classmate, (unintelligible)

11    writing student, who was being maligned by Mark Bligh.

12    Q.   Okay.

13         And when you said, "The students and faculty are

14    so shallow here," you're talking about your fellow

15    students and the faculty at the Yale drama school,

16    correct?

17    A.   Not all of them, no, just the ones who were

18    maligning him.

19    Q.   Although you didn't say that here, correct?

20    A.   Well, Jim Nicholson knew what I was talking about.

21    He's a friend.  This is a private communication that --

22    Q.   Is that a "Yes" or a "No"?

23    A.   Excuse me?

24    Q.   Are you able to confine your responses to a "Yes"

25    or "No"?  Yes?  No?  Are you able to confine your

1    responses to a "Yes" or "No"?

2            MR. WILLIAMS:  Obviously, that depends on the

3    question that he --

4            MR. NOONAN:  Let me back up.

5    BY MR. NOONAN:

6    Q.   When I started, I asked if you would confine

7    yourself to a "Yes" or "No," or indicate you don't

8    know, or tell me you can't answer the question.

9        Would you be willing to continue to do that?

10   A.   Yes.

11   Q.   Okay.

12       Now, would you agree that you actually developed a

13   bad attitude about the drama school while you were at

14   Yale?

15   A.   A bad attitude.

16       Can you be more specific?

17   Q.   Do you remember telling someone that you had

18   developed a bad attitude?

19   A.   In those words?

20   Q.   Yes.

21       Do you recall it?

22   A.   I don't.

23   Q.   All right.

24       You have a -- You had a friend, in addition to Mr.

25   Nicholson, with whom you communicated a lot.

1    You also communicated a lot with someone named
2    (unintelligible) Stevens, correct?
3    A.   Yes.
4    Q.   And do you remember indicating to him that you had
5    developed a bad attitude?
6    A.   You would have to show me that.
7    Q.   Okay.
8         MR. WILLIAMS:  (Unintelligible.)
9    MR. NOONAN:  You want to read that
10   (unintelligible).
11   BY MR. NOONAN:
12   Q.   Let me show you what's been marked --
13        MR. NOONAN:  Did you want this a full exhibit
14   or --
15        MR. WILLIAMS:  (Unintelligible.)
16   BY MR. NOONAN:
17   Q.   Showing you Plaintiff's Exhibit 19, that's an e-
18   mail you wrote to your friend, Mr. Stevens; is that
19   right?
20   A.   He was a --
21   Q.   Is that a "Yes" or a "No"?
22   A.   You're describing him -- I wouldn't call him a
23   friend.
24   Q.   Was he a friend of yours?
25   A.   He was a teacher.

1    Q.   You can tell me "Yes" or "No," if he was not a

2    friend.

3    A.   Okay.

4    Q.   Was he a friend of yours?

5    A.   Well, yes.

6    Q.   Okay.

7         And did you write to him in March of 2003, that

8    you developed a bad attitude, I think?

9    A.   Oh.  No.

10   Q.   Did you write to him, "I developed a bad attitude,

11   I think"?

12   A.   Yes.

13   Q.   Okay.

14        And you told him you didn't think you were cut out

15   to be an assistant director, correct?

16   A.   An assistant director, that's correct.

17   Q.   Okay.

18        And one of the things you told us this morning is

19   that Yale was your first choice because of its

20   tremendous reputation; is that right?

21   A.   Yes.

22   Q.   Did you ever tell anyone else that actually going

23   to Yale was not completely volitional on your part,

24   that your first choice was to go to UMass for two

25   years --

1  A.   Yes.

2  Q.   -- and snag your credential?

3  A.   Yes.

4  Q.   Okay.

5       So when you said this morning, that Yale was your

6  first choice, that wasn't really true, your first

7  choice was to go to UMass for two years and snag your

8  credential; isn't that right?  Isn't that right?  If

9  it's not, you can tell me "No."  You don't have to wave

10 your hand or say anything else, just tell me "No" and I

11 can move on.

12 A.   It's -- I don't know.

13 Q.   If you can't answer it, that's okay.  Just tell me

14 you can't answer it.

15 A.   I don't know how to answer that.

16 Q.   Okay.  Then I'll ask you another one.

17      Do you recall writing to one of your friends in an

18 e-mail that:

19      "Going to Yale wasn't exactly a completely

20      volitional choice, my first choice was two years

21      at UMass, no tuition, snag my credential.  Maybe I

22      won't return in the fall"?

23 A.   Yes.

24 Q.   Okay.

25      Now, do you recall referring to one of your

professors, Ms. Yionoulis, as a fucking fascist?

A.   I don't recall, but if I saw the e-mail I might. Is this another e-mail to Jim Nicholson?

Q.   Does it sound like something you would say?

A.   Not in conversation, no.

Q.   Okay.

It sound like something you would write in an e-mail?

A.   To one of my closest friends in St. Louis, yes.

Q.   Okay.

And you wouldn't write that unless that's the way you felt, right?

A.   In the heat of the moment.

Q.   Well, it wasn't the heat of the moment.

I mean, you actually sat down and composed an e-mail, right?

MR. WILLIAMS:  Can we mark that 20 --

MR. NOONAN:  You want to mark that (unintelligible)?

MR. WILLIAMS:  -- for ID.

BY MR. NOONAN:

Q.   Now, when you say "the heat of the moment," you actually wrote it in an e-mail, didn't you, that Evan was such a fucking fascist?

A.   I don't recall.

1   Q.   Oh.  But you said it is something that you might

2   have?

3   A.   To Jim, yes.

4   Q.   Let me show you what your lawyer has marked as

5   Plaintiff's Exhibit 20 for Identification.

6        In the last paragraph did you, in fact, refer to

7   Evan Yionoulis, the acting professor at Yale drama

8   school as "that fucking fascist"?

9   A.   Well, that's one part of a sentence, yes.

10  Q.   Okay.

11       Well, did you say anything complimentary about her

12  in that sentence?

13  A.   Yes, I did.

14  Q.   Okay.

15       Well, that sentence reads:

16       "Byum said it was all right to interrupt, and I

17       did check with the actors before I employed that

18       last night.  She is such a fucking fascist."

19       Which part of that was complimentary --

20  A.   Oh, I'm sorry, I --

21  Q.   -- to Evan Yionoulis?

22  A.   -- was looking at the --

23  Q.   No, it's -- That's all right.  Just answer the

24  questions one at a time, if you would.

25       The question that you said includes a compliment

1 to Ms. Yionoulis, says:

2   "Byum said it was all right to interrupt, and I

3   did check with the actors before I employed that

4   last night.  She is such a fucking fascist."

5 A. Uh-huh.  Uh-huh.

6 Q. There's nothing there that's complimentary of Evan

7 Yionoulis, is there?

8 A. Not in that sentence, no.

9 Q. Okay.

10   And when you said, "Byum said it was all right,"

11 Byum is a friend of yours outside the Yale School of

12 Drama, correct?

13 A. Not exactly.

14 Q. Not exactly.

15   Not exactly.  Okay.  All right.

16   A colleague of yours from outside?

17 A. He's a director.

18 Q. All right.  He's a director somewhere else.

19 A. Who I worked with --

20 Q. Previously?

21 A. -- under --

22 Q. Previously.

23 A. Who taught me, yes.

24 Q. And one of the things that Professor Diamond told

25 you when you were being dismissed, is that some of the

1    discomfort that the faculty had with you is that you

2    often got input from people outside the school, who had

3    not had the opportunity to observe what was going on in

4    the school, and you followed their advice rather than

5    the advice of the Yale faculty; is that right?

6    A.   That's not correct.

7    Q.   You don't recall her saying that?

8    A.   I -- She did not.

9    Q.   Okay.

10        You did -- It is true, however, that you went

11   outside the school to get advice from these other

12   people, Mr. Nicholson and Mr. Stevens, correct?

13   A.   Yes, I did.

14   Q.   And it is true that they weren't at the school and

15   were not in a position to observe what was happening

16   themselves?

17   A.   One actually did come to the school.  Oh, both of

18   them did.

19   Q.   All right.

20        And were they there --

21   A.   Both of them did.

22   Q.   Were they there the entire year, and could observe

23   the entire two semesters that you were at Yale?

24   A.   Not the entire year.  One came to rehearsal --

25   Q.   Came to one rehearsal?

1   A.   Yes.

2   Q.   All right.

3        Do you recall communicating this about the people

4   with whom you were supposed to be collaborating while

5   you were at Yale:

6        "This is God.  You do it their way, you become a

7        mediocre, uninspired, pedantic director, or you

8        take the highway.  If you want to cleanup God,

9        you're fucked because you are surrounded by

10       Stepford students and pod people professors."

11       Do you recall that one?

12  A.   I don't.

13  Q.   Is that something you think you might have said?

14  A.   To Jim Nicholson or a close friend in a letter,

15  possibly.

16  Q.   And "Stepford students," that's not exactly a

17  compliment to your fellow students, was it?

18  A.   You'd have to know the environment.

19  Q.   Okay.

20       What I'm trying to get at, Ms. Greenhouse, is

21  whether I know the environment or not, when you refer

22  to people as "Stepford students," did you intend it as

23  a compliment to the people with whom you were supposed

24  to be collaborating?

25  A.   Neither "Yes" nor "No."  It --

1  Q.   It -- When you referred to the professors as "pod

2  people professors" was that something you thought was a

3  compliment to them?

4  A.   It was neither a compliment nor not.  It was a

5  descriptor.

6  Q.   All right.

7       And it's an unfavorable descriptor, isn't it?

8  A.   It was a description of the climate.

9  Q.   Right.

10      It was unfavorable; was it not?

11  A.   To me.

12  Q.   Yeah.

13  A.   Maybe not to others, but to me.

14  Q.   Okay.

15      But when you referred to students as "Stepford

16  students" and professors as "pod people professors,"

17  you were indicating your displeasure with them,

18  correct?

19  A.   I was in displeasure for most of that whole year,

20  yes.

21  Q.   Okay.

22      And you remember saying that the only model you

23  have to work with is James Bundy's, and it sucks?

24  A.   I don't recall, but if you showed me the e-mail I

25  might.

1   Q.   Is that something you think you might have said?

2   A.   It's possible.

3   Q.   You do recall saying things like that, correct?

4   A.   I don't recall.

5   Q.   Would that be a -- intended as a compliment if you

6   said, "The only model I have to work with is James

7   Bundy's, and that sucks"?

8   A.   A compliment --

9   Q.   Would you have intended that as a compliment?

10  A.   To?

11  Q.   James Bundy?

12  A.   I think not.

13          (Mr. Noonan and Mr. Williams confer.)

14  BY MR. NOONAN:

15  Q.   Let me show you Plaintiff's Exhibit 21 for

16  Identification.

17      Do you see in the very last part of the e-mail,

18  the very last sentence actually, reads:

19      "The only model I have to work with is James

20      Bundy's, and it sucks."

21  A.   The letter --

22  Q.   Do you see that?  Is that what it says?

23  A.   It's referring to a --

24  Q.   I didn't -- I'm going to get there.  I can only do

25  this one at a time, Ms. Greenhouse.

1          Can you just confirm that that's what the last

2    sentence says?  The only reason I'm asking is you said

3    you don't recall it, but if I showed you the e-mail you

4    might recall it, but it does --

5    A.   It's a very specific -- Yes.

6    Q.   Yeah.  Okay.

7          And that was one that you sent to your friend --

8    I'm sorry, your former teacher, Byum Stevens, correct?

9    A.   Yes.

10   Q.   Okay.

11         Now, in addition to indicating that James Bundy's

12   model sucks, you also wrote; did you not, that -- or

13   described him as a "deviant, sadistic asshole"?

14   A.   It's possible.

15   Q.   Okay.

16         Well, do you recall indicating that to Byum

17   Stevens?

18              MR. WILLIAMS:  Well Judge, she just said

19   "It's possible" --

20              MR. NOONAN:  I know.  I just asked --

21              MR. WILLIAMS:  -- (unintelligible) what more

22   can she do?

23              MR. NOONAN:  She --

24              MR. WILLIAMS:  She doesn't remember it today.

25              MR. NOONAN:  Well, (unintelligible) --

1           THE COURT:  Well, it's cross-examination.

2    It's fair cross-examination.  Go ahead.

3    BY MR. NOONAN:

4    Q.   Ma'am, do you actually recall it?

5    A.   I don't actually recall it, but it's plausible --

6    Q.   Okay.

7         It's something you would say about --

8    A.   -- at a certain point that year, that I may have

9    described him as that, yes.

10   Q.   And is that one of the reasons you said earlier

11   that you think you developed a bad attitude, because

12   you had all these feelings about the people that were

13   teaching you, and with whom you were supposed to be

14   collaborating?

15   A.   No.

16   Q.   Okay.

17        You developed a bad attitude for some other

18   reason?

19   A.   That was a very specific --

20   Q.   Now, with regard to some of the students, you also

21   had some kind of pejorative things to say about them;

22   did you not?

23   A.   I have no idea until you ask me a specific

24   question.

25   Q.   Okay.

1       You had a fellow student by the name of Mojohn

2  (phonetic), correct?

3  A.   Yes,

4  Q.   You referred to her as the "Queen Bee," correct?

5  A.   Yes.

6  Q.   And do you recall in your Drama 50 rehearsal, that

7  you exploded at her?

8  A.   Yes.

9  Q.   And you did that intentionally, correct?

10  A.   Yes.

11  Q.   And you were pretty pleased about it and, in fact,

12  you then refused to back down; isn't that right?

13  A.   Not exactly, no.

14  Q.   Do you remember that she expressed concern about

15  the way you were treating her, and she commented that

16  she felt that you were trying to overpower her.

17  A.   No, I don't recall that.

18  Q.   And you remember that you responded, "You got that

19  right, back off."

20       Do you recall that?

21  A.   Vaguely.  That's vaguely familiar, yes.

22  Q.   And it actually came to the point where this

23  interaction brought her to tears; isn't that right?

24  A.   I don't remember, but it's possible.

25  Q.   And do you remember --

1   A.   She did cry during Drama 50.

2   Q.   And do you remember, in fact, that it was so bad

3   that she had to leave the class, and others in the

4   class went out to attend to her.

5        Do you recall that?

6   A.   Some did, yes; some stayed.

7   Q.   And you remember that everyone in the class was

8   visibly scared when you went off like that, and you

9   weren't sure whether you were crazy or just being

10  abusive?  Do you remember that?

11  A.   No.

12  Q.   Okay.

13       It is true, isn't it, that you went into this

14  outrage on purpose, because you had been trying to out

15  dominate Mojohn, correct?

16  A.   To some extent.  There was a problem in the room.

17  Q.   All right.

18       And you did it on purpose to out dominate your

19  classmate, correct?

20       You can just answer that "Yes" or "No."

21  A.   It's hard to answer words that are put in my

22  mouth.

23  Q.   If you can't answer it, ma'am, all I get to do is

24  ask questions, all right?  I can't editorialize on your

25  answers, and please, just answer the question.

1       You went into that outrage on purpose, because you

2  had been trying to out dominate her, correct?

3  A.   I can't -- It's --

4  Q.   If you can't answer the question, all you got to

5  do is say you can't answer it, and the rule is I go to

6  the next question.

7  A.   Okay.  I can't answer the question the way it's

8  phrased.

9  Q.   All right.

10      Do you remember saying this:

11      "I even knew when I did it that I was cranking her

12      up because I had been at such a loss as to how to

13      out dominate her."

14 A.   I don't recall that.  I'd have to see that.

15 Q.   Okay.

16      But it sounds like something you might have said,

17 correct?

18 A.   Not necessarily, but it's possible.

19 Q.   I'll show you what your lawyer has marked as

20 Plaintiff's Exhibit 22 for Identification.

21      Is that an e-mail that you sent to Mr. Nicholson

22 back in November of 2002?

23 A.   Yes.

24 Q.   So a couple of months into your program, correct?

25 Ms. Greenhouse?

1  A.   I'm reading it.

2  Q.   Okay.  You -- Why don't you read it, and you can

3  let me know when you're done.

4            (Pause.)

5  A.   Yes.

6  Q.   Are you set?  You want me to go on to the next

7  question?

8  A.   Hang on.

9            (Pause.)

10  A.   Okay.

11  Q.   So it's true, isn't it, that you wrote:

12       "I have been at such a loss as to out dominate

13       her"?

14       It's in the last part of the second paragraph.

15  A.   Oh, (unintelligible) and I was profoundly sick of

16  her attitude and, yeah.

17  Q.   I think that wasn't the question that I asked.

18       The question I asked is did you say, "I have been

19  at such a loss to out dominate her"?

20  A.   That's one part of the sentence, yes.

21  Q.   And the rest of the sentence says who was -- Well,

22  let me -- I'll tell you what, I'll just read the whole

23  thing.

24            MR. NOONAN:  I think maybe we should offer it

25  as a full exhibit, Your Honor.

```
 1          MR. WILLIAMS:  I haven't had time to look at
 2   it, but if I could take a look at it.
 3        (Mr. Noonan and Mr. Williams confer.)
 4        (Pause.)
 5          MR. WILLIAMS:  I have no objection, and I
 6   would ask that the entire exhibit be read as
 7   (unintelligible).
 8          MR. NOONAN:  I actually just said I was gonna
 9   read the whole thing --
10          MR. WILLIAMS:  That's great.
11          MR. NOONAN:  -- but I wanted to offer
12   (unintelligible).
13   BY MR. NOONAN:
14   Q.   It's dated November 14th, 2002, and did you write
15   as follows:
16        "Dear Jim, I exploded in my Drama 50 Odyssey
17        rehearsal today at Mojohn, the queen bee who broke
18        my back."
19        Is that right, so far?
20   A.   Yes, it is.
21   Q.   And when you say she broke your back, that
22   occurred accidently on her part, correct?
23   A.   She did cause a thoracic sprain that was very
24   severe.
25   Q.   Right.  She didn't actually break your back.
```

1       It was a sprain, correct?

2   A.   It was a severe sprain.

3   Q.   Right.

4       So she didn't break your back, correct?

5   A.   No, that's just --

6           MR. WILLIAMS:  Are you gonna read it or can I

7   interrupt (unintelligible)?

8           MR. NOONAN:  I'm going to ask questions about

9   it as I read it.  This is --

10          MR. WILLIAMS:  I would ask to --

11          MR. NOONAN:  -- cross-examination.  I intend

12  to conduct a cross-examination.

13          THE COURT:  Go ahead, Mr. Noonan.

14  BY MR. NOONAN:

15  Q.   And she didn't sprain your back on purpose, did

16  she?

17  A.   No, I'm sure not.

18  Q.   Okay.  All right.

19       Then you write:

20       "Last night I heard an earful about how on my

21       medical leave they had used rehearsal time to

22       Sally bash, which in large part is a direct result

23       of this entire cockamamie project, and I'm now

24       suspecting that as a passive/aggressive impulse on

25       David's part to diabolically set up a rehearsal in

1       which the directors are not directors, but really

2       are."

3           Now, in terms of the "Sally bash," you're

4    referring to your fellow students, correct?

5    A.   Yeah, in the project.

6    Q.   After that you write:

7           "It was quite intentional on my part, and I would

8           not back down."

9           That referred to your explosion on Mojohn,

10   correct?  That it was intentional, and you refused to

11   back down?

12   A.   That's correct.

13   Q.   "The (unintelligible) communication was decidedly

14          more important than the concept, and she actually

15          eventually got that.  She said, 'It just felt like

16          you were trying to overpower me.'  I said, 'You

17          got that, right?' Back off.  Interesting choice of

18          words on my part.  She's so fucking very

19          manipulative."

20          And when you say that, you're referring to your

21   classmate, Mojohn, correct?

22   A.   She was one of the actors, yes.

23   Q.   When you said she's so fucking very manipulative,

24   you're talking about one of your classmates; are you

25   not?

1    A.    And her bad behavior in Drama 50.

2    Q.    Was that a "Yes"?

3    A.    That's correct.

4    Q.    You continue:

5          "So she went out and others attended to her, and

6          she came back with tears in her eyes."

7          You're talking now, about Mojohn, that came back

8    with tears in her eyes, correct?

9    A.    Yes.

10   Q.    You continue:

11         "I stood my ground, admitting that I would not

12         necessarily wish to repeat the outburst, but they

13         were all having theirs, so I was fulfilling my

14         quota.  They were all visibly scared when I went

15         off, and I don't know if it means that I am crazy,

16         as Mojohn clearly called it, or whether I was

17         abusive."

18         When you say "they were all visibly scared,"

19   you're talking about your classmates with whom you're

20   supposed to be collaborating, correct?

21   A.    That's correct.

22   Q.    All right.

23         You go on to say:

24         "It was not a common thing for me, and I even knew

25         when I did it that I was cranking up because I

1          have been at such a loss as to how to out-dominate

2          her, and I was profoundly sick unto death of her

3          attitude and age-inappropriate" condensation --

4          "Condescension." I'm sorry.

5              When you talked about trying to out-dominate her,

6      you're talking about your classmate, Mojohn, correct?

7   A.   Who had been dominating the group, yes.

8   Q.   Ma'am, are you able to answer that question?

9   A.   Yes.

10  Q.   Okay.

11             Your e-mail to your friend, Mr. Nicholson, back in

12     November of 2002, goes on as follows:

13         "Now they think I am the one with the attitude, I

14         suppose, but I don't even care.  I broke all kinds

15         of rules and guidelines, and would be sure to get

16         thrown out for my adversarial behavior, since I

17         have already received that warning letter.  You

18         know what?  I don't give a shit anymore.  I cannot

19         live under this kind of repression, and if I don't

20         have the easygoing personality of a director, if

21         that's what you are supposed to have here, then I

22         am not a director, I guess.  What I see is

23         standard issue, in-the-box, boring, tedious

24         rehearsals, plays, ho-hum, whatever, studious.  I

25         can't stand it anymore.  It feels like I'm living

1        in a Chekhov play.  Oh my God, what now?"

2    A.    Uh-huh.

3    Q.    And that concludes the e-mail, correct?

4    A.    To my close friend, yes.

5    Q.    Is that "Yes"?

6    A.    Yes.

7    Q.    Okay.

8        And when you say, "What I see is standard issue,

9    in-the-box, boring, tedious rehearsals, plays, ho-huh,

10   whatever," what you're talking about is the Yale School

11   of Drama program that you were involved in at that

12   point, correct?

13   A.    At that point it was just some sort of general

14   blowing off steam.

15   Q.    Ma'am, can you just answer the question?  When you

16   wrote, "What I see is standard issue, in-the-box,

17   boring, tedious rehearsals, plays, ho-huh, whatever,"

18   you were talking about the program at the Yale School

19   of Drama, right?

20   A.    Not really.

21   Q.    What else were you referring to when you said,

22   "What I see is standard issue, in-the-box, boring,

23   tedious rehearsals, plays, ho-huh, whatever," if it

24   wasn't the Yale School of Drama?  Were you talking

25   about something else?

1    A.   What else I was -- I can answer that question now?

2    What else was I talking about?

3    Q.   Let me get an answer to the first question.

4         Were you talking about the Yale School of Drama --

5    A.   Not particularly, no.

6    Q.   Okay.  All right.

7         Did you think, as of this time, that you had

8    developed a bad attitude, when you wrote that e-mail,

9    expressed those sentiments about wanting to out-

10   dominate one of your classmates, and bringing her to

11   tears?

12   A.   I can't answer any of these, they're so out of

13   context.

14   Q.   Okay.  If you can't answer it, I'll move on.

15        You do agree though, that the class was visibly

16   scared when you went off like that?

17   A.   No, not all of them.

18   Q.   Ma'am, did you write that the class was visibly

19   scared when you went off like that?

20   A.   What I wrote in an e-mail to a close friend --

21   Q.   Is that --

22   A.   -- late at night --

23   Q.   Is that -- Is that --

24   A.   -- is not necessarily the accurate, precise

25   description of what happened.

1          MR. NOONAN:  I move to strike, Your Honor.

2          THE COURT:  I'll let the answer stand.  Just

3    move on, Mr. Noonan.

4    BY MR. NOONAN:

5    Q.   Now, one of the things that you said in that e-

6    mail, is that you simply didn't give a shit anymore,

7    correct?

8    A.   Yes.

9    Q.   All right.

10         And would you agree that you found it difficult to

11   collaborate with others at the drama school, in light

12   of the fact that you really didn't care and --

13   A.   No.

14   Q.   -- and you regarded it as a standard issue, in the

15   box, boring --

16   A.   No.

17   Q.   -- rehearsal, plays, program?

18   A.   No.

19   Q.   You were still collaborating well at that point?

20   A.   I wasn't even yet -- I think I was just expressing

21   a feeling.

22   Q.   I'm just ask -- I'm wasn't asking what you did in

23   the e-mail, I was asking in class.

24         Do you think you were collaborating well at that

25   point, as of November 2002, when you wrote this e-mail?

1   Were you collaborating well in --

2   A.   As well as anybody in Drama 50 was.

3   Q.   Okay.

4        And do you think you were collaborating well when

5   you quite intentionally, in refusing to back down,

6   exploded on one of your classmates?

7   A.   Yes.

8   Q.   And you thought you were collaborating well when

9   after she left in tears, you did not go out to help

10  her, and simply indicated that you had been at a loss

11  as to dominate -- how to out-dominate her?

12  A.   I'm really confused by the wording of that

13  question.

14  Q.   Okay.  I'll move on.

15       Now, a few days after this e-mail of November

16  14th, do you recall communicating with Mr. Nicholson,

17  and indicating with him that you saw Steve confronting

18  the newly-christened fat Latino guy about what

19  transpired at the meeting, and describing that as,

20  "What fun"?

21  A.   I cannot recall.  I would have to read the e-mail

22  exactly as it stands.

23  Q.   Okay.  I'll give you the opportunity to do that.

24  A.   Shall I read it aloud?

25  Q.   No.  You can just read it to yourself.

1        You said you'd be able to answer the question if

2   you read the e-mail.

3   A.   Okay.

4        What is the question?

5   Q.   Do you recall telling your friend, Jim Nicholson,

6   in the middle of November of 2002, that you saw Steve

7   confronting the newly-christened fat Latino guy about

8   what transpired at the meeting, and described it as,

9   "What fun"?

10  A.   I see that.

11  Q.   All right.

12       And did you also say, "Not really giving a shit

13  kind of takes me out of the loop on some of these

14  hijinx"?

15  A.   Yes.

16  Q.   Okay.

17       So by that time, you -- in both this e-mail on the

18  fourteenth, and again on the nineteenth, you really

19  didn't give a shit anymore, correct?

20  A.   That is incorrect.

21  Q.   Okay.

22       But it is what you wrote?

23  A.   Of course.

24  Q.   All right.

25       And this was written to your good friend, Jim

1    Nicholson, correct?

2    A.   Yes, lifelong friend.

3    Q.   All right.

4         Now, do you recall commenting that Steve Fried was

5    a goody-goody?

6    A.   I don't recall.

7    Q.   Do you recall referring to him as "wet behind the

8    ears"?

9    A.   I don't recall, but if you show me the e-mail I --

10   Q.   That e-mail has been marked as Plaintiff's Exhibit

11   24.

12   A.   Oh, I didn't call him a "goody-goody."  You can

13   see it's in quotes.

14   Q.   I see.

15        And the quote is -- says:

16        "Steve is what is commonly referred to as a

17        'goody-goody'" --

18   A.   Right.  Other people had been saying that.

19   Q.   All right.

20        But you didn't say other people said it.  You

21   said, "Steve is," but you --

22   A.   What is commonly referred to.

23   Q.   Right.  Okay.

24        And then you go on to say:

25        "First, he hounds me for information from

```
 1           Thanksgiving, then says, 'I must say I'm not
 2           impressed with Alan Wang's lack of professionalism
 3           discussing these matters with you.  I told him I
 4           wouldn't tell him anything anymore.  I did not
 5           tell him anything anyway."
 6    A.     Of everything.  I mean, I --
 7    Q.     All right.
 8           Is this Steve Fried you're talking about?
 9    A.     Uh-huh.
10    Q.     That's "Yes"?
11    A.     Yes.
12    Q.     And he's one of your -- one of the directors who
13    was in the program with you, correct?
14    A.     Yes.
15    Q.     All right.
16           And you and he were the closest of the -- the
17    closest two of the directors, correct, --
18    A.     Yes.
19    Q.     -- in terms of your relationship?
20           And then you say, "He is so wet behind the ears."
21           You're referring to Steve Fried there?
22    A.     Yeah.
23    Q.     Okay.
24           And you -- And then you say:
25           "You know what, I am seriously contemplating
```

1          withdrawing.  I have to spend three years with all
2          three of these guys."
3          The "three of these guys" you're referring to
4  there are the three other directors in the program,
5  correct?
6  A.   Yeah.
7  Q.   So you were thinking of withdrawing by this point,
8  because you didn't want to spend the next three years
9  with these people?
10  A.   No, I wasn't thinking of withdrawing.  I said that
11  to --
12  Q.   Well, --
13  A.   -- my closest friend.
14  Q.   Well, if you could -- Ma'am, ma'am, just answer
15  the question.
16          Did you say I -- "You know what, I'm am seriously
17  contemplating withdrawing.  I have to spend three years
18  with all three of these guys"?
19  A.   Yes.  It's not a professional communication.
20  Q.   All right.
21          Now, --
22              MR. NOONAN:  Is there a stapler around
23  (unintelligible)?
24          (Pause.)
25  BY MR. NOONAN:

1    Q.   Let me show you what will be marked as Plaintiff's
2    Exhibit 25.
3         Now, you had some bad news to report to Mr.
4    Nicholson at that point.
5         You indicated that you had flunked Joe's exam big
6    time.
7         That refers to Professor Roach, correct?
8    A.   Yes.
9    Q.   Okay.
10        And he's someone who didn't discriminate or
11   retaliate against you, correct?
12   A.   I have no idea.
13   Q.   Okay.
14        Well, you're not claiming that he did.
15   A.   Well, I saw an e-mail recently that was very
16   discriminatory.
17   Q.   Okay.
18        But at least as of the time of your deposition, do
19   you remember telling me that he was one of your
20   supporters?
21   A.   I had no idea at that point, what he was saying.
22   Q.   Ma'am, as of the time of your deposition a couple
23   of weeks ago, do you remember telling me that Joe Roach
24   didn't discriminate against you, and he --
25   A.   That's correct.

1  Q.   -- was one of your supporters?

2  A.   That's correct.

3  Q.   And you flunked his exam, correct?

4  A.   Yes.

5  Q.   And you met with him to talk about that, right?

6  A.   Yes.

7  Q.   All right.

8       And he said that he gears the exam for the lowest

9  common denominator, correct?

10 A.   Yes.

11 Q.   And he wasn't able to understand how someone could

12 use the word "tertiary" as you had just done in a

13 casual conversational sentence, to flunk one of his

14 exams because he does gear them so low, correct?

15 A.   Yes, I remember that comment.

16 Q.   All right.

17      And then you said, "Maybe I don't have what it

18 takes to be a director."

19      Correct?

20 A.   First I cried.

21 Q.   Okay.

22      And then you said, "Maybe I don't have what it

23 takes to be a director"?

24 A.   Yes.

25 Q.   All right.

1    And you -- Later on, by the way, do you remember
2    that a makeup exam was scheduled for you by Mr. Roach?
3    A.   I actually don't remember that.
4    Q.   You don't remember that?
5    I'm just asking, ma'am, whether you -- I'll wait
6    'til you're done reading, because this next question
7    actually doesn't -- you won't find the answer in the e-
8    mail.
9    A.   Oh, he thinks I'm unconsciously wanting to flunk
10   out because of what happened with the (unintelligible).
11   I -- This is an interesting e-mail.  I'm just
12   reading it.
13   Q.   Well, I was hoping to ask you a question, but it
14   didn't relate to the e-mail at the moment, but you just
15   tell me when you're ready to answer a question.
16   You all set?  You ready?
17   A.   Yes.
18   Q.   Okay.
19   Now, after you flunked this exam with Mr. Roach,
20   he actually tried to help you by setting up a time for
21   you to retake the exam, correct?
22   A.   I don't remember.
23   Q.   You don't remember?
24   And do you remember that the day that he
25   established for you to retake the exam, you turned --

1  it turned up that you were sick?  Told him you were

2  sick?

3  A.   I don't remember.  I'd have to read the e-mail, if

4  you --

5  Q.   I see.

6      And it's -- Is it true that with all these

7  conversations, there's no way you can really remember

8  what happened five years ago, without looking at the e-

9  mails.  Is that a fair statement?

10 A.   No.  That would be not correct.

11 Q.   Well, because I notice that every time I ask you

12 about these --

13         MR. WILLIAMS:  Objection; argumentative.

14 It's not a question.

15         MR. NOONAN:  Well, --

16 BY MR. NOONAN:

17 Q.   Have you noticed that during the course of the

18 afternoon, every time I ask you about --

19         MR. WILLIAMS:  Objection; argumentative.

20         MR. NOONAN:  I really do (unintelligible) --

21         MR. WILLIAMS:  It's argumentative, Your

22 Honor.

23         MR. NOONAN:  -- to get the question out.

24         THE COURT:  Well, let him finish the

25 question, Mr. Williams.

BY MR. NOONAN:

Q.   Have you noticed, ma'am, that literally every time
I've asked you one of these questions this afternoon,
you've told me you couldn't answer it without looking
at the e-mail?

          MR. WILLIAMS:  Objection; argumentative.

          THE COURT:  Overruled.

BY MR. NOONAN:

Q.   Go ahead.

     That's a "Yes" or a "No."

A.   Not every one, but for the most part, since these
were like diary entries --

Q.   Okay.  Okay.

     And, ma'am, but you did tell us this morning, that
you have total recall of exactly what was said to you
in these meetings five years ago, when Professor
Chambers and Professor Diamond --

A.   Absolutely --

          MR. WILLIAMS:  Objection.  Objection.  She
did not say "total recall."

A.   Well, --

          THE COURT:  Well, she just answered the
question.

A.   I do -- I do --

BY MR. NOONAN:

1   Q.   No, there's no -- there's no question pending.

2   A.   -- very clear.

3   Q.   But you don't remember that, without looking at an

4   e-mail on the subject, that Professor Roach actually

5   went out of his way to schedule a remake exam for you,

6   and then you told him you were too sick to take it.

7        You don't recall that part?

8   A.   No, I don't recall that.

9   Q.   You recall that after you reported you were too

10  sick to take the exam, you -- that he actually let you

11  pass the course without taking the exam?

12  A.   I don't recall that.  I --

13  Q.   We'll get to it.  If you don't remember it, it's

14  okay.

15  A.   That would be up to him.

16  Q.   Now, you remember writing to your friend, James

17  Nicholson, that you have ADD, and you really don't care

18  what someone else wants you to know, "My mind gets

19  bored easily and (unintelligible) weird connections.

20  That is not helping."

21       Do you --

22  A.   I don't remember writing that.

23  Q.   All right.  Well, take a look at Defendant's

24  Exhibit 25 that you just read.  You were reading it

25  when I -- just a moment ago, when I was trying to ask

1   you a question, and you said you needed to read it
2   first.
3        You don't recall having read that just a couple of
4   minutes ago?
5            (Pause.)
6   A.   Those aren't exactly the words I used, but --
7   Q.   Do you remember it though, from reading it just a
8   few minutes ago, because you actually sat there while
9   we were all waiting for you, and read it.
10       Were you not able to --
11  A.   I didn't have a chance to read all the way
12  through.
13  Q.   Were you not able to remember that?  Well, this is
14  in -- This is actually in the first paragraph, isn't
15  it?
16       It says:
17       "I know I now have ADD, and that I really don't
18       care what someone else wants me to know.  My mind
19       gets bored easily and likes to make weird
20       connections.  That is not (unintelligible)."
21  A.   But it made (unintelligible) to feel what I was
22  doing.  He thinks I unconsciously wanted to flunk --
23  Q.   Is what --
24  A.   -- because of what --
25  Q.   I'm not --

1    A.    -- happened with the warning letter.

2    Q.    Ma'am, you really need to answer the questions

3    "Yes" or "No," all right?

4         Is it true that you told your friend, Jim

5    Nicholson, that you have ADD, and you don't care what

6    someone else wants you to know, your mind gets bored

7    too easily --

8    A.    I did write that in an e-mail to one of my closest

9    friends.

10   Q.    All right.

11        And in that same e-mail, without any quotation

12   marks, you refer to the "the psycho guy" correct?  You

13   see that in the third paragraph?  Do you recall reading

14   that just a few moments ago?

15   A.    The psycho guy.  You actually see people wince,

16   yes.

17   Q.    Yeah.

18        So you referred to "the psycho guy," and that

19   isn't -- you're not repeating what someone else said,

20   that's something you said, correct?

21   A.    It became an apparition that Steve Fried and I had

22   used, yes.

23   Q.    And so is that a "Yes"?

24   A.    Yes.

25   Q.    Okay.  If you can, just confine yourself to "Yes"

1  or "No."

2      And you also refer to "the dumb Hispanic" correct,

3  in that same e-mail?

4  A.   Same thing, yes.

5  Q.   And "the dumb Hispanic" was one of your

6  classmates, correct?

7  A.   Yes.

8  Q.   Now, one of the things you said about your ADD and

9  the fact that you don't care what someone else wants

10 you to know, and you can make weird connections, you

11 said that it made you a good writer for what you were

12 doing, correct?

13 A.   Yes.

14 Q.   And what you're referring to there, is your

15 performance art; is that right?

16 A.   I'm referring to all my writing.

17 Q.   Okay.

18      Were you referring to your performance art?

19 A.   Not specifically.

20 Q.   That wasn't one of the things you were referring

21 to?

22 A.   That would be one of the things.

23 Q.   Okay.

24      And the performance art, that's something you had

25 done for about 20 years prior to getting to Yale,

1    correct?

2    A.    Uh-huh.

3    Q.    And in that, you didn't need to collaborate with

4    anyone, correct?

5    A.    Oh, no, I did collaborate a lot.

6    Q.    You didn't have a director, right?

7    A.    I did direct.

8    Q.    All right.

9          Weren't you -- On these performance arts, isn't it

10   true that you were, in essence, a one-woman show?

11   A.    Not always, no.

12   Q.    Okay.  I'll get to that later then.

13         Now, do you remember there were a number of times

14   you referred to one of your classmates as "Mr. Psycho"

15   when you were using the term without quoting someone

16   else?

17   A.    I don't know.  In an e-mail to Jim Nicholson I may

18   have used that term, yes.

19   Q.    Okay, because we -- Do you remember a little while

20   ago, an hour or so ago, you insisted that you never

21   used that term, except to quote someone else?

22   A.    I didn't --

23   Q.    Do you recall --

24   A.    -- say I never use that term.  I said that the

25   origination of it was not necessarily from me.

1    Q.   You didn't think much of the plays that were

2    generated by your fellow playwrighting students, did

3    you?

4    A.   That is incorrect.

5    Q.   Do you remember saying ever, that the plays being

6    generated by the playwrighting students here are

7    terribly disappointing?

8    A.   Some of them, yes.

9    Q.   So it was -- when I asked you the question, "You

10   didn't think much of these plays?", it's true, right?

11   You didn't think much of them because you thought --

12   you found them disappointing.

13   A.   Some of them.

14   Q.   Okay.

15        But when you wrote about it, you said the plays

16   being generated by the playwrighting students here are

17   terribly disappointing, correct?

18   A.   I would have to see the e-mail to Jim Nicholson.

19   Q.   All right.

20        Now, you said before, that you didn't have a

21   recollection of this makeup exam, so let me show you

22   what we'll mark as the next exhibit, Plaintiff's

23   Exhibit 26, and just read that to yourself and see if

24   that refreshes your recollection.

25            (Pause.)

1    A.   Oh.  Okay.  Yes.

2    Q.   So you didn't remember some five years later that,

3    in fact, Mr. Roach, your professor, arranged for you to

4    take a makeup exam, and it turned out that you were

5    sick on the day of the makeup exam?

6    A.   No, I didn't specifically remember that, no.  I

7    do --

8    Q.   Okay.

9         But now, --

10   A.   -- remember --

11   Q.   -- looking at this e-mail, you do agree that that

12   is what occurred, correct?

13   A.   I do agree that that is what occurred, yes.

14   Q.   Did you think that Mr. Roach was discriminating or

15   retaliating against you when he arranged for you to

16   retake an exam that you had flunked?

17   A.   No.

18   Q.   Did you -- Now after you didn't get to the makeup

19   exam, he told you that you could skip the exam,

20   correct?

21   A.   Yes, with a caveat.

22   Q.   What he said is it's -- he noted that you had a B

23   on the last one, and as long as you did okay on the

24   paper, he wouldn't make you take the exam, correct?

25   A.   Yes, with a caveat.

1    Q.   Well, let me ask you this.

2         Did you say in your e-mail to Mr. Nicholson, his

3    response, "Let's forget about it.  You got a B on the

4    last one," and provided you didn't screw up on your

5    paper, "that's fine with me"?

6    A.   Yes, with a caveat.

7    Q.   Well, I can only do them one at a time.

8         Is that what the e-mail says?

9    A.   Yes, the e-mail says that.  Yes.

10   Q.   Okay.

11        And notwithstanding the fact that you weren't

12   gonna have to retake that exam if you flunked, you were

13   still inclined to withdraw as of that time, correct?

14   A.   No.

15   Q.   Did you write:

16        "I'm still inclined to withdraw" --

17   A.   Yes.

18   Q.   -- "before next term"?

19   A.   Yes.

20   Q.   Okay.

21        Now, Evan Yionoulis was the Chair of the Acting

22   Department, correct?

23   A.   I believe so.

24   Q.   You remember calling her, "Frighteningly fucked

25   up"?

1    A.    I don't remember that exactly.

2    Q.    You remember calling her a, "Defensive, power-

3    crazed, domineering bitch"?

4    A.    That's possible.

5    Q.    And you certainly felt that she was "Punch drunk

6    with power," correct?

7    A.    Possibly my phrase to Jim, I think.

8    Q.    And do you remember saying that she has

9    everything, a husband, two children, power, the most

10   prestigious drama school in the country, and directing

11   gigs?

12   A.    Uh-huh.  Yes.

13   Q.    Did you find it difficult to collaborate with your

14   professors, in light of the fact that you thought of at

15   least one of them as frighteningly fucked up and

16   defensive, power-crazed, domineering bitch?

17   A.    Actually not.

18   Q.    Okay.

19         So you -- That wasn't the reason why you were

20   having difficulty collaborating?

21   A.    No.

22   Q.    Okay.

23         And with regard to your fellow students, who was

24   the person you called the incepted -- "The insipid Brie

25   Girl"?

1   A.   I don't know.

2   Q.   You don't?

3        Wasn't that Jedadiah Schultz' girlfriend?

4   A.   No.

5   Q.   No?

6        Do you remember indicating that Evan Yionoulis had

7   put the boys back where they belong?

8   A.   No.

9   Q.   Well, let me (unintelligible).

10            (Mr. Noonan and Mr. Williams confer.)

11   BY MR. NOONAN:

12   Q.   Let me show you Plaintiff's Exhibit 27.

13   A.   Oh.  Okay.

14   Q.   No question pending yet.

15        Let me ask you, first of all, the date at the top,

16   May 19th, 2003, that's -- you see that date?  Not the

17   date that you wrote the e-mail, just the date at the

18   top of the page.

19   A.   Right.

20   Q.   May 19th, 2003?

21   A.   Right.

22   Q.   That's the same date that is on the majority of

23   these --

24   A.   Right.  Right.

25   Q.   What happened was that Mr. Nicholson, what did he

1    do, e-mail these back to you when you requested them?

2    A.   Yes, I think he did.

3    Q.   You asked him to get these for you because you

4    were in the process of preparing some grievances,

5    correct?

6    A.   Not at that time, no.

7    Q.   But this e-mail you sent out to Mr. Nicholson, the

8    friend of yours that was giving you some advice on how

9    you should react at the Yale drama school, and it's

10   dated February 6, 2003; is that right?

11   A.   Yes.

12   Q.   All right.

13        And you write as follows:

14        "Dear Jim:

15        Evan has put the boys back where they belong," --

16   A.   Uh-huh.

17   Q.   -- "and she is not insisting on the Insipid Brie

18        girl for the female lead."

19   A.   Right.

20   Q.   "I think I've managed to intimidate her

21        effectively and articulately.  Thank you for your

22        assistance in troubleshooting this particular

23        power fuck."

24        Now, when you thanked him for his assistance in

25   troubleshooting this particular power fuck, you're

1   referring to Evan Yionoulis, the Chair of the Acting

2   Department, correct?

3   A.   Not exactly.

4   Q.   And when you said, "I think I've managed to

5   intimidate her effectively and articulately," are you

6   referring to your classmate who you refer to as "The

7   insipid bre girl" or Ms. Yionoulis?

8   A.   This was a casting meeting in which --

9   Q.   I wasn't asking what it was.  I'm just trying  to

10   find out -- Before we get to that, and just -- if you

11   can answer this "Yes" or "No," when you said, "I think

12   I've managed to intimidate her effectively and

13   articulately" --

14   A.   I can't answer this question.  It's all out of

15   context.

16   Q.   Ma'am, you can answer this one.

17        Who were you -- Were you referring to Evan

18   Yionoulis when you said, "I think I've managed to

19   intimidate her effectively and articulately"?

20   A.   I was referring to the person in charge of

21   casting.

22   Q.   Who was Evan Yionoulis?

23   A.   Yes.

24   Q.   So you were referring to the chair of the acting

25   department, and indicating that you intimidated her

1   effectively and articulately, and then you thanked Mr.

2   Nicholson for his assistance in helping you

3   troubleshoot this particular power fuck, by whom you

4   also meant your -- the chair of the acting department

5   at the Yale drama school, correct?

6   A.   Yes.  That's correct.

7   Q.   Then you write:

8        "Now on to James Bundy.  He is almost a good

9        director, key word 'almost.'"

10       Right.

11  A.   Excuse me?

12  Q.   You want me to reread that?  Did you write:

13       "Now on to James Bundy.  He is almost a good

14       director, key word 'almost.'"

15  A.   Yes.

16  Q.   Now, you also wrote about one of your classmates,

17  Jedediah Schultz, in this Exhibit 27; did you not,

18  further down the page?

19  A.   Yes.

20  Q.   You write:

21       "Oh, regarding Jedediah, that one is seriously

22       confused, and his girlfriend got in my face today

23       after class.  She came right up to me and smugly,

24       as in, 'He's fucking me,' said, 'Hi Sally.'

25       The thing is, Jed had approached me the second I

1        walked into the classroom, and when he followed

2        her out, he turned and smiled at me, saying

3        (unintelligible).  Oh, Jesus.  So tonight, we met

4        in the vestibule of his building for ten minutes.

5        I feel like I'm in high school.  I hate this.  I

6        think I need to cool it since I'm going to be a

7        director, and does this insipid girl understand

8        that she might win this minor battle, but lose the

9        war, if I decided to really put some effort into

10        this seduction?"

11        MR. WILLIAMS:  (Unintelligible.)

12 Q.  (Continuing.)  "She is" --

13        MR. WILLIAMS:  What has that got to do with

14 -- I'm gonna object, Your Honor.  I've -- You know,

15 most of this (unintelligible) fair game, but this is

16 off the limit.

17        MR. NOONAN:  This is --

18        MR. WILLIAMS:  I really think this is

19 improper questioning about personal matters that has no

20 place in this courtroom.  I move to strike it.

21        MR. NOONAN:  This has everything to do with

22 why she found it difficult to --

23        THE COURT:  Mr. Williams, --

24        MR. NOONAN:  -- collaborate.

25        THE COURT:  -- your client brought this

1    lawsuit --

2              MR. WILLIAMS:  And she --

3              THE COURT:  -- and she's subject to cross-

4    examination --

5              MR. WILLIAMS:  But not on --

6              THE COURT:  -- on communications --

7              MR. WILLIAMS:  But not about personal matters

8    --

9              THE COURT:  -- that she made with respect to

10   people that she came in contact with in the program,

11   and I'm going to permit it.

12             MR. WILLIAMS:  Okay, because Your Honor ruled

13   earlier today that when it came to personal matters,

14   you were only going to admit those that took place in

15   the classroom.

16             MR. NOONAN:  And this can --

17             MR. WILLIAMS:  And this is clearly --

18             MR. NOONAN:  Nope.

19             MR. WILLIAMS:  It's clearly one of those

20   areas that is prohibited by the rules that you read to

21   us before we started the proceedings this morning.

22             MR. NOONAN:  The Court made no such ruling,

23   and by the way, this actually talks about something

24   that happened in the classroom.

25             THE COURT:  To the extent that you're

1    interposing an objection, Mr. Williams, it's overruled.

2    BY MR. NOONAN:

3    Q.   Now, the e-mail goes on to say:

4         "She is clueless but so is he, for Christ's sake.

5         Maybe he just craves symbiotic affiliations so

6         much, he has to be led around by her.  Very hot."

7         Did I read that correctly?

8    A.   I guess.

9    Q.   Well, you have it in front of you, ma'am.

10   A.   Do you want me to read along?

11   Q.   I was under the impression you had been doing

12   that.

13        When you say, "She is clueless," you're talking

14   about one of your classmates, right?

15   A.   One of the acting students, yes.

16   Q.   And then when you said, "So is he," you're talking

17   about Jedediah Schultz, correct?

18   A.   Yes.

19   Q.   And he is one of your classmates, correct?

20   A.   Yes.

21   Q.   He was the person who was going to be cast at your

22   request in your -- the play you were going to direct,

23   correct?

24   A.   Yes.

25   Q.   Now, one of the things -- one of the people that

1  you didn't think was discriminating or retaliating

2  against you, was Victoria Nolan, correct?

3  A.   It's so hard to answer some of your questions.

4  Q.   Okay.  Well, let me ask you this.

5       When I took your deposition, didn't you tell me

6  that Victoria Nolan was one of the ones that did not

7  discriminate or retaliate against you?  Do you recall

8  that?

9  A.   Academically, that's correct.

10 Q.   And -- Well, did she -- Did you have any other

11 kind of retaliation in mind, besides academically?

12 A.   She did have a moment with me in a bathroom, yes.

13 Q.   All right.

14      And she actually complimented you on the work you

15 did in her course, correct?

16 A.   That is correct.

17 Q.   In fact, you thought she was incredibly positive

18 about you in her class, correct?

19 A.   That is correct.

20 Q.   And she certainly gave you a passing grade in the

21 course you took with her, correct?

22 A.   That is correct.

23 Q.   Nevertheless, you wrote about Victoria Nolan, that

24 she is the managing director/Volguy (phonetic) hetero

25 power-abuse person, correct?

1   A.   I don't remember that.  I'd have to see the e-

2   mail.

3   Q.   Do you remember saying something like that?

4   A.   I don't remember that until I see the e-mail.

5   Q.   Showing you Plaintiff's Exhibit 28, does that

6   refresh your recollection as to what you said -- what

7   you called Victoria Nolan, one of the professors at the

8   Yale drama school who had made incredibly positive

9   comments to you about your work.

10  A.   She hadn't at this point, but yes, this is my e-

11  mail.

12  Q.   And did you refer to Victoria Nolan, one of the

13  professors at the Yale drama school, as the "managing

14  director/Volguy (phonetic) hetero power-abusive

15  person"?

16  A.   Yes.

17  Q.   You still think that the way you were talking and

18  feeling about the people at the Yale drama school had

19  nothing to do with your ability to collaborate with

20  them?

21  A.   I don't understand the question, actually.

22  Q.   All right.  If you don't understand it, that's

23  okay.

24       Now, do you remember referring to Victoria Nolan

25  as a "male prick"?

1    A.   No, I don't recall.

2    Q.   But that's something you could imagine saying

3    about her, correct?

4    A.   I don't know.

5         In an e-mail to Jim Nicholson?  That was like my

6    diary.  I could have said anything.

7    Q.   Okay.

8         So it wouldn't surprise you if you referred to

9    Victoria Nolan as a "male prick," would it?

10   A.   In my diary?

11   Q.   Anywhere.

12   A.   I don't know.

13   Q.   Okay.

14   A.   I'd have to see it.  It's usually private.

15   Q.   Okay.  I'll show it to you.

16        It's Plaintiff's Exhibit 17.  It's

17   (unintelligible).

18            (Pause.)

19   A.   It's not here.  It might be in front of you, Ms.

20   Greenhouse.

21        Do you have Exhibit 17?

22            MR. WILLIAMS:  I have Exhibit 17 for

23   Identification.

24            MR. NOONAN:  You have 17?

25            MR. WILLIAMS:  Yeah, because it's not been

1    offered yet.

2              MR. NOONAN:  Okay.

3              But (unintelligible.)

4              MR. WILLIAMS:  I don't see that quote, but

5    (unintelligible).

6              MR. NOONAN:  Your Honor, if I may

7    (unintelligible) 17, but -- I'm sorry, it's 16.

8              MR. WILLIAMS:  Yeah.  Let me have 17.

9              MR. NOONAN:  No.  No.  No.  No.  No.  No,

10   that's mine.

11             MR. WILLIAMS:  I only have the ones that were

12   for ID only.

13             MR. NOONAN:  I apologize.  I just had -- I

14   have it mismarked.  I think this is marked.

15             Can I have this one?  I wrote down 17, but I

16   may be wrong.

17             No, you don't have to --

18             MR. WILLIAMS:  She has a bunch on the table

19   that you gave her, that's up there.

20             MR. NOONAN:  Are you willing -- Before we

21   mark --

22             MR. WILLIAMS:  Yeah.

23             MR. NOONAN:  -- (unintelligible) this happen

24   with multiples.

25             Can I -- Would you mind if I just take a look

1    at what you have?

2                    THE WITNESS:  Huh?

3                    MR. NOONAN:  Do you mind if I just take a

4    look at what you have --

5                    THE WITNESS:  Go ahead.

6                    MR. NOONAN:  -- and make sure?  I didn't want

7    to mark duplicates.

8        (Pause.)

9                    THE COURT:  Well, why don't we suspend here

10   and we'll resume in the morning.

11                   Ladies and Gentlemen, we're going to adjourn

12   now, and we'll resume at 9:00 o'clock tomorrow morning.

13                   Please remember my admonition about not

14   discussing this case with anyone, and we'll see you

15   back tomorrow morning.

16                   You're excused.

17       (Jury out.)

18                   MR. WILLIAMS:  Those are ID only.  I need to

19   hold onto those so I have -- I mean, if you want to

20   note them, that's fine, but I have --

21                   MR. NOONAN:  (Unintelligible) mind if I read

22   them, or they have to stay here --

23                   MR. WILLIAMS:  No, because I have them.

24   Otherwise, how am I gonna know?  It's the only copies I

25   have.  I have been given --

1          MR. NOONAN:  Okay.  That's okay with me.

2          THE COURT:  Let him have the --

3       (The Court and the Clerk confer.)

4          THE COURT:  All right.

5          How much longer do you think you're going to

6   be with this witness, Mr. Noonan?

7          MR. NOONAN:  I'm going to need to do some

8   work, but I think it's probably going to be another

9   hour or two, realistically.

10          THE COURT:  Okay.

11          MR. NOONAN:  I'm going to go home tonight and

12   see if I can, you know, speed things up a little.

13          MR. WILLIAMS:  The more you think about it,

14   the longer it will get.

15          MR. NOONAN:  That could be too.

16          THE COURT:  All right.

17          We'll be adjourned.

18       (Proceedings concluded at 4:55 p.m.)

19

20

21

22

23

24

25

INDEX

| | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

WITNESSES FOR

THE PLAINTIFF:

Sally Greenhouse  39    148        --        --        --

WITNESSES FOR

THE DEFENDANT:

None.

| EXHIBITS: | | Offered | Admitted |
|---|---|---|---|
| P-4-A | Schedule for Year | 38 | 39 |
| P-4-B | Listing of Factulty/Staff | 38 | 39 |
| P-4-C | Description of Directing | | |
| | Program | 38 | 39 |
| P-4-D | Summary of tuition/Expenses | 38 | 39 |
| P-9 | E-mail - Diamond/Greenhouse | 119 | 119 |
| P-18 | E-mail - Greenhouse/Nicholson | 248 | 248 |
| D-F | E-mail - Greenhouse/Bundy | 201 | 201 |
| D-H | E-mail - Greenhouse/Bundy | 223 | 223 |
| D-I | E-mail - Greenhouse/Bundy | 208 | 209 |
| D-K | E-mail - Bundy/Greenhouse | 227 | 227 |
| D-F | E-mail - Greenhouse/Bundy | 201 | 201 |
| D-Y | E-mail - Greenhouse/Bundy | 218 | 218 |

310

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____            December 8, 2008

STEPHEN C. BOWLES