```
                  UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT

SALLY GREENHOUSE,              .   Case No. 3:05-CV-01429
                               .   (AHN)
              Plaintiff,       .
                               .   Bridgeport, Connecticut
     v.                        .   September 16, 2008
                               .
YALE UNIVERSITY,               .
                               .
              Defendant.       .
. . . . . . . . . . . . . . . .
```

```
                     CONTINUED JURY TRIAL
              BEFORE THE HONORABLE ALAN H. NEVAS
               SENIOR UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

```
For the Plaintiff:      Law Offices
                        By:  JOHN R. WILLIAMS, ESQ.
                        51 Elm Street
                        Suite 409
                        New Haven, Connecticut 06510

For the Defendant:      Donahue, Durham & Noonan
                        By:  PATRICK M. NOONAN, ESQ.
                        Concept Park
                        741 Boston Post Road
                        Guilford, Connecticut 06437

Electronic Court
Recorder Operator:      MS. SANDI BALDWIN
```

Proceedings recorded by electronic sound recording.
Transcript prepared by transcription service.

_____

**BOWLES REPORTING SERVICE**
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

1          (Proceedings commenced at 9:12 a.m.)

2               THE COURT:  Morning.

3               MR. WILLIAMS:  Good morning, Your Honor.

4               MR. NOONAN:  Morning, Your Honor.

5               MR. WILLIAMS:  Your Honor, before the -- You

6     can go up.

7               Before we bring in the jury I'd just like to

8     reiterate this morning what I attempted to state in a

9     shorthand way yesterday afternoon, in the midst of the

10    cross-examination.

11              It seems to me that Attorney Noonan, in his

12    cross-examination, has gone well beyond the bounds of

13    the permissible, in attacking Ms. Greenhouse's

14    intimate, personal thoughts and life beyond her

15    relationship with the faculty, and there were, in

16    particular, several questions taken from her

17    confidential, personal notes, which I turned over

18    because I was ordered to do so.  That doesn't make them

19    admissible on the subject of a potentially romantic

20    relationship with one or more members of her class, and

21    I really do want to reiterate, I think that is a clear

22    violation of 412(b)(2), and I would ask the Court to

23    prohibit any further inquiry along those lines.

24              THE COURT:  Mr. Noonan?

25              MR. NOONAN:  I agree with your ruling

1   yesterday, Your Honor.  I think it has nothing to do

2   with 412(b)(2), absolutely nothing to do with it.

3          The -- One of the reasons Ms. Greenhouse was

4   dismissed was her inability to collaborate, not only

5   with the faculty but with her fellow students, and the

6   comments that she made, and the feelings she had about

7   them during the time she was there, and all of these e-

8   mails relate to that time, are certainly relevant and

9   this jury's entitled to know about it.

10         And by the way, Attorney Williams did not

11  object to the introduction of the e-mails.  He didn't

12  give them to me for months, along with many other

13  documents but -- and I did need to file a couple of

14  motions, but there was no objection to producing them.

15  They just didn't get around to do it.

16         MR. WILLIAMS:  Well, I have to disagree with

17  that, but that's neither here nor there, Your Honor,

18  because I think that, in fact, diary entries,

19  especially when one is claiming issues that relate to

20  emotional distress, as we were at one time, are

21  properly discoverable, but there's a big difference

22  between what's discoverable and what's admissible, and

23  the material that Mr. Noonan has been exploring is not

24  material that was communicated to or known by the

25  faculty, and that's the key distinction.

1              If he were talking about e-mails to faculty

2    members, or if he were even talking about Ms.

3    Greenhouse's, and there were a few, quotations about

4    things that she asserted that she had said to other

5    faculty, or in the presence of other faculty, that's

6    fine, and I didn't object to them, but when we're

7    talking about her feelings, her feelings articulated

8    only in intimate conversations with a lifelong friend,

9    that's, I think, a very different area, and I really

10   don't think we should be going there.  I don't think

11   it's right to go there.

12              THE COURT:  It seems to me, Mr. Williams,

13   that when these kinds of -- the kinds of claims that

14   your client is making in this case, are made, that's

15   the risk, perhaps "risk" is the wrong word, but that's

16   -- those are the consequences of what happens.

17              I mean, that's -- you have to expect that a

18   defendant who -- against whom such claims are being

19   made, is going to seek to elicit this kind of evidence,

20   and I think it's proper, and I stand on my ruling of

21   yesterday.

22              Anything else?

23              (No audible response.)

24              Mr. Noonan, you ready?

25              MR. NOONAN:  Yes, Your Honor.

1           THE COURT:  Want to call the jury.

2       (Jury in.)

3           THE COURT:  Morning.

4           JURORS:  Good morning.

5           THE COURT:  You may be seated.

6       Mr. Noonan?

7       MR. NOONAN:  Thank you, Your Honor.

8     SALLY GREENHOUSE, PLAINTIFF'S WITNESS, SWORN

9           CROSS-EXAMINATION (CONTINUED)

10  BY MR. NOONAN:

11  Q.   Good morning, Ms. Greenhouse.

12       How are you this morning?

13  A.   None the worse for wear, thank you.

14  Q.   Good.  I feel the same.

15       As I did yesterday, let me start out by asking

16  you to answer questions simply with a "Yes," a "No," "I

17  don't know," or, if you honestly can't answer the

18  question, you can tell me that and I will try to put

19  another question.

20       Is that okay?

21  A.   Yes.

22  Q.   All right.

23       One of the things -- One of the people you talked

24  about yesterday was Professor Roach.  He was your

25  theater history professor; is that right?

1   A.    That's correct.

2   Q.    He was the one that -- where you flunked the exam

3   and he scheduled a makeup, and you were unable to go to

4   the makeup because of your illness, correct?

5   A.    Yes.

6   Q.    All right.

7        Now, he was not a professor in the drama school,

8   was he?

9   A.    No.

10  Q.    Right.

11       He was in the Yale College, the undergraduate

12  program, --

13  A.    Yes.

14  Q.    -- right?

15       But you, as a drama student, took, I guess, the

16  theater history course from Mr. Roach, even though he

17  was in Yale College?

18  A.    Yes.

19  Q.    All right.

20       You also mentioned Deb Margolin.  She's the person

21  that you said repeated these things about Chris

22  Sanderson.

23       She is also in the undergraduate program; is that

24  right?

25  A.    Yes.

1   Q.   So she's not part of the drama school?

2   A.   No.

3   Q.   All right.

4        The -- At the end of yesterday, I was asking you

5   about Vickie -- Victoria Nolan, the assistant -- or the

6   deputy dean of the drama school, and you took a course

7   with her; is that right?

8   A.   Yes.

9   Q.   And there was reference yesterday, to a document

10  that was marked for identification as Plaintiff's

11  Exhibit 29, and I'd like to offer it as a full exhibit.

12       Is that an e-mail that you sent?

13          (Pause.)

14  A.   Yes.  This is more of my private correspondence to

15  my close friend.

16  Q.   Did you mean "Yes"?

17  A.   Yes.

18  Q.   You did agree you would answer me with a simple

19  "Yes," "No," "I don't know," correct?

20  A.   Yes.

21  Q.   All right.

22          MR. NOONAN:  I'll offer that --

23          MR. WILLIAMS:  May I--

24          MR. NOONAN:  -- as a full exhibit, Your

25  Honor.

1          MR. WILLIAMS:  -- see it please?  May I see

2    it, please?

3          MR. NOONAN:  Uh-huh.  This is --

4          MR. WILLIAMS:  I know you had it -- had your

5    hand on it, but I actually haven't had time to read it.

6          MR. NOONAN:  Certainly.

7          MR. WILLIAMS:  If I could just take a moment,

8    please?

9          MR. NOONAN:  This is one of the ones you just

10   gave me.

11          MR. WILLIAMS:  I know, that.  I know, but I

12   didn't have time to read it.

13          MR. NOONAN:  Fair enough.

14      (Pause.)

15          MR. WILLIAMS:  Well, once again, Your Honor,

16   I think that exploring the private, diary-type

17   communications of a person with her most intimate

18   friends, not communicated to the faculty, unknown to

19   the faculty until they got it through court order in

20   the course of pretrial discovery in this lawsuit, is

21   not proper -- is not a proper area to go into and I

22   think it's barred by Rule 412 of the Federal Rules of

23   Evidence, very respectfully.

24          I know you have indicated previously you

25   disagree with me, but I would just like to note that

1    for the record, Your Honor.

2              THE COURT:  Objection is overruled.  It may

3    be marked as a full exhibit.

4              MR. WILLIAMS:  Was that 29?

5              MR. NOONAN:  Twenty-nine, yes.

6              MR. WILLIAMS:  Thank you.

7    BY MR. NOONAN:

8    Q.   I seem to have misplaced my copy.

9         Do you mind if I read along with you?

10   (Unintelligible.)

11   A.   Can I say "No"?

12             (Laughter. )

13   Q.   I suppose you could say "No."

14             MR. WILLIAMS:  You said "Yes" or "No."

15   BY MR. NOONAN:

16   Q.   In this particular document -- But before I get to

17   that, you were -- you mentioned yesterday that Victoria

18   Nolan was one of the people that was (unintelligible)

19   positive towards you when you were a student

20   (unintelligible).

21             THE COURT:  You've got to get near a

22   microphone, Mr. Noonan.

23   BY MR. NOONAN:

24   Q.   You indicated to us yesterday, that Victoria Nolan

25   was one of the people that was incredibly positive

1    towards you when you were a student --

2    A.    In my evaluation.

3    Q.    I'm sorry?

4    A.    In my evaluation.

5    Q.    Right.

6          And yet, you referred to her in this e-mail,

7    Exhibit 29, as a "male prick," is that right?

8              MR. WILLIAMS:  Your Honor, that's

9    repetitious.  He went into that yesterday at length.

10             MR. NOONAN:  Well, it wasn't an exhibit.  I'm

11   just trying to find out if she recalls that from --

12             MR. WILLIAMS:  Your Honor, it's repetitious.

13   I object to it.

14             THE COURT:  Overruled.

15   BY MR. NOONAN:

16   Q.    Is that correct?  You refer to it -- in this e-

17   mail, but you refer to Victoria Nolan as a "male

18   prick"?

19   A.    In that correspondence, yes.

20   Q.    Okay.

21         Now, you also, in this same correspondence,

22   Exhibit 29, refer to your class as "a bunch of babies,"

23   correct?

24   A.    Specifically, yes.

25   Q.    Okay.

1        And, in fact, you write:

2        "In addition to that, Jedediah wouldn't go up to

3        try the exercises.  He is clinging metaphorically

4        to this insipid Indian Barbie doll now.  It is

5        horrifying to behold.  She would be immature for a

6        12 year-old."

7        Your reference to the "insipid Indian Barbie doll"

8  is a reference to one of your classmates; is that

9  right?

10  A.   One of the acting students.

11  Q.   Okay.

12        One of your classmates, --

13  A.   Yes.

14  Q.   -- correct?

15        And Jedediah's girlfriend?

16  A.   Yes, I think, at that time.

17            MR. WILLIAMS:  Oh (unintelligible) it does

18  need to be marked.

19            MR. NOONAN:  Oh.

20            MR. WILLIAMS:  I would ask that that one be

21  marked as a full exhibit --

22            MR. NOONAN:  Okay.

23            MR. WILLIAMS:  -- because that's the to the

24  faculty.  I think that's proper.

25            MR. NOONAN:  (Unintelligible.)

1           This is Exhibit 30, Your Honor.

2           May I publish it to the jury?

3           THE COURT:  You may.

4           MR. NOONAN:  It's an e-mail from Sally

5    Greenhouse to Evan Yionoulis, dated Friday, March 28th,

6    2003.

7           It states:

8           "Dear Evan: Thanks for the conference on the

9           run.  It really made a difference.  I did the

10          blocking.  Sally."

11   BY MR. NOONAN:

12   Q.   So, there were times that you thought Evan

13   Yionoulis, at least, had some merit as a professor?

14   A.   I never said I didn't.

15   Q.   Is that a "Yes"?

16   A.   Yes.

17   Q.   Okay.

18        But at other times, you referred to her as, "That

19   power crazed, domineering bitch, a power fuck, and

20   frighteningly fuck up"?

21          MR. WILLIAMS:  Your Honor, I'll object on two

22   grounds.

23          First, it is unbelievably repetitious.  He

24   went into that a hundred times yesterday, but more --

25   perhaps more importantly, those two are not mutually

1    exclusive.  You can't say, "You said this but you said

2    that."  You said this and you said that, however, it is

3    repetitious.

4            MR. NOONAN:  I think it's cross-examination,

5    Your Honor.

6            THE COURT:  Overruled.

7    BY MR. NOONAN:

8    Q.   Is that correct, that that's how you referred to

9    your acting professor?

10   A.   In an e-mail to Jim, yes.

11   Q.   Again, if you -- this will actually be a lot

12   slower (phonetic) if you just answer the question

13   without the editorializing.

14           MR. NOONAN:  (Unintelligible.)

15           MR. WILLIAMS:  Yeah.  You want to make this

16   full?

17           MR. NOONAN:  Yes.

18           MR. WILLIAMS:  Sure.  Make this full, as well

19   as this 31.

20           MR. NOONAN:  May I publish it to the jury,

21   Your Honor?

22           THE COURT:  You may.

23           MR. NOONAN:  Ladies and gentlemen, this is

24   Exhibit 31.  It's an e-mail from Sally Greenhouse to

25   Elizabeth Diamond, dated Friday, March 28th, 2003.

1              The body states:

2                  :Dear Liz: Thank you a million times over for

3                  last night's critique of that scene.  Wow!

4                  Rehearsal tonight was amazing!  It's

5                  happening now.  I think you'll definitely see

6                  a difference next week (I'm in love with Mark

7                  Lamos.  Can't we just keep him here

8                  forever?).  Best, Sally."

9     BY MR. NOONAN:

10    Q.   By the way, Mark Lamos, you weren't saying you

11    were actually in love with him, you were talking about

12    him as a professional; is that right?

13    A.   Right.

14    Q.   Okay.

15              MR. WILLIAMS:  I'm going to object to any

16    reference to this exhibit.

17              Again, it's an intimate, personal e-mail to a

18    lifelong friend, never known to, or shown to, or shared

19    with anyone on the faculty, and it is, in fact, about

20    personal relationships among --

21              THE COURT:  But how does that make it

22    inadmissible?

23              MR. WILLIAMS:  Because it's got --

24              THE COURT:  I mean, why is that a grounds for

25    inadmissibility?

1           MR. WILLIAMS:  Because it's irrelevant, Your

2     Honor.

3           This case is not about whether Sally

4     Greenhouse did or didn't have nice thoughts, this is

5     about what she did that was known to the faculty, and

6     whether their actions were, in fact, as we allege,

7     retaliatory for her exercise of certain rights, or were

8     motivated by legitimate, nondiscriminatory reasons.

9     Things they didn't know about could not possibly have

10    gone into their decision-making process, therefore, it

11    has nothing to do with this case, but it is, what I

12    predicted before we started, a giant smokescreen by the

13    defense to avoid talking about the real issues in this

14    case.

15           MR. NOONAN:  Your Honor, could I --

16           MR. WILLIAMS:  That's what it's about.

17           MR. NOONAN:  Can I suggest that we not have

18    these repetitive arguments that are only designed to

19    make a final argument to the jury?

20           THE COURT:  Yes, the objection is overruled,

21    and I think, if you wish, Mr. Williams, you have a

22    standing objection to these exhibits, but I don't think

23    you have to make --

24           MR. WILLIAMS:  I'm --

25           THE COURT:  -- a pitch each time.

1           MR. WILLIAMS:  I -- I'm happy --

2           THE COURT:  The Court notes your objection.

3           MR. WILLIAMS:  That you.  I appreciate it,

4   and I just want to say in response, the only reason I

5   gave that little speech just now is because you asked

6   me a question and I was trying to answer it.

7           THE COURT:  Okay.

8   BY MR. NOONAN:

9   Q.   Let me show you what we've marked as Exhibit 32

10  for Identification.

11       Is that an e-mail to you sent to Mr. Nicholson in

12  the spring of 2003?

13  A.   Yes.

14          MR. NOONAN:  I offer it, Your Honor.

15          MR. WILLIAMS:  I object, Your Honor.

16          THE COURT:  Overruled; full exhibit.

17  BY MR. NOONAN:

18  Q.   The -- In this e-mail you say:

19       "Jedediah (unintelligible) with his fickle

20       behavior."

21       You see that?

22  A.   Yes.

23  Q.   And by "Jedediah," you're referring to one of your

24  classmates, Jedediah Shultz; is that right?

25  A.   Yes.

Q.   The next sentence after that says:

"This asinine teacher of Movement for Actors,
Wesley Fatah, you have to see what he looks like
to really get it, interrupted Jedediah speaking
with me, looked right through me as though I were
invisible, embraced Jed, saying, 'Oh, I just love
you on stage,' and Jed walked off with him."

Now, with regard to the person you referred to as
the "asinine teacher for Movement of Actors," the
affectedly pretentious Wesley Fatah, he was a faculty
member at the drama school; is that right?

A.   Yes.

Q.   Okay.

With regard to Exhibit 29 that we talked about
just a few moments ago, --

MR. NOONAN:   I'll need to use this.   You mind
if I publish it, Your Honor?

THE COURT:   No.

BY MR. NOONAN:

Q.   It's an e-mail from Sally Greenhouse to James
Nicholson, dated March 4th, 2003:

"Dear Jim: Stenuski was here, which was a
(unintelligible) special master class for the
directors.   Steve was in Poland last year and I
trained them in New York, a year-and-a-half ago.

1        He's brilliant, inspired, and whacko, in old

2        school sensinardo (phonetic) kind of way, the way

3        I'm used to in the dance world.  Enough of this

4        armchair American director (unintelligible).

5        All the actors came to a lecture/dem (phonetic)

6        and Evan canceled classes, for our class is a

7        bunch of babies.  A few of them seem to get it.

8        Sally."

9        Sorry.

10        "A few of them seem to get it.  Jedediah wouldn't

11        go up to try the exercise as he is clinging,

12        metaphorically, to this insipid Indian Barbie doll

13        now.  It's horrifying to behold" --

14            MR. WILLIAMS:  Your Honor, haven't we read

15   this before?

16            MR. NOONAN:  I did read the whole thing.  I

17   didn't want to be accused of --

18            THE COURT:  He only read that -- those few

19   lines, I think.

20   Q.   (Continuing.)

21        "She would be immature for a 12 year-old,

22        unbelievable.  I don't know what upsets me more,

23        that he is so needy and passive, that he has

24        transferred that to the most talentless and phony

25        actor girl, or that he didn't bond to yours truly.

1        Anyway, at the lunch I was invited to after, I
2        realized how fatuous and completely self-absorbed
3        David is.  He is clearly not a teacher, envisions
4        himself as a potential contender for" McCarthy --
5        "MacArthur some day, and speaks of Liz Lacompt as
6        though they were best buddies.
7        Initially, he related to me any way that has led
8        me to surmise that Liz has had a little chat with
9        him, for one; and secondly, that my might back off
10       e-mail worked.  I will call his fucking bluff from
11       now on, Goddammit."
12       There is then the paragraph about Victoria
13  Nolan being male prick, which I won't read.
14        Now, Ms. --
15            MR. WILLIAMS:  Well, Your Honor, --
16  Q.   (Continuing.)  -- Ms. Greenhouse --
17            MR. WILLIAMS:  -- it seems to me he can't
18  have it both ways.
19            MR. NOONAN:  I'll read it --
20            MR. WILLIAMS:  Either he doesn't read it,
21  which is what I ask for, if he's gonna read it, then he
22  ought to read the whole thing.
23            THE COURT:  Then read it.
24            MR. NOONAN:  I'll be happy.  I was trying not
25  to be repetitious.

1          "Victoria Nolan is such a male prick.  It

2          ought to be fascinating to me that she is

3          inclined to interpret ignorance as an

4          aggressive assault, and then react with

5          ferocious annihilating attacks, except that

6          here we all are supposedly at an institution

7          of learning, and that is not the dynamic that

8          enhances learning.

9          She is emotionally ill and abusive.  This is

10         an open-air sanatorium surrounded by Gothic

11         architecture."

12    BY MR. NOONAN:

13    Q.   With regard to that last paragraph, Ms.

14    Greenhouse, you clearly were not happy to be at the

15    Yale drama school by the early March of 2003.

16         Would that be a fair statement?

17    A.   No.

18    Q.   You were happy to be there, even though you

19    regarded that as an "open-air sanatorium surrounded by

20    Gothic architecture"?

21    A.   I can answer that question based on what you're

22    reading.

23    Q.   That's okay.  If you can answer it, I can move on.

24         When you say, in this e-mail, that you realized

25    how "fatuous and completely self-absorbed David is,"

1  you're referring to the -- one of the directing

2  faculty, David Chambers; is that right?

3  A.   Yes.

4  Q.   And when you say that he got your "back off e-mail

5  and it worked," that was an e-mail in which you were

6  intentionally trying to get him to back off; is that

7  right?

8  A.   I can't recall.

9  Q.   You can't recall that one.  Okay.

10      What do you think it meant when you said,

11  "Secondly," my -- that "my back off e-mail worked."

12  A.   I can't speculate at this point.

13  Q.   All right.  That's fine.

14      And was that something that Mr. Nicholson had

15  recommended to you, that you send David Chambers a back

16  off e-mail?

17  A.   I can't --

18  Q.   You don't --

19  A.   -- speculate on that, since I already told you I

20  don't recall.

21  Q.   All right.

22      And when you say in this e-mail, "I will call his

23  fucking bluff from now on, Goddammit," that was

24  referring to David Chambers, correct?

25  A.   I can't recall.

22

1   Q.   Well, take a look at the paragraph and see whether

2   anyone else is mentioned, other than David Chambers,

3   and see whether --

4           MR. WILLIAMS:   Objection.   She said she

5   doesn't remember, Your Honor.

6           MR. NOONAN:   No, I'm asking her to --

7   A.   I've read it already.   I've read it the first time

8   you gave it to me.

9   BY MR. NOONAN:

10  Q.   I see.

11       And so, even having read it, you're not able to

12  say that when you said -- Well, you did tell me the

13  back off e-mail referred to David Chambers.

14       You said That just a moment ago, correct?   You

15  recall saying that?

16  A.   Yes.

17  Q.   Okay.

18       The very next sentence says, "I will call his

19  fucking bluff from now on, Goddammit."

20       Would it make sense to you, that that sentence

21  also refers to David Chambers, just the way the -- your

22  reference to sending him a back off e-mail referred to

23  David Chambers?

24  A.   Would that make sense?   Is that what you're

25  asking?

```
 1    Q.   Yes.
 2    A.   It would make sense.
 3    Q.   Okay.
 4              (Pause.)
 5    Q.   (Continuing.)  Now, one of the reasons you were
 6    not happy at Yale is that Yale was not your first
 7    choice in any event --
 8              MR. WILLIAMS:  Objection; repetitious and
 9    assumes a fact not in evidence.
10              THE COURT:  Well, I'll sustain the objection.
11    I mean, you can ask her if it was or it wasn't.
12    BY MR. NOONAN:
13    Q.   Do you remember indicating that Yale was not your
14    first choice?
15              MR. WILLIAMS:  Objection; repetitious.
16              THE COURT:  Overruled.
17    A.   That is incorrect.
18              (Pause.)
19              MR. WILLIAMS:  Wasn't this used yesterday?  I
20    seem to remember that it --
21              MR. NOONAN:  No.
22              THE WITNESS:  Yes, it was.
23              MR. WILLIAMS:  No, you don't know what we're
24    talking about.
25              MR. NOONAN:  It wasn't.  It wasn't marked.
```

1            MR. WILLIAMS:  Oh, okay.

2            MR. NOONAN:  Yeah.

3    BY MR. NOONAN:

4    Q.   Showing you what's been marked for identification

5    as Plaintiff's Exhibit 33, do you recognize that e-mail

6    that you sent to Diane Stevens?

7    A.   Yes.

8            MR. NOONAN:  I'd offer it, Your Honor.

9            MR. WILLIAMS:  Objection, Your Honor; grounds

10   previously stated.

11           THE COURT:  Overruled; full exhibit.

12   BY MR. NOONAN:

13   Q.   Now, having had a chance to look at this e-mail,

14   Exhibit 33, Ms. Greenhouse, isn't it true that your

15   first choice was UMass?

16   A.   No.

17   Q.   Okay.

18        Did you write to Mr. Stevens:

19        "My first choice was two years at UMass, no

20        tuition, snag my credential."

21   A.   That was a sentiment.

22   Q.   Okay.

23   A.   It was not --

24   Q.   (Unintelligible.)  That's what you wrote, correct?

25   A.   Yes.

1   Q.   That what you wanted to do was simply snag your

2   credential, right?

3   A.   At UMass.

4   Q.   Okay.

5      And what you wrote was that was your first choice?

6   A.   In that moment.

7   Q.   And that was a moment that you were at the Yale

8   drama school, correct?

9   A.   I didn't see the date or time on that.  I can't

10   answer that.

11   Q.   It's dated March 17th, 2003.  That would be during

12   the time you were at Yale, correct?

13   A.   Yes.

14   Q.   Now, let me switch gears a little bit and talk

15   about one of your classmates.

16      Sarah Treem was the playwright on your

17   collaborative work project, correct?

18   A.   Yes.

19   Q.   And you referred to Sarah Treem as a "spoiled

20   brat," correct?

21   A.   Yes.

22   Q.   And yet, when you were communicating with Sarah

23   Treem herself, you wrote to her:

24      "It was sublime to hear you reading Eddie

25      (phonetic) and I loved what you shared about the

1    play's origins.  Although I knew this from the

2    first time I read the play, it was more evident

3    how exquisite your conversational flow is in the

4    play, beautiful!"

5        Do you recall that one?

6    A.    Absolutely.

7    Q.    Now, one of the things that you've alleged in your

8    Complaint that you filed here in court is that you

9    pursued the administrative remedies, I'm sorry,

10   available to you at the university; is that right?

11   A.    Yes.

12   Q.    All right.

13        And there were, in fact, two different avenues

14   that you pursued to try to get your dismissal

15   overturned, correct?

16   A.    Yes.

17   Q.    Okay.

18        And one of them was a grievance filed with the

19   university provost office, in which a woman by the name

20   of Patricia Pierce investigated the claim; is that

21   right?

22   A.    Yes.

23   Q.    And in that --

24        MR. WILLIAMS:  Your Honor, there is an

25   outstanding matter that we argued on that on Friday

1   that you haven't ruled on yet.

2            MR. NOONAN:  I guess I wasn't aware of it.

3            MR. WILLIAMS:  (Unintelligible) know.

4            MR. NOONAN:  I don't know if you wanted to --

5            MR. WILLIAMS:  I know Mr. Noonan was aware of

6   it at the -- Well, maybe he forgot, but we had an

7   extensive argument about it after jury selection on

8   Friday and Your Honor reserved and you have not yet

9   given us a ruling on that or what I suspect is the next

10  area.

11           MR. NOONAN:  Oh, no.

12           THE COURT:  I thought the only ruling --

13           MR. NOONAN:  Yes, you --

14           THE COURT:  -- I reserved on was 412.

15           MR. WILLIAMS:  No, Your Honor.

16           MR. NOONAN:  No, the -- Oh, I know.  The

17  issue only was admissibility of the documents

18  themselves, which I had told you, assuming I -- the

19  answers are as I believe them to be, I would not offer

20  them.  So I'm not --

21           MR. WILLIAMS:  No, --

22           MR. NOONAN:  -- offering them.

23           MR. WILLIAMS:  Well, no, it wasn't just on

24  the documents.

25           MR. NOONAN:  Well, in any event, I mean, can

1    I just ask questions?

2              MR. WILLIAMS:  You could --

3              MR. NOONAN:  If he has an objection, he can

4    object to the question.

5              MR. WILLIAMS:  Yeah.  I mean, I thought it

6    was a part of the stipulation that she had exhausted

7    administrative remedies, if that's the issue, but --

8              MR. NOONAN:  It's not --

9              MR. WILLIAMS:  -- apparently it's something

10   else and that was the subject of our argument, I

11   believe, Judge.

12             THE COURT:  I don't recollect it, so --

13             MR. NOONAN:  I don't either.

14             THE COURT:  -- to the extent it constitutes

15   an objection, it's overruled, and if Mr. Noonan asks

16   questions that you think are objectionable, you, of

17   course, have the right to interpose an objection.

18             MR. WILLIAMS:  Very well, Your Honor.

19   BY MR. NOONAN:

20   Q.   In any event, there was an investigation by a

21   woman by the name of Patricia Pierce; is that right?

22   A.   Evidently.

23   Q.   Yes, and she was the dean of students at the

24   School of Management at Yale University?

25   A.   I don't recall what her figure was.

1   Q.   You do remember though, that she was someone who

2   was not affiliated with the School of Drama?

3   A.   Yes.

4   Q.   And Ms. Pierce interviewed you in connection with

5   her investigation, correct?

6   A.   Yes.

7   Q.   And you submitted a number of documents to her to

8   support your claims, correct?

9   A.   Yes.

10  Q.   All right.

11       And your claims included gender bias, correct?

12           MR. WILLIAMS:  Well, I'm gonna objection to

13  that, Your Honor.  This lawsuit is not about whatever

14  was argued at the college.

15           MR. NOONAN:  Your Honor, I'm entitled to

16  explore what else she claims, in addition to what she's

17  claiming in this lawsuit.  At different points she's

18  claimed different things.

19           MR. WILLIAMS:  Oh, I don't think so.

20           THE COURT:  Overruled.  Well, we'll -- I

21  think that's what he's trying to elicit so overruled.

22  Go ahead.

23  BY MR. NOONAN:

24  Q.   You claimed gender bias in that Complaint that you

25  filed with Ms. Pierce, correct?

1    A.   Yes.

2    Q.   You also claimed you were the victim of age

3    discrimination, correct?

4    A.   I don't recall.

5    Q.   You don't remember?

6         Let me see if I can help.

7              (Pause.)

8         Actually, I think the best thing I can show you is

9    a copy of the Complaint that you filed

10   (unintelligible).

11        (Pause.)

12        (Counsel confer.)

13   BY MR. NOONAN:

14   Q.   Just take a look at it and you can read as much or

15   as little of this as you want but I'm referring, in

16   particular, to page 3, and see if that refreshes your

17   recollection that your Complaint was investigated by

18   Patricia Pierce and was age related discrimination

19   (unintelligible).   I'm sorry.

20        The -- You don't -- Don't read it aloud because

21   it's not an exhibit, but looking at the document, does

22   that refresh your recollection that --

23   A.   Yes.

24   Q.   -- when you made this complaint --

25   A.   Yes.

1   Q.   -- you included an age --

2   A.   Yes, I did.

3   Q.   -- discrimination claim?

4   A.   Yes, I did, age-related bias.

5   Q.   Okay.

6        And you also included a claim of retaliation?

7   A.   That's correct.

8   Q.   All right.

9        And in the end -- And what you were seeking was to

10  get the dismissal reversed, correct?  Get the decision

11  reversed and be reinstated?

12  A.   Among other things, yes.

13  Q.   Okay.

14       And in the end, Ms. Pierce, after her

15  investigation, concluded that the dismissal was proper?

16            MR. WILLIAMS:  Objection, Your Honor.

17            MR. NOONAN:  I don't know what -- What would

18  the objection be?  I mean, she's -- She --

19            MR. WILLIAMS:  Well, if you'd like me to

20  cover it I'd be happy to.  I was trying to be more

21  succinct.  I'd be happy to argue my objection.

22            MR. NOONAN:  Well, I think it's perfectly

23  proper.

24            THE COURT:  Overruled.

25  BY MR. NOONAN:

```
 1    Q.   Is it correct that --
 2    A.   I guess.
 3    Q.   -- Ms. -- Well, do you need to look at her -- I'm
 4    happy to --
 5    A.   I have no idea what she did by way of
 6    investigation.
 7    Q.   No.  No.  No.  I asked about the conclusion.
 8         You received a copy of her --
 9    A.   Yes, I did.  Yes.
10    Q.   -- 14-page report that she --
11    A.   Yes.
12    Q.   -- prepared, right?
13    A.   Yes.
14    Q.   And you're aware, having looked at that, that she
15    concluded that the dismissal was entirely proper and
16    that there was no discrimination?
17    A.   That's correct.  The dean of the Yale School of
18    Management decided that.
19    Q.   Okay.
20         And you're not claiming that she was someone who
21    discriminated against you based on your gender, are
22    you?
23              MR. WILLIAMS:  Your Honor, this is not a
24    lawsuit against any --
25    A.   I --
```

1              MR. WILLIAMS:  -- individuals.  This is a

2     lawsuit against a large corporation and --

3              MR. NOONAN:  Okay.

4              MR. WILLIAMS:  -- and it's misleading to

5     imply that, you know, somebody's got a complaint

6     against a particular person.  This is a suit against an

7     institution.

8              MR. NOONAN:  Of course, an institution can

9     act only on -- through its agents.

10             THE COURT:  Overruled.

11    BY MR. NOONAN:

12    Q.   You're not claiming that when Ms. Pierce, or this

13    female who investigated your claims, and interviewed

14    you, other people, and reviewed the documents you

15    submitted to her, you're not claiming that she

16    discriminated against you because you're female --

17             MR. WILLIAMS:  I object to that question,

18    Your Honor.  It is a multiple part question and it

19    assumes --

20             THE COURT:  Sustained.

21             MR. WILLIAMS:  -- facts --

22             THE COURT:  Sustained.

23             MR. WILLIAMS:  Thank you, Judge.

24    BY MR. NOONAN:

25    Q.   Are you claiming that Ms. Pierce subjected you to

34

1    age discrimination by deciding against you?

2    A.   I wouldn't know.

3    Q.   Okay.

4         And do you think that she was -- decided against

5    you because you're female?

6              MR. WILLIAMS:   Objection; irrelevant.

7              THE COURT:   Overruled.

8    A.   I have no idea.

9    BY MR. NOONAN:

10   Q.   You certainly don't believe that she was

11   retaliating against you, do you?

12   A.   Excuse me?

13   Q.   You don't think she was guilty of retaliation, do

14   you?

15   A.   Can you be more specific in describing that?

16   Q.   I'm -- Well, you're claiming retaliation in this

17   lawsuit, correct?

18   A.   Yes.

19   Q.   And you're claiming retaliation by virtue of the

20   faculty having voted to dismiss you, correct?

21   A.   Yes.

22              MR. WILLIAMS:   Well, Your Honor, --

23   BY MR. NOONAN:

24   Q.   Are you also claiming that Patricia Pierce, when

25   she investigated this matter, and came to her

1    conclusions, that she also was retaliating against you?

2    A.   I can't answer that question.

3    Q.   All right.

4    A.   She works for Yale.

5    Q.   You can't answer it because she works for Yale?

6    A.   Partly, yeah.

7    Q.   I mean, do you believe that Patricia Pierce was

8    retaliating against you?

9    A.   Well, first of all, I have no idea --

10   Q.   Okay.  If --

11   A.   -- what she's thinking.

12   Q.   If you don't know, that's okay.

13        Now, there was another proceeding that went along

14   at Yale to review your charges, correct?

15   A.   Yes.

16   Q.   And that was a proceeding in which a total of six

17   people at the university reviewed your claims, correct?

18   A.   Yes.

19   Q.   Of those six people, four were women and two were

20   men, correct?

21   A.   I don't recall.

22   Q.   You did get a copy of the report --

23   A.   No, they never gave it to me.  They never released

24   it.  They kept it at Yale.

25   Q.   Okay.

1       You -- But you did learn, I take it --

2  A.   I learned of its existence.

3  Q.   -- of the outcome?

4  A.   Yes, I did.

5  Q.   Let me show you a document and see if you can --

6  see if that refreshes your recollection as to the

7  identity of the people who were on the committee.

8          MR. WILLIAMS:  Just for the record, is

9  counsel showing the witness T for Identification?

10          MR. NOONAN:  (Unintelligible), correct.

11  Correct.

12          MR. WILLIAMS:  Only part of T?

13          MR. NOONAN:  She can look at all of it if she

14  wants to.  I was helping her.

15          MR. WILLIAMS:  I just thought the record

16  should show whatever it is she's being handed.

17          MR. NOONAN:  She actually has the entire

18  document but I have pointed out the page containing the

19  names of the people who were on the committee.

20  A.   I wouldn't necessarily recognize their names.

21  BY MR. NOONAN:

22  Q.   Just look and review that for a moment and I want

23  to ask you whether that refreshes your recollection --

24          MR. WILLIAMS:  Your Honor, that assumes that

25  she ever knew and she said --

```
 1            THE COURT:  He hasn't finished the question,
 2     Mr. Williams.
 3            MR. WILLIAMS:  I'm sorry, I thought he had.
 4            MR. NOONAN:  I think when I do I'm entitled
 5     to an answer without Mr. Williams trying to give her
 6     instructions.
 7            MR. WILLIAMS:  On the contrary, I have a
 8     right to make an objection if he's finished the
 9     question.
10            THE COURT:  Complete the question, Mr.
11     Noonan.
12     BY MR. NOONAN:
13     Q.  Can you just review that list that's in front of
14     you, and when you're done, I want to ask you a
15     question.
16            (Pause.)
17     A.  Yes.
18     Q.  Does that refresh your recollection that the
19     committee was composed of four women and two men.
20            MR. WILLIAMS:  Objection.
21     A.  I didn't --
22            MR. WILLIAMS:  She --
23     A.  (Continuing.)  -- recall --
24            MR. WILLIAMS:  Objection.  She never said --
25            MR. NOONAN:  Well, --
```

1             MR. WILLIAMS:  -- that she had had a

2    recollection to be refreshed.  He hasn't laid a proper

3    foundation for the question.

4             MR. NOONAN:  That's not a foundation for the

5    question.  She said she doesn't recall.  I showed her

6    the document.

7             MR. WILLIAMS:  You have to show that there is

8    a recollection before you can try to refresh it.

9             THE COURT:  I think she said she didn't

10   remember --

11   BY MR. NOONAN:

12   Q.   Having looked at that --

13             THE COURT:  -- who was on --

14             Go ahead.  Overruled.

15             MR. NOONAN:  That is what she said.

16             THE COURT:  Overruled.  Go ahead.

17   BY MR. NOONAN:

18   Q.   Having looked at the document, does that refresh

19   your recollection that there were four women and two

20   men on this committee that reviewed your charges?

21   A.   I can see that there are --

22             MR. WILLIAMS:  Objection, Your Honor.  See,

23   he's -- in effect, what's happened is she's reading

24   from a document not in evidence.

25             If counsel wants to offer the document --

1              THE COURT:   The answer -- You answer the

2    question, "Does it refresh your recollection?"  You can

3    answer that question "Yes" or "No."

4    A.   I don't know.  I didn't recall.

5    BY MR. NOONAN:

6    Q.   Okay.  Let me ask you this.

7         Do you remember that Andrew Allison was a member

8    of that committee?

9    A.   I don't recognize the name.

10   Q.   Okay.

11        Did you meet with these people, by the way?

12   A.   Yes.

13   Q.   Okay.

14        And they were all there when you met with them,

15   correct?

16   A.   At a --

17   Q.   Is that just -- Is that "Yes" or "No"?  I'm just

18   trying to --

19   A.   Yes.

20   Q.   -- speed this up.

21        And there were six people, correct?  You've

22   already told us that.  You did remember that when I

23   asked you a few moments ago.

24   A.   I didn't remember how many there were but --

25   Q.   Don't you remember when I asked you if there were

40

1   six people you said "Yes"?  Would --

2   A.   I just agreed, yes.

3   Q.   It wasn't -- Well, it wasn't more than five

4   minutes ago.

5        So one of the people that you don't remember is

6   Andrew Allison.

7        Do you remember Margaret Deemer, a professor from

8   the School of Architecture?

9   A.   I don't remember any of them personally.

10  Q.   Unfortunately, I'm going to have to ask you about

11  each one.

12       Do you --

13           MR. WILLIAMS:  Well, Your Honor, I object to

14  that because now he's simply trying to put into

15  evidence, a document that apparently he doesn't want to

16  put into evidence, or thinks he can't put into

17  evidence, by --

18           MR. NOONAN:  Oh, I'd be delighted --

19           MR. WILLIAMS:  -- reading it.

20           MR. NOONAN:  I'd be delighted to put the

21  document in evidence.

22           MR. WILLIAMS:  Good.  I have no objection.

23           MR. NOONAN:  Oh.  Excellent.

24           THE COURT:  All right.  Then it's a full

25  exhibit then.

1          MR. WILLIAMS:  And that's T, I believe, Your

2   Honor.

3          MR. NOONAN:  It is.

4      (Pause.)

5   BY MR. NOONAN:

6   Q.   Now that it's actually in evidence, you can

7   confirm by looking at the list, that there were four

8   women and two men on that panel, correct?

9   A.   I don't see that page.

10  Q.   It's perhaps the tenth page in, a page that looks

11  like this.

12  A.   Okay.

13  Q.   Now that we have Exhibit T in front of you, can

14  you confirm that the document indicates that there were

15  two men and four women?

16  A.   Yes.

17  Q.   Okay.

18      And the committee concluded; did it not, that your

19  claims were not warranted?

20  A.   I don't know the official language.

21  Q.   Okay.  I'm not asking you the official language.

22      Didn't the committee reject your claims?

23  A.   They did not find in my favor.

24  Q.   Okay.

25      And are you claiming that those four women and two

1   men were motivated by gender bias when, after hearing

2   the evidence, they decided against you?

3   A.    No.

4   Q.    Okay.

5       Are you claiming they were motivated by age

6   discrimination when they decided against you?

7   A.    No.

8   Q.    Are you claiming that they decided against you out

9   of retaliation?

10  A.    Can you define exactly what you mean by that

11  question?

12  Q.    Well, I -- the word "retaliation," I think, is a

13  word that you used, ma'am, in your claims and in your

14  claim here in court.  I meant it in the same way that

15  you intended it.

16      Are you claiming that these six people, four women

17  and two men, retaliated against you by listening to

18  your claim and finding against you?

19          MR. WILLIAMS:  Your Honor, I have to object

20  to that because, of course, we all know that she didn't

21  write her lawsuit, I wrote her lawsuit, and unless we

22  stipulate that somehow she and I are psychologically in

23  sync, I don't think she can say what the legal terms

24  mean that I had in mind, and I think --

25          MR. NOONAN:  That's --

1              MR. WILLIAMS:  -- Your Honor plans to charge

2       the jury on that, and tell them the Court -- tell the

3       jury what they mean.

4              MR. NOONAN:  I'll withdraw the --

5              MR. WILLIAMS:  And these --

6              MR. NOONAN:  I'll withdraw the question.

7              THE COURT:  The question's withdrawn.

8       BY MR. NOONAN:

9       Q.   Do you recall alleging in your grievance -- By the

10      way, you wrote the grievance yourself, correct?

11      A.   Yes.

12      Q.   You didn't have Attorney Williams write the

13      grievance for you?

14      A.   No.

15      Q.   And do you recall in your grievance that you had

16      endured retaliatory action against you?

17      A.   Can you specify the page?

18      Q.   Well, it's actually the grievance --

19      A.   It's in here as well?

20             MR. WILLIAMS:  It's in T.  It's part of

21      Exhibit T.

22      BY MR. NOONAN:

23      Q.   It's the third page of your grievance.  I can just

24      show in my copy if you like?

25      A.   Uh-huh.  Yes.

44

1   Q.   So you used the word "retaliation" correct?

2   A.   "Retaliatory action."

3   Q.   Okay.

4   A.   Yes.

5   Q.   And retaliatory action and retaliation, they would

6   be pretty close?

7           MR. WILLIAMS:  Objection, Your Honor.  That's

8   a legal term that Your Honor is going to charge the

9   jury on.  He can't be doing that.

10          MR. NOONAN:  I'm not asking about the legal

11  term.  I'm asking about the way you used --

12          MR. WILLIAMS:  Well, that's --

13  BY MR. NOONAN:

14  Q.   Would you agree that retaliation and retaliatory

15  action are synonyms, the way you use the term?

16  A.   Yes.

17  Q.   Okay.

18       So --

19          MR. WILLIAMS:  Well, wait a minute --

20  Q.   (Continuing.)  -- we get back then --

21          MR. WILLIAMS:  -- she's obviously not

22  finished her question.  She was in the --

23          THE COURT:  She answered "Yes."  I think it

24  was -- it called for a "Yes" or "No" answer.

25  BY MR. NOONAN:

1    Q.   Let me get back, then, to the question I asked,

2    which dealt with the word "retaliation" and you said

3    that you couldn't answer it because you didn't know the

4    meaning of the word.

5         Using the meaning of the word in the same fashion

6    you intended it when you accused your professors of

7    retaliatory action in your grievance, do you believe

8    that these four women and two men who decided the

9    grievance against you --

10   A.   Uh-huh.

11   Q.   -- were acting out of a retaliatory motive?

12   A.   Then I would say not.

13   Q.   Okay.

14        Now, you also mentioned yesterday that you filed a

15   complaint with a state agency.  You called it --

16        MR. WILLIAMS:  Objection, Your Honor.  I

17   think that's a totally different area which we did

18   discuss Friday and if the Court has any lack of

19   recollection of that, I think we really need to be

20   heard about that before it's gone into further, at

21   side-bar or otherwise.

22        MR. NOONAN:  The only discussion we had was

23   whether or not we would introduce a --

24        MR. WILLIAMS:  No.  No.

25        MR. NOONAN:  -- a copy of the --

1          MR. WILLIAMS:  No.

2          MR. NOONAN:  If I could just finish.  I

3    didn't interrupt Mr. Williams.  The only discussion on

4    this was whether we would introduce a copy of the

5    findings, and I said I didn't think I'd need to.

6          MR. WILLIAMS:  Absolutely not true, Your

7    Honor.

8          MR. NOONAN:  Well, that was the discussion,

9    and Ms. --

10         MR. WILLIAMS:  That's --

11         MR. NOONAN:  The question I asked right now

12   related to her testimony yesterday, in which she talked

13   about --

14         THE COURT:  All right.

15         Can you move into a different area, Mr.

16   Noonan, and then we'll --

17         MR. NOONAN:  Sure.

18         THE COURT:  -- take it up later?

19   BY MR. NOONAN:

20   Q.   Let me ask you about Professor Diamond.

21        She was the chair of the directing department,

22   correct?

23   A.   I believe her title was "Interim Acting Chair of

24   Directing."  I'm not positive.

25   Q.   Okay, but of the directing department?

1    A.   Yes.

2    Q.   Your department?

3    A.   Yes.

4    Q.   And it's your position in the case that she is

5    guilty of gender discrimination against you, correct?

6    A.   I can't answer that question.  It's --

7    Q.   Well, you certainly have claimed that she acted in

8    a discriminatory fashion?

9    A.   Yes, discriminatory.  Yes.

10   Q.   Okay.  All right.

11        And the particular type of discrimination is

12   gender discrimination, correct?

13             MR. WILLIAMS:  Objection, Your Honor.  This

14   is a lawsuit about retaliation and violation of Title

15   9.

16             MR. NOONAN:  This lawsuit --

17             MR. WILLIAMS:  That's something else.

18             MR. NOONAN:  This lawsuit alleges

19   discrimination.  It's in the Complaint.

20             MR. WILLIAMS:  Specifically under Title 9,

21   which is a different animal, as the Court will instruct

22   the jury at the end of the case.

23             MR. NOONAN:  It's a discrimination complaint.

24             Your Honor, Your Honor introduced the case by

25   telling the jury that this was a claim for

1   discrimination.

2          THE COURT:  The objection is overruled.  The

3   witness can answer.

4   BY MR. NOONAN:

5   Q.  Isn't it true that you have accused Elizabeth

6   Diamond -- Well, first of all, you do agree you accused

7   her of discrimination?

8   A.  Yes.

9   Q.  All right.

10         And the type of discrimination was both age and

11  gender, correct?  Is that --

12  A.  In this --

13  Q.  -- "Yes" or "No"?

14  A.  -- lawsuit, --

15  Q.  No.

16         Ma'am, did you accuse her in the past, at any

17  point in time of age and gender discrimination?

18  A.  Yes.

19  Q.  Okay.

20         And in terms of the age, she is about the same age

21  as you; is she not?

22  A.  I believe she's younger.

23  Q.  All right.

24         How much younger do you think she is than you?

25  A.  A couple of years.

1   Q.   So when I say "She's about the same age," you'd

2   have to agree she's about the same age, right?

3   A.   Well, in my mind she either is the same age or she

4   isn't.

5   Q.   I see.

6   A.   A couple of years, it could be four.  I don't know

7   how old she is.

8   Q.   Okay.

9        Professor Diamond is one of the people who saw

10  your audition when you were applying to the Yale drama

11  school, correct?

12  A.   Yes.

13  Q.   And she was the one who actually informed you of

14  your admission to the school through that telephone

15  call; is that right?

16  A.   Yes, she did.

17  Q.   And when she called you, she told you -- when she

18  called to invite you to come to the school, she

19  commented that you gave a very impressive audition;

20  isn't that right?

21  A.   I don't recall exactly that word --

22  Q.   Well, do you remember --

23  A.   -- but she may have.

24  Q.   Do you remember telling me that just a couple of

25  weeks ago in your deposition?

1   A.   You'd have to show me those words in order for me
2   to know that.
3   Q.   I just want to find out, are you telling me you
4   don't remember saying a couple of weeks ago, that she
5   told you, you had given a very impressive audition?
6   A.   That's correct.
7   Q.   All right.
8        But you are able to remember in minute detail,
9   other conversations you had --
10  A.   That's correct.
11  Q.   So I will then show you what you said two weeks
12  ago.
13           MR. WILLIAMS:  Objection.  It was three weeks
14  ago.
15           MR. NOONAN:  It was --
16           MR. WILLIAMS:  Three weeks ago.
17           MR. NOONAN:  Oh.  All right.  I'm sorry.
18           MR. WILLIAMS:  I mean, not to be picky --
19           MR. NOONAN:  I guess it's two weeks ago
20  (unintelligible).
21           MR. WILLIAMS:  We've been here longer than
22  you think.
23           MR. NOONAN:  Three weeks ago.
24  BY MR. NOONAN:
25  Q.   Did you say that --

1          MR. WILLIAMS:  Page?

2          MR. NOONAN:  On page 214:

3          MR. WILLIAMS:  Thank you.

4     BY MR. NOONAN:

5     Q.   "Ms. Diamond said, you know, you gave a very

6          impressive audition," on page 214?

7     A.   Oh, right.  That was the first sentence.

8     Q.   Did you think that she was engaging in age or

9     gender discrimination when she invited you to come to

10    be admitted to the school, and told you, you -- that

11    you had given a very impressive audition?

12    A.   No.

13    Q.   Now, you have referred to Professor Diamond as a

14    "feminist director," correct?

15    A.   She refers to herself as a "feminist director."

16    Q.   And you regard her as such?

17    A.   Not necessarily.

18    Q.   All right.

19         One of the things that you told us is that you

20    can't get inside her head and therefore, you can't know

21    what her motivation was when she gave you the warning,

22    correct?

23    A.   Correct.

24    Q.   And that would be true of all of the people at the

25    Yale drama school whom you have accused of improper

1    motives.  There's no way for you to get inside their

2    heads to know what they're thinking, right?

3    A.   Correct.

4    Q.   Okay.

5         If we want to know what their motivation was, we'd

6    need to ask them?

7              MR. WILLIAMS:  Objection, Your Honor, that's

8    a legal conclusion and I think Your Honor plans to

9    instruct the jury on --

10             MR. NOONAN:  Well, I --

11             MR. WILLIAMS:  -- circumstantial evidence as

12   the way one understands the motivations of most of us.

13             THE COURT:  I'll sustain the objection.

14   BY MR. NOONAN:

15   Q.   Do you agree, Mr. Greenhouse, that one of the

16   possibilities is that when the faculty voted

17   unanimously to dismiss you, they did it because they

18   felt that you had not demonstrated the capacity to take

19   on the responsibilities of a second year directing

20   student at the Yale School of Drama?

21   A.   I can't even follow your question.

22   Q.   All right.  I'll try it again.

23        Do you agree that one of the possibilities in this

24   case, is that when the faculty unanimously voted to

25   dismiss you from the school of drama, that they

1  honestly felt that you had not demonstrated the

2  capacity to succeed and take on the responsibilities of

3  a second-year directing student at the school?

4  A.   No.

5  Q.   Okay.

6      Now, with regard to Professor Diamond and why she

7  might think that you were not cut out for the Yale

8  drama program, you do admit that you did your worst

9  directing ever when she was there, correct, in front of

10 her?

11 A.   I don't know what you're referring to.

12 Q.   You remember indicating that you had done your

13 worst directing ever in front of Liz Diamond?

14 A.   No, I don't recall.

15 Q.   Okay.

16      (Pause.)

17          MR. NOONAN:   (Unintelligible.)

18          MR. WILLIAMS:   Oh, sure.

19      (Pause.)

20 BY MR. NOONAN:

21 Q.   Let me just show you this document, which is only

22 marked for Identification, Number 34.  You can look at

23 any part you want, but I'm referring you to the

24 paragraph number 2, and ask you whether that refreshes

25 your recollection that you, at least at one time,

54

1    indicated that you had done your worst directing ever

2    in front of --

3    A.   Oh, yes.  I remember this.

4    Q.   Okay.

5         I don't --

6              MR. NOONAN:  I don't have any other questions

7    on this document.

8    BY MR. NOONAN:

9    Q.   Now, despite your feelings that Ms. Diamond was

10   discriminating against you based on your age and your

11   gender, you did say some nice things about her when you

12   were communicating with her, correct?

13   A.   I think that's correct.

14   Q.   Do you remember saying to her:

15        "You made so much sense and I am thirsty for

16        knowledge about actors and how they work.  You

17        were right in suggesting that I may have felt

18        paranoid."

19   A.   I don't remember that but --

20   Q.   Sounds like something --

21   A.   -- if you show it to me, I would know whether I

22   wrote it or not.

23   Q.   Do you remember saying to her:

24        "So even though I jumped to understandably logical

25        conclusions that were inaccurate, it gave you the

1           opportunity to do intense directorial

2           supervision."

3                MR. WILLIAMS:  Your Honor, this is a pretty

4   long read.  I think it should be --

5                MR. NOONAN:  This is cross-

6                MR. WILLIAMS:  -- he can't read from a

7   document not in evidence.

8                MR. NOONAN:  This is cross-examination.  I'm

9   asking whether she remembers it.

10                MR. WILLIAMS:  Too long to be reading from a

11   document not in evidence, I would say, Your Honor.

12                MR. NOONAN:  I don't know what rule of

13   evidence says if it's too long you can't state the

14   question.

15                THE COURT:  Overruled.

16   BY MR. NOONAN:

17   Q.   Do you remember saying to Ms. Diamond, or writing

18   to Ms. Diamond:

19           "So even though I jumped to understandably logical

20           conclusions that were inaccurate, it gave you the

21           opportunity to do some intense directorial

22           supervision that left me feeling that my needs as

23           a student were met swiftly and skillfully"?

24   A.   I would have to see it in order to agree --

25   Q.   Okay, but --

1  A.   -- that I heard it or not.

2  Q.   All right.

3       But is that the kind of thing that you wrote to

4  Professor Diamond from time to time?

5  A.   I don't know how to characterize all of my

6  communications --

7  Q.   Okay.

8  A.   -- in that way.

9  Q.   I wasn't asking about all of them.  I was talking

10 about some of them.

11      Isn't it true that some of the communications you

12 made to Ms. Diamond were complimentary, telling her how

13 much she had helped you?

14 A.   Yes.

15 Q.   Okay.

16      And you do agree that there were times in class

17 when Ms. Diamond gave you positive feedback, gave you

18 compliments, correct?

19 A.   There were.

20 Q.   Okay.

21      And you didn't think she was discriminating

22 against you or retaliating against you when she gave

23 you those positive comments?

24 A.   On the contrary, I felt all year she was.

25 Q.   Okay.

1          So even though she was giving -- making these

2     positive comments to you, you thought she was

3     retaliating against you in doing that?

4     A.    Yes.

5     Q.    Okay.

6     A.    Not in doing that.  Not in doing that, --

7     Q.    Well, that's --

8     A.    -- underneath there was --

9     Q.    Oh, okay.  I don't think you understood the

10    question.

11         My question was --

12    A.    Okay.

13    Q.    -- when Ms. Diamond was giving you this -- these

14    positive comments, did you think she was discriminating

15    against you or retaliating against you?

16    A.    Not apparently, no.

17    Q.    Not in those comments.  Okay.

18         And one of the things that Professor Diamond did

19    was pass you in your course work, correct?

20    A.    Pass me in my course work?

21    Q.    Yes, the course work that you had with her, you

22    got a "Pass" right?

23    A.    Of the directing practicum.

24    Q.    Correct.

25    A.    That was David Chambers and Liz Diamond.

1  Q.   All right.

2       So they both gave --

3  A.   The both of them.

4  Q.   Right, they both gave you a pass.

5  A.   Evidently they did, yes.

6  Q.   All right.

7       And you know that because you've seen your

8  transcript and it's in evidence, right?

9  A.   Yes.

10  Q.   All right.

11       And if they wanted to retaliate against you, they

12  could have failed you, correct?

13  A.   Or dismissed me, yes.

14  Q.   All right.

15       And can you just answer this question?  If they

16  wanted to retaliate against you, isn't it true that

17  they could have failed you in your courses?

18  A.   I suppose.

19  Q.   Okay.

20       But even after you got this warning, and even

21  after you had raised your concerns about Ms. Rochette,

22  Mr. Sanderson, even after that, they gave you a "Pass"

23  in your courses, correct?

24  A.   And Frank Deal.

25  Q.   Is that correct?

1    A.    You left out Frank Deal.

2    Q.    Okay.

3          Did you want to amend the question?  Okay.

4          So even after you raised these concerns, and even

5    after you got the warning, your professors passed you

6    in your courses, correct?

7    A.    Yes.

8    Q.    Right.

9          And as a matter of fact, even when Ms. Diamond was

10   dismissing you, she told you that you did have a

11   contribution to make to theater?

12   A.    That isn't correct.

13   Q.    You don't recall that?

14   A.    She said that in that warning --

15   Q.    Okay.

16   A.    -- letter --

17   Q.    I see.  So --

18   A.    -- meeting.

19   Q.    -- at the time you got the warning --

20   A.    Uh-huh.

21   Q.    -- she told you, you had a positive contribution

22   to make to theater?

23   A.    That's what she said.

24   Q.    Okay.

25         You didn't think she was retaliating against you

1    when she told you that, did you?

2    A.   That statement?

3    Q.   Right.

4    A.   Not apparently, no.

5    Q.   Now, let me show you Exhibit G.

6          MR. NOONAN:  I don't think -- There's no

7    objection to this one, I don't think.

8          MR. WILLIAMS:  That's correct.

9          MR. NOONAN:  I'd like to mark this full.

10         May I publish it to the jury?

11         THE COURT:  (No audible response.)

12         MR. NOONAN:  This is an e-mail from Liz

13   Diamond, Acting Chair of the Directing Program at the

14   Yale School of Drama.  It's to a number of faculty

15   members.  It's dated November 7, 2002.

16         The faculty members are David Chambers,

17   Josephine Brown, Joseph Roach, Benjamin Mortinai.  I'm

18   not sure if we mentioned this (unintelligible).

19         Help me out?

20         MR. WILLIAMS:  (Unintelligible.)

21         THE ECRO:  You've got to move back

22   (unintelligible).

23         MR. NOONAN:  Oh, I'm sorry.

24         Evan Yionoulis, Catherine Sheehy, Maria

25   Levitson and Victoria Nolan.

1           And it reads as follows:

2           "Dear Everyone:

3           As you all know, Sally Greenhouse suffered a

4           back injury during a Drama 50 rehearsal two

5           weeks ago.  She spent last week recuperating

6           and seeing her doctors and has returned to

7           school this week.  The diagnosis is severe

8           back sprain.  Sally is still in pain and is

9           taking pain medication.  Her doctors have

10          prescribed pain killers and have sent a note

11          which states as follows:

12          'Patient has a back injury for which she

13          should be allowed to lie down as needed for

14          the next two weeks.  Patient should also see

15          an orthopedist.'

16          This means that Sally may need to lie down

17          during some classes and that she should not

18          engage in any strenuous physical activity

19          until fully recovered.  She may also need to

20          be excused from class to see the orthopedist

21          though she is striving to schedule those

22          appointments outside class hours.  Sally

23          resumes Drama 50 rehearsals this week.

24          Within the limitations that Sally's medical

25          condition impose, Sally will participate

1                        fully in the creation and presentation of the

2                        work.  Again, however, she must not engage in

3                        physically strenuous actions in rehearsal.

4                        Please call me if you have any questions or

5                        concerns."

6       BY MR. NOONAN:

7       Q.   Do you think that Ms. Diamond was discriminating

8       against you when she informed the faculty that you had

9       had an injury and asked that they be aware of your

10      limitations?

11      A.   No.

12      Q.   And, in fact, what -- it's obvious that what she

13      was doing is she was trying to help you by explaining

14      to the faculty that you might not be able to properly

15      or fully participate in all of the exercises, correct?

16      A.   Correct.

17      Q.   And this e-mail that was sent to help accommodate

18      that injury was sent after you had registered your

19      concerns and after you had the warning, correct?

20      A.   Correct.

21      Q.   Let me ask you about Professor Chambers.

22           He's one of the people -- He's a directing

23      professor, correct?

24      A.   Correct.

25      Q.   And as you said, he's one of the people that

1    taught directing, along with Elizabeth Diamond, who

2    gave you the passing grade both semesters, correct?

3    A.   Correct.

4    Q.   And he was also one of the people that attended

5    your audition, correct?

6    A.   Correct.

7    Q.   And you're aware that he voted in favor of

8    admitting you to the school?

9    A.   I would assume so.

10   Q.   All right.

11        You didn't regard that as an act of gender

12   discrimination, did you?

13   A.   I can't -- What can I say?  I -- No, I suppose

14   not, unless he favors women over men.

15   Q.   Well, this is your case.

16        Are you claiming that it was an act of

17   discrimination when you were invited to join --

18   A.   Obviously not.

19   Q.   -- the drama school?  Okay.

20        And indeed, if Professor Chambers wanted to

21   discriminate against women, he could have simply voted

22   against having you come, correct?

23   A.   Then there would have been no women in the class.

24   Q.   Correct.

25        By the way, the class ahead of you had three women

1   and one man director, correct?

2   A.   Excuse me?

3   Q.   Do you recall that the class ahead of yours had

4   three female directors and one male?

5   A.   The second year class?

6   Q.   The one ahead of you.

7   A.   That's incorrect.

8   Q.   You don't remember that.  Okay.

9   A.   I do remember.

10  Q.   All right.

11  A.   Two women and two men.

12  Q.   And Professor Chambers is one of those who

13  sometimes provided positive feedback to you on your

14  work; did he not?

15  A.   He did.

16  Q.   And that was after you raised your complaints,

17  correct?

18  A.   Correct.

19  Q.   It was after you were on warning, correct?

20  A.   Correct.

21  Q.   And nevertheless, he have you positive feedback,

22  correct?

23  A.   Correct.

24  Q.   And do you recall that he told you, you had done

25  very well on a paper that you wrote in the first

1    semester?

2    A.    Yes.

3    Q.    In fact, you told us yesterday that he told you

4    the paper was so good it could be published; isn't that

5    right?

6    A.    He said something along those lines, publishable.

7    Q.    Okay.

8         And after -- And prior -- I'm sorry, that

9    statement that you had done very well on your paper and

10   it was publishable, that was made by Professor Chambers

11   after you had raised your complaints and after you were

12   on warning, correct?

13   A.    Correct.

14   Q.    You don't think he was acting out of bias against

15   females or out of a retaliatory motive when he praised

16   your course work and told you your paper was good

17   enough to be published, do you?

18   A.    No.

19   Q.    And I take it, it's your view that Professor

20   Chambers was giving his honest opinion when he

21   commended your work and praised your paper?

22   A.    I can't really speak to anybody's level of honesty

23   in a definitive way, but I would --

24   Q.    Did you --

25   A.    -- I would assume.

1    Q.   Okay.

2         And would you also agree that it is possible he

3    was giving his honest opinion when he concluded, as did

4    the rest of the faculty, that your work did not merit

5    advancement to the second year?

6              MR. WILLIAMS:  I'll object to

7    "possibilities," Your Honor.  I think that's improper

8    form.

9              MR. NOONAN:  Well, I think this is cross-

10   examination.

11             THE COURT:  Overruled.

12   A.   He didn't say that at the CHRO.

13   BY MR. NOONAN:

14   Q.   Okay.

15        The "CHRO" is the --

16             MR. WILLIAMS:  Objection.

17   Q.   (Continuing.)  -- Commission on Human Rights and

18   Opportunities?  Is that what you're referring to?

19   A.   Yes.

20   Q.   Now, despite these positive comments that you got

21   from Professor Chambers about your course work and your

22   paper, you didn't actually think much of him, did you?

23   A.   Oh, that -- that's incorrect.

24   Q.   Oh.

25        Do you remember, this is actually in Exhibit 29

1    that we talked about a little earlier, --

2            MR. WILLIAMS:   Therefore it's repetitious.

3    Q.   (Continuing.) -- do you remember saying that you

4    realized how fatuous and completely self-absorbed he

5    is?

6            MR. WILLIAMS:   Object, it's repetitious.

7    BY MR. NOONAN:

8    Q.   Do you recall that?

9            MR. WILLIAMS:   He asked the question --

10           THE COURT:   Overruled.

11   BY MR. NOONAN:

12   Q.   Do you recall it?

13   A.   Yes.

14   Q.   And it was David Chambers, this gentleman who made

15   positive comments about your work and told you, you had

16   a publishable paper, that you had sent a back off e-

17   mail to and decided that you would call his fucking

18   bluff from now on, God dammit.

19       Isn't that right?

20   A.   We're all pretty self-absorbed in theater.

21   Q.   Did I -- Was that a "Yes."

22   A.   Yes.

23   Q.   And by the way, was it Mr. Nicholson who

24   recommended that you send that e-mail to Professor

25   Chambers telling him to back off or --

1   A.   You asked me that before and I said, "I have no
2   recollection of an e-mail about that."
3        There was a conversation with Liz Diamond.
4   Q.   Well, your -- you do agree that when I showed you
5   that exhibit earlier this morning, it indicates that
6   you -- "The back off e-mail worked."
7        So there was a back off e-mail; was there not?
8   A.   There must have been.
9   Q.   Okay.
10       But you don't remember that it was Mr. Nicholson
11  who suggested that to you?
12  A.   No.
13  Q.   Okay.
14       Did you think -- Do you think you did that on your
15  own --
16  A.   I don't recall.
17  Q.   -- decided to send Mr. Chambers --
18  A.   You'd have to show me the e-mail.
19  Q.   Okay.  Well you -- actually, you'd have to show it
20  to me because I don't have it.  I got all these e-mails
21  from your lawyer.
22          MR. WILLIAMS:  Maybe that's because it
23  doesn't exist because if he got it he would have it
24  too.  He's sitting right here.
25  BY MR. NOONAN:

1   Q.   The -- Of course, these e-mails that we've been

2   discussing, they came actually from -- the printed

3   versions came from Mr. Nicholson, correct?

4   A.   The printed versions?

5   Q.   Yes, the ones that we've been marking as exhibits

6   here.  Remember, yesterday you went through and looked

7   at them and they all have Mr. Nicholson's name at the

8   top and he apparently printed them in May of 2003?

9        We talked about that yesterday.  Do you recall it?

10  A.   No.  I think I printed them out.  He sent them

11  back to me.

12  Q.   Fair enough.  Fair enough.

13       You went to -- or requested of Mr. Nicholson, that

14  he send you these e-mails because you no longer had

15  access to them, --

16  A.   Right.

17  Q.   -- correct?  Okay.

18       And you did that in connection, as you said

19  yesterday, in connection with preparing for --

20  A.   No, you said that.  I never said that.

21  Q.   Do you recall saying yesterday that you asked Mr.

22  Nicholson for these e-mails in connection with one of

23  the proceedings?

24  A.   No.  You said that.

25  Q.   And you answered --

1   A.   You said it was in preparation.  I didn't say

2   that.

3   Q.   And your answer was "Yes."

4   A.   Then I didn't hear the question correctly.

5   Q.   All right.

6        So you -- So when you asked Mr. Nicholson for

7   these -- to send you -- resend you the e-mails, was it

8   in connection with preparing your various proceedings?

9   A.   Initially, no.

10  Q.   Okay.

11       The reason you asked these outsiders, Mr.

12  Nicholson and Mr. Stevens for advice, is that you

13  simply didn't think the Yale faculty was worth

14  listening to; isn't that right?

15  A.   No.

16  Q.   Let me switch gears a little bit.

17       There were some people that you had good

18  relationships with at the Yale drama school, correct?

19  A.   Well, you'd have to be more specific, I guess.

20  Q.   Were there any?  I'll get into specifics.  I'm

21  just asking, were there any?

22  A.   Yes.

23  Q.   Okay.

24       Steve Fried was one of the directors in your

25  class, right?

1    A.   Yes.

2    Q.   You had a good relationship with him, didn't you?

3    A.   Yes.

4    Q.   All right.

5         In fact, the two of you were the closest among the

6    four directors; is that right?

7    A.   For a while, yes.

8    Q.   And he took you out to dinner for your birthday,

9    correct?

10   A.   Yes.

11   Q.   You had a very collegial relationship with Kate

12   McCall, didn't you?

13   A.   Yes.

14   Q.   And what role did she play?  What part?  Was she

15   an actor, a director, a dramatur?

16   A.   Dramaturgy student.

17   Q.   And she's an ardent feminist, correct?

18   A.   I have no idea.

19   Q.   Oh.  Okay.

20        And while you were at school together, you also

21   had a good rapport with David Bardeen, another student,

22   correct?

23   A.   Pretty good.

24   Q.   I'm sorry?

25   A.   Pretty good.

1    Q.   And you wouldn't accuse those three people, Steve

2    Fried, David Bardeen or Kate McConnell, as

3    discriminating or retaliating against you, would you?

4    A.   Now or then?

5    Q.   Well, at any point in time.

6         Do you think --

7    A.   It depends.

8    Q.   Well, as of the time you graduated, did you think

9    that they were acting towards you in a discriminatory

10   or retaliatory way?

11   A.   I didn't graduate.

12   Q.   I'm sorry, you're correct.  I stand corrected.

13        As of the time of your dismissal, did you think

14   that Steve Fried, Kate McConnell or David Bardeen had

15   acted towards you in a discriminatory or retaliatory --

16             MR. WILLIAMS:  Objection, it's a multiple

17   part question.

18             MR. NOONAN:  I'll be happy to ask it three

19   times.

20             THE COURT:  Is that your objection, that he's

21   asking -- he's lumping the three of them together?

22             MR. WILLIAMS:  That's right.

23             THE COURT:  Well, to that extent I'll --

24             MR. NOONAN:  I have no objection to making it

25   longer.

1    BY MR. NOONAN:

2    Q.   As of the time you were dismissed from the

3    program, you didn't think that Steve Fried was

4    discriminating or retaliating against you, did you?

5    A.   Not discernibly, not to my knowledge.

6    Q.   All right.

7         And you don't have any reason to think that he is

8    discriminating or retaliating against you today, do

9    you?

10   A.   Sure, today, given -- Yes, it's possible.

11   Q.   No.  No.  I didn't ask if it's possible.

12        Do you have any reason to believe, as of today,

13   Steve Fried done something that causes you to think he

14   discriminated or retaliated against you since you left?

15   A.   It's possible.

16   Q.   I didn't ask you if it was possible.

17        I'm asking you if you have any -- Is there

18   anything that happened that causes you to believe that

19   Steve Fried has discriminated or retaliated against

20   you?

21   A.   I don't know.

22   Q.   So you don't have any reason to believe it?

23   A.   I don't know.

24   Q.   Okay.

25        And how about Kate McConnell, do you have any

1    reason to believe that Kate McConnell has acted in a

2    discriminatory or retaliatory fashion against you?

3    A.   Yes, I have a question regarding something she

4    said.

5    Q.   And David Bardeen, do you have any reason to think

6    that he is discriminating or retaliating against you?

7    A.   I have a question at this point, as well.

8    Q.   And the reason you have a question about him is

9    that his deposition was taken in this case and he has

10   offered testimony that's unfavorable to you, correct?

11   A.   I've heard.  I haven't heard it or spoken with

12   him.

13   Q.   All right.

14       But my point is the reason you have a question

15   about David Bardeen is simply the fact that he has

16   testified in this case in a way that is unfavorable to

17   you, correct?

18   A.   Something along those lines, yes.

19   Q.   Okay.

20       So if it turns out that any of these people give

21   testimony that's unfavorable to your case, then in your

22   mind they are doing so out of discriminatory or

23   retaliatory motives, correct?

24   A.   Largely because Yale gave them their degrees and

25   they are --

1    Q.   Is that a "Yes" or a "No."

2    A.   It's a "Yes."

3    Q.   That's all I --

4    A.   They give allegiance to Yale.

5    Q.   That's all I was asking.

6    A.   Now, in this case, as I understand it, you are

7    claiming that it's the fault of the faculty --

8         MR. NOONAN:   Actually, Your Honor, this

9    probably would be a time, if this is convenient for

10   you, to get a ruling on the CHRO, the Commission on

11   Human Rights and Opportunities issue.

12        THE COURT:   All right.   The jury will -- is

13   excused.

14      (Jury out.)

15        THE COURT:   Okay.   All right.

16        MR. NOONAN:   I was starting to ask a question

17   about that and I realized we hadn't --

18        THE COURT:   Okay.

19        MR. NOONAN:   -- discussed it.

20        THE COURT:   Mr. Williams, why don't you

21   revisit that issue of the CHRO?

22        MR. WILLIAMS:   Correct.

23        The fact that CHRO complaint was filed has

24   nothing whatsoever to do with this case since the CHRO

25   does not enforce Title 9, and any rulings by the CHRO

1   do not have res judicata or collateral estoppel effect

2   and, in fact, are not only irrelevant but highly

3   prejudicial for the same reason that such rulings are

4   not admissible, nor is reference to them permissible in

5   a Title 7 case, and I'm sure Your Honor has presided

6   over many such Title 7 cases and Lord knows I've

7   litigated enough of them, where ruling one way or the

8   other by the CHRO or the EEOC have been held

9   inadmissible to the extent that you can't even

10  introduce a right to sue letter into evidence as part

11  of your case in chief, despite the fact that it's a

12  necessary element of your case, and for all of those

13  reasons it's inadmissible here even more so, since it

14  has nothing whatsoever to do with a Title 9 case,

15  again, a claim against an educational institution.

16          MR. NOONAN:  I think it's admissible in this

17  case, Your Honor, for these reasons.

18          The -- for credibility.  This is an

19  individual where every time things go against her

20  claims it's somebody else's fault, and when she failed

21  to persuade the Human Rights investigator of the

22  justice of her cause, she then wrote to the Human

23  Rights Commission that it was her lawyer's fault that

24  they los the case.

25          MR. WILLIAMS:  Well, Your Honor, that's news

1  to me but if it's true, first of all, it wouldn't be

2  the first time that a client said that about a lawyer.

3          Secondly, --

4          THE COURT:  Was Mr. Williams her lawyer at

5  the time?

6          MR. NOONAN:  Yes.

7          MR. WILLIAMS:  It would require at this trial

8  -- Since it would make me a necessary witness, it would

9  create a (unintelligible).  It would make me a

10 necessary witness.  It would create a conflict of

11 interest and so if that's where Mr. Noonan is going,

12 then --

13         THE COURT:  Has Mr. Williams seen that

14 letter?

15         MR. NOONAN:  I assume so.  I got a copy of it

16 from CHRO, sent to me --

17         THE COURT:  Well, why don't you show it to

18 him?

19         MR. WILLIAMS:  Well, I wouldn't have gotten

20 it because I had withdrawn my appearance.

21         THE COURT:  Show it to him.

22         THE WITNESS:  I had released him.

23         MR. NOONAN:  Oh.  Okay.  I didn't know that.

24         THE WITNESS:  He had agreed to be released

25 and I released him.

1          MR. NOONAN:  Yeah, I -- Just the first

2     paragraph.  The rest of it is a whole bunch of other

3     explanations but it won't require Mr. Williams --

4          MR. WILLIAMS:  Well, he's turning me into a

5     witness and he's creating -- I mean, you talk about a

6     smoke screen, this is beyond the smoke screen -- the

7     mother of all smoke screens and I object to it.

8          MR. NOONAN:  Well, it doesn't require Mr.

9     Williams to be a witness.

10          THE COURT:  Let me ask you a question.

11          With all the evidence you have elicited, do

12     you really need this?

13          MR. NOONAN:  I understand, Your Honor.  I

14     won't pursue it.

15          THE COURT:  Want to recall the jury.

16          MR. WILLIAMS:  Your Honor, before we do that,

17     can I have about a --

18          THE COURT:  Sure.  All right.  We'll take a

19     break.

20        (Recess at 10:37 a.m., until 10:55 a.m.)

21                    AFTER RECESS

22          THE COURT:  You have much more, Mr. Noonan?

23          MR. NOONAN:  No, Your Honor.

24        (Jury in.)

25     SALLY GREENHOUSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (CONTINUED)

Q.   Ms. Greenhouse, I want to ask you a little bit about (unintelligible) Nicholson, the gentleman with whom you (unintelligible) e-mail correspondence during the time you were at Yale.

He is a playwright; is that right?

A.   Yes.

Q.   He's not a director, is he?

A.   He has directed, I believe.

Q.   But you wouldn't (unintelligible) as a director, would you?

A.   I don't know how he describes himself completely.

Q.   All right.

But you know him as a playwright, correct?

A.   I know him as someone who's known me since I was 17.

Q.   Okay.

And do you know him as a playwright?  Is he a playwright?

A.   Yes.

Q.   Okay.

And during the time you were corresponding with him when you were at Yale, he was attempting to get a faculty position and was having some difficulty doing that; was he not?

1    A.   What?  I --

2    Q.   Was he trying to get a faculty position at a

3    university?

4    A.   I have no idea.

5    Q.   Do you remember writing him whatever college or

6    university gets to have you on its faculty would be so

7    lucky to have you, you must keep applying?

8              MR. WILLIAMS:  Objection.  What in the world

9    has this got to do with anything?

10             MR. NOONAN:  Well, it has -- If you want me

11   to respond?  It has to do with the fact that she was

12   getting a lot of advice about her program from a

13   playwright who was having difficulty getting a job

14   instead of getting advice from her professors.

15             MR. WILLIAMS:  That's nonsense.

16             MR. NOONAN:  Well that's, I suppose, for

17   argument.

18             THE COURT:  Well, I'll permit it, but let's

19   not spend a lot of time on this, Mr. Noonan.

20   BY MR. NOONAN:

21   Q.   You remember writing that e-mail?

22   A.   I don't remember writing that e-mail, but it

23   sounds like a sentiment I would have expressed.

24             MR. WILLIAMS:  Are we gonna mark it, please?

25             MR. NOONAN:  I wasn't going to.

1          MR. WILLIAMS:  Well, if you're handing it to

2     her, please mark it.

3     BY MR. NOONAN:

4     Q.   Does it sound, in fact, like something that you

5     said?

6     A.   It sounds like a sentiment I would have expressed.

7     Q.   Okay.

8          Now, let me ask you just a little bit about the

9     meeting you had with Professor Diamond and Professor

10    Chambers on May 15th, 2003 when you were told that you

11    would not be invited back to continue in the second

12    year of the program.

13         First of all, you did know, even before you got to

14    Yale, that the first year -- all of the first year

15    students are on probation, correct?

16    A.   Correct.

17    Q.   And you have to be invited back at the end of the

18    first year; is that right?

19    A.   Correct.

20    Q.   All right.

21         And at that meeting you were given the option of

22    withdrawing from the program so you wouldn't have a

23    dismissal on your record, correct?

24    A.   Correct.

25    Q.   All right.

1          And initially, Professor Diamond told you that

2     under the rules, there was on 24 hours within which you

3     had to exercise your choice, correct?

4     A.   Correct.

5     Q.   And you asked her whether it wouldn't be possible

6     to get an extension of that time, correct?

7     A.   Correct.

8     Q.   And she directed you to Deputy Dean Victoria Nolan

9     about whom we -- there was some discussion earlier,

10    correct?

11    A.   Correct.

12    Q.   All right.

13         And let me just show you --

14              MR. NOONAN:  Well actually, it's already in

15    the record as an exhibit.

16              May I publish this to the jury, Your Honor?

17    It's --

18              THE COURT:  Yes.

19              MR. NOONAN:  This is Plaintiff's Exhibit 10,

20    a letter dated May 16 (unintelligible) Victoria Nolan -

21    - Oh, sorry.  I did that to you again.  I'm terribly

22    sorry.

23              We moved that one so that I would have it

24    over there and now I've messed up again.  I'm sorry.

25              It's May 16th, 2003 to Sally Greenhouse from

1  Victoria Nolan, Deputy Dean:

2  "Dear Sally: This is to confirm the

3  conversation that you and I had earlier today

4  in which you requested some additional time

5  to consider the option of withdrawing from

6  the drama school.  I agree that we will

7  afford you the entire week of May 19th,

8  concluding on Friday, May 23, 2003 at 5:00

9  o'clock p.m. in which to consider your

10  decision whether you wish to withdraw from

11  the drama school as has been offered to you

12  by your faculty.  In the event that you

13  choose not to withdraw, at that time the

14  faculty will forward a letter of dismissal to

15  you which will then be recorded in the

16  registrar's office.

17  If you have any questions, please do not

18  hesitate to call me at 432-1591.

19  Most sincerely."

20  BY MR. NOONAN:

21  Q.   Now, you're not claiming, are you, that Deputy

22  Dean Nolan was discriminating or retaliating against

23  you by giving you that extra week within which to make

24  your decision as to whether you wanted to withdraw so

25  that you would not have a dismissal on your record?

1    A.   Could you split up that question?  You added a lot

2    at the end and I couldn't even hear it.

3    Q.   Fair enough.  Fair enough.

4         Are you claiming that Deputy Dean Nolan was

5    discriminating against you by giving you that extra

6    week to decide whether you wanted to avoid having a

7    dismissal on your record?

8    A.   Of course not.

9    Q.   All right.

10        And she certainly wasn't retaliating against you,

11   was she?

12   A.   Of course not.

13   Q.   Okay.

14        Now, let me ask you about -- a little bit about

15   Exhibit O which is in evidence and let me put it in

16   front of you so that you have a copy as well.

17        Now, those -- Your lawyer showed you those notes

18   yesterday.

19        Do you recall that?

20   A.   Yes, I do.

21   Q.   Those are the notes that Professor Diamond made in

22   order to be prepared for the May 15th, 2003 meeting,

23   correct?

24   A.   I have no idea.

25   Q.   Okay.  Okay.

1          That's what it say, in any event, on them,

2     correct?

3     A.   Excuse me?

4     Q.   That's what it says on the notes?

5     A.   That's what it says.

6     Q.   Okay.

7          Now, do you see on page 1 where it says the

8     following:

9          "While your course work" and theater management --

10         "course work in theater management, acting,

11         dramaturgy and directing have been solid, and

12         especially in management seminar are strong, the

13         same cannot be said for your production work."

14         Do you think that Professor Diamond was trying to

15    retaliate or discriminate against you when she comments

16    that "your course work was solid" in all of those

17    courses, and particularly strong in the management

18    seminar?

19    A.   It doesn't sound like it.

20    Q.   Okay.

21         But you think she was discriminating against you

22    and retaliating against you by telling you that the

23    same could not be said of your production work; is that

24    right?

25    A.   That's correct.

1    Q.   Okay.

2         So when your professors gave you positive

3    feedback, it was not retaliation or discrimination, but

4    when they made criticisms of you, it was?

5    A.   No, not -- No, that's not true.

6    Q.   Okay.

7         In that instance though, you think it was?

8    A.   This was the dismissal.  Yes.

9    Q.   All right.

10        Now, let me show you (unintelligible) Exhibit C.

11        Is this something you've seen?

12             MR. WILLIAMS:  Undated notes, no, that's not

13   --

14             MR. NOONAN:  It's marked as an ID so I don't

15   think it's --

16             I can't recall.  Did you have an objection to

17   C or not?

18             MR. WILLIAMS:  Yeah, because --

19             MR. NOONAN:  Oh.

20             MR. WILLIAMS:  -- it doesn't -- It --

21             MR. NOONAN:  Okay, doesn't matter.

22             MR. WILLIAMS:  It has --

23             MR. NOONAN:  No, if you object, it's okay.

24             MR. WILLIAMS:  It's not signed.  It's not

25   dated.  We don't even know who wrote it.  Right.  You

1    said you -- that you (unintelligible) qualify it.

2            MR. NOONAN:   Yeah.

3    BY MR. NOONAN:

4    Q.   Is that something you've seen before?

5    A.   I've never seen this.

6    Q.   Okay.  Then I won't offer it at this point.

7    A.   Who wrote it?

8    Q.   Well, I'm not supposed to testify.

9            MR. NOONAN:  If you can go back I can move

10   along.

11   It's up to you.  I mean, I just thought you'd probably

12   want to move along with this.

13   BY MR. NOONAN:

14   Q.   Let me ask you this.

15        The evidence in this case is likely to indicate

16   that Professor Diamond thought that your rehearsal

17   process --

18            MR. WILLIAMS:  Well, Your Honor, objection.

19            MR. NOONAN:  Well, I have --

20            MR. WILLIAMS:  The evidence in this case is

21   likely to indicate and then he's gonna ask her about

22   that?  That's not proper.

23            MR. NOONAN:  If --

24            THE COURT:  I don't think he finished the

25   question.

1          MR. NOONAN:  Right.

2    BY MR. NOONAN:

3    Q.   If Professor Diamond believed that your rehearsal

4    process was a shambles from start to finish in the CWP,

5    if she further believed that you had no discernable

6    rehearsal plan beyond the vague idea that the actor

7    should come to rehearsal having done on a run

8    immediately prior, and that the setting for the show

9    would evolve out of the work on the floor, but it never

10   did, in your mind, would that be a valid reason for

11   dismissal?

12          MR. WILLIAMS:  Objection, Your Honor.  It

13   assumes a ton of facts not in evidence and asks for

14   speculation.

15          THE COURT:  Sustained.

16   BY MR. NOONAN:

17   Q.   If Professor Diamond concluded that on the basis

18   of your experience in the first year, she could not

19   assure the faculty that in the second year you would be

20   able to handle the greater demands and bigger

21   challenges of the second year, would that be a

22   legitimate reason to recommend your dismissal?

23          MR. WILLIAMS:  Objection on the same grounds.

24          THE COURT:  Overruled.

25   A.   You'll have to repeat the question.

1   BY MR. NOONAN:

2   Q.   If Professor Diamond concluded that on the basis

3   of your first-year experience there was just no way she

4   could assure the faculty that in the second year you

5   would be able to handle the greater demands and bigger

6   challenges of the second year, would that be a

7   legitimate reason to recommend your dismissal?

8   A.   I have no idea.

9   Q.   If Dean Bundy concluded, as a result of your work

10  with him as an assistant director, that you were the

11  most difficult assistant director he had ever had, that

12  you had no sense of boundary vis-a-vis the actors or

13  the director, that you offered feedback at

14  inappropriate moments, and that the content of your

15  feedback was often irrelevant to the work underway in

16  the rehearsal, would that be an appropriate reason for

17  him to vote for your dismissal?

18         MR. WILLIAMS:  Objection, Your Honor.  It

19  assumes facts not in evidence and it asks for

20  speculation.

21         MR. NOONAN:  I don't think it's at all

22  speculative.

23         THE COURT:  Overruled.

24  A.   I can't answer that question.  It's so -- I can't

25  even comprehend it.

1  BY MR. NOONAN:

2  Q.   You do agree that there would be grounds,

3  hypothetically, for your dismissal that would be

4  appropriate, correct?

5  A.   It's possible.  I --

6  Q.   Okay.  That's all.  That's all I'm asking.

7       Thank you very much for your time.

8            THE COURT:  Mr. Williams?

9            MR. WILLIAMS:  Yes.  I'm waiting for Mr.

10  Noonan to return the items he borrowed from me at the

11  beginning of the morning.

12       (Mr. Noonan and Mr. Williams confer.)

13            MR. NOONAN:  The clerk has all of the

14  exhibits.

15            MR. WILLIAMS:  I would ask that Mr. Noonan

16  return to me, 17, 19, 20, 21, 22, 23, 24, 25, 26, 27

17  and 28, all of which he borrowed and promised to return

18  before I did my redirect.

19            THE COURT:  Were they all marked as full?

20            MR. NOONAN:  Those were all marked --

21            MR. WILLIAMS:  For ID only.  For ID only, and

22  Your Honor recall last night Your Honor ordered that I

23  keep custody of them.

24            THE COURT:  Where are they?

25            MR. NOONAN:  They're up here with the

1    exhibits.

2          THE COURT:  Okay.  Do you want to get them

3    together.  Do you want to read slowly so the clerk can

4    gather them.

5          MR. NOONAN:  These all are the exhibits?

6          THE CLERK:  (Unintelligible.)

7          MR. NOONAN:  These are all (unintelligible).

8          MR. WILLIAMS:  Okay.  Thank you.

9          Well, Your Honor, this isn't -- Your Honor

10   recall that yesterday after the jury went home Your

11   Honor issued an order that I should maintain custody of

12   the ID exhibits?  I did so.  This morning Mr. Noonan

13   asked to borrow them so he could use them.  He promised

14   to return them.  They're not in this pile.  Obviously

15   he has them if the clerk doesn't have them, and I can't

16   proceed until I get them back.

17         MR. NOONAN:  Perhaps Your Honor could do this

18   outside the presence of the jury.  I gave the exhibits

19   to the clerk along with -- I gave the exhibits to the

20   clerk, the full exhibits, the ID exhibits.  The clerk

21   then indicated she separated them into full and ID

22   exhibits.

23         THE COURT:  Do you have them?

24         MR. NOONAN:  She just handed me the ID

25   exhibits, which I handed to Attorney Williams.  If he

1    wants the full exhibits, I'll walk over there and get

2    those and give them to him.

3              MR. WILLIAMS:  Those exhibits were not all

4    marked as full.  I'm sure of it.  That's a long list

5    and they didn't mark that many exhibits.

6              THE COURT:  Well, why don't you get started.

7    Give the clerk -- read it slowly, the list of numbers.

8              MR. WILLIAMS:  Yeah.  Maybe I'll -- I'll tell

9    you what I'll do is I'll just -- I don't want to make a

10   big issue out of something that's just between Mr.

11   Noonan and me.  I'll give this to --

12             I'll just take both piles.  There's no IDs in

13   here?

14             THE CLERK:  (Unintelligible.)

15             MR. WILLIAMS:  All right.

16             THE CLERK:  (Unintelligible.)

17             THE COURT:  Well, there's some up here.

18             MR. WILLIAMS:  Oh, that's where they are.

19   (Unintelligible.)

20             Thank you.

21             MR. NOONAN:  I guess I didn't see all the

22   exhibits after all.

23             MR. WILLIAMS:  Oh, yes, you did.  Oh, yes,

24   you did.

25             THE COURT:  Come on.  Come on.  Come on.

```
 1                        REDIRECT EXAMINATION

 2    BY MR. WILLIAMS:

 3    Q.   Forgive me Ms. -- There was a lot of cross and

 4    it's gonna take me a while to go back and cover all of

 5    that territory.

 6         Now, I think the first exhibit about which Mr.

 7    Noonan questioned you, at least in my notes, was

 8    Defense Exhibit Y, which is an e-mail exchange between

 9    you and Dean Bundy in December of 2002.

10         On this e-mail exchange, it concerned a play that

11    -- involving a scene between Arkadina and Tregorin, and

12    I'm gathering from that, that -- since I'm not as smart

13    about these things as some of the folks in this room,

14    that Arkadina is a female and --

15    A.   It's -- Are you asking what it concerned --

16    Q.   Well, I'm just going one step at a time.  It's

17    okay.  Don't anticipate me.

18         Arkadina is the female role in that scene, and

19    Tregorin is a male role; is that it?

20    A.   It was scene work in an acting class.

21    Q.   Okay.

22         And you were playing the role of Arkadina?

23    A.   Right.

24    Q.   And who was playing the role of Tregorin?

25    A.   That would have been Luke.
```

1    Q.    Luke?  Okay.

2          And Mr. Bundy was directing it?

3    A.    Well, he was pinch hitting for Evan.  He was

4    teaching acting class.

5    Q.    Okay.

6          Even though you were directing student, you had to

7    take some classes in acting; is that right?

8    A.    The directing students in the first year took the

9    acting class with the actors.

10   Q.    Okay.

11         And at some point in that process he directed you

12   to hike up your skirt and straddle the male actor; is

13   that correct?

14            MR. NOONAN:  Objection, Your Honor.  It's

15   leading.

16            THE COURT:  Sustained.

17   BY MR. WILLIAMS:

18   Q.    Mr. Noonan asked you about whether Dean Bundy had,

19   in the course of that class, instructed you to hike up

20   your skirt and straddle the actor.

21         Do you recall whether that's what happened?

22   A.    No.

23   Q.    Okay.

24         And do you recall whether you were supposed to --

25   under the instruction from Dean Bundy, you were

1   expected to act something out while you were hiking up

2   your skirts and straddling this male actor?

3   A.   It was -- He just wanted us to play the scene with

4   that -- what was provocative about that, what the --

5   was considered a fairly provocative instruction and the

6   acting students made fun of me, were teasing me about

7   it afterwards.

8            MR. NOONAN:  Well, objection, Your Honor.

9   Objection, Your Honor.  It's irrelevant as to what the

10   -- It's nonresponsive --

11            MR. WILLIAMS:  In his cross-examination, he

12   opened it up on cross, Judge.

13            MR. NOONAN:  It's actually not cross-

14   examination, it's redirect.

15            MR. WILLIAMS:  No, but it was opened up on

16   cross --

17            MR. NOONAN:  Your Honor, but I --

18            MR. WILLIAMS:  -- examination.

19            MR. NOONAN:  Could I -- I have the floor.

20   Could I at least finish the objection?

21            It's nonresponsive and it's irrelevant as to

22   what other actors thought.  This is not a claim against

23   the actors, it's a claim against the school.

24            THE COURT:  Sustained.  The answer can go

25   out.

1   BY MR. WILLIAMS:

2   Q.   Was Dean Bundy --

3           THE COURT:  Just listen to the questions and

4   try to answer the question.

5   BY MR. WILLIAMS:

6   Q.   Was Dean Bundy present while the other actors were

7   reacting to the instructions that he gave you and the

8   male actor?

9   A.   Yes.

10          MR. NOONAN:  Objection, Your Honor.  I didn't

11  ask anything in my examination about the reaction of --

12          THE COURT:  Well, she answered.  The question

13  can be answered "Yes" or "No."  She answered "Yes," so

14  I'll let it stand.

15          Go on, Mr. Williams.

16  BY MR. WILLIAMS:

17  Q.   And was Dean Bundy, therefore, able to observe

18  whatever reaction the students had to his instructions

19  and your carrying out his instructions?

20          MR. NOONAN:  Objection, Your Honor.

21          THE COURT:  Sustained.

22  BY MR. WILLIAMS:

23  Q.   Would you tell us whether or not Dean Bundy was

24  able to observe the reactions that the students had to

25  your carrying out his instructions?

1           MR. NOONAN:  Objection, Your Honor.

2           THE COURT:  Sustained.

3    BY MR. WILLIAMS:

4    Q.  Was there a reaction by the other students that

5    was visible to those in the room --

6           MR. NOONAN:  Objection.

7    Q.  (Continuing.) -- when you carried out Dean Bundy's

8    instructions?

9           MR. NOONAN:  Objection.

10          THE COURT:  Sustained.

11          MR. WILLIAMS:  Could I inquire as to the

12   ground for the -- I don't want to beat a dead horse

13   here.  I thought it was because you thought I was

14   leading and I was trying to avoid that, so if Your

15   Honor wants to --

16          THE COURT:  Mr. Noonan will state the ground.

17          MR. NOONAN:  Relevance and beyond the scope,

18   --

19          MR. WILLIAMS:  It's within the scope.

20          MR. NOONAN:  -- and some of them were

21   leading, but it was --

22          MR. WILLIAMS:  I'm sorry, go ahead.

23          MR. NOONAN:  -- but relevance is the primary

24   one, but yeah, some of them were leading.

25          MR. WILLIAMS:  I objected to those questions

98

1    when they were asked on cross on the ground that they

2    were irrelevant and Your Honor overruled me.

3              MR. NOONAN:  I didn't ask those questions on

4    cross, Your Honor, never asked them.  Never asked about

5    --

6              MR. WILLIAMS:  The subject matter was asked

7    on cross.  I objected to it.  I was overruled on

8    relevancy grounds.  Since it was opened up, I'm allowed

9    to go back and explore it.  You can't have a one-way

10   street here, and I know Your Honor wouldn't want it.

11             MR. NOONAN:  Your Honor, it misstates the

12   record.  I did not ask these questions on cross-

13   examination.  The students' reaction is simply not

14   relevant.

15             THE COURT:  Well, the Court agrees that the

16   reactions of the students isn't -- are not relevant, so

17   to that extent, that line of questioning -- the

18   objection to that line of questioning is sustained.

19             MR. WILLIAMS:  If I may just address that,

20   Your Honor?

21             Without saying whether or not it was the case

22   in this particular instance, if the students are in the

23   presence of the head of the school engaging in --

24             MR. NOONAN:  Your Honor, you have ruled.

25             MR. WILLIAMS:  -- prohibited conduct --

99

1          MR. NOONAN:  I object to further argument in

2    front of the jury.

3          MR. WILLIAMS:  -- that would be evidence that

4    would support a common line (phonetic) of our claim.

5          THE COURT:  I've ruled.

6    BY MR. WILLIAMS:

7    Q.   Now, Attorney Noonan, on cross, about that scene,

8    the hiking up your skirts and straddling scene, asked

9    you whether or not you had objected to Dean Bundy

10   instructing you to do this and you said no, you didn't

11   object to it.

12   A.   That's correct.

13   Q.   Now, at that time, that -- did that occur at

14   either the end of November or the very beginning of

15   December of 2002?

16          MR. NOONAN:  Objection, Your Honor, it's

17   leading.

18          THE COURT:  Overruled.

19   A.   I can't remember the exact date but it would have

20   been sometime in -- after September.

21   BY MR. WILLIAMS:

22   Q.   Okay.

23        Just to show you Defendant's Exhibit Y, and I'll

24   show you that -- the e-mail that you sent to Dean Bundy

25   was dated December 12, 2002 at 1:39 a.m, and his

1    response to you is not dated, but is right at the top

2    of it.

3         Would that refresh your recollection as to when

4    this occurred?

5    A.   Oh, yes.  It's November, late November.

6    Q.   Late November --

7    A.   Uh-huh.

8    Q.   -- of 2002?

9    A.   Uh-huh.

10   Q.   So it was within approximately two months after

11   you had been placed on probation -- I'm sorry, had been

12   placed on warning for reasons, one of which explicitly

13   was that you had complained about the Rock Out With

14   Your Cock Out --

15            MR. NOONAN:  Objection, Your Honor.

16   BY MR. WILLIAMS:

17   Q.   (Continuing.) -- is that right?

18            MR. NOONAN:  It's leading.

19   A.   That's correct.

20   BY MR. WILLIAMS:

21   Q.   Now, --

22            MR. NOONAN:  It's leading.

23            MR. WILLIAMS:  Can you --

24            MR. NOONAN:  It's leading.

25            MR. WILLIAMS:  Well, it's preliminary, Your

1    Honor.

2              MR. NOONAN:  It's not preliminary, it's

3    leading.

4              THE COURT:  Well, it is leading so I'll

5    sustain the objection.

6              MR. WILLIAMS:  All right.  I'll ask it again

7    in a non-leading way.

8    BY MR. WILLIAMS:

9    Q.  Can you tell us whether or not the incident in

10   which Dean Bundy instructed you to hike up your skirts

11   and straddle a male actor as though simulating a sexual

12   act, to which you did not object, occurred within

13   proximately -- occurred within approximately two months

14   of the date on which you had been placed on written

15   warning because among three stated reasons, one being

16   because you had objected to the Rock Out With Your Cock

17   Out incident?

18   A.  Yes, that would be accurate.

19   Q.  All right.

20       Did that -- Can you tell us whether or not that

21   fact affected your decision not to object?

22   A.  More -- Can I answer with more than "Yes" or "No"?

23   Q.  Yes.

24   A.  I think what determined my whole -- the way that I

25   absorbed things after that was that I had been

1   expressly told, "You are not allowed to register any

2   complaints with anyone."

3        It was a provocative instruction and I was

4   definitely uncomfortable, as was the actor at the time,

5   but we did it --

6             MR. NOONAN:  Objection to what the actor

7   thought, Your Honor.

8             THE COURT:  Sustained.

9             MR. NOONAN:  Your Honor, could you instruct

10  the jury what it means to "strike" a response?

11            THE COURT:  When a Court grants a motion to

12  strike an answer it means it's out of the record.

13            Try to listen to the question and just answer

14  the question.  I think we'll move along in a more

15  orderly fashion if we do that.

16  BY MR. WILLIAMS:

17  Q.   On that point, when you were placed on written

18  warning in September, the first month that you were a

19  student, were you, at that meeting, given oral

20  instructions as to how you must behave in the future

21  while you are on written warning?

22  A.   Well, I was given this list of stipulations.  I

23  was not given stipulations for how to remove it, but I

24  was given a list of stipulations in addition.

25  Q.   Now, when you say you were given a list, you

1    talking about something in writing or you talking about

2    something they stated to you?

3    A.   Stated.

4    Q.   Stated, okay.

5         So it's oral?

6    A.   Yes.

7    Q.   Okay.

8         And what were those oral requirements that they

9    imposed on you at that meeting in September of 2002?

10   A.   Okay.

11              MR. NOONAN:  Objection, Your Honor.  It's

12   repetitive.  She's already testified about that.  This

13   -- Repetitive.  She already testified about this very

14   thing on direct.

15              THE COURT:  It's cross-examination.  I'm

16   gonna allow it.

17              Go ahead, Mr. Williams.

18              MR. NOONAN:  It's actually redirect.

19              THE COURT:  I'm sorry, redirect.  You're

20   correct.  I'll permit it.

21   A.   I was forbidden from beginning any sentence with

22   the word, "I."

23        I was forbidden from registering any further

24   complaints.

25        I was instructed to think about myself just like

1    all the other 22 year olds.

2        I wrote these down and I -- at the time, so I have

3    a note.

4        Oh, I was forbidden from using the vernacular form

5    of the word "nightmare" as in "What a nightmare."

6        Oh, I was to think of myself as being in boot

7    camp.

8        I was told that none of my previous work

9    experience or professional experience was applicable or

10   meant anything now that I was at Yale drama.

11       Oh, and I was forbidden from disclosing my age.

12   BY MR. WILLIAMS:

13   Q.   Now, with respect to the requirement that you not

14   make any further complaints, how did you understand

15   that?

16       MR. NOONAN:   Objection, Your Honor.   Her

17   understanding, I think, is not relevant.   It's what she

18   claims she was told, which she's now testified about

19   several times.

20       THE COURT:   Well, I think she can testify as

21   to what she thought the instruction meant to her, how

22   she perceived it.

23       Overruled.

24   A.   It meant -- What I understood it to mean was that

25   when something happened in a classroom that I found

1    offensive or that I had to participate in, I was not to

2    contact anyone to report it.  I was not to report any

3    kind of -- what I had reported, that I felt offended or

4    ashamed.

5    BY MR. WILLIAMS:

6    Q.   Now, one of the things that Attorney Noonan

7    questioned you about at some length during his cross-

8    examination was your meetings with Susan Rochette, the

9    financial aid officer, and he asked you a lot of

10   questions about the details of the numbers and the

11   crunching and all that sort of thing.

12        When you went to Professor Diamond, and raised

13   with her question about your interaction with Susan

14   Rochette -- You're shaking your head.

15        Did I get it wrong?

16   A.   I didn't go to her in person.  It was --

17   Q.   Yeah, on the phone.

18   A.   She talked to me on --

19   Q.   Right.  No, I understand that, and I -- You're

20   right, I was too casual because this was in the spring

21   before you had actually arrived in New Haven, right?

22   A.   That's correct.

23   Q.   Okay.

24        But when you contacted her on the phone on the

25   subject of your interaction with Susan Rochette, were

1    you complaining about the way the numbers crunched or

2    were you complaining about something else?

3    A.   Well, Liz Diamond had told me to get back to her.

4    So I got back to her and left a message for her, that

5    it -- there seemed to be no workability around the

6    numbers and I added that I was very taken aback at the

7    remark that Sue Rochette had made, which was that, "I

8    guess you're just gonna have to decide between

9    motherhood and Yale drama," which I felt was incredibly

10   not appropriate to say to an incoming student and it

11   just personally -- I just wanted to register that I

12   found that really shocking, that she would say that.

13   Q.   Sort of like somebody saying to Governor Palin,

14   "You have to choose between" --

15           MR. NOONAN:  Well, Your Honor, --

16   Q.   (Continuing.) -- "your kids and being vice

17   president"?

18           MR. NOONAN:  I object, Your Honor;

19   argumentative.

20   A.   Maybe.

21           THE COURT:  Just a minute.  Just a minute,

22   Mr. Williams, please.

23           MR. WILLIAMS:  I think it's a fair question.

24           THE COURT:  Maybe after November 4th.

25           MR. WILLIAMS:  When you and I are on opposite

1    sides of the (inaudible) anyway, but we love each other

2    so that's okay.

3           THE COURT:  Well, how do you know what my

4    political views are?

5           MR. WILLIAMS:  Never mind.  I'm sorry, Your

6    Honor.

7           THE COURT:  What relevance does it have to

8    this case?

9           MR. WILLIAMS:  I'm trying to be light.  I'm

10   trying to inject a light note in the trial and I

11   apologize, I shouldn't.  It's not appropriate.  I agree

12   with you.

13          Let me move on.

14   BY MR. WILLIAMS:

15   Q.   Attorney Noonan questioned you at great length

16   yesterday afternoon about Exhibit 16 for

17   Identification.  That is an e-mail that you sent on

18   November 19th, 2002, to your friend, Jim Nicholson, in

19   which he had highlighted and quoted only the words "The

20   dumb guy.  The fat Latino guy," and "Dumb guy power

21   fucked Steve."

22        I'd like to show you the entire e-mail that

23   Attorney Noonan was reading from and my question is

24   were those words your words or were you quoting one of

25   the other students?

A.   I was quoting.

Q.   And the person you were quoting was whom?

A.   His name is "Steve."

Q.   Is that Steven Fried?

A.   Yes.

Q.   And he was a student -- also a directing student, one of the three men in the directing group; is that correct?

A.   Yes.

Q.   And he was not put on warning, was he?

A.   Oh, no.

Q.   And, in fact, he graduated, didn't --

        MR. NOONAN:  Objection, Your Honor; relevance.

A.   Yes.

        THE COURT:  Sustained.

        MR. WILLIAMS:  I'm going to offer that exhibit, Your Honor, in order to put in context the quotes that Mr. Noonan read.

        MR. NOONAN:  Oh, I see.  No objection, as I said yesterday.

        MR. WILLIAMS:  Can I have that?

        THE COURT:  It may be marked as a full exhibit.

        What number -- letter is it?

1          THE CLERK:  Sixteen.

2     BY MR. WILLIAMS:

3     Q.   And, in fact, you went on to tell your friend, Jim

4     Nicholson, that you had actually watched Steven Fried

5     having a confrontation with that other student; isn't

6     that right?

7     A.   Yes.

8     Q.   And, in fact, you characterized that as, "hijinx."

9          Isn't that right?

10    A.   Yes.

11    Q.   And what were you trying to convey -- If you

12    remember, what were you trying to convey to your

13    friend, Jim Nicholson, when you gave him this

14    description of what you called in the subject line,

15    "Just another normal day at Yale drama"?

16    A.   There was a lot of contentiousness between

17    students at various times.  There were lots of

18    allegiances and competitive strivings, especially in my

19    directing quartet.  In the beginning there seemed to be

20    some kind of contentiousness that -- between Steve and

21    Nick and between Nick and myself, and --

22          MR. NOONAN:  Your Honor, I object at this

23    point.  It's well beyond the scope of the question and

24    it's irrelevant.

25          THE COURT:  Well, it's going beyond the scope

1   of the question so I'll sustain the objection to that

2   extent.

3   A.   (Continuing.)  Steve was confronting him --

4   BY MR. WILLIAMS:

5   Q.   Okay.  Let me ask -- I'm trying to think of the

6   right way to ask the question.

7        Can you tell us whether or not the interactions

8   among the students that you observed, not even

9   involving you, but just those that you observed, were

10  all sweetness and light?

11  A.   Oh, no.

12            MR. NOONAN:  Objection, Your Honor.

13            THE COURT:  Sustained.

14  BY MR. WILLIAMS:

15  Q.   What was the -- during the -- during that first

16  year, the only year you were there, were you able to

17  observe what the overall tone of the student

18  interactions --

19            MR. NOONAN:  objection.

20  Q.   (Continuing.) -- was within the first year at the

21  Yale drama?

22            MR. NOONAN:  Objection, Your Honor.  It's

23  irrelevant and it's beyond the scope.  I didn't --

24            MR. WILLIAMS:  Well, it is relevant because

25  Attorney Noonan --

1            MR. NOONAN:  Well, if I could just finish.

2            MR. WILLIAMS:  I thought he had.  I'm sorry.

3            MR. NOONAN:  Okay.  I --

4            MR. WILLIAMS:  When he's done I'll --

5            MR. NOONAN:  I did not ask about the overall

6     -- First of all, I think it's an improper question in

7     terms of its form.

8            Secondly, I didn't ask about the overall

9     ambiance of the school, vis-a-vis the students; and

10    thirdly, it would be irrelevant.

11            MR. WILLIAMS:  Well, Your Honor, the second

12    and third obviously are the same point and it is true

13    that Attorney Noonan didn't ask about other students.

14    He only asked about her but the only way that he was

15    able to claim that her feelings and her interactions

16    with other students was relevant to the faculty was by

17    saying she was somehow different, and therefore that

18    this justifies the fact that she was treated

19    differently in that she was the only one given these

20    various disciplinary actions culminating with

21    expulsion, and if I can show that, in fact, there was a

22    lot of that going on among this group of highly-

23    competitive young theater people trying to make a go in

24    that world, then I think that puts it in a very

25    different setting and it's relevant.

1           MR. NOONAN:  I never made that argument, Your

2      Honor.

3           The reason I offered certain testimony was to

4      demonstrate, and the faculty, by the way, didn't vote

5      her out because of those feelings that she may have

6      had, but I offered it to demonstrate her feelings about

7      her faculty and her fellow students to suggest that

8      perhaps she was incapable of collaborating, which is

9      what the faculty concluded.

10          MR. WILLIAMS:  But that's exactly my point,

11     because if that proves that, and all the others were

12     doing similar things, then how come they all weren't

13     thrown out?

14          MR. NOONAN:  Because they were -- Because they

15     weren't all doing similar things and this witness

16     wouldn't be competent to testify --

17          MR. WILLIAMS:  She would know that.

18          MR. NOONAN:  -- to that.

19          THE COURT:  Well, I'm not -- this trial is not

20     about what other students did.  We're only talking

21     about this plaintiff, so I'm not going to go off in

22     that direction.

23          I'm going to sustain the objection.

24          MR. WILLIAMS:  If I can just be heard on that

25     point, Your Honor.

1              In any case in which any type of

2    discrimination is alleged, one of the requirements is

3    that there be comparators and that you put that

4    complaining person in the context of the others.  How

5    else do you prove it?  That's the legal standard, with

6    all due respect.

7              THE COURT:  This is a Title 9 case and I think

8    it's different.

9              Go ahead.

10             MR. WILLIAMS:  Oh, I see.  Okay.  I understand

11   what you're saying.

12   BY MR. WILLIAMS:

13   Q.  Now, Defendant's Exhibit G was introduced into

14   evidence this morning, and Defendant's Exhibit G is an

15   e-mail from Liz Diamond to a whole bunch of people on

16   the faculty about you, dated November 7th, 2002, and in

17   it, it says, among other things:

18        "As you all know, Sally Greenhouse suffered a back

19        injury during a Drama 50 rehearsal two weeks ago.

20        She spent last week recuperating and seeing her

21        doctors.  The diagnosis is severe back sprain."

22        It goes on to say that you're taking medication

23   and have a doctor's letter.

24        Now, you were asked some questions by Attorney

25   Noonan, about a person whose name was "Mojohn Navadi,"

1  and he asked you whether you had made the statement

2  that she "broke your back."

3      Question is, this incident involving a severe back

4  strain, medical treatment, special procedures and so

5  forth, that's articulated by Professor Diamond over

6  here, was that the Mojohn Navadi incident that you were

7  talking about?

8  A.   You mean was -- the time when she -- yeah.

9  Q.   Okay.

10     What exactly did she do to you?

11 A.   She was -- We were in Drama 50 -- Can I give you

12 the context --

13 Q.   Yes, please.  Yes, I would --

14 A.   -- or just -- Okay.

15     So the Drama 50s were very lively and people

16 argued a lot.  I kind of hung back and she and another

17 actor were arguing with each other and I stood in to

18 diffuse it with humor or something, and she felt, I

19 guess, a surge of affection or rambunctiousness and

20 she's very tall, she's much bigger than I am, and she

21 kind of jumped on top of me to -- she didn't hug me

22 from the side but she got on top of me and then she

23 stayed there and kind of pressed down, and I already

24 had a pretty fragile back, it was before my neck was

25 broken, but I had a fragile back and it was a thoracic

1  sprain.  I was told it would take six weeks to six

2  months to heal.

3  Q.   Incidently, you mentioned back -- Do you have a

4  history of back problems?

5  A.   Before that?

6  Q.   Yeah.

7  A.   I had had a ruptured lumbar disc once in my

8  twenties.

9  Q.   Okay.

10  A.   Yeah.

11  Q.   And since then you've --

12  A.   My neck was broken two years ago.

13  Q.   That was in a car accident?

14  A.   I was rear-ended.  Actually, the sprain hurt more.

15  Q.   Now, another exhibit about which Attorney Noonan

16  questioned you was Exhibit H, which is an e-mail that

17  you sent to Dean Bundy on January 31st, 2003 at 1:45 in

18  the morning.

19  A.   We had long days.

20  Q.   And the subject line says, "Me gauche???" and it

21  was on the subject of gum chewing.

22       What's -- What was that about?

23  A.   Okay.  Well, I'm not really a gum chewer at all.

24  The only time I chewed gum was at Yale drama during

25  that rehearsal period, and James Bundy chewed gum

1   during rehearsals and would offer me gum and so he

2   offered me gum this day and I was -- I used to sit sort

3   of next to him, slightly behind him.  He would give me

4   notes and I would -- got where I was supposed to sit,

5   and there was this one time in rehearsal when he was

6   just thinking and it was really quiet, and I noticed

7   that I was -- you could hear me chewing gum and he sort

8   of looked back and he didn't say anything, and I went,

9   "Oh, whoa" and I spit out the gum and sent him that e-

10  mail of apology because it was gauche.

11  Q.   Now, I believe that you were also questioned by

12  Attorney Noonan about Exhibit K, and that is an e-mail

13  you sent to Dean Bundy on March 23rd, 2003, that's a

14  Sunday -- I'm sorry, that's an e-mail he sent to you.

15  Let me get it back.

16       Now, one of the paragraphs in there, the --

17  depending on how you count.  I guess I would call it

18  the fourth paragraph, refers to a recommendation and he

19  says:

20       "I wrote the recommendation in good faith and I

21       believe you can contribute as an assistant at

22       Williamstown this summer."

23       Do you know what that refers to?

24  A.   Yes.

25  Q.   What does that refer to?

1    A.   I had asked him if, based on my assisting him at

2    the Yale Rep, he would be willing to write a

3    recommendation for me to apply for the summer

4    internship in directing at the Williamstown Theater

5    Festival since he had not given me much indication that

6    he was thoroughly dissatisfied with my assistantship.

7    He was quite positive, and so he said, yes, he would,

8    and that refers to the letter of recommendation to

9    Williamstown Theater Festival.

10   Q.   Okay.

11        And did you get the job?

12   A.   It wasn't a job, first of all.  It was an

13   internship and I was called --

14            MR. NOONAN:  Well, objection.  Objection, Your

15   Honor.

16   A.   (Continuing.)  -- and offered --

17            THE COURT:  Wait just a --

18            MR. NOONAN:  Objection, it's -- the question

19   asked --

20            THE COURT:  -- just a minute.

21            MR. NOONAN:  -- whether she got the job.

22            THE COURT:  Yeah.  The question calls for a

23   "Yes" or "No" answer.

24            MR. WILLIAMS:  Right.  I'll elaborate.

25   BY MR. WILLIAMS:

1    Q.   What did it involve your doing?

2    A.   That was a summer internship in assistant

3    directing at the Williamstown Theater Festival.

4    Q.   And did you, in fact, do that?

5    A.   No.

6    Q.   Why not?

7            MR. NOONAN:   Well, objection, Your Honor.

8    A.   The --

9            MR. NOONAN:   Your Honor, objection.  I don't

10   think that's relevant.

11           THE COURT:   Sustained.

12   BY MR. WILLIAMS:

13   Q.   Did you get -- You were offered the position?

14   A.   I was offered another position.

15   Q.   You were offered another position, okay.

16       What -- And that was after Dean Bundy sent his

17   letter of recommendation?

18   A.   Yes.

19   Q.   Okay.

20       And after Dean Bundy had sent that letter of

21   recommendation, what position did you get at the

22   Williamstown Theater Festival?

23           MR. NOONAN:   Objection, Your Honor.

24           What difference would it make?

25   A.   It --

1          MR. NOONAN:  This is a summer program that she
2   did after she left Yale.
3          MR. WILLIAMS:  She got it while she was there.
4          THE COURT:  I'll overrule the objection.  She
5   can answer this question then let's move on.
6   A.   (Continuing.)  I was offered a (unintelligible)
7   position.  They said that I was over-qualified, they
8   had met me, they interviewed --
9          MR. NOONAN:  Objection, Your Honor.
10          THE COURT:  Sustained.
11          MR. NOONAN:  Can I move to strike?
12          THE COURT:  Motion is granted.  The answer
13   will go out.
14          MR. WILLIAMS:  Then I'll ask it again then, so
15   we'll get an answer.
16          MR. NOONAN:  You got an answer.
17   BY MR. WILLIAMS:
18   Q.   Can you tell us whether or not as a result of your
19   application and your interview and the letter of
20   reference from Dean Bundy, you were, in fact, offered a
21   paid position at the Williamstown -- some theater
22   festival (unintelligible)?
23          MR. NOONAN:  Objection, Your Honor; asked and
24   answered.  She's already said "Yes" to it --
25          MR. WILLIAMS:  No, that answer was stricken.

120

1          MR. NOONAN:  No, she answered "Yes."

2          THE COURT:  No, I think she said "Yes."

3          MR. WILLIAMS:  I thought you struck the whole

4    answer, Your Honor.

5          THE COURT:  Well, she started to describe what

6    the position was.

7          MR. NOONAN:  That was the subsequent answer.

8          MR. WILLIAMS:  So the answer "Yes" is still

9    part of the record?  I'm not clear where I'm supposed

10   to go, Your Honor.

11         THE COURT:  I think she answered "Yes."

12         MR. WILLIAMS:  Okay.

13   BY MR. WILLIAMS:

14   Q.   Now, was that a better position than the one you

15   applied for?

16         MR. NOONAN:  Objection, Your Honor,

17   couldn't --

18         THE COURT:  Sustained.

19         MR. WILLIAMS:  Why?

20         THE COURT:  What relevance does this all have?

21         MR. WILLIAMS:  What relevance did it have for

22   Attorney Noonan to bring it up on cross?

23         MR. NOONAN:  I didn't.

24         MR. WILLIAMS:  Well then why was my objection

25   overruled?

1          THE COURT:  Let's move on, Mr. Williams.

2          MR. WILLIAMS:  Well, Your Honor, I mean, I'm

3    sorry, and I -- with all due respect --

4          THE COURT:  Let's move on, Mr. Williams.

5    BY MR. WILLIAMS:

6    Q.   In Exhibit K, Dean Bundy says that you were going

7    to serve, "as an assistant director at Williamstown."

8         Did you, in fact?

9    A.   No.

10   Q.   What did you serve as, --

11         MR. NOONAN:  Objection, Your Honor.

12   Q.   -- if anything?

13         MR. NOONAN:  What's the relevance of this?

14         THE COURT:  What's the claim of relevance, Mr.

15   Williams?

16         MR. WILLIAMS:  Because he makes a claim in his

17   exhibit, and if that claim is inaccurate, I have a

18   right to correct it.  This is the defense exhibit --

19         MR. NOONAN:  She just said --

20         MR. WILLIAMS:  -- written by the person that

21   Mr. Noonan claims, and that's the only reason he's

22   sitting at counsel table, who is supposed to embody the

23   defendant, Yale University.

24         MR. NOONAN:  She just said she applied for a

25   program that involved assistant directing but didn't

1  get it.

2          MR. WILLIAMS:  That she got something better.

3          MR. NOONAN:  She got something else.  Well,

4  she didn't say that.

5          MR. WILLIAMS:  Well, she's tried to but Mr.

6  Noonan didn't want to have her allowed to say that.

7          MR. NOONAN:  And it's not relevant.

8          MR. WILLIAMS:  And he objected to it.

9          MR. NOONAN:  And her opinion as to whether

10  it's better is not relevant.

11          MR. WILLIAMS:  Well, it's not your opinion.

12  One's paid and one's unpaid.  There's no opinion about

13  that.

14          MR. NOONAN:  It's not relevant and I didn't

15  raise it.

16          THE COURT:  What's the relevance, Mr. --

17          MR. WILLIAMS:  The relevance of it, Your

18  Honor, is that it argues against their claim that she

19  was no good, that she had a disastrous experience,

20  according to their story, --

21          THE COURT:  What's the --

22          MR. WILLIAMS:  -- with --

23          THE COURT:  -- relevance of what her

24  experience was at the Williamstown Playhouse?

25          MR. WILLIAMS:  Because it was doing comparable

1    work on the recommendation of the very guy that they

2    claim said she was no good.

3            THE COURT:  I sustain the objection.  Let's

4    move on.  I don't think it's relevant.

5    BY MR. WILLIAMS:

6    Q.   Now, in this e-mail to you, dated March 23rd,

7    2003, in the middle of the e-mail, Dean Bundy goes out

8    of his way to say:

9        "We both know that in addition to being on

10        probation, as are all first year students, you are

11        also on warning, which is the stage before

12        dismissal."

13        Did you interpret that as a threat?

14   A.   Yes.

15            MR. NOONAN:  Objection, Your Honor.

16            THE COURT:  Overruled.

17   BY MR. WILLIAMS:

18   Q.   Now, Attorney Noonan showed you Exhibit Z for

19   Identification, and that's an e-mail that you sent to

20   Dean Bundy on the afternoon of February 17th, 2003, on

21   the subject of being stuck in snow.

22       Do you remember that or would you like me to show

23   it to you?

24   A.   I haven't seen the e-mail.  I think I looked at it

25   briefly, but I didn't really --

1    Q.   Let me to hand it to you so you can take a look at

2    it.

3              (Pause.)

4              MR. NOONAN:  Can you indicate the date again?

5    A.   I --

6              MR. NOONAN:  I just didn't hear it.

7              MR. WILLIAMS:  It's -- Yeah.  It's February of

8    '03.

9              MR. NOONAN:  February what?

10             MR. WILLIAMS:  '03.

11             MR. NOONAN:  Yeah.  I --

12             MR. WILLIAMS:  That's the snowstorm e-mail.

13             MR. NOONAN:  The --

14   A.   (Continuing.)  Yeah --

15             MR. NOONAN:  -- particular date.

16   A.   (Continuing.)  -- I didn't see this yesterday.

17             THE COURT:  What's the date of the e-mail?

18             MR. WILLIAMS:  I can't read something I'm

19   not --

20             THE WITNESS:  It's February 17th.

21             MR. NOONAN:  Thank you.

22             THE COURT:  February 17th.

23   BY MR. WILLIAMS:

24   Q.   Now, this says:

25        "I live about two blocks down from you on Barnett

1       Street."

2           Is it, in fact, the case that you and the Bundy's

3       lived in the same neighborhood in New Haven?

4       A.   I guess we did, yeah.

5       Q.   Okay.

6           It's what they call the "Westville" neighborhood?

7       A.   Yeah.

8       Q.   And that is out on the western edge of town,

9       towards Woodbridge?

10      A.   I'm really bad at geography.

11      Q.   Anyway, it's not downtown, correct?

12      A.   Yeah.

13      Q.   And it's not down in the heart of Yale, correct?

14      A.   No.

15      Q.   And, in fact, it's far enough that, although it's

16      possible to walk it, most people drive it?

17      A.   Yeah.  It's a long walk.

18      Q.   Okay.

19          Whereas Mr. Sanderson lived on campus so he's

20      right there?

21      A.   Yes.

22      Q.   And in this e-mail you indicate that, in fact,

23      Chris Sanderson was going to take notes for Dean Bundy

24      because there was a question about whether Dean Bundy

25      could make it in during the snowstorm; is that right?

1   A.   I --

2             MR. NOONAN:  Objection, Your Honor.  That's

3   not what it says.

4             MR. WILLIAMS:  Well look, let's not argue

5   about it.  I'll offer it, Z for Identification as a

6   full exhibit.

7             MR. NOONAN:  Oh, I don't have any objection.

8   I thought --

9             THE COURT:  Full exhibit.

10             MR. NOONAN:  I actually thought it was full.

11   BY MR. WILLIAMS:

12   Q.   And, in fact, was it -- was it the case during the

13   winter of 2003, that those of you faculty and students

14   who lived at -- out in the Westville neighborhood would

15   give each other rides in bad weather?

16             MR. NOONAN:  Objection, Your Honor; relevance.

17             THE COURT:  What is the --

18             MR. NOONAN:  "Those of you who live in the

19   Westville neighborhood give yourselves rides?"

20             MR. WILLIAMS:  Gives each other rides, I

21   believe, is what I said.  If I didn't I apologize for

22   my bad grammar, Mr. Noonan, I didn't go to Yale, but I

23   do the best I can.

24             MR. NOONAN:  I still think it's relevant

25   (phonetic).

1              THE COURT:  But you did go to Harvard, Mr.

2    Williams.

3              MR. WILLIAMS:  I did go to Harvard, that's

4    true.

5         (Laughter.)

6              MR. WILLIAMS:  At Yale they think that's a

7    black mark on you.

8              Anyway, I think it's a proper question because

9    --

10             THE COURT:  Overruled.

11             Go ahead and answer the question.

12   BY MR. WILLIAMS:

13   Q.   The question is in the bad winter in the winter of

14   '03, did you and the other students and faculty who

15   happened to live in Westville on occasion share rides

16   into school?

17   A.   Well, I don't know about what other students and

18   faculty did exactly.  I think --

19             MR. NOONAN:  The -- Then I object to anything

20   further, Your Honor.  She's indicating she doesn't

21   know.

22             THE COURT:  She said she doesn't know so let's

23   move on.

24   BY MR. WILLIAMS:

25   Q.   So did you share rides with other students and

1    faculty --

2    A.    Well, with James Bundy.

3    Q.    Okay.

4          Were there other students also?

5    A.    No -- In the car?  No.

6    Q.    Okay.

7          You refer, in Exhibit Z, to one classmate that you

8    know who lives in the same neighborhood but that he was

9    stuck out of town and couldn't even get back to New

10   Haven.

11         Do you remember that?

12   A.    Oh, yeah.

13   Q.    Do you know who that was?

14   A.    I can't -- Wait.  Who lives in Westville?  I

15   remember Niko lived out in Westville.

16         I'm not remembering who.

17   Q.    You haven't been blessed with living in New Haven

18   as long as I have, I can see that.

19   A.    Is it Niko?  Niko's a woman.  Was it Niko Wright?

20   Q.    It doesn't say.  I'm -- I -- Never mind.  We'll

21   move on.

22   A.    It's probably Niko.

23   Q.    Now, I think Mr. Noonan marked as a full exhibit,

24   Plaintiff's Exhibit 18, which is an e-mail that you

25   sent Dean Bundy on March 9th, 2003 also -- No, I'm

sorry, you sent your friend Jim Nicholson on March 9th,

2003, which is a Sunday afternoon, and I'll put that in

front of you.

     Now, before I ask you questions specifically about

that exhibit, I want to ask you a couple of questions,

if I may, about you and Jim Nicholson.

A.   Uh-huh.

Q.   I believe you testified this morning to Mr. Noonan

that you have known Mr. Nicholson since you were 17

years old?

A.   Uh-huh.

Q.   Obviously most of your life?

A.   Yes.  He's older than I am.

Q.   And he's even older than you are, ah, but not as

old as I am, I'm sure.

     Now, you grew up in the -- or spent a lot of your

growing up in the St. Louis area; isn't that right?

A.   Clayton, yeah.

Q.   Is that suburb of St. Louis?

A.   Missouri.

Q.   And Mr. Nicholson also?

A.   No, he's not from Clayton but he went to

Washington University in Clayton.

Q.   Right.  And Washington University, you say it's

located in Clayton?

1    A.   Yes.

2    Q.   I always thought it was in St. Louis.  I guess

3    it's the same --

4    A.   Well, St. Louis and Clayton.

5    Q.   Okay.

6         And would you say that he's your closest friend?

7    A.   He's a very close confidant, mentor.

8    Q.   He's the sort of person who --

9              MR. NOONAN:  Could we do this in a non-leading

10   way, Your Honor.

11             MR. WILLIAMS:  I certainly will.  I'll be very

12   happy to.

13   BY MR. WILLIAMS:

14   Q.   Can you tell us whether or not he's the sort of

15   person with whom you share your most private thoughts?

16   A.   Yes.

17             MR. NOONAN:  I object, Your Honor.

18             THE COURT:  Overruled.

19             She's answered.

20   BY MR. WILLIAMS:

21   Q.   Mr. Noonan obviously had in his possession, all of

22   these private e-mails between you and Mr. Nicholson

23   because I --

24   A.   Evidently.

25   Q.   -- because I, of course, turned them over to him

1    because he had a right to them.  I'm not saying that

2    there's anything improper about that.

3        Did you anticipate that you would ever be -- even

4    when you filed your lawsuit, that you would be called

5    upon to answer in a court of law, to private thoughts

6    that you expressed to your closest friend?

7    A.   Never --

8             MR. NOONAN:  Objection, Your Honor; relevance.

9             THE COURT:  Sustained.

10   BY MR. WILLIAMS:

11   Q.   You -- Yesterday on two or three occasions,

12   described your e-mails to Mr. Nicholson as being like

13   diary entries; --

14   A.   Yes.

15   Q.   -- is that correct?  What did you mean by that?

16   A.   Well, I don't keep a diary but Jim, during that

17   year that I was there, because he had been in

18   professional theater his whole life and knew me from a

19   really young age, it was an e-mail diary and we would

20   speak on the phone ever since what was unfolding in

21   September, ever since that happened I was very in shock

22   and troubled by it, and I would, late at night, as

23   though writing in my diary, I would write to Jim.  He's

24   very nonjudgmental and tried to do his best to just

25   keep me functioning, you know, keep my chin up and kept

1    saying, you know, "They'll discover your talent and,

2    you know, you just keep going."

3         And so I would write to him, you know, at the end

4    of the day, the stresses.  These were not communicated

5    to anybody else in this form whatsoever.

6    Q.   On that subject, Mr. Noonan confronted you many,

7    many times with quotes taken from these private e-mails

8    to your friend, in which you made comments about fellow

9    students and faculty which certainly, if you said them

10   to your face -- to their face, everybody would say,

11   "Well, pretty unkind, if not improper."

12        Did you ever anticipate that comments like that

13   were going to be shown to the people you were talking

14   about?

15   A.   No.

16             MR. NOONAN:  Objection, Your Honor.

17   Objection.

18   A.   (Continuing.)  Not at all.

19             MR. NOONAN:  Objection.  Your Honor already

20   ruled on this very question.

21             THE COURT:  Sustained.

22             MR. WILLIAMS:  It wasn't the very question,

23   Your Honor.  It's different --

24             THE COURT:  It's similar.

25             MR. WILLIAMS:  Okay.

1    BY MR. WILLIAMS:

2    Q.    Did you, more importantly, share feelings like

3    that out in public?

4    A.    No.

5    Q.    These were purely private ruminations, correct?

6    A.    Completely private and utilizing colloquial

7    language I never used in public in classes.

8    Q.    All right.

9          Now, in this exhibit, it's 18, I think, which you

10   have in front of you?

11   A.    Yes.

12   Q.    You start out by actually saying something very

13   nice about another student, the one you call the

14   "psychologically complex one from Canada."

15   A.    Yes.

16   Q.    And you said that the one was sick but still kept

17   coming to classes, right?

18   A.    Yes.

19   Q.    And then you say about him that Pete Cook has been

20   ostracized by Mark Bligh for writing a play that wasn't

21   like the one he was accepted into Yale for.

22   A.    Yes.

23   Q.    Now, I think you were asked yesterday about who

24   Mark Bligh was but I don't remember your answer.

25         Who is Mark Bligh?

1    A.   He was the play wrighting teacher, professor,

2    chair.  Play wrighting, I think, as well.

3    Q.   And when you say that Mark Bligh was ostracizing

4    this male student from Canada, what did you mean by

5    that?

6              MR. NOONAN:  Objection, Your --

7    A.   That was something --

8              THE COURT:  Just a minute.

9              MR. NOONAN:  Objection, Your Honor.  It's

10   irrelevant and I didn't ask about it.  It's beyond the

11   scope.

12             MR. WILLIAMS:  He introduced it into evidence.

13

14             MR. NOONAN:  I didn't introduce this.  It's

15   Mr. Williams' exhibit.

16             MR. WILLIAMS:  No.  It's a plaintiff's exhibit

17   but it was introduced by Mr. --

18             THE COURT:  On the issue of relevance, the

19   objection is sustained.

20   BY MR. WILLIAMS:

21   Q.   Can you tell us whether or not you felt that

22   Professor Bligh was being unfair to the student from

23   Canada?

24             MR. NOONAN:  Objection, Your Honor.

25             THE COURT:  Sustained.

BY MR. WILLIAMS:

Q.   You then referred to another student, "His lead actor, Kevin."

That was another student in your program; is that right?

A.   Yes.

Q.   And you say that Kevin, "Is doing a magnificent job."

Again, you were praising about as highly as it's possible to praise another student right?

A.   In the production, yeah.

Q.   And then you go on to say that this student had told you that the writing student, the one from Canada, who you call "David," was discouraged by the way he was being treated, right?

A.   Yes.

Q.   Okay.

And you then say that:

"Kevin said that we should all feel compassion for

Nick."

That refers to the -- That refers to yet another student; is that correct?

MR. NOONAN:   Your Honor, I'm going to object at this point and ask, under Federal Rule of Evidence 106, that the entire passage be read because there's

1    derogatory comments about other students that Mr.

2    Williams is avoiding, and --

3                MR. WILLIAMS:  Well, you know, I --

4                MR. NOONAN:  -- it should be read -- he didn't

5    -- it should be read in the context.

6                MR. WILLIAMS:  That was exactly what I asked

7    with regard to Mr. Noonan and I was told, "You'll get

8    your chance."

9                So I think --

10               THE COURT:  Same answer.

11               Mr. Noonan can raise it on recross.

12               MR. WILLIAMS:  Right.  Thank you, Your Honor.

13   BY MR. WILLIAMS:

14   Q.   And then you go on to say:

15        "I think David is a twenty-first century O'Neill

16        if he is a playwright."

17        In fact, let me read that whole sentence because

18   Mr. Noonan read only a part of it.

19        "I think David is a twenty-first century O'Neill."

20        Let me interrupt it.

21        When you talk about "O'Neill" you're talking about

22   Eugene O'Neill, is that right?

23   A.   Yes.

24   Q.   Considered by most people, the greatest playwright

25   who ever lived in the United States?

1    A.    One of them.

2    Q.    One of.   Okay.

3          "I think David is a twenty-first century O'Neill

4          if he is a playwright, and that he ought to

5          explore poetry and short story-like writing too,

6          and that Mark Bligh ought to fuck himself because

7          he isn't even a writer anyway, and this place is

8          so fucking fascist."

9          Was the -- Can you tell us whether or not the

10   point you were making there was that Professor Bligh

11   had no business criticizing this student because as far

12   as you were concerned --

13             MR. NOONAN:   Objection, Your Honor.

14   Q.   (Continuing.)   -- this student was better than the

15   professor --

16             MR. NOONAN:   It's leading.

17             MR. WILLIAMS:   May I finish the question

18   before I'm interrupted, just like Mr. Noonan said, "I

19   have the floor at the moment"?   Maybe if I could just

20   ask the question and then he can object.

21             Don't answer it.   Let me ask it and then he'll

22   object.

23   BY MR. WILLIAMS:

24   Q.   Was the point -- Can you tell us whether or not

25   the point you were trying to make was that Professor

1    Bligh was out of line in coming down on that young

2    student playwright because, in fact, in your opinion,

3    the student was better than the professor?

4             MR. NOONAN:  Objection, Your Honor.

5             THE COURT:  It's a -- leading.  It's

6    sustained.

7             MR. WILLIAMS:  Okay.

8    BY MR. WILLIAMS:

9    Q.   What point were you trying to make in that

10   paragraph?

11            MR. NOONAN:  Objection, Your Honor; relevance.

12            THE COURT:  Overruled.

13   A.   My point was that David was becoming terribly

14   discouraged.  One, he was sick with mono, and that Mark

15   Blight had really berated him.  My point wasn't that

16   David was a -- was better than Mark Bligh, it was that

17   the affect that this was having on David Nugent was, I

18   thought, really terrible and I was doing my best to

19   support David.

20   BY MR. WILLIAMS:

21   Q.   Now, I'm referring to Plaintiff's Exhibit 34 for

22   Identification and that's an e-mail that you sent to

23   Jim Nicholson on March 22nd of '03 --

24            MR. NOONAN:  Sorry, I missed the exhibit

25   number.

1          MR. WILLIAMS:  Thirty-four for ID.

2     Q.   (Continuing.) -- and in the first paragraph of

3     that e-mail, you refer to a conversation with Professor

4     Diamond and say that:

5          "She hadn't eaten dinner.  It was 10:30 p.m. and

6          she was late to meet David to decide on their

7          fresh kill for next year's class."

8          MR. NOONAN:  Can I suggest that this be marked

9     as a full exhibit and I take a look at it, because if

10    it's gonna be quoted from, I think it should be a full

11    exhibit.

12         MR. WILLIAMS:  Yeah, I'm reluctant to do that

13    just because it's so lengthy maybe it's not worth it.

14         MR. NOONAN:  Well, I guess I object to reading

15    from something not in evidence.

16         MR. WILLIAMS:  I think he's right on that,

17    Your Honor.  I'm withdrawing the question.

18         THE COURT:  All right.

19         MR. WILLIAMS:  And I just want to take a look

20    at it here.

21         (Pause.)

22         MR. WILLIAMS:  Oh, yes.  I'm going to move on

23    to the Exhibit 22 because this one was quoted at

24    length.

25    BY MR. WILLIAMS:

1   Q.   This was an e-mail that you sent to Jim Nicholson

2   on November 14th, 2002 in the evening, in which you

3   were quoted -- or quoted in here, you say to him:

4       "Dear Jim: I exploded in my Drama 50 Odyssey

5       rehearsal today at Mojohn, the queen bee who broke

6       my back."

7       We've been through this before.

8       What did you mean when you -- This was the woman

9   that was very big and she gave you that --

10  A.   Uh-huh.

11  Q.   -- top down (phonetic) hug.

12      What did you mean when you called her "the queen

13  bee"?

14  A.   She dominated the process most of the time, but in

15  a negative way.  She was lying on the floor face down

16  most of the time, complaining.  She objecting to every

17  suggestion anybody made about anything, and she just

18  basically didn't want to do the project.

19  Q.   And you say that you intentionally gave her a hard

20  time.

21          MR. NOONAN:  Well, objection, Your Honor.

22  That isn't what it says.

23          MR. WILLIAMS:  Well, it says, "I exploded in

24  my Drama 50," and then in the next paragraph says, "It

25  was quite intentional on my part."

```
 1              This is all quoted by Attorney Noonan.

 2              MR. NOONAN:  Yeah, I just think if he's gonna

 3    pretend to quote, he should quote the language not --

 4              MR. WILLIAMS:  I'm not pretending --

 5              MR. NOONAN:  -- characterize it.

 6              MR. WILLIAMS:  -- to quote it.  I said -- If I

 7    was --

 8              THE COURT:  Overruled.

 9              Go ahead, Mr. Williams.

10    BY MR. WILLIAMS:

11    Q.  Why did you do that in that particular interaction

12    with --

13    A.  Okay.

14              MR. NOONAN:  Objection, Your Honor.

15    A.  (Continuing.)  I'd been --

16              MR. NOONAN:  Objection, Your Honor.  I don't

17    think it's relevant as to why she did it.

18              MR. WILLIAMS:  Well, he brought it out.

19              MR. NOONAN:  She -- I didn't bring anything

20    out.  What I brought out was the relevance was how she

21    was -- her thoughts reflect what she was thinking about

22    her colleagues and her faculty, and indeed, as she has

23    said, these were her deepest thoughts that she shared

24    with one of her best friends, which I think gives --

25              MR. WILLIAMS:  And that's exactly --
```

142

1              MR. NOONAN:  -- which I think gives some

2    indication as to how she was feeling.

3              THE COURT:  All right.  Overruled.  She can

4    answer.

5    BY MR. WILLIAMS:

6    Q.   Go ahead.

7    A.   Okay.

8         What was the question?

9    Q.   And the question was, why was it that you decided

10   to confront her in that way?

11   A.   Okay.

12        I did that and I was not really out of control and

13   I didn't yell expletives at her or say anything

14   demeaning at all.  Somebody had made a suggestion

15   again, and again she was trashing it, which tended to

16   suck all the energy in the room out, and I answered her

17   in a way, very strongly and for the first time in that

18   whole process I actually raised my voice.  They assumed

19   that I was really, really laid-back and kind of, you

20   know, I was not that -- I didn't get into argument with

21   people and I had to spend some time lying on my back

22   anyway, so it's not really very intrusive in the

23   process, but at that point the reason that people

24   looked shocked is that --

25              MR. NOONAN:  Your Honor, I'm gonna object to

1   this, it's --

2   A.   (Continuing.) -- they had never heard me talk like

3   that.

4             MR. NOONAN:  I object.  It really --

5   BY MR. WILLIAMS:

6   Q.   The question, if I may, is why did you decide to

7   do that?

8   A.   To turn her around, to get her to snap out of it

9   because we had to make this piece and she needed to get

10  onboard.

11  Q.   Okay.

12       Now, 27 for Identification is an e-mail you sent

13  to Mr. Jim Nicholson at five minutes before midnight or

14  six minutes -- I'm sorry, yeah, six minutes before

15  midnight on February 6th, 2003 --

16            MR. NOONAN:  Is this not a full exhibit?  I

17  actually thought that it was a full exhibit --

18            MR. WILLIAMS:  It's marked for ID here.

19            THE COURT:  What's the number?

20            MR. WILLIAMS:  Twenty-seven.  I have it for ID

21  in my notes, as well.

22            MR. NOONAN:  Well, if there's gonna be quoting

23  from it, then I'm -- why don't we make it a full

24  exhibit.

25            THE COURT:  Want to make it a full exhibit,

1   Mr. --

2            MR. WILLIAMS:  No, I am not.  This was one in

3   a -- certain parts of it were quoted by Mr. Noonan and

4   I'm just gonna quote the parts that he chose to quote.

5   BY MR. WILLIAMS:

6   Q.   This is the one where at five minutes to midnight

7   on February 6, 2003, you say:

8        "Dear Jim: Evan has put the boys back where they

9        belong and she is not insisting on the insipid

10       Brie girl for the female lead."

11       Okay.  What did you mean by that?

12  A.   This was a casting negotiation, always a delicate,

13  intimidating issue.  We -- The play wrighting student,

14  the dramaturgy student and I had had a lot of meetings

15  about who we would try to get cast and it's never a

16  guarantee and you don't ever get everybody that you

17  want, and there was a question of the two male leads

18  and she was switching them, she was putting -- she was

19  reversing their characters and we wanted them to be the

20  characters we wanted them to be, and this other woman

21  had been suggested by Evan but none of us wanted to

22  cast her in this other position.

23       So it was always a very dicey and intimidating

24  situation.  She's a -- I found Evan to be a very, very

25  intimidating person, we -- and all of us did going into

1    casting meetings, so it was a dicey situation and we

2    had to kind of buck ourselves up and see how we could

3    present it so that we could get the cast -- at least

4    the most ideal cast, you know, that we might get.

5            MR. NOONAN:  Your honor, I'm gonna move to

6    strike the part about what other people felt and could

7    you suggest to the witness that she can only testify

8    about her feelings, not feelings of others --

9            MR. WILLIAMS:  I -- respectfully --

10           MR. NOONAN:  -- which she's done several

11   times.

12           MR. WILLIAMS:  -- to Mr. Noonan, Your Honor,

13   if it's a group dynamic and you're trying to explain

14   your thought process, that's how you do it.

15           MR. NOONAN:  Well, it's not proper evidence

16   and Mr. Williams knows that.  She can't testify as to

17   what --

18           MR. WILLIAMS:  She -- It is because --

19           MR. NOONAN:  She can't testify as to what

20   other people were thinking.

21           THE COURT:  The objection is overruled.

22           Let's move on.

23   A.   (Continuing.)  It was a team --

24           THE COURT:  No.  Just a minute.  There's no

25   question pending.

1    BY MR. WILLIAMS:

2    Q.   In that same e-mail, there's a paragraph about

3    Dean Bundy in which Mr. Noonan quoted you as saying,

4    "He's almost a good director," key word "almost" and in

5    that paragraph you say:

6         "Last night he;" that is, Dean Bundy, "told me

7         that I could have a tuition refund for being so

8         astute but I feel that he also is irritated that I

9         point things out."

10        What did you mean by that?

11   A.   He would often solicit my feedback.  He would

12   invite me to go on dinner walks with him and say that

13   he wanted to hear my comments about how things were

14   going in rehearsal, so he would solicit them, and if I

15   said anything that he felt like wasn't a really good

16   thing, he was irritated.

17   Q.   I'm going to move on to Exhibit 19 for

18   Identification, and that's an e-mail that you sent the

19   evening of St. Patrick's Day, 2003, to Byum Stevens,

20   and I'll ask you again to tell us exactly who Byum

21   Stevens is.

22   A.   Byum Stevens is the artistic director of a theater

23   in the Berkshires where I trained before I came to

24   Yale.  I was his assistant director.

25   Q.   And being the artistic director of a regional

1   theater means basically you run the show?

2   A.   Oh, yeah.   He chooses the plays, then he directs

3   one production.

4   Q.   Okay.

5        And I think you told Attorney Noonan yesterday

6   afternoon that you had had a number of e-mail exchanges

7   with Mr. Stevens, as well; is that right?

8   A.   Yes.

9   Q.   Okay.

10       And I understand that you had trained under him at

11  some point.

12       Did you maintain, thereafter, a kind of

13  mentor/mentee relationship?

14  A.   Yes.   I invited him to one of my rehearsals to

15  specifically work with me on learning how to block

16  actors differently from choreography.   He's a

17  specialist in teaching ballet dancers how to act and in

18  working with actors on movement, and my first year

19  directing faculty was away --

20            MR. NOONAN:   Your Honor, I object, this is --

21  A.   (Continuing.)   -- which is David Chambers, so --

22            MR. NOONAN:   Your Honor, I object.

23            THE COURT:   Sustained.   The answer can go out.

24            MR. WILLIAMS:   In its entirety?

25            THE COURT:   Well, --

1           MR. WILLIAMS:  I mean, I can go back and pick

2    up pieces.

3           THE COURT:  I think the first part of it would

4    have called for a "Yes" or "No" answer, didn't it?

5           MR. WILLIAMS:  No, it didn't.  This is not --

6    I asked her to explain the nature of her relationship

7    with him.

8           MR. NOONAN:  Well, I'm not gonna ask you to go

9    back and parse it out, Your Honor.

10          Can we just get to a question?

11          MR. WILLIAMS:  I'll ask the question again

12   then, if there's a dispute, --

13          MR. NOONAN:  Well, --

14          MR. WILLIAMS:  -- and it may be that my memory

15   is bad, the Lord only knows.

16   BY MR. WILLIAMS:

17   Q.   What was the nature of your relationship with Byum

18   Stevens after you had stopped working in his theater?

19   A.   We occasionally e-mailed.  He came to the Yale Rep

20   to see productions with me, and thesis productions, and

21   attended one rehearsal,

22   Q.   Far as you know, is he well regarded in the

23   theater world?

24          MR. NOONAN:  Objection, Your Honor.

25          THE COURT:  Sustained.

1   BY MR. WILLIAMS:

2   Q.   Now, in this e-mail, Attorney Noonan had quoted a

3   part about Dean Bundy, where you said:

4        "James Bundy left a message on my machine now that

5        he is back from Russia and LA" --

6             MR. NOONAN:  I object, Your Honor.  I did not

7   quote from that part.  Never did.

8             MR. WILLIAMS:  I thought I remembered the

9   quote about coming back from Russia.

10            THE COURT:  I do remember some reference to a

11  return from Russia.  Whether it was in an e-mail or

12  not, I don't know.  I don't remember.

13            MR. NOONAN:  Ms. Greenhouse testified about

14  that on her direct, but I did not ask her about that on

15  cross.

16            MR. WILLIAMS:  All right.  Well, in any event,

17  it's neither here nor there.

18  BY MR. WILLIAMS:

19  Q.   In that paragraph you say about Dean Bundy:

20       "He's a bit like a Doberman, I've learned.  For

21       the most part he commended me, but he bites."

22            MR. NOONAN:  Your Honor, I'm going to object

23  at this point.  I think as long as he's gonna quote

24  from the exhibit, as opposed to asking whether she

25  recalls, then it ought to be marked as a full exhibit.

1          MR. WILLIAMS:  Well, you know, what, maybe I
2     should because Attorney Noonan quoted from a lot of it
3     too.
4          Let's make 19 a full exhibit.
5          THE COURT:  Full exhibit.
6     BY MR. WILLIAMS:
7     Q.   I'm not gonna read all of it, but I am gonna read
8     a bit and ask you a question about it.  This paragraph
9     about Dean Bundy, you say:
10         "James Bundy left a message on my machine now that
11         he is back from Russia and LA," saying that since
12         he wrote (actually I wrote it and he had someone
13         forge his signature on it) a letter to
14         Williamstown on my behalf, he'd like to debrief me
15         on my assistanceship."
16         Now, on that, we've already -- you've already
17     testified about this letter of recommendation that Dean
18     Bundy sent to the Williamstown Theater, correct?
19     A.   Yes.
20     Q.   Did Dean Bundy -- Strike that.
21         Tell us whether or not Dean Bundy actually
22     instructed you to write it for him and he'd review it,
23     sign off on it if he liked it?
24     A.   He did instruct me to write it.
25     Q.   Okay.

1      And then it was up to him to review what you had

2   written and if he agreed with it, sign it.  If he

3   didn't agree with it, send it back?

4   A.   I guess, yes.

5   Q.   All right.

6      And he apparently agreed with it and signed it, or

7   had somebody sign his name to it; is that it?

8   A.   I'm not sure what he eventually did.  I never

9   asked to see my letters of recommendations, but I think

10  he did -- he raised some questions in an e-mail, and

11  then I wrote back, "Okay.  Whatever."

12  Q.   Rewrote it?

13  A.   I'd never written a letter like that so.

14  Q.   Okay.

15     Rewrote it to his specifications?

16  A.   I assume that he did.

17  Q.   Okay.

18     And then he told you that it had been sent off,

19  correct?

20  A.   I assumed that it had been.

21  Q.   Okay.

22     Now, you say, concerning him, and this refers to

23  the fact that he wants to have a meeting with you:

24     "He's a bit like a Doberman, I've learned during

25     the process, for the most part.  For the most part

1    he commended me, but he bites."

2    What did you mean by that?

3    A.   I can give an example.

4    Q.   Okay.

5    A.   Am I allowed to give an example?

6    Q.   Would you, please?

7    A.   Okay.

8    So there was -- I had never assisted in a

9    traditional theater setting before and so some of the

10   guidelines that I broke, I wasn't aware existed, so I

11   had to learn after the fact, and I'd be bumping into

12   the furniture, metaphorically.

13   There was an experience during the first

14   performances of the production and one of the other

15   students came and grabbed me during intermission.  She

16   was in costume and she said, "You have to come back

17   stage.  You have to come right now.  There's an actor

18   having a meltdown," and so I went back with her and it

19   was one of the actors who was hysterical and she was

20   crying and she was in the dressing room and she was

21   complaining about James Bundy was the director and I

22   guess he had said something to her that really upset

23   her, or whatever.  She was crying and I had to get her

24   to calm down so she could make her entrance, and so I

25   stood there and I calmed her down.  I listened to her.

1  I placated her and so forth and got her ready for her
2  entrance, then I went back to sit next to Mr. Bundy in
3  the back where I took notes for him and he was furious
4  with me.  I said I just was brought back to talk with
5  Phyllis and he said, "You're never supposed to go back,
6  ever, ever, ever," and I said, "Oh, I didn't know that.
7  This other student, Chloe, grabbed me and she brought
8  me back and Phyllis is crying," and so then the play
9  started and Phyllis came on and he said, "Well, you
10  must have done something right.  That was the best
11  entrance she's ever made."

12        Or one other example, which is the reverse, is
13  that after one of the early production, like, dress
14  rehearsals, he had -- James Bundy had disappeared with
15  the playwright and Ben Sandler, who was the head, who
16  was the head of technical theater couldn't find him and
17  we were going into overtime, which means that his crew
18  had to be paid double, so everybody was sitting and
19  waiting and I had given my notes to James Bundy, and
20  Ben Sandler didn't know where he was, and so he looked
21  at me and I said, "I can try to give the notes from
22  memory," and so he asked me to do so and I did, and I
23  gave the notes from memory, and he thanked me, and when
24  I found James Bundy he was -- he viciously said, "Yes,
25  but you left the most important one out," and he never

1    told me what that was, whereas I might have expected,

2    as a first year, and the only first year student doing

3    this, he might go, "Good try" or "Good job, but you

4    left one thing out."  Everybody else had treated me

5    really graciously.  Ben Sandler had commended me and he

6    wasn't that forthcoming with, you know, commendation,

7    and James Bundy was vicious, "You left the most

8    important one out."

9            It seemed as though I could never really get

10   it right, you know?  I mean, I could give you another

11   list of examples in class, but he did the same thing

12   with me in class when he subbed for David Chambers.

13   Q.   You will recall perhaps, that yesterday in his

14   opening argument, Attorney Noonan referred to your

15   being appointed to assist Dean Bundy at the production

16   at the Yale Repertory Theater?

17   A.   Yes.

18   Q.   And indicated that that was a good thing, or an

19   honor that you were given.

20   A.   Uh-huh.

21   Q.   Did it seem that way to you at the time it

22   happened?

23           MR. NOONAN:  Objection, Your Honor.  I didn't

24   ask about this and it's not relevant, so it's beyond

25   the scope --

```
 1              MR. WILLIAMS:  He asked her a lot about the
 2     assistantship, Your Honor.
 3              MR. NOONAN:  It's beyond the scope and it's
 4     irrelevant.
 5              THE COURT:  Overruled.  I'll let her answer.
 6     A.   I didn't know what was going on.  I know that I
 7     was the only --
 8              MR. NOONAN:  Well, then I object to anything
 9     further.  She's just said she doesn't know.
10              THE COURT:  That's her answer.
11              MR. WILLIAMS:  Okay.
12     BY MR. WILLIAMS:
13     Q.   So you didn't know one way or the other whether it
14     was a good thing or a bad thing?
15     A.   I didn't --
16              THE COURT:  You can answer that "Yes" or "No."
17     A.   (Continuing.)  Was it a good thing or a bad thing?
18     BY MR. WILLIAMS:
19     Q.   Yeah.
20          Is it true that you did not know whether it was a
21     good thing or a bad thing because of the way it
22     happened?
23     A.   That would be true.
24     Q.   Okay.
25          Now, in this e-mail, Exhibit 19, you then go on to
```

1    a paragraph and Attorney Noonan read little portions of

2    it.  I'd like to read the whole last paragraph, and

3    then I'll ask you about it.  This is the one where you

4    talk about what was your first choice.

5    A.    Oh.

6    Q.    Here's the context, okay?

7          "Byum, I had to get my MFA.  I am not employable

8          and would be living in continual desperation.  I

9          am never married at 49 and living on the edge as

10         it is.  This wasn't exactly a completely

11         volitional choice.  My first choice was two years

12         at UMass, no tuition, snag my credential.  Maybe I

13         won't return in the fall, I don't know yet.  This

14         has been a difficult incarnation for me in every

15         aspect."

16         This is an e-mail that you sent on St. Patrick's

17   Day of 2003.

18         What did you mean by that paragraph?

19              MR. NOONAN:  Objection, Your Honor.  The

20   document clearly speaks for itself.  If she meant

21   something else then it would be irrelevant.

22              THE COURT:  Overruled.  She can answer.

23   A.    I was so stressed.  At that point I had felt I was

24   being just harangued.  I could never figure out what

25   these people wanted from me.  They would never tell me

1    how to lift the warning letter from -- for dismissal.

2              MR. NOONAN:  Your Honor, now I object because

3    it's gets into an area that you already ruled.

4              THE COURT:  Sustained.

5              It's not responsive to the question.

6              MR. WILLIAMS:  Well actually, if I may, Your

7    Honor, in that paragraph she talks about how this has

8    been a difficult incarnation in every respect.  I don't

9    know whether to come back or not.

10             I mean, and I'm asking her what she means by

11   that.  It sounds to me like that's exactly what she's

12   telling us.

13             THE COURT:  I've ruled.

14             MR. WILLIAMS:  All right.

15   BY MR. WILLIAMS:

16   Q.  When you say that your first choice was two years

17   at UMass free of charge, what were you talking about?

18             MR. NOONAN:  Objection, Your Honor.

19             THE COURT:  Overruled.

20   A.  One, when I first started thinking about going

21   this route I looked at the possibility of remaining at

22   the -- in Massachusetts, and that the most affordable

23   way for me to go back to school at 49 would be to stay

24   there, get an MFA in directing from UMass and then it

25   wouldn't cost me anything but the reality was that that

1    was a mediocre degree, it wouldn't really forward my

2    career.  I had to take a huge risk.

3         It's something even David Chambers and I had

4    spoken about after I had gotten in so --

5              MR. NOONAN:  Well, Your Honor, I'm gonna

6    object now.  This is well beyond the scope of the

7    question.

8              THE COURT:  She's answered the question.

9              MR. WILLIAMS:  Okay.

10   BY MR. WILLIAMS:

11   Q.   So when you say that your first choice was to take

12   two years free of charge at UMass Amherst, you meant

13   that that would be the easy way?

14   A.   I had felt --

15             MR. NOONAN:  Objection, Your Honor.

16   A.   (Continuing.) -- at that --

17             MR. NOONAN:  It's --

18             THE COURT:  Sustained.

19             MR. WILLIAMS:  Okay.

20   BY MR. WILLIAMS:

21   Q.   When you said that your first choice was two years

22   at UMass Amherst free of charge, what did you mean by

23   that?

24             MR. NOONAN:  Objection, --

25   A.   I think I was --

1          MR. NOONAN:  Objection, Your Honor.  She's

2    already answered that question.  You asked her that

3    before, she answered it, then she started to get into

4    something else.

5    BY MR. WILLIAMS:

6    Q.   Can you tell us whether or not you meant by that,

7    that that was the easy way?

8          MR. NOONAN:  Objection, Your Honor.  She's

9    answered the question.  He's now trying to put --

10          THE COURT:  Sustained.

11   BY MR. WILLIAMS:

12   Q.   So why did you decide to go to Yale instead of

13   taking the free ride at UMass Amherst?

14   A.   Well, a couple of reasons.

15        One, I didn't get into UMass Amherst, incredibly

16   enough.  You just sent your transcripts and your, you

17   know, resume and I didn't get in, and so the incredible

18   happened, I got into Yale drama, which I thought would

19   be the best possible training program in the country,

20   and it was -- you know, I think I was just expressing a

21   sentiment there.  I felt so beleaguered --

22          MR. NOONAN:  Well, objection, Your Honor.

23   She's -- I think she's answered the question.

24          THE COURT:  She has.

25          MR. WILLIAMS:  She has and I'm satisfied with

1    the answer.

2    BY MR. WILLIAMS:

3    Q.   In Exhibit 21 for Identification, that's an e-mail

4    you sent to Byum Stevens on March 28th, 2003, --

5              MR. NOONAN:  I'm sorry, did you say "21"?

6              MR. WILLIAMS:  March 28.

7              MR. NOONAN:  No.  No, I mean --

8              MR. WILLIAMS:  Oh, that's right, exhibit --

9    Exhibit 21 for ID.

10             MR. NOONAN:  Thanks.

11   BY MR. WILLIAMS:

12   Q.   Oh, yeah, this is the one that contains all of the

13   -- the reference to "Stepford students and pod people

14   professors."

15        I'm gonna, just so it's (unintelligible), I'm

16   gonna show you this exhibit.

17        Is this, in fact, the e-mail that you sent to Byum

18   Stevens on March 28th, 2003?

19   A.   Yes.

20   Q.   Okay.

21        And in the course of that e-mail you were trying

22   to describe a variety of your experiences that you were

23   having at that time at the Yale drama school?

24   A.   Yes.

25             MR. WILLIAMS:  I'm gonna offer this, Your

Honor.

           MR. NOONAN:  Oh, I don't have any objection.

           THE COURT:  Full exhibit.

BY MR. WILLIAMS:

Q.   In the opening line it says:

     "Dear Byum: Gee, I think you're swell.  My

     rehearsal was observed by Liz Diamond, David

     Chambers and Evan, the fascist, incipient acting

     teacher."

     What did you mean by that?

A.   She's a really overpowering presence.  She's just

very, you know, she's very overpowering.

Q.   Strong personality?

A.   Very.  Very.

Q.   Something some people in this room have accused

you of being, on occasion?

A.   I'm thinking.

           MR. NOONAN:  Well, objection.  I don't think

anyone has ever accused her of being an omnipotent

fascist.

           MR. WILLIAMS:  Okay.  Strong personality is

the accusation.

           MR. NOONAN:  Well, that isn't what she said.

She said, "fascist," --

           MR. WILLIAMS:  All right.

1           MR. NOONAN:  -- "omnipotent acting teacher."

2           MR. WILLIAMS:  And she said that's what it

3    meant --

4           MR. NOONAN:  I see.

5           MR. WILLIAMS:  -- and I'm just suggesting that

6    --

7           THE COURT:  Well, come on.  Let's go.

8           MR. WILLIAMS:  I agree, Judge.  Thanks.

9    BY MR. WILLIAMS:

10   Q.   Now, I'm not gonna read all of this but I am gonna

11   go through certain parts.

12        There's a reference to Evan Yionoulis in the

13   middle of this.  It says:

14        "She thought I was confusing them by giving them

15        the 'task' of acting the scene and following their

16        impulses to make an action or take their action

17        off of a line."

18   A.   Uh-huh.

19   Q.   "She said I should 'just block it' or let them

20        explore without interrupting ever."

21   A.   Uh-huh.

22   Q.   "I had checked in with them to see if they would

23        be willing to take adjustments on the fly and they

24        agreed, but I was still a bad director because I

25        am never supposed to interrupt like that."

1          What do you mean by that?

2     A.    James Bundy had -- that was one of the ultimatums

3     he gave me, that I should never do that, I should never

4     give a direction what he called, "On the fly."

5     Q.    Okay.

6          And had somebody else told you that you should or

7     --

8     A.    Well, everybody's different, I guess, in the

9     field.

10         Byum Stevens was teaching --

11              MR. NOONAN:  Well, objection.  Your Honor,

12    objection.  It's nonresponsive --

13              MR. WILLIAMS:  Yeah.

14    BY MR. WILLIAMS:

15    Q.    The question is did somebody else -- and somebody

16    else suggested that you should --

17              THE COURT:  Well, the objection is sustained.

18              MR. WILLIAMS:  Yeah.  I'm withdrawing the

19    question.  Yeah.

20    BY MR. WILLIAMS:

21    Q.    Did somebody else then suggest that you should do

22    that?

23              MR. NOONAN:  And I object to that one on the

24    ground that that would be hearsay and irrelevant.

25              MR. WILLIAMS:  No, --

1          MR. NOONAN:  Why would it matter if someone

2     else suggested it?

3          MR. WILLIAMS:  it's not hearsay because it's a

4     -- the statement is itself the fact.  It's not an

5     assertion of another fact, so --

6          MR. NOONAN:  Well, it's --

7          MR. WILLIAMS:  -- it's not hearsay.

8          MR. NOONAN:  It is --

9          MR. WILLIAMS:  And as to its relevance, it's

10    not relevant because it explains this paragraph that's

11    in an exhibit that's a full exhibit.

12         MR. NOONAN:  If Mr. Stevens thought something

13    else and communicated that to Ms. Greenhouse, that

14    would not be relevant, Your Honor.

15         MR. WILLIAMS:  But that's not the question.

16    The question is --

17         THE COURT:  Well, let's hear the -- I have to

18    --

19         MR. NOONAN:  I object.

20         MR. WILLIAMS:  -- did somebody else --

21         THE COURT:  Ask the question again.

22    BY MR. WILLIAMS:

23    Q.  Did somebody else at Yale indicate that they had a

24    different view of what you should do about interrupting

25    actors?

1          THE COURT:   Now you can answer that question

2    "Yes" or "No."

3    A.   Yes.

4    BY MR. WILLIAMS:

5    Q.   Okay.

6         Who was it?

7    A.   James Bundy.

8    Q.   And who -- Who gave two conflicting instructions?

9    A.   I don't -- I might -- I'm confused.

10   Q.   I see.  You told us -- Let me make my point clear.

11   I know I -- We go on and we get -- it gets mixed up.

12        You just testified, I think, stop me if I'm wrong,

13   that --

14   A.   Uh-huh.

15   Q.   -- that Dean Bundy told you that you should never

16   interrupt an actor, okay, and give instructions on the

17   fly --

18   A.   Uh-huh.

19   Q.   -- during rehearsal, okay?

20   A.   Uh-huh.

21   Q.   And you indicated that then you were getting

22   contrary advice or something, and so my question --

23          MR. NOONAN:  Objection, Your Honor, she hasn't

24   said --

25   BY MR. WILLIAMS:

1    Q.    Whatever you said.  It doesn't matter.

2          My question to you was, did somebody else at Yale

3    give you a contrary suggestion to that one that Bundy

4    had given you?

5              THE COURT:  "Yes" or "No."

6    A.    Let me think.  Something was presented, yes, --

7              THE COURT:  "Yes" or "No."

8    A.    -- that -- Yes.

9    BY MR. WILLIAMS:

10   Q.    Okay.

11         And who was that?

12   A.    In directing class.

13   Q.    And who taught directing class?

14   A.    Well, we had David Chambers for first year

15   directing and we had Liz and David for directing

16   practicum.

17   Q.    Okay.

18         And so in their class you got a -- what you

19   understood to be a contrary --

20             MR. NOONAN:  Objection, Your Honor.  It's

21   leading and it's --

22             MR. WILLIAMS:  All right.  I'll reword it.

23   I'll withdraw that question.

24   BY MR. WILLIAMS:

25   Q.    Can you tell us whether or not in their class you

1    got an instruction that you felt was contrary to the
2    instruction you'd been given by Dean Bundy on that
3    particular point?
4               MR. NOONAN:  And I object to that, Your Honor,
5    unless it's limited to one of the professors.
6               MR. WILLIAMS:  Well, if it's done in their
7    presence and they ratify it, it's the same thing.
8               MR. NOONAN:  I object, Your honor.
9               It's -- We're going well far afield of the
10   cross, for one thing.
11              THE COURT:  Sustained.
12              MR. WILLIAMS:  I'm gonna move on.
13   BY MR. WILLIAMS:
14   Q.   Following that paragraph that I just read and we
15   got into this debate about it, you make this paragraph
16   that Attorney Noonan repeated so many times yesterday:
17         "This is a dodge.  You do it their way, you become
18         a mediocre, uninspired, pedantic director, or you
19         take the highway."
20         That sentence, what did you mean by that?
21   A.   I was referring to the ultimatums that James Bundy
22   -- His rigidity for what I could or couldn't, or should
23   or shouldn't do.
24   Q.   Okay.
25         Did you feel that rigidity kind of characterized

1     the way he was supervising you?

2     A.    Yes.

3     Q.    Okay.

4           And in your experience in the theater, both at

5     Yale and elsewhere, is rigidity something that is not

6     commonly seen?

7                MR. NOONAN:   Objection, Your Honor.

8                THE COURT:   Sustained.

9     BY MR. WILLIAMS:

10    Q.    And then you go on and you say:

11          "If you want to cleanup Dodge you're fucked

12          because you're surrounded by Stepford students and

13          pod people professors."

14          What did you mean by that sentence?

15    A.    That -- When I said "Stepford students" there was

16    a certain segment of the student population that were

17    -- it was kind of like being in the military, where it

18    really was like boot camp and they would -- their only

19    opinions would be to parrot what the teachers would

20    say.

21          And when I said "Pod people," it was a reference

22    to the Invasion of the Body Snatchers.  There were a

23    few people who taught at Yale who were not -- you

24    couldn't really make contact with them.  They were

25    just, you know, they would sort of law down the law and

1    it was as though -- it was something unique to me in

2    academia.  I obviously had been in a lot of school

3    (phonetic) before, but I'd never been in this kind of

4    environment, repressively.

5    Q.   Now, you mentioned this business about how there

6    was this quality of being -- like being in boot camp.

7         Were you, in fact, instructed by the people who

8    met with you at that warning meeting in September, when

9    they put you on warning, that as part of being on

10   warning, you must act like this was boot camp?

11   A.   I was told, "This is boot camp."  "Think of this

12   as boot camp," I think, is what was said.

13   Q.   And then you go on and say:

14        "Mark Lamos taught his last guest class for us

15        today on directing opera.  I rushed up to him

16        after.  We've spoken before and have a really

17        strong affinity."

18        Who is Mark Lamos?

19   A.   Mark Lamos.  Right.

20   Q.   Sorry.

21   A.   He's a director and he principally is directing

22   opera now, and --

23   Q.   Major, world renowned figure in the field?

24        MR. NOONAN:  Objection, Your Honor.

25   A.   Yes.

1          THE COURT:  Sustained.

2     BY MR. WILLIAMS:

3     Q.   And he was -- Was he a visiting faculty member?

4     A.   Yes, he was a guest teacher for a while, who

5     invited me to watch his rehearsals and.

6     Q.   He wasn't somebody you thought of as a "pod people

7     professor," was he?

8     A.   No.  He wasn't on the full-time faculty.

9     Q.   Do you think he was good?

10          MR. NOONAN:  Objection.

11    A.   Do I think he was --

12          MR. NOONAN:  Objection, Your Honor.

13    BY MR. WILLIAMS:

14    Q.   No, did you?

15          THE COURT:  Sustained.

16    BY MR. WILLIAMS:

17    Q.   As a student, what was your reaction to that

18    particular teacher?

19          MR. NOONAN:  Objection, Your Honor.

20          MR. WILLIAMS:  Her reaction to her teachers

21    has been this whole -- practically the whole subject --

22          THE COURT:  What's the relevance of some

23    visiting professor?

24          MR. WILLIAMS:  Because --

25          MR. NOONAN:  Who didn't vote on this.

1          MR. WILLIAMS:  Because Mr. -- Yeah, but none

2    of them knew what was in these private e-mails.

3          Mr. Noonan's position was that the way she

4    reacted to students and faculty and other people who

5    passed through the system is relevant to whatever he

6    thinks it's relevant to, and I objected but Your Honor

7    said, "No, he's got a right."  So since he's gone into

8    it, I feel I have a right to go into the same area.

9    It's the same subject.  "What was your reaction to this

10   teacher that Yale said, 'Here's his course.'"

11         THE COURT:  I -- Perhaps I misheard, but I

12   didn't hear that he was giving a course.  I thought she

13   said he came to visit her on a --

14         MR. WILLIAMS:  Well, let me clarify that.  I'd

15   be happy to.

16         THE COURT:  I think you ought to.

17         MR. WILLIAMS:  Yeah.

18   BY MR. WILLIAMS:

19   Q.   Was he, in fact, a visiting teacher?

20   A.   He was, and a director --

21   Q.   Okay.

22   A.   -- at the Yale Rep.

23   Q.   So he came in, he directed a production at the

24   Yale Rep, and he taught students, correct?

25   A.   Yes.

```
1   Q.   Oh.

2        And you took his course --

3             MR. NOONAN:  Well, --

4   A.   He came in to --

5   Q.   -- or sat in on it?

6   A.   -- our directing --

7   Q.   Okay, came into your directing course?

8   A.   Right.

9   Q.   Okay.

10            MR. NOONAN:  Objection, Your Honor, it's --

11            THE COURT:  So he was not teaching the course,

12  I take it?

13            MR. NOONAN:  Correct.  He was a guest

14  lecturer, is what she said.

15            MR. WILLIAMS:  He participated in teaching the

16  course.

17            THE COURT:  How often?  How frequently?

18            MR. WILLIAMS:  Well, I was trying to ask.

19            THE COURT:  So why don't you find out?

20            MR. WILLIAMS:  Okay.

21  BY MR. WILLIAMS:

22  Q.   How often did he participate in teaching that

23  course?

24  A.   It was during the time that period that he was

25  directing and it was more than once.
```

1    Q.   Okay.

2    A.   As I recall.

3    Q.   Oh.

4         And what was your reaction to him?  Do you think

5    he was a pod person or not?

6    A.   Oh, no.  He was amazing, and that -- we had such

7    an amicable rapport that he invited me to --

8              MR. NOONAN:  Objection.  Objection, Your

9    Honor.

10             THE COURT:  Sustained.

11             MR. NOONAN:  She's now described --

12   BY MR. WILLIAMS:

13   Q.   And how did you get out of him -- How did you get

14   along with him?

15   A.   Great.

16   Q.   Did he -- Strike that.

17        In this paragraph you got on and you say that you:

18        "Approached him and asked if he ever took a female

19        apprentice."

20   A.   Yes.

21   Q.   And you go on and say that you asked that because

22   he's seriously into all guy teams and casts?

23   A.   Yes.

24   Q.   But he said, "Yes, occasionally."

25   A.   Yes.

1    Q.   And you said, are -- Or I'm sorry, and you said,

2    "I would like to train with you."

3    A.   Uh-huh.

4    Q.   And he said, "Absolutely.  Here's my phone number

5    and address."

6    A.   Yes.

7    Q.   And then you went on and you said about him, "He

8    is so fucking brilliant and passionate."

9    A.   Yes.

10    Q.   Okay.

11        Attorney Noonan quoted to you and questioned you

12    about Exhibit 25 for Identification, an e-mail that you

13    sent to your friend, Jim Nicholson, on December 3rd,

14    2002 and -- in which you talked about Professor Roach,

15    and --

16    A.   Yes.

17    Q.   -- and the exam, and then the conversation that

18    the two of you had had after that.

19        And you talked about -- You said that:

20        "I know I now have ADD."

21        Was that a diagnosis or were you just speaking

22    colloquially?

23    A.   No.

24        Can I answer that?

25    Q.   Yes.

```
1    A.   Okay.
2              THE COURT:  No, the question was --
3    BY MR. WILLIAMS:
4    Q.   Was it a diagnosis or were you speaking
5    colloquially?
6              THE COURT:  -- a specific question.  It's a
7    specific question requiring a specific answer.
8              MR. WILLIAMS:  Right.
9    A.   Just "Yes" or "No"?
10   BY MR. WILLIAMS:
11   Q.   Well, you can't "Yes" or "No," you can say that
12   (a) it was a diagnosis or (b) I was speaking
13   colloquially.
14   A.   I was speaking colloquially.
15   Q.   Okay.
16        And then you say:
17        "He thinks I'm unconsciously wanting to flunk out
18        because of what happened with the warning letter."
19        When you say "He," are you talking about Professor
20   Roach?
21   A.   Yes.  That's what he said.
22   Q.   Okay.
23        And so would you tell us what exactly you -- to
24   the best of your memory, Professor Roach said to you on
25   that occasion about the warning letter?
```

```
 1   A.    That's what he said.

 2   Q.    Oh.

 3   A.    "I think you're unconsciously wanting to flunk out

 4         because of that warning letter."

 5         He --

 6   Q.    Was Professor Roach the one who had told you that

 7   in sending you the warning letter, they were creating a

 8   paper trail to throw you out?

 9   A.    Yes.

10   Q.    Okay.

11         And then in that e-mail you go on and you say:

12         "I don't think that I want to flunk out.  I just

13         feel like nothing makes sense and that warning

14         letter experience was the most undermining and

15         sick thing."

16         Is that how you were feeling when -- in the months

17   right after you got that warning letter?  This is

18   December 2nd -- it's December 3rd, '02.

19   A.    I felt that way, yes.

20   Q.    Okay.

21         Now, Exhibit 29, which is a full exhibit, is an e-

22   mail that you sent to your friend, Jim Nicholson, on

23   March 4th, 2003, and that was the one, I think Attorney

24   Noonan read a great deal of it, if not all of it, into

25   the record, and I just want to read a couple of opening
```

1   paragraphs and then ask you about it.

2       "Dear Jim: Stenuski was here, which was a charge.

3       He led a special master class for the directors.

4       Steve was in Poland last year and I trained with

5       them in my New York -- in New York a year and a

6       half ago.  He is brilliant and inspiring and

7       whacko in an old school sensadario (phonetic) kind

8       of way, the way I'm used to in the dance world."

9       Who is Stenuski?

10  A.   Stenuski.

11  Q.   Stenuski, right.

12  A.   Well, he has a company called "Gardjanita"

13  (phonetic).

14  Q.   I beg your pardon?

15  A.   He is the director of a company in Poland called

16  "Gardjanita" and they live on practically nothing as a

17  commune and they have an old abandoned church as their

18  stage and rehearsal hall.

19  Q.   And it says here that:

20      "He led a special master class for the directors."

21      Is that including you?

22  A.   Yes.  The directing practicum students, that's all

23  three years --

24  Q.   Okay.

25  A.   -- that (unintelligible).  Oh, and then there was

1    -- I'm sorry.

2         There was something in the directing practicum and

3    then there was something on the stage with all the

4    acting students.

5    Q.   Okay.

6    A.   Yeah.

7    Q.   And Yale brought him over to the United States to

8    teach this master class?

9    A.   I don't know if Yale brought him or if he was here

10   with his company anyway, or how that worked.

11   Q.   But in any event, Yale brought him in to New Haven

12   to --

13   A.   To New Haven.

14   Q.   -- teach this master class; is that right?

15   A.   Yes.

16   Q.   Okay.

17        And were all of the directing students required to

18   attend or simply given the opportunity to attend?

19   A.   I think it was part of our -- It was

20   (unintelligible).

21   Q.   All right.

22        So this is some part of your educational

23   experience first year at Yale drama?

24   A.   It became a little bit of that, yeah.

25   Q.   Okay.

1        And I take it from this that you thought very

2    highly of this person, this faculty person they brought

3    in?

4    A.   He was a guest --

5    Q.   Right.

6    A.   -- teacher.  Yes, I do.

7    Q.   All right.

8        Oh yeah, and this is the one -- with the last

9    paragraph, and again, this is a full exhibit, but in

10   the last paragraph which Mr. Noonan read, it says:

11       "Victoria Nolan is such a male prick.  It ought to

12       be fascinating to me that she is inclined to

13       interpret ignorance as an aggressive assault and

14       then react with ferocious annihilating tactics."

15       Can you tell us what you meant by that?

16   A.   Yeah.  We had a run-in, in the bathroom.

17   Q.   Tell us about that.

18   A.   It was during the Yale Repertory rehearsal phase

19   in the theater, the final phase, when I was assisting

20   James Bundy.  One of the actors in the cast, who was a

21   lot older, was very ill and he was becoming

22   progressively sicker so we were trouble shooting this

23   and trying to get him medical attention, so I had asked

24   James Bundy where he was or how he was doing and he

25   still was really, really sick and there was some talk

about, you know, the doctor that he saw and also James

Bundy made the remark, you know, he wasn't that much

better, and James Bundy said, "Oh, they sent him to a

quack."

        And so shortly after that I went into the bathroom

and ran into Victoria Nolan in the bathroom and she

asked me how that actor was and I said, "I don't know.

He's not really much better evidently they sent him to

a quack," and she like completely went off on me, like

yelling, yelling, "How dare you say that," and it was

quite an experience.  It was -- She was -- It was

indescribable.

            THE COURT:  We'll suspend here.

BY MR. WILLIAMS:

Q.   And all you were doing was quoting Dean Bundy?

A.   I -- At the end of it I said "I didn't make that

up.  This is something James Bundy said," and then that

-- she kind of eased off, and then I got in trouble

with James Bundy when I talked to him about it and I

said I was worried that I offended her and I didn't

know -- and he told me she was in charge of finding the

doctor.

            THE COURT:  We'll suspend here.

        (Recess at 1:00 p.m., until MR. NOONAN:02 p.m.)

                        AFTER RECESS

1              THE COURT:  Couple of questions before we

2      resume.

3              First of all, try to give me an idea how much

4      longer with this witness, Mr. Williams, and then I'll

5      ask Mr. Noonan the same question with respect to

6      recross.

7              MR. WILLIAMS:  I think about another hour,

8      Your Honor, for me.

9              THE COURT:  Okay.

10             Mr. Noonan?

11             MR. NOONAN:  At this point I don't think I

12     have more than 15 minutes or so.

13             THE COURT:  Okay.

14             So I take it then, and I'm not holding you to

15     this, Mr. Williams, but based on what you said

16     yesterday, I take it at that point you would then rest?

17             MR. WILLIAMS:  I -- You know, Mr. Noonan asked

18     me that question too, and the answer is, "I'm not sure

19     yet."

20             THE COURT:  Okay.  Fair enough.

21             I'm trying to get an idea of timing here.

22     Let's assume we finish up with Ms. Greenhouse today and

23     just assume for the moment that Mr. Williams doesn't

24     have any other evidence or doesn't intend to call any

25     further witnesses, that would pretty much take us --

1   then we have to hear argument on the Rule 50 motion, so

2   let's say that takes the day.

3            Then, Mr. Noonan, what do you anticipate

4   tomorrow?

5            MR. NOONAN:  Well, we definitely have a full

6   day tomorrow.  I mean, I --

7            THE COURT:  Okay.

8            MR. NOONAN:  I mean, I think it's gonna take

9   -- I think it will take at least three days to put

10  our --

11           THE COURT:  Three days?

12           MR. NOONAN:  I think so.  You know, we've

13  taken two full days of the plaintiff's case, Your

14  Honor, with a single witness, and I suspect it's gonna

15  take at least three more (unintelligible).

16           THE COURT:  Okay.

17           So that's gonna take us to -- into next week.

18           MR. NOONAN:  I think it's unlikely we're gonna

19  finish this week, including argument and charge.  I

20  mean, I think it's conceivable that we could finish the

21  evidence (unintelligible).

22           THE COURT:  All right.

23           Well, that helps because I was thinking about

24  a charge conference today but I don't think, given what

25  you're telling me, we're not gonna get to that until --

1    we probably may have the charge conference Thursday or

2    Friday.

3              You agree, Mr. Williams?

4              MR. WILLIAMS:  I guess if that's what it's

5    coming to.  I find it all very depressing, but if

6    that's what it is, that's what it is.

7              THE COURT:  How do you think I feel?

8         (Laughter.)

9              THE COURT:  All right.  Okay.

10             I think the jury's gonna be disappointed but I

11   did tell them that it would be a week and hopefully

12   we'd get it done in a week, but the possibility of next

13   week and there may -- I hope we don't have any problems

14   with any members of the jury, but we've got two extras,

15   so we're okay.

16             Ms. Greenhouse, you want to come up, please?

17        (Jury in.)

18             THE COURT:  Okay, you may be seated.

19             Mr. Williams?

20             MR. WILLIAMS:  Thank you, Your Honor.

21   SALLY GREENHOUSE, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

22                  REDIRECT EXAMINATION (CONTINUED)

23   BY MR. WILLIAMS:

24   Q.   Yesterday you were asked a few questions on cross-

25   examination about certain things that came up at the

1    second half of your deposition in this case.

2        Do you remember that you were -- your deposition

3    was taken by Attorney Noonan on two separate days?

4    A.   Yes.

5    Q.   And would it be correct to say that the first of

6    those was in May of 2006 at his office out in Guilford?

7    A.   Yes.

8    Q.   Okay.

9        And then the second one was up in Hartford at the

10   end of August of this --

11   A.   Yes.

12   Q.   -- year, right?  Okay.

13       Now, at that second deposition, and I'm referring

14   to page 163, you were asked some questions about the

15   Rock Out With Your Cock Out incident, and in

16   particular, about whether or how you had been

17   restrained when you attempted to flee the stage after

18   the second run through of that --

19   A.   Yes.

20   Q.   -- masturbation scene.

21       And you were asked whether you had said that he

22   was a certain number of feet away from you or what, and

23   there was a lot of confusion back and forth about that.

24       Do you recall stating that Mr. Noonan asked you

25   the question:

1         "Did he actually touch you or physically restrain

2         you?"

3         Do you remember being asked that question?

4    A.   Yes.

5    Q.   Do you remember what your answer was to that

6    question?

7    A.   I said "No, he didn't jump on top of me and" --

8    Q.   Do you remember saying:

9         "I don't know" --

10        MR. NOONAN:  I'm going to object, Your Honor.

11   He's asked the question and got the answer but

12   evidently he doesn't like it.

13        MR. WILLIAMS:  It's not a question of what I

14   like.  It's a question of what's the truth.  It's in

15   the transcript.

16        MR. NOONAN:  Well, but he asked her what her

17   recollection was.

18        THE COURT:  Right.

19        MR. NOONAN:  He's got her recollection.

20        THE COURT:  Sustained.

21        MR. WILLIAMS:  That's fair.  That's fair, if

22   it's just a question of recollection.

23   BY MR. WILLIAMS:

24   Q.   In fact, is it the case that you said to Mr.

25   Noonan:

1          "I don't know whether his hand -- I don't remember
2          whether his hand actually touched my body or not.
3          It may have lightly," --
4     A.   That's correct.
5     Q.   -- "Yeah, he may have."
6          Do you remember saying that?
7     A.   Yes.
8     Q.   Was that, to the best of your ability, accurate at
9     the time you testified to it --
10    A.   Yes.
11    Q.   -- on August 26th?
12    A.   Yes.
13    Q.   Okay.
14         Incidently, who was that student who stuck out his
15    hands and tried to keep you from leaving the stage?
16              MR. NOONAN:  Objection, Your Honor.  There's
17    no way she could know what he was intending to do and
18    she said she doesn't know whether he touched her or
19    not.
20              MR. WILLIAMS:  Oh.  I'll reword it.  I'll
21    reword it.  I don't want to get into an argument on it.
22              THE COURT:  Sustained.  You can lay a
23    foundation, Mr. Williams.
24    BY MR. WILLIAMS:
25    Q.   Who was the student who held out his hands in the

1    way that you described at the Rock Out With Your Cock
2    Out incident?
3            MR. NOONAN:  Well, she actually said "one
4    hand."  It's a minor point perhaps, but it -- we ought
5    to at least get it accurate.
6            MR. WILLIAMS:  Well, I remembered it being two
7    hands at another point but it doesn't matter.
8            MR. NOONAN:  Just -- What he just read said --
9    BY MR. WILLIAMS:
10   Q.   Regardless of whether it was one hand, two hands
11   or a foot, who was the student?
12   A.   Dave Bardeen.
13   Q.   Dave Bardeen.
14       Is that the same person that Attorney Noonan was
15   telling you was giving Yale a deposition --
16   A.   Yes.
17           MR. NOONAN:  Objection, Your Honor.  I didn't
18   tell her anything.  He didn't give anyone a deposition.
19           THE COURT:  Sustained.  Sustained.
20           MR. WILLIAMS:  All right.
21   BY MR. WILLIAMS:
22   Q.   Was that the same person that Attorney Noonan was
23   questioning you about this morning, on the subject of
24   whether he gave a deposition?
25   A.   Yes.

```
1    Q.   Okay.
2         Did he graduate from the program?
3              MR. NOONAN:   Objection, Your Honor.
4    Objection; relevance.
5              THE COURT:   Sustained.
6    BY MR. WILLIAMS:
7    Q.   Do you know what he's doing now?
8              MR. NOONAN:   Objection, Your Honor.
9              THE COURT:   Sustained.
10   BY MR. WILLIAMS:
11   Q.   Now, at pages 170 and 171 of that August 26th
12   deposition, you were questioned by Attorney Noonan
13   about your reaction after you had left the Cabaret
14   Theater building at Yale, and gone back home to Barnett
15   Street, following the Rock Out With Your Cock Out
16   episode, and I believe you testified that you sat in
17   your kitchen and you --
18              MR. NOONAN:   Well, objection, Your Honor.  I
19   did not go into this on cross-examination.  It would go
20   into an area that you've ruled is inadmissible, mainly
21   the non-economic damages.  So it's --
22              MR. WILLIAMS:   I don't remember --
23              MR. NOONAN:   -- it's beyond the scope and it's
24   irrelevant and, of course, it's leading.
25              THE COURT:   I -- Well, it's -- it certainly is
```

1    leading, so I'll sustain it for that --

2            MR. WILLIAMS:  Yeah.  Well, anyway, that was

3    just preliminary.  It isn't important.

4    BY MR. WILLIAMS:

5    Q.   Do you recall testifying on cross-examination

6    about after you had pulled yourself together in your

7    kitchen that evening, calling Evan Yionoulis?

8    A.   Yes.

9    Q.   Okay.

10        And telling her what had happened at this

11   incident?

12   A.   Yes.

13   Q.   And do you recall testifying on cross-examination

14   that she had attempted to say, and I believe Attorney

15   Noonan quoted you on this subject from 171, that

16   perhaps he was trying to get Jeff to fully commit to

17   his actions?

18   A.   Yes.

19   Q.   Okay.

20        And did, in fact, Professor Yionoulis say that to

21   you in the course of that conversation?

22   A.   Yes.

23   Q.   That by saying "masturbate and really cum" that

24   somehow this was supposed to be getting this male actor

25   to commit to whatever it was that he was supposed to be

1    doing?

2    A.    Yes.

3    Q.    And what was your response to that?

4    A.    I think immediately I said, "But it wasn't an

5    acting class."

6    Q.    And was there significance in the fact that this

7    was a collaboration class and not an acting class?

8            MR. NOONAN:  Objection.  Objection.  That's

9    leading.

10           MR. WILLIAMS:  Oh, fine.  I'll be happy to

11   reword it.

12   BY MR. WILLIAMS:

13   Q.    What, if any, significance was there in the fact

14   that this was a collaboration class and not an acting

15   class?

16   A.    It's -- It was supposed to have a completely

17   different purpose.  It wasn't a class on perfecting

18   acting technique for actors.  It was a workshop for the

19   dramaturs, the directors and the actors to learn an

20   effective process for creating collaboratively, a

21   performance piece based on a section of Homer's

22   Odyssey.

23   Q.    Was the overall purpose of a collaboration class

24   somehow involved in helping to teach you all how to

25   work together as a unit?

1   A.   Yes.

2           MR. NOONAN:   Objection, Your Honor.   It's

3   leading and I object further on the --

4           THE COURT:   It is.   Sustained.   It's leading.

5           MR. WILLIAMS:   Yeah.

6   BY MR. WILLIAMS:

7   Q.   What was the overall purpose of the collaboration

8   class or that (unintelligible)?

9           MR. NOONAN:   Objection, Your Honor.   It would

10  go to Mr. Deal's state of mind, wouldn't it?

11          MR. WILLIAMS:   (Unintelligible.)

12  BY MR. WILLIAMS:

13  Q.   What was your understanding of the overall purpose

14  of the collaboration (unintelligible)?

15  A.   My understanding of it was to create a workshop in

16  which we all were going to learn and practice how we

17  would create a performance piece together in the first

18  semester.

19  Q.   And in this instance, I believe Attorney Noonan

20  elicited from you that this was something that had been

21  put together between the two young men and the

22  professor without telling you about it, correct?

23  A.   Yes.   I didn't know what was happening.

24  Q.   And is two members of the team pulling a surprise

25  prank on another member of the team, is that in any

1    way, as far as you could understand it, does that have

2    anything to do with teaching how to collaborate?

3    A.   No.

4    Q.   Does two young men humiliating an older woman in

5    front of a group of people have anything to do with

6    collaborating, as far as you understand it?

7              MR. NOONAN:  Objection, Your Honor.

8              THE COURT:  Sustained.

9    BY MR. WILLIAMS:

10   Q.   Now, I wanted to ask you a few questions about

11   Defendant's Exhibit T, which the defense introduced

12   this morning, and I will place that exhibit on the

13   table in front of you, and I promise you I will not

14   read through every page but there are a few pages I

15   want to --

16   A.   Okay.

17   Q.   -- talk to you about.

18        Now, included in the Defendant's Exhibit T is a

19   segment headed with the letter "B" and within that is a

20   section called "Time line" that has your signature on

21   the top of the page.

22        Can you find that?

23   A.   Yes.

24   Q.   Okay.

25        And on that -- the first page of that --

1          MR. NOONAN:  Your Honor, I'm gonna object to

2    this on the ground that I did not ask about this time

3    line at all.

4          MR. WILLIAMS:  He introduced the exhibit

5    during his questioning of --

6          MR. NOONAN:  I asked --

7          MR. WILLIAMS:  -- this witness, and I,

8    therefore, have a right to question her about that --

9    some of the contents, at least, about that exhibit.

10         MR. NOONAN:  I asked nothing about the time

11   line.

12         THE COURT:  Well, I don't think -- The fact

13   that you didn't ask, Mr. Noonan, I think the exhibit's

14   in evidence so I think if it's in evidence Mr. Williams

15   has a right to ask questions about a piece of evidence.

16         So I'm going to overrule the objection.

17   BY MR. WILLIAMS:

18   Q.   That -- The first of the pages under the heading

19   "Time line," you have that?

20   A.   Yes.

21   Q.   And in that you describe a September 18th meeting

22   with Ms. Diamond, and you quote her as you say,

23   "yelling repeatedly, 'I'm really pissed off at you for

24   reporting this to me.'"

25   A.   Uh-huh.

1  Q.   Is that, to the best of your memory, an accurate

2  recitation --

3  A.   Yes.

4  Q.   -- of something that happened at that September

5  18th meeting?

6  A.   On the phone she started --

7  Q.   That was on the phone.  Okay.

8       And in that meeting you -- you're purporting to

9  her -- I'm sorry, in that conversation you say here on

10  this page, that you related that you had:

11       "Received a phone call from a female colleague on

12       the faculty of Yale University warning me to "Keep

13       my distance," from a potentially dangerous

14       "psychotic" male directing classmate in my quartet

15       who had demonstrated bizarre and disturbing

16       behavior as an adjunct at Yale previously.  She

17       related that he had been stalking a female

18       student, that he was a Dr. Jekyll/Mr. Hyde

19       personality, that there had been numerous

20       complaints lodged."

21       Did you, in fact, report all of those things to

22  Professor Diamond?

23  A.   Yes, I did.

24  Q.   And that -- Those were things that you had been

25  told by this person who was a member of the faculty of

1  Yale University?

2  A.   That's correct.

3  Q.   And that person was who?

4  A.   Deb Margolin.

5  Q.   Okay.

6       And to your knowledge she is still a member of the

7  Yale faculty; is that correct?

8  A.   Yes.

9  Q.   And on that same page you then say that Professor

10 Diamond said to you:

11      "Okay, Sally, let's just get this out in the open.

12      This fucker's name is Chris Sanderson, isn't it?"

13      Do you remember her making that statement?

14 A.   Yes, I do.

15 Q.   Okay.

16      And you then say, on the same page:

17      "He is a recovering alcoholic so he is going to

18      have issues."

19      Do you remember her making that statement to you?

20 A.   Yes, I do.

21 Q.   And then you say that she called you -- "she," Liz

22 Diamond, called you in her office and chastised you for

23 giving her this information and possibly creating a

24 legal situation by naming a classmate as potentially

25 dangerous that could cause, "A student to be removed

1    from the program."

2            MR. NOONAN:  I'm gonna object, Your Honor.

3    This is all repetitive.  I don't know why we're going

4    into this.  This is exactly what she said on direct

5    examination.

6            MR. WILLIAMS:  It is not exactly what she said

7    and it is in the defendant's exhibit.

8            THE COURT:  Overruled.

9            Go ahead, Mr. Williams.

10   BY MR. WILLIAMS:

11   Q.   Do you remember having that conversation?

12   A.   Yes, I do.

13   Q.   And then you quote her, starting at the bottom of

14   that first page, and continuing on to the top of the

15   next page, as saying to you:

16        "Aw come on, Sally, you're a strong woman.  You

17        can deal with this guy."

18        Did she make that statement to you?

19   A.   Yes.

20   Q.   Now, I'm gonna move on to page 6 of that part of

21   Exhibit T, which starts with a paragraph numbered 6, in

22   which you describe having had a conversation with a

23   third year directing student about your meeting with --

24   meetings and conversations with Liz Diamond; is that

25   right?

1   A.   Yes.

2   Q.   Okay.

3        And you state that the next day, on September

4   28th:

5        "Although I have never availed myself of emergency

6        psychiatric services in my life, I checked into

7        the urgent care division of the Yale Health

8        Services distraught.

9        And then go on to describe and say that you went

10  there because of your surprise at this meeting where

11  they put you on warning.

12  A.   That's correct.

13  Q.   Okay.

14       And then you go on and say that -- describing your

15  conversation with that Yale University psychiatrist:

16       "I tell her I am terrified that I would not know

17       when I had done or said something that would get

18       me dismissed since the letter they have handed me

19       contained nothing specific in it, merely that I

20       was on warning, which is the first phase of

21       dismissal."

22       Do you remember making that statement?

23  A.   Yes.

24  Q.   And did the doctor, as you say here, tell you that

25  you -- that there was a possibility that you are

1    exhibiting symptoms of PTSD and gave you a prescription

2    for a tranquilizer?

3    A.   Yes.

4    Q.   Okay.

5         Now, I'm going to move on several pages to, I

6    believe it's page 13.

7         Have you found that?  It's page 13 of the time

8    line section of this exhibit.

9    A.   Oh.

10            MR. NOONAN:  Do you have a paragraph number,

11   John?  Mine don't have page numbers on it.

12            MR. WILLIAMS:  There's a -- Yes, paragraph 17,

13   April.

14            MR. NOONAN:  Thanks.

15   A.   (Continuing.)  Yes.

16   BY MR. WILLIAMS:

17   Q.   See that?

18   A.   Yes.

19   Q.   And this is what you say in that part of this

20   exhibit:

21        "April.  In a private communication, Chris

22        Sanderson tells me that he has been placed on

23        warning for 'scaring' Professor Joe Roach.  He

24        tells me that this was a result of 'one' of his

25        'psychotic breaks' and that he is on his way to

         the Yale Health Services to obtain 'anti-psychotic
         medication.'"
         And then you, in parenthesis, in handwriting you
had written:
         "(CS is the classmate about whom I had been
         warned.)"
         Was Christopher Sanderson the person that
Professor Margolin had warned you about?
A.   Yes.
Q.   And that, of course, confirmed what Ms. Diamond
said to you in that conversation where she said Chris
Sanderson is the one you're talking about?
A.   Yes.
Q.   Did -- When he told you that he had been placed on
warning for scaring Professor Roach, --
A.   Yes.
Q.   -- did Mr. Sanderson tell you what it was that he
had done to scare Professor Roach?
A.   Yes.
         MR. NOONAN:  Objection, Your Honor.  That
would be hearsay.  That would clearly be hearsay.
         THE COURT:  Well, she can answer the question
"Yes" or "No."  She --
         MR. NOONAN:  Oh.  If it's limited to "Yes" or
"No."

1          THE COURT:  But the question was -- was, as I
2    understand it, did he tell you, so that question can be
3    answered "Yes" or "No."
4          MR. WILLIAMS:  Okay.
5          THE COURT:  Did you answer the questions?
6          THE WITNESS:  Yes.
7    BY MR. WILLIAMS:
8    Q.   He did tell you?
9    A.   Yes.
10   Q.   Okay.
11        Now, I'm gonna move quite a distance in this
12   thing.  You come to a section headed "D."  It's, I
13   would guess, maybe two-thirds of the way through.  It's
14   --
15   A.   I have it.
16   Q.   Okay.
17        Well, they call it -- It's a review of written
18   materials and testimony presented by the parties?
19   A.   Yes.
20   Q.   Okay.
21        And if you go through that, let's see, maybe about
22   six pages, you come to a section that's called "Faculty
23   interview responses," and the first is headed, "James
24   Bundy"?
25   A.   Yes.

1    Q.   Okay.

2         And in that section, it is stated in the second

3    paragraph that Dean Bundy said that he consulted with a

4    lawyer before issuing you the warning letter?

5    A.   That's what --

6    Q.   Do you see that?

7    A.   -- it says.

8    Q.   You've never read this part of this before, have

9    you?

10   A.   No.

11   Q.   Okay.

12        Did he ever tell you that he had checked with a

13   lawyer about issuing you the warning letter?

14   A.   So early?

15   Q.   He never told you that, did he?

16   A.   No.

17   Q.   And under the heading on that same page, "Frank

18   Deal class," he states that he had asked the chair of

19   the acting department whether Rock Out With Your Cock

20   Out was acceptable.

21        Who was the chair of the acting department at that

22   time?

23   A.   Evan Yionoulis.

24   Q.   All right.

25        Was the class in which Rock Out With Your Cock Out

1  was done, an acting class?

2  A.   No.

3  Q.   And so -- Evan Yionoulis is a female, correct?

4  A.   Yes.

5  Q.   Because what it says here in referring to the

6  Frank Deal class, is that the chair of the acting

7  department was asked to evaluate, et cetera:

8       "He determined that such activity was acceptable."

9       Do you understand that to mean that Mr. Bundy

10  determined that it was acceptable?

11  A.   I -- No idea.

12            MR. NOONAN:   Objection, Your Honor.

13  BY MR. WILLIAMS:

14  Q.   All right.  You wouldn't know.  I'll withdraw the

15  question.  You're right.

16       He says that -- or this quotes Dean Bundy as

17  saying that:

18       "Such activity was acceptable because it was a

19       class where students were asked to reveal

20       themselves in a direct and immediate fashion."

21       Was that, in fact, a class where students were

22  asked to reveal themselves?

23            MR. NOONAN:   Objection, Your Honor.  I don't

24  know how she could -- she's --

25            MR. WILLIAMS:   She was in the class.

1          MR. NOONAN:  -- again is being asked to look

2     into the minds of the professors who are teaching --

3          MR. WILLIAMS:  She knows what she was asked.

4          MR. NOONAN:  -- the class.

5          THE COURT:  Well, I'll sustain the Objection.

6     Maybe you can lay a little better foundation, Mr.

7     Williams.

8          MR. WILLIAMS:  Okay.

9     BY MR. WILLIAMS:

10    Q.   Were you and your fellow students in that

11    collaboration class, Drama 50, told that you were

12    expected to reveal yourselves in a direct and immediate

13    fashion?

14    A.   Not that I recall, no.

15    Q.   In your experience at the Yale drama school, was

16    revealing yourself something that took place in a

17    collaboration class?

18    A.   I -- It doesn't make sense.  No.

19    Q.   Now, if you turn to the next page under the

20    heading of "Diamond," there's a section at the very

21    bottom headed "Sanders."

22         And in it, Professor Diamond is quoted as saying

23    of Chris Sanderson:

24         "He had been a risk and had personality issues,

25         but was doing well as a director."

1      Did Professor Diamond ever tell you that she

2 considered Sanderson to be a risk?

3 A.   No.

4 Q.   Now if you'll turn to the last section of this

5 exhibit, Defense Exhibit T, and that is the section

6 headed, "F."

7      Very end.

8 A.   Okay.

9 Q.   And following the page that has the letter "F" on

10 it, is a document dated June 30th, 2003.

11      Do you have that there?

12 A.   I'm sorry, I'm in shock.

13 Q.   You're reading something else.  You're --

14 A.   Yes.  Yes.

15 Q.   -- not listening to me.

16      You've never actually had a chance --

17 A.   No.

18 Q.   -- to sit down and read this --

19 A.   No, that --

20 Q.   All right.

21      Well, anyway, I don't want to put you through that

22 but if you would just turn to the end of it.  You found

23 Section F?

24 A.   Yes.

25 Q.   And you found the letter dated June 30th, 2003 in

1    Defense Exhibit T?

2    A.    Yes.

3              MR. WILLIAMS:  I'd like to publish that to the

4    jury, Your Honor.

5              This is a letter, Yale University, Yale School

6    of Drama, June 30th, 2003:

7              "To Whom It May Concern:

8              As current students in the theater management

9              program at the Yale School of Drama, we have

10             developed relationships, professional and

11             personal, with members of each academic

12             discipline.  One individual with whom we

13             collaborated extensively, was directing

14             student Sally Greenhouse.  Having had the

15             opportunity to work with Sally this year, we

16             have been witnesses to her creative insight

17             and vision, superior leadership and command of

18             language.  Our assignment in which we were

19             partnered with Sally encompassed the entirety

20             of the spring semester of the 2002-2003

21             academic year.  We were tasked with creating

22             and establishing a six-show season for a

23             fictional, regional LORTD theater.  Sally very

24             naturally assumed a leadership role,

25             exhibiting not only her managerial skills, but

her artistic style.  The planning process for
our theater was always group-driven, and Sally
was unfailingly open to discussion and debate
of her ideas and those of the rest of the
group.  Sally's adeptness at synthesizing our
diverse goals into a unified focus was most
clearly manifested during the final
presentation of our project in which she
articulated the nuances of her creative
aspirations and the realities of the budgetary
restraints that were assigned.  She embraced
the educational experience with zeal and
recognized the value of the assignment to her
professional and personal growth.  Sally's
aptitude in the areas of communication and
persuasion, was not only an enormous asset to
our group, but has also been recognized by
Sherman Alexi and his manager, who are eager
to realize the fictional production that Sally
included in our season.  We are grateful to
have had the opportunity to collaborate with
Sally in an academic setting and look forward
to the day when we may extend this
collaboration into the professional world.
We are available to speak further on Sally's

1          behalf.  Please do not hesitate to contact us.

2          Sincerely,

3          Justin D. Hazrit and Karen Lyman."

4          Now, following that letter, also in Section F

5   of Defendant's Exhibit T, do you see a letter dated

6   June 23rd, 2003?

7   A.   Yes.

8   Q.   And that letter is addressed to "Provost Allison

9   Richard."

10         Is that correct?

11  A.   Yes.

12  Q.   And at that time, Allison Richard was the Provost

13  of Yale University; is that correct?

14  A.   Yes.

15  Q.   Which is pretty much second in command to the

16  president, correct?

17  A.   Yes.

18  Q.   All right.

19         And I'll publish that to the jury.

20         This is from Kristin Falkowski, 120 Dwight Street,

21  New Haven, Connecticut.

22         "Dear Provost Richards:

23         Over the course of the past academic year, I had

24         the opportunity to work with Sally Greenhouse on

25         one Yale School of Drama production.  After my

1    experiences with her on that production, I was

2    disappointed to hear about Sally's dismissal from

3    the program.  It is my understanding that this

4    letter is a part of a larger packet which outlines

5    Sally's full experience here in the drama school,

6    and I hope that the opinions here assist you in

7    making a final decision regarding Sally's

8    dismissal from the School of Drama's directing

9    program.

10   This past year was my first year at Yale, as well.

11   I am enrolled in a technical design and production

12   department where this year I served primarily as

13   the assistant production manager for the Yale

14   Repertory Theater and School of Drama.  My duties

15   as such were to oversee the technical elements of

16   five student-run shows and assist our production

17   supervisor on two Yale Rep shows.

18   I arrived at Yale with five years of professional

19   theater experience, filling diverse technical

20   roles, including technical director, lighting

21   designer, general technician and production

22   manager.

23   Against the Wall was the show Sally and I worked

24   on.  It was one of series of seven or eight

25   collaborative workshop projects (CWPs) that is

1      produced each year.

2      CWPs are projects that allow a first year

3      director, playwright and stage manager to work

4      with a full cast and a production manager to

5      produce a small-scale production of the

6      playwright's work."

7      For a production manager -- I'm sorry.

8      "For this production, I was the production manager

9      and my duties were to help the team decide on a

10     simple set, lighting scheme, basic props and

11     costumes, and then to realize those within our

12     budget of $50.  This is typically accomplished for

13     CWPs through discussing technical possibilities

14     with the director, and then with the full team, in

15     three or four meetings in the three weeks prior to

16     the load in of the show.  The technical elements

17     are then installed during load in.  The show is

18     rehearsed with those elements for two rehearsals,

19     tech rehearsals or tech, and the show is then

20     performed for an audience.

21     Sally approached me early, about four weeks prior

22     to loading with a variety of ideas for the scenery

23     of Against the Wall.  She was aware of the

24     difficulties that the play presented to our budget

25     and was anxious to ensure the success of the

1       production.

2       Sally was, from the start, positive, creative and

3       responsive.  She worked within the monetary

4       constraints with a maturity and patience that I

5       hope to find in all students.

6       Instead of attempting to skirt the rules laid out

7       for these productions, Sally was thoughtful and

8       creative in her own ideas and in reviewing the

9       ideas that I brought to her.  During the first

10      full team meeting I presented the ideas for the

11      set, props and lighting to the team.  The concepts

12      were discussed anc certain concepts were agreed

13      upon.  At that point, roughly three weeks before

14      the load in, everyone seemed to understand what

15      the concepts were and actively agreed that they

16      suited the production.

17      About one week before load in, it became clear

18      that the playwright did not approve of the

19      concepts for the technical elements of the show.

20      In the time between the previously mentioned

21      meeting and this point, there had been no changes

22      to the technical elements.  It is unclear to me

23      how this information was given to Sally, via the

24      playwright herself or through the playwrighting

25      advisor, as by this time in the production process

1        there were clearly divisive personality conflicts

2        between the director and the playwright.  Despite

3        these open conflicts, I still found Sally's

4        communication with me to be clear and direct.  I

5        still found her to be open to ideas, willing to

6        collaborate and to work within our confines.

7        In my opinion, when the playwright's objections

8        became clear, Sally worked very hard to

9        accommodate the wishes of the playwright, almost

10       allowing the playwright to take over the design,

11       conceptualization of the production.  As a result,

12       almost all of the technical elements changed.

13       Most were, in the end, extremely simple because of

14       the lack of preparation time we were left with.

15       As we moved into tech, I feared the usual battle

16       against time, last minutes requests for additional

17       technical elements, and the first year learning

18       curve of learning a specific lighting system in

19       our theater.  Sally worked her way through two

20       nights of tech, eight hours.  I was wonderfully

21       surprised.  Sally used her time efficiently,

22       recognizing within the play that -- what needed to

23       be worked on during the rehearsal and what could

24       be addressed in a work note to the actors or

25       technical staff.  Sally took a strong stance that

the elements we had going into tech were what we
had to work with, and did not request changes or
additions.  Sally ran her tech in a smooth,
professional and pleasant manner.  Despite
tensions that ran high, Sally's dealing with the
tech staff and myself during the rehearsals were
concise and appropriate.  I remember thinking that
I wished all of our techs could run so smoothly.
My frustrations at this point came from my
perception that the playwright would egg Sally
into fits of anger.  I had little opportunity to
discuss the play and its progress or process with
the playwright outside of our formal meetings.
However, it was always my impression in those
meetings that the playwright agreed with the
technical direction the show was going, and the
decisions that had been made regarding the set,
props and lighting.
When asked directly for her opinions, she would
make statements of support for the proposed ideas,
sometimes asking for drawings or adding details
herself.  It was a disappointment to learn that
the playwright did not express her true feelings
regarding these issues within the team, despite
the specifically structured opportunities for

1          contributions, questions and feedback on the

2          concepts provided during our meetings, and rather,

3          took her concerns first to the faculty, and then

4          to us.  It was my impression that the playwright

5          had only been involved in a limited number of

6          productions previous to her enrollment here, and

7          that her lack of experience juxtaposed to Sally's

8          wide-ranging experience provided the seed of what

9          became explosive tensions during this production.

10         Well, I can only speak relevantly on how Sally

11         handled the technical process for this production.

12         I would like to stress that Sally managed the

13         technical aspects, their planning and proposed

14         implementation with creativity, clear

15         communication, maturity and professionalism.  She

16         ran a smooth and efficient tech rehearsal, again,

17         behaving towards the technical staff in a

18         professional, organized and fitting manner.

19         It seems apparent to me that Sally acknowledges

20         that her place is not in the Yale School of

21         Drama's directing program.  Despite that, I feel

22         strongly with the decision to leave should be

23         granted to Sally herself.

24         Should you have questions regarding the material

25         presented here or have further questions for me,

```
 1        please feel free to contact me at my Yale e-mail
 2        account.  Thank you for your time and efforts in
 3        this matter.
 4        Kristin Falkowski."
 5             MR. WILLIAMS:  I have no further questions.
 6             THE COURT:    Mr. Noonan?
 7                      RECROSS-EXAMINATION
 8   BY MR. NOONAN:
 9   Q.   Good afternoon again, Ms. Greenhouse.
10   A.   Hello.
11   Q.   As I have in the past, I'll ask you to answer
12   questions with a simple, "Yes, No, I don't know, I
13   can't answer the question."
14        Is that okay?
15   A.   Yes.
16   Q.   Okay.
17        Did -- I want to pick up right where Mr. Williams
18   left off, the very last paragraph of that letter from
19   the -- I think her name was Kristin Falkowski, and she
20   was in the -- she was in your class, I take it, right?
21   A.   No.
22   Q.   Oh.  I thought you said it was her first year.
23   A.   Oh, well, she was in the technical --
24   Q.   Was she in the graduate program?
25   A.   Yes.
```

1    Q.   Okay.

2         So she was in your class in the drama school?

3    A.   Oh, yes.

4    Q.   All right.

5         But she was not a director?

6    A.   No.

7    Q.   And she was not an actor?

8    A.   No.

9    Q.   She was not a playwright?

10   A.   No.

11   Q.   She was in the technical design and production

12   department, --

13   A.   Yes.

14   Q.   -- correct?

15        So they deal with moving things around, props,

16   stages, things like that?  Lighting?

17   A.   Yes.

18   Q.   Okay.

19        And she says now, in that very last paragraph:

20        "It seems apparent to me that Sally acknowledges

21        that her place is not in the Yale School of

22        Drama's directing program."

23        She goes on to say:

24        "Despite that, I feel strongly that the decision

25        to leave should be granted to Sally herself."

1        And, of course, that was -- that opportunity was

2   given to you, correct?

3   A.   No.

4   Q.   Well, wasn't it the case that the school said you

5   could withdraw if you want to and, in fact, gave you an

6   extra week to make that decision?  Don't you recall

7   that from earlier today?

8   A.   The --

9   Q.   Is that --

10  A.   -- decision to leave --

11  Q.   Is that correct that --

12  A.   I didn't make the decision.

13  Q.   Is it correct that you were allowed to withdraw if

14  you chose to?

15  A.   Yes.

16  Q.   All right.

17       And it's also correct; is it not, that you were

18  given an extra week beyond the usual time limit, to

19  make that decision?

20  A.   Oh, yes.

21  Q.   All right.

22       And do you agree that you had fits of anger that

23  Ms. Falkowski refers to?  That something that happened?

24  A.   At the end.

25  Q.   Is that a "Yes" or a "No"?

1    A.   I don't know what she's referring to, but yes, at
2    the end, I think.
3    Q.   Okay.  Well, she said that you had fits of anger.
4         Do you agree with her assessment in that regard?
5    A.   No.  She said she provoked me.
6    Q.   I understand, but she also said you had fits of
7    anger, and that was true, wasn't it?
8    A.   I have -- You have to ask her.  I have no idea.
9    Q.   Okay.  You don't know one way or the other, all
10   right.
11        Now, one of things that you were asked was -- or
12   at least you expressed surprise at was that Dean Bundy
13   had sought legal counsel after you had made a complaint
14   abut the Drama 50 acting class.
15        You recall that?  I'm not referring to a
16   particular page.  I'm just asking you if you remember
17   just testifying about that a few moments ago?
18   A.   Okay.
19        Could you repeat the question, please?
20   Q.   Sure.
21        Do you remember just a few moments ago expressing
22   surprise that Dean Bundy would seek out legal counsel?
23   A.   Oh, yes.  I didn't know that.
24   Q.   All right.
25        And it might be easier, instead of getting you to

1   flip to a page, I can show you my copy.

2        It's about halfway through Exhibit T, it says:

3        "On September 21 Ms. Greenhouse reported an

4        incident from her Drama 50 acting class to

5        Professor (unintelligible)."

6   A.   It's (unintelligible).

7   Q.   "In her grievance she said that this incident

8        represented a potential Title 9 violation."

9   A.   Oh.

10  Q.   Do you see that?

11       I'm just asking you whether I read it correctly.

12  A.   You've read it correctly.

13  Q.   All right.

14       And you wouldn't find it surprising, would you,

15  that the dean of the school might consult the

16  university's lawyers if a student were making a claim

17  of a Title 9 violation within three weeks of getting to

18  school?

19  A.   I guess not.

20  Q.   All right.

21       Now, let me jump back a little bit to a few of the

22  things Mr. Williams asked you about.

23       He asked you about Exhibit H, which was the one

24  that started out referencing your gum chewing.

25       Do you recall that?

1    A.   Yes.

2    Q.   And it goes on later on in that same exhibit, you

3    mention your feeling about all the wild mistakes that

4    you were making and just wishing you had more time to

5    confer with Dean Bundy to help you, but with regard to

6    the gum chewing, do you remember when I asked you on

7    cross-examination whether that referred to you chewing

8    gum and you said "No"?

9    A.   I don't believe I said "No."

10   Q.   You don't recall that?  Do you remember actually

11   in your cross-examination you said it referred to Dean

12   Bundy's gum chewing?  Do you recall saying that to me

13   in this courtroom?

14   A.   I recall saying he did chew gum.

15   Q.   Okay.

16        Do you recall me asking you whether it wasn't the

17   case that when you said, "I am terribly sorry about the

18   gum chewing," you were talking about your gum chewing

19   and then you, in fact, denied that and said it was his

20   gum chewing that you were referring to in this e-mail?

21   Do you recall that at all?

22   A.   No, I don't recall denying that I chewed the gum.

23   Q.   Fair enough.

24        But in any event, on redirect examination here

25   with your lawyer, at least, you do agree that it

1    related to you chewing gum in a way that evidently

2    disturbed Dean Bundy, correct?

3    A.   Yes.

4    Q.   All right.

5         Now, with regard to Exhibit K, which is an e-mail

6    to you from Dean Bundy about his willingness to send a

7    letter of recommendation to Williamstown for you, you

8    don't claim that was an act of discrimination or

9    retaliation when he tried to help you get a position at

10   the Williamstown Theater, do you?

11   A.   No.

12   Q.   Okay.

13        And in that e-mail, do you recall Dean Bundy

14   saying this:

15        "I believe you can contribute as an assistant at

16        Williamstown this summer.  More importantly, I

17        believe there is much you have to learn there."

18        Do you recall that from the exhibit?

19   A.   Yes.

20   Q.   All right.

21        And do you recall him also saying:

22        "And continuing in the second and third year of

23        the school of drama is considerably more rigorous

24        and meaningful a responsibility, than serving as

25        an assistant director for a summer at

1          Williamstown."

2          Do you recall that?

3     A.   Yes.

4     Q.   Now, with regard to Jim Nicholson, whom you've

5     talked about quite a bit, you said that he's one of

6     your closest friends, correct?

7     A.   Yes.

8     Q.   And you said that in your e-mails, what you were

9     intending to do was to share your innermost thoughts

10    with him, correct?

11    A.   Yes.

12    Q.   And I take it that when you were writing these

13    innermost thoughts, which you said were similar to a

14    diary, you were intending them to be truthful; were you

15    not?

16    A.   I don't know if I had a particular intention.  I

17    was just writing to him my sentiments and thoughts.

18    Q.   You were writing your sentiments, your innermost

19    thoughts?  Your honest, innermost thoughts, right?

20    A.   I guess.

21    Q.   All right.

22         So when you wrote that Evan Yionoulis was a

23    "defensive, power crazed, domineering bitch," that's

24    what you felt, right?

25    A.   I'm sure.

1    Q.   And when you wrote that Victoria Nelson
2    (phonetic), the Deputy Dean, is a male prick and
3    referred to her as the managing director, bull dyke,
4    hetero-power abusive person, that's the way you were
5    feeling about her, right?
6    A.   I'm sure.
7    Q.   All right.
8         And so all of these people that you were writing
9    these vile things about to your -- the person you used
10   as your --
11        MR. WILLIAMS:  I'm gonna object to the
12   comment, Your Honor.  It's not for Mr. Noonan to say
13   whether they were "vile."  That's inappropriate.
14        MR. NOONAN:  Fair enough.  I'll ask the
15   question.
16   BY MR. NOONAN:
17   Q.   Did you think it was vile to refer to the deputy
18   dean as the "male prick and a managing director bull
19   dyke" --
20        MR. WILLIAMS:  Objection.
21   Q.   (Continuing.) -- "hetero-power abusive person"?
22        MR. WILLIAMS:  It's irrelevant.
23        MR. NOONAN:  I don't think it's --
24        THE COURT:  Well, it's her words.  Overruled.
25        MR. WILLIAMS:  I understand that.

1          THE COURT:  Overruled.  She can answer.

2     A.   What is the question?

3     BY MR. NOONAN:

4     Q.   Do you agree that it was vile for you to be using

5     this kind of language about the professors and the

6     students with whom you were supposed to be

7     collaborating?

8     A.   I can't answer your question.

9     Q.   All right.

10    A.   I don't know how to answer that particular

11    question.

12    Q.   And when you wrote to Mr. Nicholson about your

13    innermost thoughts, that you had developed a bad

14    attitude and you don't think you were really cut out to

15    be an assistant director, that represented your honest

16    thoughts at that time, correct?

17    A.   Those were abbreviated, correct.

18    Q.   Now, you mentioned Mark Lamos and it was

19    referenced that he was the -- one of the guest

20    lecturers and you asked him if he might be interested

21    in working with you and you actually gave him your

22    address and telephone number; is that right?

23    A.   No, he gave me his.

24    Q.   Okay.

25         And did he ever hire you?

1  A.   I didn't pursue it after I was dismissed.

2  Q.   Okay.

3       Now, with regard to Exhibit 27, which you --

4            MR. NOONAN:  Are laid up here now?

5            MR. WILLIAMS:  They're all there.

6            MR. NOONAN:  Since there was testimony on it

7  I'd like to mark it as a full exhibit, Your Honor.

8  It's marked for identification at this point.

9            MR. WILLIAMS:  Could I just see it for a

10 second --

11           MR. NOONAN:  Oh, sure.

12           MR. WILLIAMS:  Well, Your Honor, this is the

13 one where I raised the 412 exhibit -- objection

14 yesterday, and I'll just adhere to that.

15           THE COURT:  All right.  Overruled.  Full

16 exhibit.

17           That's what exhibit number again, 27?

18           MR. NOONAN:  Twenty-seven, Your Honor.

19           THE COURT:  Just give it to Rody.

20     (Pause.)

21 BY MR. NOONAN:

22 Q.   Now that's the exhibit where you write to Mr.

23 Nicholson and you say that you've --

24      "Evan has put the boys back where they belong.

25      She is not insisting on the insipid Brie girl for

1            the female lead.  I think I've managed to

2            intimidate her effectively and articulately."

3            That sentence refers to you intimidating Evan

4    Yionoulis, correct?

5    A.   Yes.

6    Q.   All right.

7            And the next sentence says:

8            "Thank you for your assistance in troubleshooting

9            this particular power fuck."

10           In that sentence you're thanking Mr. Nicholson for

11   advice he gave you in helping you to effectively and

12   articulate -- effectively and articulately intimidate

13   one of your professors, correct?

14   A.   Yes.

15   Q.   You recall yesterday when I asked about some of

16   these things that you put in your e-mails to your

17   friend, Mr. Nicholson and Mr. Stevens, that you said

18   that they didn't really represent your thinking, it was

19   just spur of the moment?  Do you recall that?

20   A.   I don't know if I used the word, "Spur of the

21   moment" --

22   Q.   Words to that --

23   A.   -- sentiments.

24   Q.   Words to that effect though, correct?  But --

25   A.   Feelings at the time, yes.

1    Q.   But today, in response to your lawyer's questions

2    what you told us is that when you wrote these things

3    they were appropriate because you were justified in

4    suggesting that Mark Bligh, one of the professors,

5    should fuck himself because he isn't a writer anyway,

6    and it was justified because you disagreed with the way

7    he was carrying on his instruction of the -- one of the

8    playwrighting students, correct?

9    A.   Is that a --

10              MR. WILLIAMS:  Objection, Your Honor.  Is that

11   a -- The word "justification" was never used in my

12   cross -- redirect examination, and the subject wasn't

13   about justification, it was about her state of mind and

14   her intention when she had those thoughts and

15   articulated them.

16              MR. NOONAN:  This is cross-examination, Your

17   Honor, but I'll repeat the question for you.

18              MR. WILLIAMS:  It is cross-examination, we all

19   agree with that.

20              THE COURT:  Are you repeating or reframing the

21   question?

22              MR. NOONAN:  I can rephrase it now that it's

23   been so long and I'm sure the witness has forgotten it.

24   BY MR. NOONAN:

25   Q.   You recall earlier today, just a few moments ago

1    when Mr. Williams was asking you questions, that you,

2    in fact, said it was appropriate for you to comment

3    that Mark Bligh should fuck himself --

4    A.   I don't believe I used the word "appropriate."

5    Q.   You didn't try to suggest to us that it was

6    appropriate for you to tell Mark Bligh to fuck himself

7    because he -- you disagreed with the way he was

8    teaching a student?

9            MR. WILLIAMS:  Objection, Your Honor.  That's

10   misleading.  It's not the same as -- He first said,

11   "Did you say it was appropriate?"  She said "No" and

12   now he's on shock when she says something different and

13   he puts a different spin on it.  He's trying to trick

14   the witness.

15           THE COURT:  It's cross-examination.

16           MR. NOONAN:  I'm not trying to trick anyone

17   and I don't think I could trick this witness.

18           THE COURT:  It's cross-examination, Mr.

19   Williams.

20           MR. WILLIAMS:  Okay.

21           THE COURT:  Overruled.

22           Go ahead.

23   BY MR. NOONAN:

24   Q.   Didn't you try, in response to Attorney Williams'

25   questions, to convince this jury that it was perfectly

1    appropriate for you to tell one of the professors to

2    fuck himself because you disagreed with the way he was

3    handling the playwrighting class?

4    A.   No, I don't think I did.

5    Q.   Okay.

6         But you did think it was appropriate for you to

7    write in this e-mail, that Mark Bligh ought to fuck

8    himself, right?

9    A.   I believe in the First Amendment.

10   Q.   Okay.

11        And you thought that because you disagreed with

12   the way he was handling his class, right?

13   A.   No, it wasn't his class.  This was --

14   Q.   Oh, this was a theater exercise, correct?

15   A.   No.

16   Q.   All right.

17        You tell us what -- What was the exercise with the

18   person that you called the something Canadian?

19        Isn't this the one where you were -- made a

20   reference to a "Canadian"?

21   A.   (No response.)

22   Q.   You don't recall that?

23   A.   Yes.

24   Q.   So what you said was:

25        "The psychologically complex one from Canada."

1    A.   Yes.

2    Q.   All right.

3         And I may be incorrect, but I thought I heard you

4    say to Attorney Williams, and you correct me if I'm

5    wrong, that you thought it was okay to say that Mark

6    Bligh ought to fuck himself because you disagreed with

7    the way he was handling one of the playwrights.

8         Is that what you said just a short while ago?  Is

9    that what you're trying to convey?

10        MR. WILLIAMS:   Which is it?   That's two

11   different questions.

12        THE COURT:   Well, did she say it was the --

13   A.   What's the question?

14   BY MR. NOONAN:

15   Q.   Well, that's all right.   I'll move on.

16        Let me ask you this.

17        If the drama school faculty felt you had not met

18   the criteria needed to advance the -- to the second

19   year, would you agree it would be justifiable for them

20   not to invite you back?

21   A.   If I'd agree?   If the entire drama school faculty

22   agreed --

23   Q.   Uh-huh.

24   A.   -- not to invite me back?   It would depend.

25   Q.   Okay.

1      So if the entire -- that would be like a unanimous
2  vote.  If there was a unanimous vote of the faculty
3  that they didn't think you should be invited back, you
4  could accept that?
5  A.   I'm obviously not accepting it.
6  Q.   Okay.
7      Because you do know it was a unanimous vote of the
8  faculty, correct?
9  A.   Yes, I do.
10 Q.   All right.
11     Now, let me ask you, do you still have Exhibit T
12 in front of you?
13 A.   Yes.
14 Q.   I want to just read a portion, starting at page 5.
15 That's the fifth page of the exhibit, although it says
16 page "4" at the top.  Starting at the very bottom.  It
17 starts off with:
18     "The committee concludes"?
19     Maybe I should -- If you just count in five pages,
20 you'll see --
21 A.   Oh, their finding.  Yes.
22 Q.   Just -- I don't want -- Just let me know when you
23 get to the page that has, as the very -- The second to
24 last line starts off with, "The committee concludes."
25 A.   Page 5?

1    Q.    Right.

2          "The committee concludes from this series of

3          incidents that Greenhouse was frequently more

4          prepared to talk at a meeting than to listen and

5          was more prepared to accept and act on positive

6          comments than on negative ones, and for some

7          reason was unable to understand that some aspects

8          of what she was doing could be good and deserving

9          of praise, while at the same time other aspects

10         needed major reworking.

11         Greenhouse was getting positive feedback and

12         encouragement, but did not seem to be listening or

13         absorbing the negative comments she was also

14         getting.  Consequently, it may have been difficult

15         for her to be able to respond to the criticisms

16         and her failure to do so was viewed by the faculty

17         as her inability to make progress in her approach

18         to directing.

19         The withdrawal/dismissal decision, taken by a

20         meeting of the full faculty of the School of

21         Drama, was not based in any way on Greenhouse's

22         class work or her classroom participation which

23         were viewed as strong and quite acceptable, but

24         was rather based on what the faculty saw as a

25         failure in her directing projects.  Most

1      particularly, her first year CWP project, which is

2      seen as the single most important project in the

3      first year for determining a student's ability to

4      successfully complete the program.

5      The faculty members we interviewed all indicated

6      that she had clear problems with collaboration and

7      communication, and that her rehearsals were

8      unacceptable.

9      They indicated that her dismissal had nothing to

10      do with the earlier warning but was entirely based

11      on the fact that she simply couldn't direct and

12      hadn't shown improvement during the course of the

13      year.  Her failure in this area was viewed as

14      arising from her apparent inability to communicate

15      effectively with her colleagues (actors,

16      playwrights, dramaturs) and to find the crucial

17      balance between leadership and collaboration.

18      This was laid out in detail by Diamond at the May

19      15th meeting with Greenhouse and Chambers.  The

20      committee did not find any evidence that

21      Greenhouse was evaluated unfairly or in a

22      discriminatory manner."

23           You do not think that that six-member

24  committee composed of four women and two men was

25  discriminating against you when they reached that

conclusion, do you?
A. Maybe just in favor of Yale.
Q. The question I asked you, ma'am, is do -- and this could be answered "Yes" or "No."
Do you believe that that committee of six, composed of four women and two men was discriminating or retaliating against you when they reached the conclusion that they did?
A. I think in a way they were discriminatory.
Q. Okay.
Because you're a woman?
A. Not necessarily, no.
Q. Okay.
MR. NOONAN: I don't have any other questions. Thanks very much.
THE COURT: Mr. Williams?
MR. WILLIAMS: Thank you, Your Honor.

FURTHER REDIRECT EXAMINATION

BY MR. WILLIAMS:
Q. So Attorney Noonan didn't ask the obvious next question, which is --
MR. NOONAN: Your Honor, Your honor, I object.
MR. WILLIAMS: I'm asking a question.
THE COURT: Well, --
MR. WILLIAMS: -- because of a -- and I'm

1    referencing his last --

2              THE COURT:  Just whoa.  Whoa.  Whoa.

3              Just ask the question, Mr. Williams.

4              MR. WILLIAMS:  Right.

5              THE COURT:  No editorials.

6              MR. WILLIAMS:  Right.

7    BY MR. WILLIAMS:

8    Q.  So if it wasn't that then, it was because of what?

9              MR. NOONAN:  Objection, Your Honor.

10             THE COURT:  Well, I -- I'll sustain the

11   objection as to the form of the question.  I mean, ask

12   her a direct question.

13             MR. WILLIAMS:  Right.  I'll try to word it the

14   same way Attorney Noonan worded his question so that I

15   can make it appropriate as re-redirect examination.

16   BY MR. WILLIAMS:

17   Q.  Is it your belief that the committee, in reaching

18   the conclusion he just read, that there was nothing

19   wrong with what Yale had done to you, if it is your

20   opinion that that was not necessarily because of

21   discrimination on the basis of sex, is it your opinion

22   that it was for some other reason and, if so, what?

23             MR. NOONAN:  Objection, Your Honor.  It

24   wouldn't be relevant.

25             This -- I asked her whether it was

1    discriminatory on the basis of gender or retaliatory,

2    she said "No."

3              MR. WILLIAMS:  No, he didn't say "or

4    retaliatory."

5              THE WITNESS:  I didn't say that.

6              MR. WILLIAMS:  He just said or "gender" --

7              MR. NOONAN:  I did.  That was the prior

8    question.

9              THE WITNESS:  I didn't say "No."

10             THE COURT:  Just --

11             MR. WILLIAMS:  That's true.  She said, "Not

12   necessarily."

13             THE COURT:  Sustain the objection.

14             MR. WILLIAMS:  Well, let me ask it a different

15   way.

16   BY MR. WILLIAMS:

17   Q.   Attorney Noonan was kind enough just to repeat

18   once again the question and you said that your answer

19   was "Not necessarily."

20       What do you mean by that answer?

21             MR. NOONAN:  Objection.

22   A.   I --

23             MR. NOONAN:  Objection.  This is not a forum

24   for a speech.

25             THE COURT:  I think she answered "Not

1    necessarily" to the -- to what Mr. Noonan was saying in

2    his objection," so --

3            MR. NOONAN:  Correct.

4            THE COURT:  -- so he -- it wasn't a pending

5    question, so I'll sustain the objection.

6            If you want to ask her a question, Mr.

7    Williams, ask her the question.

8    BY MR. WILLIAMS:

9    Q.   What was the reason you believe that they affirmed

10   Yale's action?

11   A.   They had to kill my --

12           MR. NOONAN:  Objection, Your Honor.

13   Objection, Your Honor.

14           It's -- She has already testified --

15           MR. WILLIAMS:  Exactly the --

16           MR. NOONAN:  -- it had nothing to do with age

17   --

18           MR. WILLIAMS:  -- other side of the coin that

19   he asked.

20           MR. NOONAN:  -- sex discrimination.

21           THE COURT:  All right.  I'm gonna overrule the

22   objection, let her answer.

23           Go ahead.

24   BY MR. WILLIAMS:

25   Q.   What was the reason, in your opinion?

1    A.   They had to kill my complaint.  I was really

2    naive.

3    Q.   I'm sorry.  I can't hear you.  I know you're

4    upset.

5    A.   They had to decide in favor of Yale.  I was very

6    naive in bringing this before them.

7    Q.   Why do you believe they had to decide in favor of

8    Yale?

9          MR. NOONAN:  I object, Your Honor.  That would

10   be --

11         THE COURT:  Sustained.

12         MR. NOONAN:  -- total speculation.

13         THE COURT:  Sustained.

14         MR. WILLIAMS:  No further questions.

15         MR. NOONAN:  Nothing further, Your Honor.

16         THE COURT:  All right.

17         You're excused, Ms. Greenhouse.

18         Next witness, Mr. Williams.

19         MR. WILLIAMS:  Professor Chambers.

20       DAVID CHAMBERS, PLAINTIFF'S WITNESS, SWORN

21         THE CLERK:  Please state your name.

22         THE WITNESS:  David Chambers.

23         THE CLERK:  Please spell your last name.

24         THE WITNESS:  C-h-a-m-b-e-r-s.

25         THE CLERK:  And please state your city and

1    state of residence.

2                THE WITNESS:  I'm sorry?

3                THE CLERK:  Your city and state of residence.

4                THE WITNESS:  My residence?  Hastings-on-

5    Hudson, New York.

6                THE CLERK:  Thank you.

7                      DIRECT EXAMINATION

8    BY MR. WILLIAMS:

9    Q.   And you commute into Yale because you're a member

10   of the Yale Faculty.

11        Is that correct, sir?

12   A.   That's true.

13   Q.   All right.

14        Now you've sat here during the entirety of this

15   trial so far; is that correct?

16   A.   That's true.

17   Q.   Okay.

18        And are there exhibits in front of you?

19   A.   Yeah.

20   Q.   You have Exhibit T in front of you; is that

21   correct?  Defense Exhibit T?  I believe it's a blue

22   sticker on the front?

23   A.   Yes.

24   Q.   All right.

25        Now, sir, I'm going to ask you to -- This is not

1   going to be easy.  I'll tell you what I'll do.  I'm

2   gonna hand you my copy --

3           MR. NOONAN:  Can you just show me what page

4   you're on, John, --

5           MR. WILLIAMS:  Yeah, it's the David Chambers

6   page.

7           MR. NOONAN:  -- because I know they're not

8   that --

9           MR. WILLIAMS:  It's the page headed "David

10  Chambers."

11          MR. NOONAN:  Okay.  Can I just take a peek?

12  (Unintelligible.)

13  BY MR. WILLIAMS:

14  Q.   Maybe you found it.  It's this one here.

15  A.   No.  Does it have a page number?

16  Q.   It doesn't.  Unfortunately (unintelligible).

17  A.   And it's in this?

18  Q.   Yeah.  So if you want it -- I'll just leave this

19  here.  If you prefer to borrow my copy, it's okay.

20  A.   Okay.

21  Q.   Because (unintelligible).

22       You see that this refers to a interview conducted

23  with you in connection with the review committee's

24  consideration of Ms. Greenhouse's appeal; is that

25  right?

1    A.    It's seems to be, yes, with a quick reading.

2    Q.    All right.  All right.

3          At the bottom of that page, it states that you

4    told the review committee the following with regard to

5    Chris Sanderson:

6          "Chris has gotten a warning recently and it seems

7          to have had a positive effect.  His warning was

8          not a delay of something that could have been

9          issued as early as Sally's, his was related to a

10         specific and more recent incident."

11         You see that?

12   A.    Uh-huh.  Yes, I do.

13   Q.    Is that a fair summary of what you told the

14   interviewer?

15   A.    I don't recall what I said.

16   Q.    What was the specific and more recent incident for

17   which Mr. Sanderson was given his warning?

18   A.    To the best of my memory, he had had a confusion

19   of dates that had to do with and exam, and he, as I

20   recall, showed up for the exam -- or possibly just woke

21   up, on the day of what he thought was the exam in

22   either venue wherever he was, realized today is not the

23   exam, realized that he was in some sort of confusion,

24   trouble and took himself to the medical center.

25   Q.    What was there about that frightened Professor

241

1    Roach?

2    A.    I have no idea.

3    Q.    Did you ever speak to Professor Roach about the

4    incident?

5    A.    I don't recall, no.

6    Q.    You agree, do you not, that it in some way

7    concerned Professor Roach?

8    A.    I have no memory of that.

9              MR. NOONAN:   Objection, Your Honor.   He just

10   said he never spoke to --

11   BY MR. WILLIAMS:

12   Q.    You have no memory of that?

13             MR. NOONAN:   He just said he never spoke to

14   Professor Roach about that.

15             MR. WILLIAMS:   No, he said he had no memory of

16   it.

17             THE COURT:   He says he has no memory.

18             MR. WILLIAMS:   Thank you, Professor Chambers.

19   I have no further questions.

20                         CROSS-EXAMINATION

21   BY MR. NOONAN:

22   Q.    Let me just -- Could you stay there for a moment?

23   A.    Sure.

24             MR. NOONAN:   Your Honor, I don't intend to do

25   my direct examination of Mr. Chambers at this point,

1   but while he's on that page --

2   BY MR. NOONAN:

3   Q.   Can you find that page, by any chance?

4   A.   I already lost it and it's hard to find.  I'll try

5   it again.

6            THE COURT:  Maybe you can show him, Mr.

7   Noonan.

8            THE WITNESS:  Do you have it there?

9            MR. NOONAN:  Yes.

10  BY MR. NOONAN:

11  Q.   You know what, let me just -- You know what, I

12  probably don't need to have you have it out.  Since

13  it's an exhibit I'll just read it to you.

14       This is the page that says "David Chambers," which

15  I gather is --

16  A.   There's several pages here, though.

17  Q.   -- the committee's summary of talking with you.

18       What it says is:

19       "Warning.  During the admissions process Chambers

20       had met Greenhouse first and had been very

21       impressed.  He felt she had a great audition and

22       the fact that she hadn't gotten on the floor to

23       direct was not unusual or controversial."

24       What did you mean by that, first of all, when it

25  says, "She hadn't gotten on the floor to direct during

1   the audition"?

2   A.   Well, let me split this into two parts, if I can.

3   We do a preliminary interview of roughly half the

4   applicants.   We divide that among the faculty.   In this

5   case I was the first to interview Sally.

6        Then a short list of roughly a dozen is made and

7   those dozen are invited back to do what we call

8   "audition," which actually entails working with a

9   couple of actors, Yale School of Drama actors in a

10  simulated rehearsal situation, which the faculty

11  observes.   So there are two different points there, the

12  point of being impressed was the personal interview,

13  which is roughly an hour long, one on one in my office,

14  in this particular case, and the audition is working

15  with the actors.

16       When I say, "Did not get on her feet or them on

17  their feet," there's a part of rehearsal which we call

18  "table work" which basically has to do with textual

19  analysis, the director planting ideas, perhaps

20  outlining the scope of what they think the play is

21  about, et cetera, et cetera, working with the actors,

22  and Sally had executed that well.

23       Some people indeed do get up and actually stage

24  the scene as a kind of demonstration for us.   Sally

25  chose not to.

```
 1   Q.   All right.
 2        So when you say she did the -- was it the table
 3   work?  Is that what's --
 4   A.   Yes.
 5   Q.   -- the table work well, you're talking about
 6   during the audition?
 7   A.   During the audition itself, yes.
 8   Q.   So you didn't have an opportunity in the audition
 9   to actually see her direct a scene --
10   A.   Well, --
11   Q.   -- simply because she didn't --
12   A.   No, I consider that a part of directing.
13   Q.   Right.
14   A.   And it's not uncommon for a applicant/director to
15   stay at the table, some do, some don't.
16   Q.   Okay.
17        The -- This summary goes on to say:
18        "But he felt strongly that her intelligence and
19        different background could be a positive addition
20        to a program that shouldn't be too homogenous."
21        Is that a fair statement of how you felt?
22   A.   Absolutely.
23   Q.   "But in any case, she was understood by all to be
24        a high risk given that she had never directed
25        before."
```

```
 1          What does that mean, to be "at high risk"?
 2    A.   I don't think those are my words --
 3    Q.   Okay.
 4    A.   -- and I doubt that I would have used it at the
 5    time.
 6          I would say that for me personally, part of the
 7    appeal of Sally was that she came from a related but
 8    different background, which I thought could add some
 9    novelty on the one hand, and depth on the other hand,
10    to our program.
11    Q.   The -- And when you say you were in favor, you
12    were in favor right from the start?
13    A.   Yes.
14    Q.   Okay.
15          So you were not discriminating against her because
16    she's a female?
17    A.   No.
18    Q.   Okay.
19          The -- It goes on to say:
20          "The deliberative process was hard, long and
21          intense."
22          And I assume that means about the admission of
23    students?  Was -- Is that --
24    A.   Yes.
25    Q.   -- accurate?
```

1    A.   Yes, accurate.

2    Q.   All right.

3         And how many -- You started to describe the

4    process.

5         How many students typically apply?

6    A.   It's anywhere from 100 to 150.

7    Q.   And you said roughly half get invited for an

8    interview?

9    A.   Roughly.  There's not a quota.  It -- We do screen

10   the applicants very, very carefully.  An interview is

11   prized and we want to be very careful that -- about who

12   we invite.  On the other hand, we want to keep our

13   parameters open and invite people who interest us.

14   It's roughly half.

15   Q.   Okay.

16        And the -- How many get to audition?

17   A.   Generally --

18   Q.   Of the half?

19   A.   Generally, a dozen.  Actually, during Sally's

20   time, a few years back, it may have been slightly more,

21   up to 15, perhaps.

22   Q.   Now, this same page states:

23        "The school works hard not to let people go.  They

24        feel that they have made a commitment to the

25        people who they have accepted.  The warning wasn't

1   seen as laying the foundation for dismissal.  They

2   all wanted her to succeed."

3 A.   I think that's true across the board and in this

4 particular case.

5 Q.   All right.

6   So why was the warning issued if you really wanted

7 her to succeed?

8 A.   We consider warning to be a moment in which we can

9 sit down with the particular student, outlines causes

10 of concern which, in this case, were quite high, it why

11 we did it strong with the warning and why we did it

12 early.  We felt that we were seeing patterns develop

13 that we wanted to arrest or correct as soon as we

14 possibly could.  We thought the warning was the best

15 way to do this.

16   You can look at warning as a kind of teaching

17 tool.  We don't use it as a punitive measure.  It is

18 not laying a foundation for expulsion.  It is indeed a

19 teaching tool.  It may ultimately result in expulsion

20 but it's used for positive effect.

21 Q.   Now, there are students who are placed on warning

22 who are -- successfully graduate?

23 A.   Yes.

24    MR. NOONAN:  I don't have any other questions

25 at this point.  Thank you.

1                    REDIRECT EXAMINATION

2    BY MR. WILLIAMS:

3    Q.   Is it unusual, when you're placing a student on

4    warning, to meet with the university lawyer before you

5    do it?

6              MR. NOONAN:   Objection, Your Honor.

7              Is this with or without the student having

8    made a claim of a Title 9 violation?

9              MR. WILLIAMS:   I'm entitled to ask the

10   question in the form I did.

11             THE COURT:   Overruled.  You can answer it.

12   A.   I did not meet with the university lawyer.

13   BY MR. WILLIAMS:

14   Q.   Are you aware of the fact that Dean Bundy did?

15   A.   I was made aware of that today.

16   Q.   Okay.

17        He didn't tell you at the time?

18   A.   Not that I recall.

19   Q.   You state in the page that -- in the portion of

20   the page of Defense Exhibit T, from which Attorney

21   Noonan was just reading, the page that refers to you,

22   and he was referring to the upper part of the page from

23   which you -- or in which the interviewer of you

24   discussed what you said about the warning letter to Ms.

25   Greenhouse, and it states in here that you stated to

1    the interviewer that, "There were early signs that
2    collaboration was impossible," and then you go on to
3    number them.
4        One, the inappropriate way in which the financial
5        aid officer was treated;
6        two, the hijacking of class time with hyperbolic
7        language and self-centered behavior.
8        Three, the impossibility of her working with Chris
9        Sanderson who had similar issues; and
10       four, the device of making herself the center of
11       the Frank Deal class controversy."
12       Now, with respect to that number four, it was your
13   understanding; was it not, that what had happened in
14   the Frank Deal class was that Frank Deal had announced
15   that the presentation of the two young male actors and
16   Ms. Greenhouse on-stage, was going to be, "Rock Out
17   With Your Cock Out," and involved at least one of the
18   males engaging in simulated masturbation.
19       Was that your understanding?
20           MR. NOONAN:  Objection, Your Honor.  I know it
21   was a very long question.  I'm objecting to the parts
22   in which Mr. Williams said, "You said the following,
23   you listed the following."  This document is obviously
24   not from Mr. Chambers.  It is -- purports to be someone
25   who had interviewed him and wrote down a summary to

1  things.

2          MR. WILLIAMS:  With all due respect, I think

3  that Mr. Noonan misheard that part of my question

4  because I said it was in which it was reported that he

5  had said this.

6          THE COURT:  All right.

7          With that understanding, the witness can

8  answer.

9  A.   I'm afraid I'm a little at a loss here without

10 being able to see this part four to which this question

11 refers.

12          THE COURT:  He doesn't have it in front of

13 him.

14 BY MR. WILLIAMS:

15 Q.   Oh, I -- he took it away from you?

16 A.   No, I couldn't find it in this volume here.

17 Q.   (Unintelligible.)

18 A.   Yeah, and so if I could look at that before I try

19 to answer your question, that would be helpful.

20      Thank you.

21          (Pause.)

22 Q.   Second paragraph.

23 A.   Right.

24      And is this a "Yes/No" question you were asking

25 me, based on this?

1    Q.   I try not to do that.

2    A.   Or could I sort of explain what I think this

3    means?

4    Q.   Yeah.

5    A.   Okay.

6         My remembrance is that upon arrival in our

7    Thursday morning class, which followed the Saturday of

8    the second Frank Deal workshop, that there was general

9    concern amongst the class, particularly three of the

10   students, about what had gone on in the course of that

11   class.  The class was an improvisation class taught by

12   an instructor in the acting department, to make that

13   clear.

14        The three students who were concerned spoke about

15   three different concerns that they had, although

16   interrelated.  It was my feeling at the time, although

17   I took copious notes and listened carefully, as I

18   thought was my job as their teacher and a member of the

19   faculty, it was my concern at the time that Sally's

20   story needed to be dominant, as far as Sally was

21   concerned, and ultimately I said we have to leave this

22   topic because I felt we were getting nowhere.

23        However, I did do my best to find out further,

24   what had gone on in the class and at that point found

25   out that roughly more or less what had been recounted

had happened, although perhaps not in the scale with

which it was being recounted in my class.

Q.   Would you agree with me that this was not, in

fact, as you have remembered it, an improvisation

class, but rather a collaboration class?

A.   Yes.  Actually, I'm glad you bring this up.  No, I

would not agree with you.

The -- It's necessary to explain how this works

because it's a little complex and a little unorthodox.

The Drama 50s are a first year collaboration

between directors, dramaturs and actors.  It is co-

taught by three members of those faculties.  In the

directing department's case, me.  Evan Yionoulis was

the chair of the acting program at that time, and also

was the faculty representative to the Drama 50s.

Katherine Sheehy from dramaturgy.

Each year we would choose a project for the

students and this year it was Homer's Odyssey and we

would set up a schedule, et cetera, et cetera.  They're

broken into several groups.

It was decided, and I'm not sure this was the

first year but it continues to this day, that before

the students were actually broken into their ensembles,

which was four at that point, that they would have

group classes with a teacher of improvisation.  Frank

1    Deal was at that point the acting faculty member

2    teacher of improvisation.  It was requested that he

3    teach the class.

4        Now, group improvisation indeed may involve issues

5    of collective creation, which is the point of the Drama

6    50s, however, he was teaching improvisation which also

7    involves full commitment to the choices that the

8    actors, dramaturgs or directors make.

9    Q.   What was the title of the course?

10   A.   The title of the course is called "The

11   collaborative process."

12   Q.   I see.

13       And when you speak of the choices that the actors

14   made, does that include two of the actors making a

15   decision behind the back of the third and springing it

16   on her?

17   A.   I have no idea what happened there.  I was not in

18   the room.

19   Q.   You wouldn't consider that appropriate, would you?

20   A.   It would depend on what the ground rules of the

21   room were.

22   Q.   Would you consider it appropriate to subject a

23   woman such as Mr. Greenhouse, without warning, to what

24   was described by your own students in your class, the

25   Monday after this had happened?

A.   Well, that topic in particular, Ms. Greenhouse's
concern was not the only topic that was brought up in
the class.  I would consider it a courtesy.  I'm not
consider it -- I'm not sure in an improvisation class
that I would consider it a huge violation.

Q.   So you yourself would feel that it's acceptable to
subject a female student to that kind of behavior
without warning to her?  You think that that's okay?

A.   No, because I wouldn't use the word "subject."

Q.   Ah.  Well, then I don't want to do anything that
would taint the question.

     You think it's okay to do what was done to a
female student, to have these young guys come out
without warning to her and pretend to masturbate in
front of her, not once but twice?  You think that's
okay?

          MR. NOONAN:  Objection, Your Honor.

          THE COURT:  I'm sorry?

          MR. NOONAN:  Objection.  They didn't
masturbate in front of her.

          MR. WILLIAMS:  They attempted to -- pretended
to masturbate.

          MR. NOONAN:  Oh, I'm sorry, I thought he said
they masturbated.

          MR. WILLIAMS:  Obviously they didn't take

1    their clothes off.

2    BY MR. WILLIAMS:

3    Q.   You think that's okay?

4    A.   I'm sorry, you'll have to rephrase the question.

5    Q.   You think it's acceptable to have these two young

6    men come out on stage without warning to the middle-

7    aged woman who's there on stage, without notice to her,

8    and pretend to masturbate, not once but twice, once to

9    orgasm?  You think that's okay?

10   A.   Yes.

11   Q.   And that's what you guys teach over at the Yale

12   drama school?

13   A.   No.

14           MR. WILLIAMS:  Maybe that's why we have

15   punitive damages.  I have no further questions.

16           MR. NOONAN:  Move to strike that comment, Your

17   Honor.  Mr. Williams knows better than that.

18           THE COURT:  That comment can go out.  That's

19   -- You know better than that, Mr. Williams.

20           MR. WILLIAMS:  I know that I've never seen

21   a --

22           THE COURT:  Well, you know better than --

23           MR. WILLIAMS:  -- discrimination case --

24           THE COURT:  -- to make a comment like that.

25           MR. WILLIAMS:  -- where they actually defended

1    what they did.

2            THE COURT:  You know better than to make a

3    comment like that.

4                        RECROSS-EXAMINATION

5    BY MR. NOONAN:

6    Q.   Mr. Chambers -- Professor Chambers, you said that

7    this -- the class is the collaborative workshop --

8    A.   Yes.

9    Q.   -- but the two -- there are two sessions at the

10   beginning that are taught by an acting instructor.

11   A.   Yes.

12   Q.   So that those two classes taught by Mr. Deal, or

13   those two sessions, that he was overseeing, those are

14   acting exercises, correct?

15           MR. WILLIAMS:  Object, Your Honor.  He's

16   leading the witness and although it's cross, it's --

17           MR. NOONAN:  It's cross-examination.

18           MR. WILLIAMS:  -- he can't do that and the

19   federal rule clearly prohibits that.

20           MR. NOONAN:  I don't think it does at all.  He

21   called him.

22           THE COURT:  Well, I'll sustain the objection.

23   It's your -- It is -- He is your witness actually, Mr.

24   Williams.

25   BY MR. NOONAN:

1   Q.   You heard Ms. Diamond claim that this -- there was

2   something improper about giving a direction to a

3   student in this exercise because it was not an acting

4   class.

5        Do you agree with that?

6   A.   I'm sorry.  I heard Ms. Diamond claim?

7   Q.   I'm sorry.  Yeah.

8            MR. NOONAN:  John -- It's a private joke

9   between John and myself.  We had a case together --

10           THE COURT:  All right.  Let's --

11           MR. NOONAN:  -- with a plaintiff by the name

12  of Diamond, so I keep getting that -- I've done that a

13  couple of times in private conversations.  I apologize.

14  BY MR. NOONAN:

15  Q.   You heard Ms. Greenhouse say that the reason she

16  objected to the instruction by Mr. Deal was that this

17  was not an acting class and it was, therefore, an

18  inappropriate direction?

19  A.   Uh-huh.  Yes, I did hear that.

20  Q.   Do you agree or disagree with that?

21  A.   I would disagree.  I would say that it was not

22  formally an acting class in the formal sense of the

23  syllabus of the acting program, but it was a section of

24  a collaborative class being taught by a member of the

25  acting faculty who, of course, will involve acting

1    principles in his teaching.

2    Q.   And these were actors who were acting on this

3    stage, in this sequence, as you understood --

4              MR. WILLIAMS:   Objection; leading.

5              MR. NOONAN:   Okay.

6    BY MR. NOONAN:

7    Q.   As you understood it, the gentlemen who were

8    involved in the scene, which program were they in?

9    A.   Two of the five, as I understand it, were from the

10   acting program, of the five people on the stage.

11   Q.   Right.

12        And the two, what were their names?  The two

13   actors?

14   A.   Jeff and Jeff.

15   Q.   Okay.

16        And you were here when it was -- when Ms.

17   Greenhouse testified that it was Jeff and Jeff who were

18   engaging in the -- or one of the Jeffs was engaging in

19   the pretended masturbation?

20   A.   Yes.

21   Q.   And you said that it wouldn't necessarily be

22   inappropriate to have that kind of exercise.

23        Why do you say that?

24   A.   Well, we'll go into possibly a little bit of

25   acting theory here.

1      Improvisation, particularly with younger students,

2   will very often involve, and the instructor may

3   encourage for a point, issues of sexuality, sometime

4   drugs, other things that may preoccupy the minds of

5   younger actors in particular, younger human beings in

6   particular perhaps, and that the goal is not

7   necessarily to explore that as much as go through that.

8   If you will, my words, on to higher ground.  There's

9   more to be made of life, there's more to be observed of

10  life, but perhaps to get there one needs to go through

11  certain things that are restricted, forbidden country,

12  whatever it may happen to be.

13  Q.   Have you had occasion yourself to supervise these

14  improvisational classes?

15  A.   Yes.  Not these particular ones but I have taught

16  improvisation several times in my life.

17  Q.   Is there anything unusual about people in a drama

18  school selecting as their scene, scenes that have to do

19  with blatant sexuality?

20  A.   No.

21  Q.   All right.

22      And do you think there's anything inappropriate

23  with it?

24  A.   No, as long as physical harm is not involved, or

25  unless there's a violation of some kind that would be

1    extreme or bordering on physical or criminal.

2              MR. NOONAN:  Thank you, Your Honor.  I don't

3    have any other questions at this point.

4              MR. WILLIAMS:  I have no further questions,

5    Your Honor.

6              THE COURT:  All right.

7              Thank you, sir.

8              Next witness.

9              MR. WILLIAMS:  Plaintiff rests.

10             THE COURT:  All right.

11             The jury is excused.  We'll take a recess

12   here.

13        (Jury out.)

14             THE COURT:  All right.

15             Mr. Noonan, you've got a motion?

16             MR. NOONAN:  I do, Your Honor.  I've already

17   filed a brief, actually, yesterday.

18             THE COURT:  I've seen it.

19             Do you want to --

20             MR. NOONAN:  I guess I don't know if you'd

21   want me to say more.  I don't want to repeat what's in

22   the brief.

23             THE COURT:  Well, why don't you just make some

24   kind of a record here, please?

25             MR. NOONAN:  The -- I do move for judgment

1   under Rule 50 on the ground that the plaintiff has not

2   made out a claim in this case.

3           It seems to me that there were, at least as I

4   understood the Complaint, three, although it's unclear

5   to me, given the Complaint, but I think there's three

6   potential claims: Discrimination, hostile environment

7   and retaliation possibly alleged in the Complaint, and

8   I think it's quite clear that the plaintiff has not

9   made out a claim of a hostile environment claim.

10  There's actually no evidence of that.

11          The case law in that requires that it be

12  pervasive, offense, and repeated, and that's simply --

13  there's just no evidence of that, the -- and it has to

14  be objectively offensive in the context, and I know

15  Your Honor has already ruled in a similar motion on

16  this with regard to the state law claim of the

17  intentional infliction of emotional distress that the

18  Rock out With Your Cock Out skit, in the context of a

19  graduate drama program, would not meet the standard

20  under the state statute.  I think the same would apply

21  here, simply doesn't meet the standard.

22          With respect to gender discrimination, we've

23  cited the case law to indicate that where someone is

24  put on warning and then dismissed within a short period

25  of time after being brought into a program, and the

gender has not changed, there is a strong presumption
that those who voted her into the program were not
acting out of gender discrimination when they decided
to dismiss her from the program.  I think there is no
evidence of gender discrimination.

        With respect to retaliation, the plaintiff
really has not offered any evidence whatsoever of
retaliation other than the fact that she was put on
warning and then nine months later she was dismissed by
the unanimous vote of her faculty.  She's acknowledged
that it was the unanimous vote.

        The plaintiff has offered an exhibit, I think
it's Exhibit 4-A, I believe, or possible B, that lists
all of the faculty members, and I think there's roughly
70.  There was simply no evidence offered to suggest a
retaliatory motive on the part of the defendant.

        The one defense -- The one representative of
the defendant the plaintiff chose to call unequivocally
stated that he had no retaliatory motive, so I don't
think that any of the three potential causes of action
alleged in the Complaint would suffice to reach the
jury.

        I therefore move for a judgment of dismissal.

        THE COURT:  Mr. Williams?

        MR. WILLIAMS:  Your Honor, I said yesterday

1  morning, and I think I've said consistently in this

2  case, and I'll repeat it today, that this is at its

3  heart a case about prohibited Title 9 retaliation and

4  the evidence is more than sufficient to support that.

5  As a matter of fact, the evidence is really sufficient

6  to support a directed verdict in favor of the plaintiff

7  on that claim.

8           There is no question that Ms. Greenhouse had

9  experiences which she perceived as constituting sexual

10  harassment, that she complained about those

11  experiences, and that within literally days, after

12  consulting with counsel, I might add, she was placed on

13  academic warning specifically because of those

14  complaints, and that was articulated not only in the

15  documents that are in the file, but again, even in the

16  testimony of Mr. Chambers here, that she was placed on

17  warning specifically because, among other things, but

18  there's a very short list, so that a motivating factor

19  in placing her on warning, a motivating factor was her

20  complaint about Rock Out With Your Cock Out, and

21  another motivating factor was her complaint that she

22  was told she had to choose between motherhood and the

23  Yale drama school.

24           And the third and final motivating factor was

25  her complaint about a -- as documented in Defense

1    Exhibit T, about a student who a female faculty member

2    told her had been stalking other women and she

3    complained about -- she didn't even complain about it,

4    she just went for counseling about it, and was

5    disciplined for that, and this is an absolutely clear

6    case that retaliation, her complaints about perceived

7    sexual harassment were -- constituted a motivating

8    factor in placing her on academic warning.  That

9    clearly constituted an adverse action as Dean Bundy

10   kept repeating and indeed repeated most recently less

11   than two months -- in an e-mail that's in evidence,

12   less than two months before she was finally expelled,

13   that she remained under the cloud of that academic

14   warning throughout her year at the Yale School of

15   Drama.

16          It was the necessary step -- the necessary

17   condition precedent to termination, being placed on

18   written warning and that was retaliatory.

19          There is clearly enough evidence here from

20   which a jury could find that she was, in fact,

21   subjected to an adverse action in the form of that

22   warning in retaliation for having complained about

23   perceived Title 9 violation, and just as in the cases

24   of retaliation under Title 7, and Attorney Noonan

25   argued Friday that in deciding these cases you look for

1    guidance to Title 7, and we know that in a Title 7
2    retaliation case, it is never a question whether the
3    complainant's complaint was, in fact, correct, in other
4    words, if you have a race discrimination case and it's
5    a retaliation, the person comes in and complains, "I'm
6    being discriminated against because of my race," the
7    issue is not were they right or wrong, the issue is
8    were they retaliated against for complaining.

9            The issue here is not, although I think it's a
10   clear one but we don't have to do there, it is not
11   whether Ms. Greenhouse was right or wrong in
12   complaining that Rock Out With Your Cock Out and,
13   "Well, you have to choose between motherhood and Yale,"
14   and "I'm really pissed off with you for bringing it to
15   my attention about a stalker among you, a male stalker
16   among you," that any or all of those constituted sexual
17   harassment, we don't have to prove, it is clear that
18   she believed it, and that's all that's necessary.  It
19   was an honest complaint and she was in fact retaliated
20   against.  She was placed on warning specifically,
21   expressly because she did that.  That's retaliation.
22   All the rest of it goes to the extent of her damages.

23           And remember, you yourself plan to charge this
24   jury on nominal damages, so we don't have to prove
25   actual out-of-pocket injury, although I think we have,

1    but we don't have to prove that.  All we have to prove

2    is the liability.  At a -- At the minimum, that gets us

3    to nominal damages, and therefore, Your Honor, this

4    motion has to be denied.

5            THE COURT:  All right.  The motion is denied.

6    I would say that the Court has thought about this

7    matter, obviously anticipating that the motion was

8    going to be made.  It's made in every case, and I would

9    also say that in 23 years on the bench I've never

10   granted one of these motions.  I've come close but I've

11   never granted one except I did once in a bench trial,

12   but I thought about it here, but I'm gonna let it go to

13   the jury.  I think there's enough to get it to the jury

14   and the jury should make the decision, so the motion is

15   denied.

16           We --

17           MR. NOONAN:  Your Honor, can I just ask for a

18   point of clarification?  Are you denying it in its

19   entirety or just as to the retaliation?

20           THE COURT:  I'm denying it in its entirety.

21           MR. NOONAN:  All right.  Thank you, Your

22   Honor.

23           THE COURT:  All right.

24           We'll take just a very quick recess.  I want

25   to get in as much as we can this afternoon.

1              I'd also just say, for the benefit of Mr.

2    Noonan and Mr. Williams, I was thinking during the

3    course of this trial as some of the evidence came out,

4    of Judge Clarie, how he would have --

5              MR. NOONAN:  This would have been a --

6              THE COURT:  -- sat --

7              MR. NOONAN:  This would have been a difficult

8    case to try.

9              THE COURT:  -- and listened to some of this

10   evidence.  Mr. Noonan clerked for Judge Clarie and Mr.

11   Williams tried many cases before Judge Clarie and I was

12   thinking about him this afternoon.

13             MR. WILLIAMS:  Hard not to, Your Honor.

14             THE COURT:  All right.

15             We'll take a short recess.

16        (Recess at 3:50 p.m., until 4:07 p.m.)

17                       AFTER RECESS

18             THE COURT:  All right.

19             Want to call your first witness?  You can put

20   him in the box, Mr. Noonan.

21             MR. NOONAN:  Oh, sure.

22             Susan Rochette.

23        (Jury in.)

24             THE COURT:  Okay, Ladies and Gentlemen.

25             Rody, you want to swear the witness, please?

1              You can stand, raise your right hand, please.
2           SUSAN ROCHETTE, DEFENDANT'S WITNESS, SWORN
3              THE CLERK:  Please state your name.
4              THE WITNESS:  Susan Rochette.
5              THE CLERK:  Please spell your last name.
6              THE WITNESS:  R-o-c-h-e-t-t-e.
7              THE CLERK:  Thank you.
8              Please state your city and state where you
9    reside.
10             THE WITNESS:  Woodbridge, Connecticut.
11             THE CLERK:  Thank you.
12                      DIRECT EXAMINATION
13   BY MR. NOONAN:
14   Q.   Good afternoon, Ms. Rochette.
15        How are you?
16   A.   Fine, thank you.
17   Q.   With whom do you reside in Woodbridge?
18   A.   My husband and two children.
19   Q.   Okay.
20        And how old are your children?
21             THE COURT:  Ms. Rochette, you want to just
22   pull that microphone up a little.  Okay.  Fine.
23   BY MR. NOONAN:
24   Q.   How old are your children?
25   A.   Twenty-six and twenty-seven.

1    Q.   All right.

2       Can you tell us about your educational experience?

3    A.   My background?

4    Q.   Yes.

5    A.   I have a bachelor's degree in -- from College of

6    New Rochelle.

7       I've spent 20 years as a bank compliance officer

8    and eleven years at Yale as the financial -- in the

9    financial aid office.

10    Q.   Okay.

11       And what do you do at Yale in the financial aid

12    office?

13    A.   I'm the financial aid officer for two schools, so

14    I work part time in the School of Drama and part time

15    in the School of Art.

16    Q.   And what do -- what does that entail, being a

17    financial aid officer?

18    A.   Basically, I have a population of 300 students,

19    and after their offered admission I actually make a

20    financial aid award based on the federal guidelines

21    institutional grant for each school, and looking at the

22    FAFSA for students for federal guidelines, looking at

23    their information, coming up with a student

24    contribution and making an award package that this --

25    the student has the resources to attend the school.

```
1    Q.   And you said that you use federal guidelines?
2    A.   Yes.
3    Q.   All right.
4         And why is it that you use federal guidelines to
5    come up with the financial aid package?
6    A.   Because we offer federal loans, the Stafford
7    and --
8    Q.   And --
9    A.   -- Stafford and Perkins loans.
10   Q.   All right.  That microphone, you'd have to really
11   be exactly at the right distance, I think.
12            THE COURT:  Just a little bit further, just a
13   tiny bit.
14            THE WITNESS:  Okay.  Sorry.
15            THE COURT:  Okay.
16   BY MR. NOONAN:
17   Q.   The -- And you mentioned the "FAFSA."
18        What is that?
19   A.   The Free Application for Federal Student Aid.
20   Q.   All right.
21        And is that a form that's promulgated by the
22   Federal Government?
23   A.   Yes, it's a federal form for offering actually
24   federal loans.
25   Q.   All right.
```

1        And are you allowed to just give any award you
2    want or are you constrained by any type of guidelines?
3    A.   We're constrained by the federal guidelines for
4    federal loans, by the institutional guidelines for
5    school grant, and then we're -- in that -- the budget
6    that the school -- that I have to work with.
7    Q.   Now, what was your -- Actually, first of all, let
8    me show you what we've marked as Exhibit A, which is
9    Ms. Greenhouse's financial aid application and package,
10   and can you tell us when you first became involved with
11   Ms. Greenhouse's application for financial aid?
12   A.   I'm not sure.  All students apply in February --
13   Q.   Okay.
14   A.   -- and then I actually handle the calculations
15   after I'm advised as to who's admitted in April --
16   Q.   Okay.
17   A.   -- usually the first -- last week in March, the
18   first week in April.
19   Q.   All right.
20        So when do you do the calculations themselves?
21   The last week of March, beginning --
22   A.   Uh-huh.
23   Q.   -- of April?
24   A.   Right.
25   Q.   All right.

1      And you do them for everybody in the school at the
2  same time?
3  A.   For all of the incoming.  So about 60 drama
4  students and 60 art students.
5  Q.   All right.
6      Now, Exhibit A, the first page is dated April 2,
7  2002, and it's a letter from you to Ms. Greenhouse; is
8  that right?
9  A.   Right.  It's a -- It's our standard financial aid
10  letter.
11  Q.   All right.
12      And in that letter -- Well, what is the purpose of
13  the letter?  Why do you send this out to Ms. Greenhouse
14  and other students?
15  A.   We send it out because usually these students have
16  applied for financial aid.  It shows the cost of
17  attendance, the tuition, moving expenses, books and
18  supplies.
19      It shows the -- what we're expecting as a
20  contribution from the student, and actually, back in
21  2002, from parents, and then it shows the federal loans
22  that we're offering, and we offer $14,000 in loan to
23  every student that applied for financial aid that year
24  as the first part of their package.
25      Then we offered a work-study job to every student,

1    2800, and then lastly, the grant, and that's a school

2    grant, 3,366.

3    Q.   All right.

4         And let me just go through with you, this -- And

5    that's all contained in this letter that you sent to

6    Ms. Greenhouse?

7    A.   Right.

8    Q.   And the -- What was the total financial aid listed

9    over in the, I guess, lower-right?

10   A.   $20,166.

11   Q.   Okay.

12        And the total anticipated expenses were what?

13   A.   The total student contribution was 10,034.

14   Q.   Okay.

15        So in other words, you were contemplating that a

16   total budget, including living expenses of what?

17   A.   The total budget is 30,200.

18   Q.   All right.

19        And so basically you were -- Basically, the school

20   is coming up with a financial aid package of 20,000,

21   the student would contribute 10,000?

22   A.   Right.

23   Q.   Okay.

24        And how did you go about reaching those numbers?

25   A.   By actually looking at the FAFSA and the need axis

1    calculation.

2    Q.   All right.

3         And so what are those, two --

4    A.   Two separate calculators.

5    Q.   All right.

6         And are they computer programs?

7    A.   Yes, they're both computer programs.

8    Q.   So essentially, what you do is put in the various

9    numbers that you get from, in this case, Ms.

10   Greenhouse, in terms --

11   A.   Well, correct.

12   Q.   -- of her asset level and income and so forth.

13   A.   It's all self-reported, yes.

14   Q.   All right.

15        And in terms of -- You said this would include

16   parent contributions.

17        In Ms. Greenhouse's case, how much were you

18   expecting her parents to contribute?

19   A.   During 2002 it was parent contributions for

20   students, I think it was age 25 and under, so we didn't

21   expect any contribution from her parents.

22   Q.   Okay.

23        Now, if you look at page 2 of Exhibit A, is that

24   part of your calculations?

25   A.   Yes.

1  Q.   And can you just describe, in sort of a broad way,

2  how you go about arriving at these calculations?

3  A.   Sure.  The column that's listed as "Estimated

4  Federal," that's an estimate of the federal calculation

5  before we actually look at FAFSA.

6       The "Estimated Student Federal" is actually based

7  on no income, and the "Axis Group" is based on

8  projected income and looks at actually more assets.

9  Q.   All right.

10      And do you include in that calculation -- or do

11  you consider, when you're calculating the level of the

12  students assets?

13  A.   What do you consider?

14  Q.   Do you consider -- When you're making these

15  calculations, do you take into account the amount of

16  assets the student has?

17  A.   Right.  Absolutely.

18  Q.   Okay.

19      And why is that?

20  A.   The federal guidelines require 35 percent.

21  Q.   I'm sorry, give me that again?

22  A.   Thirty-five -- The federal guidelines require a

23  contribution of 35 percent.

24  Q.   Programs require that the student contribute 35

25  percent of his or her assets?

1    A.    Right.

2    Q.    Is that per year?

3    A.    Yes.

4    Q.    Okay.

5          And so the $10,000 figure that you came up with

6    for the student contribution, that was based on the 35

7    percent of the assets?

8    A.    Right, minus the asset protection allowance.

9    Q.    Okay, and tell me about that.  What's the asset

10   protection allowance?

11   A.    The FAFSA was actually developed for families with

12   undergraduate students, so the asset protection

13   allowance was developed so that parents entering, you

14   know, their years towards retirement would protect part

15   of their assets.  It doesn't really apply in -- Or the

16   purpose wasn't to be used in the graduate school but

17   it's the federal calculation that we're left with and

18   we abide by it.

19   Q.    All right.

20         Now, the award that's shown on the first page of

21   Exhibit A, the total financial aid of $20,166, was that

22   the original calculation that you made?

23   A.    I'm sorry?  Tell me again.

24   Q.    Yes, the first page of Exhibit A which shows that

25   you calculated a total financial aid award of $20,166.

1    A.   Okay.

2    Q.   Was that the first award you calculated for Ms.

3    Greenhouse, or was there a subsequent one?

4    A.   That was the only award.  I didn't calculate a

5    subsequent one because I didn't have -- she didn't

6    provide additional financial information.

7    Q.   Okay.

8         Now let me ask you this.

9         Did you have -- Once you sent this out to Ms.

10   Greenhouse on April 2nd, 2002, did you have any further

11   communications about her financial aid award?

12   A.   No.  She communicated with my assistant, Marsha,

13   and then later came in and met with me, I think in May.

14   Q.   Okay.

15        So you did not talk to her on the phone when you

16   met her.

17   A.   Yeah, I don't recall talking to her on the phone.

18   I only remember the meeting.

19   Q.   All right.

20        And can you tell us what you recall of that

21   meeting?

22   A.   She actually wanted an increase in her scholarship

23   and we talked about her asset.  We talked about -- She

24   mentioned her debt at that time.  I thought I had come

25   up with a good plan in order to -- if she wanted to

1    reduce her debt and provide documentation then I could

2    actually reduce the asset in the calculation which

3    would actually give her a little bit more grant money.

4    Q.   Okay.

5         So let me just take that apart a little bit --

6    A.   Uh-huh.

7    Q.   -- if I can.

8         She came in and talked to you about trying to get

9    more grant support, --

10   A.   Uh-huh.

11   Q.   -- as opposed to loan; is that right?

12   A.   Correct.

13   Q.   And you said you talked to her about reducing her

14   debt?

15   A.   Right.

16   Q.   What -- Well, why would that help?

17   A.   Because if she -- I think her asset was $40,000

18   and she spent 5,000 of that asset to reduce her debt,

19   then her asset would be 35,000 and the calculation

20   would then be based on the 35,000.

21   Q.   I see.  So the calculation of the grant award is

22   based on the level of assets that the student has at

23   the particular time?

24   A.   Right, incoming assets.

25   Q.   All right.

1      So what you were suggesting to her is if she just

2  pays off some of her debts she would then have lower

3  assets.

4  A.   Right.

5  Q.   You could then recalculate it and give her a

6  larger award.

7  A.   Right.

8  Q.   All right.

9      And did you -- If you turn to about the middle of

10  that -- they're not paginated, but you're gonna find a

11  -- there's a page that says, in the upper-right,

12  "Meeting with student."

13  A.   Uh-huh.

14  Q.   And those are some handwritten calculations.

15      Whose calculations are those?

16  A.   Those are mine.

17  Q.   And the, "Meeting with student," is that referring

18  to your meeting with Ms. Greenhouse?

19  A.   Yes, it is.

20  Q.   All right.

21      And the date of the letter is 4/15/02, so did you

22  meet with her April 15th of 2002?

23  A.   Right.

24  Q.   What is it that you were -- What is it that you

25  ended up telling Ms. Greenhouse with regard to your

1  ability to redo the numbers in an effort to get her

2  more grant support?

3  A.   We went through every scenario that I'm allowed to

4  look at institutionally and federally, and using

5  actually PJ, professional judgment, and I was able to

6  reduce her projected income down from the --

7  contribution down from the 5,079 to the 3,139, and then

8  looking at her assets again and then to decide looking

9  at reducing her assets by 5,000, and what the 35,000

10 would do, because our goal is to try and provide

11 assistance for students as best we can within all the

12 guidelines and federal rules that we have to work with.

13 Q.   And what did you tell Ms. Greenhouse about your

14 ability to increase her grant support?

15 A.   That if she provided documentation and reduced her

16 asset, we could increase the grant.

17 Q.   Okay.

18      And if you look at the page after the one you were

19 just looking at --

20 A.   Uh-huh.

21 Q.   -- in Exhibit A, there is -- it looks like the

22 copy of something from a computer.

23 A.   It's in our Banner program (phonetic).  It's where

24 we write notes so that, you know, anyone that -- well

25 actually my assistant, if she answers the phone, knows

1  exactly, you know, what last transpired with the

2  student.

3  Q.   Okay.

4      And the -- on that pages it's -- the

5  identification for this is a number and then Sally

6  Greenhouse's name next to it; is that right?  Where it

7  says, "ID" --

8  A.   Oh, yes.  It's her ID number and her name, yes.

9  Q.   And the date of this note was April 15th, 2002?

10 A.   Right.

11 Q.   And that's the same date as this meeting you had

12 with her, where you redid the numbers?

13 A.   Right.

14 Q.   All right.

15     Can you just -- And did you make this entry into

16 your computer system?

17 A.   Yes.

18 Q.   Can you just read that to the jury?

19 A.   Sure.

20     "Many e-mails and phone calls from student.  Met

21     with student.  If she pays down 5,000 in asset for

22     debt, will reduce asset contribution by 1750.  She

23     will provide documentation of bank statements and

24     credit card payments, along with a letter by May

25     1."

1    Q.   All right.

2         When you say she can reduce asset contribution by

3    1750, you're talking about $1,750?

4    A.   Yes.

5    Q.   All right.

6         And the way you do that is by reducing the asset

7    contribution into the amount she has to contribute?

8    A.   Correct.

9    Q.   Okay.

10        And so she -- When she left it was your

11   understanding that she would be supplying you with

12   documentation of her having paid down her debt by May

13   1st?

14   A.   Yes.

15   Q.   All right.

16        And did she ever, in fact, get back to you and

17   provide that documentation?

18   A.   No.

19   Q.   Now, looking at the next page of Exhibit A, it's

20   an e-mail dated May 1, 2002 to you from Maria Leviton,

21   correct?

22   A.   Yes.

23   Q.   And who is Maria Leviton?

24   A.   She's the registrar.  She actually -- Her office

25   is directly across from my office.

```
1   Q.   All right.

2        And it says:

3        "Just in case Sally didn't"  -- It's says "Re" --

4        The subject is "Sally Greenhouse."

5        And it, in the body says:

6        "Just in case Sally didn't contact you directly,

7        Sally sent me an e-mail indicating she is not

8        going to resubmit her appeal."

9        Did you understand that to mean that she had

10  decided not to ask you to do the recalculation?

11  A.   Yes.

12  Q.   She didn't want to pay down her debts at that

13  point?

14  A.   Right.

15  Q.   Okay.

16       Now, Ms. Greenhouse has claimed in this case that

17  you told her, when you met with her, that you would

18  have to -- she would have to choose between motherhood

19  and attending the Yale drama school.

20       Did you --

21            MR. WILLIAMS:  Your Honor, I object to the

22  form of that question.  She does not and never did

23  claim that any such statement was made when they met.

24            The claim was that it was made in a telephone

25  conversation, and that's always been the claim.
```

1          THE COURT:  I think -- That is my
2    recollection.
3    BY MR. NOONAN:
4    Q.   Did you ever tell Ms. Greenhouse -- Let me -- I
5    will amend the question then.
6          Ms. Greenhouse has claimed in this case that you
7    told her that she would have to choose between
8    motherhood and attending the School of Drama.
9          Did you, in fact, ever say that?
10   A.   Absolutely not.
11   Q.   Is it true that Ms. Greenhouse told you that the
12   objection to committing $10,000 of her own assets to
13   her education was that she had hoped to adopt a child
14   and therefore wanted to set aside money for that
15   purpose?
16   A.   Right.
17   Q.   All right.
18         And what did you say in response to that?
19   A.   I don't recall.
20   Q.   Were you able to -- Did the federal guidelines
21   permit you to set aside funds for someone to adopt a
22   child?
23   A.   No.
24   Q.   Would the federal guidelines permit you to set
25   aside the money for some other purpose --

1    A.    No.

2    Q.    -- when you make the calculations?  And by the

3    way, were you in any way opposed to Ms. Greenhouse

4    adopting a child?

5    A.    We never really discussed it.

6    Q.    And when you told Ms. Greenhouse that you would

7    not be able to protect those assets so that she could

8    adopt a child, did it make any difference to you

9    whether she was a man or a woman?

10   A.    No.

11   Q.    I take it you would have given the same --

12           MR. WILLIAMS:  Objection; leading.

13           THE COURT:  Sustained.

14   BY MR. NOONAN:

15   Q.    Can you tell us whether you would have given the

16   same answer to a man who had wanted to set aside money

17   to adopt a child on figuring his financial aid

18   calculation?

19   A.    Same.  Same answer.

20   Q.    In any of your dealings with Ms. Greenhouse, did

21   you discriminate against her because she is a female or

22   because she wanted to adopt a child?

23   A.    No.

24           MR. NOONAN:  I don't have any other questions.

25   Thanks.

1          THE COURT:  Mr. Williams?

2          MR. WILLIAMS:  Thank you, Your Honor.  Just a

3     couple of questions.

4                         CROSS-EXAMINATION

5     BY MR. WILLIAMS:

6     Q.   Good afternoon, ma'am.

7     A.   Hi.

8     Q.   Was it your testimony that you do not remember

9     ever having had a telephone conversation with Mr.

10    Greenhouse?

11    A.   No, I really don't.

12    Q.   Okay.

13         And does that mean that you are saying

14    affirmatively you did not or simply you don't remember

15    one way or the other?

16    A.   I don't remember.

17    Q.   Thank you, ma'am.

18         MR. WILLIAMS:  No further questions.

19                       REDIRECT EXAMINATION

20    BY MR. NOONAN:

21    Q.   Is there any doubt in your mind about whether you

22    ever told Ms. Greenhouse that she had to choose between

23    motherhood and the Yale drama school?

24         MR. WILLIAMS:  Beyond the scope, Your Honor.

25         MR. NOONAN:  Well, no, it's not.

```
 1              THE COURT:  Sustained.

 2              MR. NOONAN:  It's not beyond the scope.

 3              THE COURT:  It's sustained.  I -- Let's move

 4   on.

 5   BY MR. NOONAN:

 6   Q.   If you had -- You said you don't -- You said you

 7   have no recollection of any phone call with Ms.

 8   Greenhouse.

 9   A.   And I couldn't remember word for word, no.

10   Q.   Okay.

11        If you had told Ms. Greenhouse that she had to

12   choose between motherhood and the Yale drama school, is

13   that something you would recall?

14              MR. WILLIAMS:  Objection; leading.

15   A.   Yes.

16              THE COURT:  Overruled.

17   BY MR. NOONAN:

18   Q.   Did you ever say that?

19   A.   No.

20   Q.   Thank you.

21              MR. WILLIAMS:  No further questions.

22              THE COURT:  Mr. Williams?

23              Thank you.  You're excused, ma'am.

24              Next witness?

25              MR. NOONAN:  Call Elizabeth Diamond, Your
```

1    Honor.

2          ELIZABETH DIAMOND, DEFENDANT'S WITNESS, SWORN

3                MR. NOONAN:  Your Honor, Ms. Rochette's

4    notified me she left her purse on the witness stand.

5                THE CLERK:  Will you please state your name?

6                THE WITNESS:  Elizabeth Diamond.

7                THE CLERK:  Please spell your last name.

8                THE WITNESS:  D-i-a-m-o-n-d.

9                THE CLERK:  And please state your city and

10   state of your residence.

11               THE WITNESS:  New York City, New York.

12               THE CLERK:  Thank you.

13                      DIRECT EXAMINATION

14   BY MR. NOONAN:

15   Q.   Good afternoon, Professor Diamond.

16        How are you?

17   A.   Fine.

18   Q.   You -- And with whom do you live in New York?

19   A.   My husband, Ralph Chitman (phonetic), and our

20   daughter, Han (phonetic).

21   Q.   How old's your daughter?

22   A.   She's 13.

23   Q.   Since we've just been talking about adoption, tell

24   me how you came by --

25               MR. WILLIAMS:  Objection, Your Honor.

1                THE COURT:   Sustained.

2     BY MR. NOONAN:

3     Q.   Can you tell me about your educational background?

4     A.   I went to high school in the town I grew up, which

5     was Redding, Massachusetts.

6          And I went to Wellesley College, and then I went

7     to school in the University of Geneva in -- for a year,

8     and then to Columbia University where I earned my

9     master's of fine arts.

10    Q.   And did you get a degree from Wellesley?

11    A.   I did, my bachelor's.

12    Q.   All right.

13         And what was that in?

14    A.   History and political science.

15    Q.   And now -- then you said you went to Geneva for a

16    year.

17         What did you study there?

18    A.   International relations, cultural development.

19    Q.   Okay.

20         Was that a degree program?

21    A.   No, certificate program, not a --

22    Q.   All right.

23         And then you got a Master of Fine Arts from

24    Columbia?

25    A.   Yes.

1    Q.   And what year was that?

2    A.   1983.

3    Q.   All right.

4         And did you -- When you got your master of fine

5    arts, or sometimes it's call the "MFA," was it in a

6    particular discipline?

7    A.   Directing/theater studies.

8    Q.   And did you go to those schools all in a row, so

9    to speak, or did you have time out to do other things

10   in between?

11   A.   In between College and Geneva -- After I came back

12   from Europe I joined the Peace Corps and I was in the

13   Peace Corps for three years in West Africa.

14   Q.   Probably a lot different than the rest of your

15   career.

16            MR. WILLIAMS:  Objection, Your Honor.

17            MR. NOONAN:  It's not claimed, Your Honor.

18   BY MR. NOONAN:

19   Q.   You weren't involved in the theater in West

20   Africa?

21   A.   I was.

22   Q.   Oh, you were.

23        Oh.  Okay.  I didn't realize it.

24        So tell us about that then.  That is relevant.

25   A.   I founded, with some colleagues, folks who were my

1    professional colleagues at the University of
2    Ouagadougou in Burkina Faso, where I was posted, and we
3    founded a rural theater project.  It was a sort of
4    social grassroots theater project that put on plays in
5    local languages that dealt with social and political
6    issues, and traveled the countryside putting on plays.
7    Q.    And you did that for three years?
8    A.    Yes, I did.  Yes, I did.
9    Q.    All right.
10          And then at that -- was it at that point that you
11   went to Geneva?
12   A.    No, that was prior to going to West Africa.
13   Q.    I'm -- Then I'm confused.
14          THE COURT:  She went to Geneva first.
15   BY MR. NOONAN:
16   Q.    Oh, I'm sorry.  You went to Geneva first, then to
17   West Africa --
18   A.    That's correct.
19   Q.    -- after.  Okay.
20          And then at what point -- How long after you left
21   West Africa did you go to Columbia?
22   A.    Immediately.  I entered Columbia in 1980.
23   Q.    All right.
24          And how long a program was that?
25   A.    A three-year MFA program.

1    Q.   All right.

2         So you graduated in '83?

3    A.   That's correct.

4    Q.   And I know you're now at Yale.

5         Can you tell us what you did after you got your

6    degree from Columbia in directing in the MFA directing

7    program up to the time you got to Yale?

8    A.   I worked in New York City where I was living, and

9    I worked primarily in the experimental theater in

10   downtown New York.

11        I worked with many young playwrights, peers of

12   mine.

13        I collaborated with poets, worked at many downtown

14   theaters, and began, as my work gained some

15   recognition, to have opportunities to work in larger,

16   regional theaters in other parts of the country, but my

17   main life was downtown New York theater.

18   Q.   All right.

19        What other parts of the country did you work in?

20   A.   Portland, Maine; Seattle, Washington; Dallas,

21   Texas; Montreal, obviously not part of the United

22   States.  I think that's -- Minneapolis, Minnesota.

23   Q.   And how would that work?  Are these things that

24   you go to on a project basis, you go for a period of

25   time and then return back?

1    A.    Yes, these are -- Essentially, these were

2    theatrical productions that I was hired to direct.  In

3    some instances they were projects that I initiated and

4    pitched to producers who then took them on, and in

5    other cases I was brought in for a specific project

6    that an artistic director of one of these theaters

7    thought I was appropriate for.

8    Q.    And you did that from '83 up until when?

9    A.    Until -- Well, I continue to do it --

10   Q.    Oh.

11   A.    -- to this day.

12   Q.    Oh, okay.

13   A.    But my function as a teacher and department chair

14   at Yale has -- and being a parent has caused me to

15   spend a lot less time on the road then I used to.

16   Q.    And how many different productions have you

17   directed since leaving Columbia?

18   A.    Not sure.  Maybe over 60, I would assume.

19   Q.    All right.

20         And --

21   A.    Sixty, 75.

22   Q.    And is the amount of time you'd spend on each

23   production, is it always the same or does it vary?

24   A.    It varies.

25   Q.    Okay.

1          Can you give us the parameters, I mean, how much
2     time we're talking about?
3     A.   A typical theater production in an American non-
4     profit theater, there might be a -- from the start of
5     rehearsals, which is a six-day work week, generally,
6     eight hour day, through to the opening of the
7     production is likely to be between four and six weeks
8     of work, of intense work.  There is much research and
9     preparation that goes into the project prior to the
10    start of rehearsals.
11    Q.   And how much time does that typically take?
12    A.   Well, you can -- it depends on what the horizon
13    (phonetic) time is between getting the gig and starting
14    rehearsals.  You can spread that out over a year if you
15    have the luxury of that amount of time, or it is often
16    condensed if the project is suddenly launched.  So you
17    can have as few as some -- as four weeks before you
18    have to go on.
19    Q.   All right.
20         And then after that period of time you go into
21    rehearsal and you said that was roughly four to six
22    weeks, depending on the production?
23    A.   Yes.
24    Q.   And then how long is a typical production?  How
25    long is it staged?

1   A.   That is very much dependent upon the venue.  Many

2   American regional theaters will have a show running for

3   what's called a "limited run," and that might be a

4   three to five week to six week run.  I've had shows

5   running as long as, I guess, seven or eight months.

6   Q.   All right.

7        Now, and when you're running shows for seven or

8   eight months, does that mean you don't need to practice

9   any longer, you don't need to rehearse?

10  A.   Not only that but if it's a show that I've

11  directed out of town I may not even be on site any

12  longer and the show is maintained by the stage manager.

13  Q.   At what point did you start working at Yale?

14  A.   The fall of -- I directed a production for Yale

15  Repertory Theater in 1990 -- the 1991-1992 season, and

16  I directed -- and I became a member of the faculty and

17  a resident director at Yale Rep in 1992, fall.

18  Q.   Ninety-two, okay.

19       And as long as you mentioned it, what is the "Yale

20  Repertory Theater"?

21  A.   It's a -- an American regional non-profit theater,

22  a professional theater that engages professional

23  directors and designers and other artists, actors to

24  put on plays, and it also integrates into the work of

25  the repertory theater, students, current students at

1    the Yale School of Drama who will fill in roles

2    generally at the assistant level, but in the case of

3    design students, they will often assume full-blown

4    roles as designers.

5         Student technicians work in the technical

6    department.

7         Drama -- Student dramaturs will assist the

8    production dramaturs, et cetera.

9         And student directors will be assigned work with

10   professional directors working at the Rep.

11   Q.   And do student actors act in the Yale Rep?

12   A.   Yes, often.

13   Q.   All right.

14        And do professional actors act there also?

15   A.   Yes.  Yes.

16   Q.   The -- So you began -- You directed a play.  Was

17   that your first involvement with Yale was directing a

18   play?

19   A.   Yes.

20   Q.   All right.

21        And that was in '91/'92, and then the fall of '92

22   is when you began your work on the faculty?

23   A.   Yes.

24   Q.   All right.

25        And when you began as a faculty member, what was

1  your position?

2  A.   I was an assistant -- I was at the rank of

3  assistant professor adjunct.  There's no tenure at the

4  Yale School of Drama, and I believe faculty members

5  with full-time positions have the term "adjunct" next

6  to their title, so I was an assistant professor

7  adjunct.

8  Q.   Okay.

9       And what is your title now?

10 A.   Professor Adjunct.

11 Q.   All right.

12      And when did you get promoted?

13 A.   I guess I became an associate professor in the

14 late 1990s.  I'm not sure I can remember which year,

15 and I became a professor six or seven years ago.  I'm

16 not -- I can't recall exactly which year.

17 Q.   Okay.

18      And how was that done, all of those promotions

19 done, from assistant to associate, from associate to

20 full professor?

21 A.   I believe that after a certain period of service

22 in one rank, your name is brought forward for a review.

23 You're -- You submit your CV.  You -- I recall having

24 to submit reviews of my work as a director and I

25 believe a committee of -- ultimately at the level of

1    the university, adjudicates on advancements.

2        I think these are brought to the university level

3    by the dean of the -- of our school.

4    Q.   Okay.

5        Now, as a professor at the drama school, what are

6    your duties?

7    A.   Well currently, and for the past five -- four --

8    five years, I've served as the chair of the directing

9    program of the Yale School of Drama, and I'm also --

10   and in that role I run a department which now numbers,

11   in addition to myself and David Chambers, several other

12   faculty members that I've brought in to teach in the

13   program.

14       Do you want me to name them?

15   Q.   Sure.   That might be helpful.

16   A.   Mark Lamos, Tina Landeau (phonetic), Kan Cuderod

17   (phonetic), Robert Woodruff, Tim Vasin (phonetic).

18   Q.   And how did you become the chair of the directing

19   department?

20   A.   I was named interim chair in the last semester of

21   a former dean's tenure, Dean Stan Wojowedske, and --

22   named me interim chair, and I believe it was the

23   following fall, which would have been 2002, or over

24   that summer, I was asked to serve as acting chair by

25   the incoming dean, Dean --

1    Q.   Who was that?

2    A.   Dean Bundy, and the -- I believe it was the

3    following fall I was asked to assume the role of chair.

4    That would have been the fall of 2003.

5    Q.   Okay.

6         So you started off as the interim chair for a

7    semester, then acting chair for a year?

8    A.   Yes.

9    Q.   And then since the fall of 2003 you've gotten a

10   chair?

11   A.   Yes.  It might have been a little earlier than

12   that.  No, I think it was the fall but it -- the fall

13   of 2003.

14   Q.   And who appointed you the chair?

15   A.   Dean James Bundy.

16   Q.   Now, with regard to the Rep, do you have the --

17   The Yale Repertory Theater, do you have any

18   responsibilities there?

19   A.   As resident director I pitch projects to the

20   artistic director, who is also the Dean of the School

21   of Drama, James Bundy, and his Associate Artistic

22   Director, Jennifer Keiger (phonetic).

23        I try to generate ideas for projects for plays,

24   for productions that I think would be great for our

25   audience and exciting and valuable learning experiences

1   for our students.  I hope that they get selected.

2        I generally am directing either every year or

3   every couple of years, once production in our six-play

4   season.

5   Q.   Now, are there other resident directors at the

6   Yale Rep?

7   A.   Yes, Evan Yionoulis.

8        I also have other functions.  There are times when

9   I served as a line producer on a show, offering notes

10  to the director.

11       I've directed workshops of plays that the Rep

12  wanted to listen to.

13  Q.   The -- With regard to the resident directors, you

14  mentioned Evan Yionoulis.

15       Is there anybody else or is it just the two of

16  you?

17  A.   It's Evan Yionoulis and myself.

18  Q.   All right.  All right.

19       And who appointed you two -- the two of you to be

20  the resident directors of the Yale Rep?

21  A.   I was appointed a resident director at Yale Rep in

22  1992 and have served in that role ever since, and I

23  believe Evan was invited to come in to teach acting and

24  to serve in a resident director in about '96, 1996 or

25  so, by Dean Stan Wojowedske.

1    Q.   Is that something you have to be reappointed to or
2    is it sort of a -- do you have it until you decide to
3    leave it?
4    A.   Well, I don't know.  I've enjoyed the position for
5    a while and I think, you know, I've got to make my work
6    interesting and make a contribution.
7    Q.   All right.
8         Now, in addition to that, do you have some
9    responsibility for teaching drama students as well?
10   A.   Yes, I do.
11   Q.   All right.
12        And what -- Can you just describe what
13   responsibilities those are?
14   A.   I -- I've been teaching since 1992 a seminar for
15   the third year directors.  There are nine directing
16   students in the program, three -- There are three
17   students currently, in each year, and I teach the third
18   year directing seminar which meets once a week for
19   three hours and it's called "Directorial Approaches to
20   Non-Naturalistic Drama."
21        I also teach a tutorial, which is a companion
22   course to the directors third year large thesis
23   production, and that course has a number.  It's called
24   "Director's Thesis Number 140," and I teach that.  It's
25   a -- I do one-on-one tutorials weekly.

302

        And in addition to those two responsibilities, I
co-teach with David Chambers a course called "Directing
Practicum" which we've come to consider the core course
in the directing program.  It meets once a week on
Fridays for five hours, 9 to 2, and it's very much a
practical laboratory where directors practice their
craft.

Q.  You might just move the mic back a shade.  It
sounds like you're getting some extra static there.
        The -- So the teaching you do, you said one course
is for the third year directors.
        The tutorial, is that for --

A.  Third year directors.

Q.  Third year directors also.
        And the practicum is for first year?

A.  Well, it's first, second and third.

Q.  Oh.

A.  There are nine students in that course.
        And the last course that I teach, which I offer in
alternate years to students who are not in the
directing program, they're in the drama -- they may be
in the dramaturgy program, the playwrighting program,
stage management, is called "Introduction to Theatrical
Composition," and it's a course that I have created to
provide theater -- artist theater workers who are

1   training in other areas in the school, kind of a hands-

2   on experience of the kinds of artistic questions and

3   challenges the directors and actors confront when

4   they're on the floor in rehearsal.

5   Q.   Now, in addition to your duties as the chair of

6   the department and the courses you just described, it

7   sounds like there's four courses, --

8   A.   Yeah.

9   Q.   Do you still get involved in directing

10  productions?

11  A.   Yes.

12  Q.   All right.

13       And how frequently is that?

14  A.   I -- At Yale Rep --

15  Q.   Yes.

16  A.   -- it would be once a year or once every other

17  year --

18  Q.   Okay.

19  A.   -- once every two years.  It varies.

20  Q.   Okay.

21  A.   I'd say on average it's been sort of like once

22  every other year.

23  Q.   All right.

24       And do you have any other times when you direct,

25  other than at the Yale Rep --

1    A.    Yes.

2    Q.    -- at the present time?

3          And what sorts of venues do you do that?

4    A.    I directed recently at such theaters as the Oregon

5    Shakespeare Festival, The Women's Project in New York.

6    Some years ago I direct at Awena Stage (phonetic) in

7    Washington.  ART in Cambridge.

8    Q.    What's the name of that?

9    A.    American Repertory Theater --

10   Q.    Oh.

11   A.    -- in Cambridge.

12   Q.    All right.

13         Now, were you involved in the process whereby Ms.

14   Greenhouse was admitted to the Yale School of Drama?

15   A.    Yes.

16   Q.    All right.

17         And that was in 2002?

18   A.    Yes.

19   Q.    All right.

20         Can you describe how that -- Can you give us an

21   overview of the process itself, first of all?

22   A.    Yes.  As David Chambers described, it's a three-

23   part process.

24         The first part is a written application.  The

25   Faculty -- The directing faculty, myself and David

1    Chambers being the full-time directing faculty, take

2    responsibility for reading every application.

3        We get together.  We choose from our reading of

4    those written applications, which always includes a

5    kind of personal artistic statement, a curriculum vitae

6    which will include their -- the candidates' history --

7    artistic history, letters of recommendation, et cetera.

8        Who choose a substantial slate of what we call

9    "semi-finalists."  We try to err on more rather than

10   fewer, and we always interview well over half of our

11   candidates at the -- what we call the "second round of

12   the interview phase."

13       We interview candidates in New Haven, Chicago, San

14   Francisco and we do not both interview every candidate.

15   We divide the interview candidates in half and we each

16   interview half of the candidates, and then we come

17   together with our notes and observations and we

18   together, put together a slate of finalists.

19       We then bring them to New Haven --

20   Q.   Before you go on, how many finalists -- Does that

21   vary or is it the same every year?

22   A.   It has changed as the program has, in recent

23   years, moved from admitting four students to three

24   students.  We take twelve candidates (unintelligible).

25   Sometimes we've taken as many as 14 candidates --

1    Q.   How about in Ms. Greenhouse's year?  She was one

2    that had the four --

3    A.   Yeah, I would have --

4    Q.   -- in her class, right?

5    A.   -- we might have taken 15.

6    Q.   Okay.

7         I'm sorry, I interrupted you.

8         And so you said that you -- whatever the number

9    is, whether there's 12 or 14 or 15, you bring those

10   people to New Haven?

11   A.   Yes.

12        And prior to their arrival we send them, a few

13   weeks in advance, some guidelines.  We give them the

14   choice of four different scenes from four different

15   plays.  One of the plays is likely to be Shakespeare.

16   Once of the plays is likely to be a major modern drama.

17   It could be a modern drama like Chekhov, and one of the

18   plays might be a contemporary American play.  Sometimes

19   it's an ancient Greek tragedy in translation.

20        The scene is usually no more than five minutes

21   long.  We instruct them to prepare, to come in and

22   rehearse the scene in front of the faculty, which for

23   the final auditions always include the dean, and the

24   faculty in this case would be myself and David Chambers

25   as the full-time faculty members, and they are going to

1    be offered the opportunity to work with two student

2    actors in their second year, who've prepared the scene,

3    that is to say, they're familiar with the scenes,

4    they've read the plays, but they're not cooked, so to

5    speak, they're not fixed in their ideas about the

6    choices they would make, but they're game and they're

7    ready to work.

8         We invite them to use the room as they see fit for

9    up to 40 minutes.  They can stay at the table.  They

10   can get up.  They can move around.  They can bring a

11   couple of props with them.

12        They audition, and then we sit down with them for,

13   oh, I'd say up to 30 or 40 minutes after the audition

14   to have a conversation about the work that we've seen

15   them do and in a way what we're trying to do is model

16   the kind of interaction that we would hope to have with

17   them as enrolled students.

18   Q.   And when you say "they," you're -- you do this one

19   at a time, however?

20   A.   Correct.

21   Q.   Okay.

22        Now, can you just describe what happened, in

23   particular, with Ms. Greenhouse's application, sort of

24   how that -- just take us through the process with what

25   she did, what you did.

1   A.   We read her application and it excited us.

2        We invited her for an interview and it was David

3   Chambers who interviewed her.

4   Q.   I'm sorry, it was David Chambers who what?

5   A.   It was David Chambers who conducted the interview,

6   the second round.

7        David recommended that we invite her for a final

8   audition and --

9   Q.   So you did not participate in that interview?

10  A.   That's right.

11  Q.   Okay.

12  A.   And based on David's strong recommendations about

13  her qualifications, we brought her in for an audition

14  and Sally auditioned and then we deliberated.

15       We had several candidates that we were debating

16  about and we try to reach consensus, which we did in

17  the case of every student we admit, and we very

18  confidently invited the four students that we admitted

19  that year, including Sally, to come to the program, and

20  at that point we hope they say "Yes" to us.

21  Q.   And who is it that votes on who gets admitted?

22  It's yourself?

23  A.   It's myself and David Chambers and James Bundy,

24  and we -- Yeah, it's a -- We try to make it a

25  consensual, you know -- We discuss every candidate at

```
 1  length.  We have several meetings, in fact.
 2  Q.   All right.
 3       Now, in the year in question, in the -- And when
 4  are these auditions done, in the springtime?
 5  A.   I believe early March typically.  Yeah, typically
 6  the first week in March.
 7  Q.   All right.
 8       And in March of 2002 when Ms. Greenhouse was being
 9  -- was auditioning, was James Bundy the dean yet?  Do
10  you recall?
11  A.   No.  Stan Wojowedske was in fact part of the trio.
12  David Chambers, myself and Stan Wojowedske conducted
13  the application process that spring.
14  Q.   All right.
15       And do you recall anything about the scheduling of
16  Ms. Greenhouse's audition?
17  A.   It happened at the end of the last day of our
18  auditions, I believe.
19  Q.   And what was -- was that at her request or did you
20  insist that she come in the last day?
21  A.   No.  It was very strongly at Sally's request.
22  Q.   And did she indicate why she wanted to --
23  A.   I didn't speak to her --
24  Q.   -- perform last?
25  A.   -- about this.  It was -- I believe the
```

1    appointments were made via our registrar.

2    Q.   Okay.

3         And who was it who informed Ms. Greenhouse that

4    she was admitted to the Yale School of Drama?

5    A.   The -- No, what am I saying?   Me.   I made the

6    phone call.

7    Q.   And do you recall that --

8    A.   Yes.

9    Q.   -- phone call?

10        And what do you remember about it?

11   A.   Well, it's one of the most exciting and fun

12   aspects of my job, to call a candidate who has worked

13   really, really hard who wants very much, I hope,

14   actually, they may be applying to other schools and

15   have other exciting options, but to call someone up and

16   say we've -- you know, "We're very excited about you

17   and we want you to join our program" and then to --

18   Yeah, it's just a -- Am I answering your question?

19   Q.   Yes.   I think you are.

20        And did she respond when you invited her to come?

21   A.   I -- Yes, I believe it was a -- we were both

22   excited and happy.

23   Q.   Did -- When you asked Ms. Greenhouse to become a

24   member of the Yale drama school community, were you in

25   any way influenced by her gender?

1    A.   No.

2    Q.   All right.

3         And was there any -- in the deliberations as to

4    who would be asked to join as directors that year, was

5    there any discussion among the three of you, Dean

6    Wojowedske, Professor Chambers and yourself, was there

7    any discussion at all about the gender of the

8    individuals?

9    A.   No.

10              THE COURT:  All right.

11              We'll suspend here, Mr. Noonan.

12              MR. NOONAN:  Okay.

13              THE COURT:  All right, Ladies and Gentlemen.

14   We'll suspend here for the evening and we'll see you

15   back tomorrow morning at 9:00 o'clock.

16              Just remember my usual admonition about not

17   discussing the case with anyone and you're now excused.

18   Have a good evening.

19       (Jury out.)

20              THE COURT:  Okay.  We'll stand adjourned and I

21   just want to see counsel in the robing room for a

22   minute, please.

23       (Proceedings concluded at 5:00 p.m.)

24

25

INDEX

|  | Direct | Cross | Redirect | Recross | Further Redirect |
|---|---|---|---|---|---|

WITNESSES FOR
THE PLAINTIFF:

| Sally Greenhouse | -- | 5 | 93 | 214 | 233 |
| David Chambers | 238 | 241 | 247 | 236 | -- |

WITNESSES FOR
THE DEFENDANT:

| Susan Rochette | 268 | 286 | 286 | -- | -- |
| Elizabeth Diamond | 288 | -- | -- | -- | -- |

EXHIBITS:                                     Offered   Admitted

| P-16 | Greenhouse e-mail to Nicholson | 106 | 106 |
| P-19 | Greenhouse e-mail to Stevens | 146 | 146 |
| P-21 | Greenhouse e-mail to Stevens | 157 | 157 |
| P-27 | Greenhouse e-mail to Nicholson | 219 | 219 |
| P-29 | Greenhouse e-mail to Nicholson | 8 | 8 |
| P-30 | Greenhouse e-mail to Yionoulis | 11 | 11 |
| P-31 | Greenhouse e-mail to Diamond | 13 | 13 |
| P-32 | Greenhouse e-mail to Nicholson | 16 | 16 |

313

INDEX (CONTINUED)

P-33      Greenhouse e-mail to Stevens    24        24

D-G       Diamond to Staff                59        59

D-T       Committee Report                40        40

314

C E R T I F I C A T E

I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceedings
in the above-entitled matter.


/s/_____          December 8, 2008
STEPHEN C. BOWLES